## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

BEAR WARRIORS UNITED, INC, a
Florida Not for Profit Corporation,

    Plaintiff,

v.

                         **CASE NO.:  6:22-cv-02048**

SHAWN HAMILTON, in his
Official Capacity as Secretary of the
FLORIDA DEPARTMENT OF
ENVIRONMENTAL
PROTECTION,

    Defendant.

## MOTION OF DEFENDANT
## FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW IN SUPPORT

Defendant, Shawn Hamilton, in his official capacity as Secretary

of the Florida Department of Environmental Protection (DEP), under rule

56, Federal Rules of Civil Procedure, moves for summary judgment on the

Second Amended Complaint of Plaintiff Bear Warriors, Inc. In support of

this motion DEP states:

**STATEMENT OF RELIEF REQUESTED AND BASIS OF RELIEF**

DEP requests entry of summary judgment in its favor. For two reasons, with no genuine dispute of material fact, DEP is entitled to judgment as a matter of law. First, contrary to the allegations of the Second Amended Complaint, DEP has not violated the Endangered Species Act. Second, as a matter of law, DEP is entitled to Eleventh Amendment Immunity. DEP is filing with this motion the following materials in support of its motion for summary judgment: the declarations of four DEP employees, Ken Weaver, Moira Hamann, Nathan Hess, and Kim Duffek; the transcript for the deposition of Martine deWit; Plaintiff's answers to DEP's first set and second sets of interrogatories; and Plaintiff's supplemental answer to DEP's first set of interrogatories.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs seek relief based on the theory that DEP has violated the Endangered Species Act, by failing to enforce certain rules and statutes. [Second Amended Complaint ⁋ 39]. Plaintiff's two-count Second Amended Complaint is based on the allegation that DEP has violated the Endangered Species Act (ESA) by failing to regulate nutrient pollution, starting a chain events leading to manatee mortality in the North Indian River Lagoon

(NIRL). As alleged, the North IRL reached a tipping point in 2011, as hypereutrophication caused losses of seagrasses, a food source for manatees. [Second Amended Complaint ⁋ 22, 23]. As further alleged, this hypereutrophication caused a "catastrophic level" of manatee deaths in the winter of 2020-2021. *Id.* ⁋ 24.

The deposition transcript of Dr. Martine deWit, a research scientist employed by the Florida Fish and Wildlife Commission (FWC) [deWit Transcript at 10, lines 21-25], provides information on rates of manatee mortality in the Indian River Lagoon under present conditions. During the past year, average mortality for manatees in the Indian River Lagoon is at or below baseline conditions. [deWit Transcript at 88, line 2- 89 line 11]. There are no instances of emaciation among deceased manatees as of the time of the deposition. [deWit transcript at 89, lines 2 - 6].

Plaintiff alleges two general areas where DEP allegedly fell short as a regulator. First, Plaintiff alleges that the Department has failed to enforce laws related to septic tanks, more precisely referred to as Onsite Sewage Treatment and Disposal Systems (OSTDS). [Second Amended Complaint ⁋⁋ 39(1), (5)] As alleged, DEP became responsible for implementing the OSTDS program in 2021; although permitting and inspection activities are

3

actually performed by local county health departments, those activities are "subject to the supervision of DEP." [Second Amended Complaint ⁋38]. But the Second Amended Complaint does not explain how DEP is responsible for the events that preceded its assumption of the OSTDS program. The Second Amended Complaint likewise does not include any allegations explaining how its "supervision" of the OSTDS program, since DEP assumed overall responsibility of the program, would constitute an ESA violation.

Second, Plaintiff generally alleges that the Department has mismanaged the regulation of discharges from "wastewater plants" [Second Amended Complaint ⁋ 39 (3), (4), (6), (7), (8)]. With this motion, the Department has submitted record evidence that it has fully implemented all of its responsibilities in regulating those sources of pollution, through its permitting enforcement; its adoption of a total maximum daily load, which has been approved by USEPA and remains in effect; and in its implementation of the Basin Management Action Plain program, which is designed to restore the water body.

If Plaintiff were able to point to any occasion where DEP had failed in its regulatory responsibilities, Plaintiff must still overcome DEP's

4

immunity under the Eleventh Amendment to the United States Constitution. Plaintiff has attempted to establish an exception to state immunity under the *Ex parte Young* doctrine, by naming the agency head as a defendant in his official capacity. As a matter of law, Plaintiff cannot invoke the *Ex parte Young* exception. Because Plaintiff cannot overcome Eleventh Amendment immunity, Plaintiff's claim is even further attenuated, and it cannot conceivably support its claim for relief.

## STATEMENT OF UNDISPUTED FACTS

Impairment of North Indian River Lagoon Act, TMDLs, BMAPs, and Wastewater Permitting

1.    The NIRL is an "impaired water" based upon excessive nutrient concentrations; an impaired water is one that does not meet water quality standard. [Weaver Declaration ¶¶ 4, 17]. A nutrient standard refers to a water quality standard intended to reduce the loading of certain pollutants (generally, nitrogen and phosphorus) in the water column. *Id.* Excess nutrient pollutants can, under different condition, cause an imbalance of flora and fauna in a water body. *Id.* A harmful algae bloom is an example of such an imbalance. *Id.*

2.      DEP has also developed a process for developing regulations known as total maximum daily loads, or TMDLs. A TMDL for an impaired water is the mean the sum of the individual wasteload allocations for point sources and the load allocations for nonpoint sources and natural background. *Id*. ⁋ 3.

3.      DEP has developed numeric standards for nutrients; in the case of the NIRL, DEP has adopted a TMDL in lieu of a more general numeric standard. *Id*. ⁋⁋ 8-10.

4.      TMDLs serve a specific purpose in the attainment of surface water quality standards.  *Id*. ⁋ 4. A state regulatory agency may fully implement permit requirements in the National Pollutant Discharge Elimination System (NPDES) program for a given water body, but the water body may not meet surface water criteria after full implementation of point source controls. *Id.* Such a water body that is not meeting water quality standards is commonly referred to as an impaired water. *Id.* Generally, there is no parallel federal program for the control of nonpoint pollution sources, such as urban runoff or groundwater flow of effluent from septic tanks. *Id.*

5.      The NIRL TMDL is set for four separate segments of the Indian River; the TMDLs are set as masses of total nitrogen and total phosphorus per year. [Weaver Declaration Exhibit C, Fla. Admin. Code R. 62-304.520(3), (4), (5), and (6).] For each segment, the TMDL sets wasteload allocations (i.e., required reductions) for categories of permitted sources, as well as a separate load allocation for nonpoint sources. *Id*.

6.      The NIRL TMDL is derived from an appropriate analysis of the issues presented, and is supported by reliable data sources. Weaver Declaration ⁋ 12.

7.      USEPA has approved the NIRL TMDL under section 303(d) of the Clean Water Act. [*Id* ⁋ 18, Weaver Declaration Exhibit D.] USEPA has also approved the NIRL TMDL as a water quality standard under section 303(c) of the Clean Water Act. [Weaver Declaration ⁋ 18, Weaver Declaration Exhibit E at 1] Those approvals remain in effect. [Weaver Declaration ⁋ 18].

8.      DEP has adopted a Basin Management Action Plans for TMDLs in the Indian River Lagoon, including the North Indian River Lagoon BMAP. *Id.* ⁋ 15; Homann Declaration ⁋ 3, Homann Declaration Exhibits B, C]. The NIRL BMAP is presently in effect, and the Department is making

efforts to implement that BMAP at the present time. [Homann Declaration ¶ 4].

9.     The BMAP process incorporates commitments by local governments and stakeholders to implement projects that will lead to the reduction in nutrient loading. [*Id.* ¶ 5, Homann Declaration Exhibit C, Tables 20 and 22 at pages 68, 83]. Those commitments are binding on the parties making the commitments. [Homann Declaration ¶ 5].

10.     Based on statutory amendments during the 2020 legislative session (chapter 2020-150, Laws of Florida), the Department is adopting an updated BMAP that would amend the existing NIRL BMAP. *Id*. ¶ 6. This BMAP update will include the wastewater treatment plan (WWT plan) described in section 403.067(7)(a)9a of that statute as amended, as well as the onsite treatment and disposal system remediation plan (OSTDS plan) described in section 403.067(7)(a)9b of that same statute. *Id*.

11.     DEP is working diligently to meet its statutory July 1, 2025 deadline. The updated plans will improve the ability of the Department to meet the nutrient reduction goals described more particularly in the BMAP. *Id.* ¶ 8.

12.     Based on statutory amendments during the 2023 legislative session (chapter 2023-169, Laws of Florida), the Department is required to update BMAPs to incorporate 5-year milestones and work with responsible entities to identify projects to meet the next milestone. *Id.* ¶ 9. The Department must evaluate and update the IRL BMAPs every five years. *Id.* The law also requires all domestic wastewater facilities discharging to an impaired waterway to upgrade to meet advanced waste treatment standards by 2033. *Id.* As of January 1, 2024, the installation of conventional onsite sewage treatment and disposal systems (OSTDS; septic tanks) is prohibited in all IRL BMAP areas. *Id.* By July 1, 2030, all existing conventional systems must connect to central sewer if available or upgrade to an enhanced nutrient reducing system or other wastewater system that achieves 65 percent reduction in nitrogen. *Id.*

13.     Based on statutory amendments during the 2024 legislative session (chapter 2024-180, Laws of Florida), any wastewater treatment facility providing reclaimed water that will be used for commercial or residential irrigation or be otherwise land applied within a nutrient BMAP or RAP area must meet advanced waste treatment standards if the Department has determined that the use of reclaimed water is causing or

contributing to the nutrient impairment being addressed in the BMAP or

RAP. *Id.* ⁑ 10.

14.     The NIRL BMAP, like other BMAPs, is intended to operate as

part of an iterative process. If DEP is able to improve its restoration

strategies over time, it will adjust its strategies as appropriate in order to

expedite the restoration of the water body. *Id.* ⁑ 11.

<u>Alleged Deficiencies with DEP's Regulatory Response to Nutrient
Pollution in the NIRL; Record Evidence on those Deficiencies</u>

15.     Plaintiffs allege that the Department had the authority to

enforce laws and regulations related to septic tanks and wastewater

treatment plants, but had failed to do so. [Second Amended Complaint ⁑

39]. The Department has sent two set of interrogatories related to this

allegation and received answers and one supplemental response, as

described below.

16.     Plaintiff was directed to the allegations in that paragraph 39,

and was asked to identify each occasion where DEP had failed to enforce

those laws and regulations. [Plaintiff's Answers to Defendant's First Set of

Interrogatories (Initial) at 12, interrogatory 3D].  Plaintiff, in its answer to

the interrogatory, was unable to identify any such occasion in its initial set

of answers. [Plaintiff's Answers to Defendant's First Set of Interrogatories (Initial) at 16, answer to interrogatory 3D].

17.     On May 6, 2024, (the date of the discovery cutoff), Plaintiff served answers to a follow-up interrogatory on that previous answer. Plaintiff, in its answer to this interrogatory, was still unable to identify any occasion where the Department had failed to enforce the laws and regulations. [Plaintiff's Answers to Second Set of Interrogatories at 5-6, answer to interrogatory 2].

18.     On May 6, 2024, Plaintiff also served a set of "supplemental responses" to the first set of interrogatories. Plaintiff provided no supplement to subpart 3D. [Plaintiff's Supplemental Answers to First Interrogatories].

Record Evidence on DEP's Implementation and Enforcement of its Wastewater Permitting Program

19.     Industrial wastewater facilities and domestic wastewater facilities, when discharging to the Indian River Lagoon or other surface waters, must obtain NPDES permits to authorize the discharge. [Hess Declaration at 3 ⁋ 4].

11

20.     DEP is required to review NPDES permit applications, including permits for renewed operations, to assure reasonable assurances of compliance with applicable water quality standards, including surface water quality criteria; total maximum daily loads (TMDLs); and the requirements of Basin Management Plans. *Id.* ¶ 5. Specifically for discharges to the Indian River Lagoon and the Indian River Lagoon basin, the Department imposes permit conditions designed to achieve compliance with those criteria, TMDLs, and the requirements of Basin Management Action Plans. *Id.*

21.     The NPDES permitting process has led, and continues to lead, in the improved treatment of nutrient discharges from wastewater facilities that contribute nutrients to the Indian River Lagoon. *Id.* ¶ 6. Facilities have been required to install advanced wastewater treatment systems as defined in section 403.086(4), Florida Statutes. *Id.* For those facilities that have not done so, section 403.086(1)(c)1 of the Florida Statutes provides a deadline of July 1, 2025, for providing advanced wastewater treatment. *Id.* The installation of advanced wastewater treatment is an effective means of reducing nutrient discharges from domestic wastewater facilities and

industrial wastewater facilities, as described more fully in the statute referenced above. *Id*.

DEP's Alleged Failure to Assess Penalties

22.    In its operative pleading and in responses to discovery, Plaintiffs have disclosed three instances where the Department's enforcement response is alleged to have been deficient.

23.    Paragraph 35 of the Second Amended Complaint refers to a discharge of an "admitted minimum of 7,200,000 gallons of untreated wastewater" at the time of Hurricane Ian.

24.    In fact, this occasion was an unauthorized discharge of approximately 15,000,000 gallons of fully treated wastewater that met requirements for discharge to surface water. [Hess Declaration at 5 ⁋ 10]. The discharge occurred prior to the storm to create additional storage capacity for the expected rainfall. *Id.* There were occasions during that storm where portions of wastewater collection systems failed, leading to the discharge of untreated wastewater to the ground or to surface waters. *Id.* In each of those instances, DEP undertook a full and appropriate enforcement response. *Id*. As is not uncommon in the aftermath of a major storm, the Department was required to investigate other discharges of

wastewater in the basin of the Indian River Lagoon. *Id.* ¶ 11. The

Department took appropriate actions to investigate those discharges and

take appropriate enforcement action. *Id.*

25.    Plaintiff's answers to interrogatories refer to an unauthorized

discharge in September 2017. [Plaintiff's Answer to First Interrogatories,

page 10, answer 2d].

26.    During Hurricane Irma and its aftermath in September and

October 2017, Brevard County experienced localized flooding and power

outages. [Hess Declaration at 6 ¶ 13]. These events led to the failure of

portions of the permitted collection system operated by Brevard County,

with significant discharges of untreated wastewater to the ground and to

canals adjacent to the Banana River.  *Id.*

27.    In response, the Department negotiated a consent order with

Brevard County, in which the County committed to the payment of a

monetary penalty and more significantly, the installation of improvements

that would reduce the probability of future overflows. [*Id.*; Hess

Declaration Exhibit C at 4-5 ¶11, 6 ¶ 15].

28.    DEP required Brevard Couty to publish notice of the Consent

Order in order to allow for an administrative challenge to that Consent

Order before it was adopted as final agency action. [Hess Declaration at 7 ¶15.]. DEP did not receive a timely challenge. *Id.*

29.     In addition, as is not uncommon in the aftermath of a major storm, the Department was required to investigate other discharges of wastewater in the basin of the Indian River Lagoon. *Id.* ¶ 16. The Department took appropriate actions to investigate those discharges and take appropriate enforcement action. *Id.*

30.     Finally, Plaintiff contends: "An unauthorized discharge occurred between December 16 and December 23, 2020, at the City of Titusville's Osprey sewer plant." [Plaintiff's Answer to First Interrogatories, page 10, answer 2d].

31.      The incident refers to a facility known as the North Osprey plant, a wastewater treatment facility operated by the City of Titusville. [Hess Declaration at 8 ¶ 18]. The December 2020 incident resulted in a warning letter from DEP and ultimately, the negotiated resolution of enforcement actions in a consent order between the Department and the City of Titusville. [Hess Declaration at 8 ¶ 19, Hess Declaration Exhibit D].

32.     The Department imposed a monetary penalty of $200,000 in settlement of penalties and costs and expenses ($1,000) incurred. [Hess

Declaration Exhibit D at 6 ⁋ 9]. In the Consent Order the City of Titusville also committed to substantial corrective actions with process improvements designed to reduce the probability of failures in its collection system.  [[Hess Declaration at 9 ⁋ 21, Hess Declaration Exhibit D at 2-5  ⁋⁋ 6(a)- 6(h)]

33.    The Consent Order was the outcome of a negotiation based on potential outcomes, with the opportunity for members of the public to challenge the Consent Order in an administrative proceeding. [Hess Declaration at 9 ⁋ 22].

34.    Wastewater treatment systems and collection facilities are relatively complex systems. [Hess Declaration at 10 ⁋ 15]. The resolution of any enforcement matter requires the exercise of professional judgment, and reasonable minds can differ on the appropriate exercise of professional judgment. *Id.* However, for each of the events described above, DEP's enforcement responses represented a diligent exercise of enforcement discretion. *Id.*

35.    For the relevant time period, there has been no occasion where DEP has overlooked the substantial discharge of untreated wastewater into the Indian River Lagoon, or where the Department has failed to assess or

pursue appropriate remedies, including civil penalties, where appropriate.
*Id*.

### DEP's Assumption of the OSTDS Program in 2021

36.     Onsite Treatment Disposal Systems (OSTDS), of which septic tanks are a part, do not require permits under the NPDES permitting program. OSTDS discharge to the ground and do not discharge directly into surface waters, such as the Indian River Lagoon. [Hess Declaration at 9-10 ⁋ 24].

37.     DEP assumed the responsibilities for the Onsite Sewage Program in an interagency agreement effective July 1, 2021. [Duffek Declaration ⁋⁋ 2, 3; Duffek Declaration Ex. A at 5].  Before then, the Florida Department of Health (DOH) managed that program. [Duffek Declaration at 2 ⁋ 3]. DOH had created standardized manuals for general operations, permitting, OSTDS regulation, complaint investigation and enforcement, and OSTDS regulation. [Duffek Declaration at 3 ⁋⁋ 5, 6, Duffek Declaration Exhibits B, C]. Chapter K of that manual addresses general operations, including permitting and operations, for OSTDS regulation; Chapter Y of that manual provides an objective set of expectations and deadlines that

promote prompt and thorough investigations and enforcement actions. [Duffek Declaration at 3 ¶¶ 5, 6].

38.     DEP continues to implement chapters K and Y of the Environmental Health Program in its oversight of county health departments, including the counties at issue in these proceedings. *Id.* ¶ 7 Those county health departments have consistently followed and implemented those chapters. *Id.*

39.     Since the local health departments in the counties at issue in this case have diligently conducted their permitting, inspection, and enforcement of laws related to OSTDS. [Duffek Declaration ¶8].

40.     As of July 1, 2024, enhanced nitrogen reducing onsite sewage treatment and disposal systems (ENR-OSTDS) are required for new OSTDS construction permits on lots of one acre or less within a basin management action plan, reasonable assurance plan, or pollution reduction plan (s. 373.811(2), 403. 067(7)(a)10., Fla. Stat.), where sewer is not available. As of January 1, 2024 the requirements for ENR-OSTDS extended to new OSTDS construction permits on any size lot within the Indian River Protection Program (s. 373.489(3), (3)(d), Fla. Stat.) where sewer is not available. [Duffek Declaration ¶ 9].

## III. MEMORANDUM OF LAW

### A.    Pertinent Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).

### B.    DEP has not violated the ESA.

Plaintiffs' legal theory is predicated on alleged violations of the ESA, based on the alleged unpermitted "take" of an threated species, the West Indian Manatee. [Second Amended Complaint ⁋ 12, citing 16 U.S.C. § 1538(a)(1)]. Plaintiff allege that DEP has caused a take by failing to enforce environmental regulations which would prohibit third parties from causing pollution, which in turn has allegedly started a lengthy chain of events leading to the death of manatees.

As a preliminary matter, DEP cannot be liable for a violation of the ESA merely because it assumed the OSTDS program on July 1, 2021 –- after

the "ecological tipping point" of 2011 [Second Amended Complaint ¶22], and after the "Unusual Mortality Event" that began in the winter of 2021 [Second Amended Complaint ¶ 24]. As framed by the Second Amended Complaint, DEP's participation in the OSTDS is limited to the "supervision" of the OSTDS program since it assumed overall responsibility of that program. Plaintiff cannot point to any instance where DEP's supervision has been inadequate, or where any alleged omission in its supervision has caused harm to a protected species. To the contrary, DEP has presented record evidence showing that it has fully and diligently implemented its responsibilities after it assumed the OSTDS program.

Furthermore, there is a distinction between the regulation of nonpoint sources and point sources. As noted in the pending motion to dismiss, Congress did not authorize federal agencies to regulate water pollution from nonpoint sources, and did not mandate the creation of state regulatory programs for that purpose. *See Fisherman Against the Destruction of the Env't, Inc. v. Closter Farms, Inc.*, 300 F.3d 1294, 1297 (11th Cir. 2002). A separate Clean Water Act program addresses water bodies that do not achieve water quality standards by the control of point sources alone.

In the Total Maximum Daily Load (TMDL) program, states must identify water bodies where effluent limitations have proven insufficient to achieve water quality standards. 33 U.S.C.A. § 1313(d)(1)(A); *see* Fla. Admin. Code R. 62-303.200(7). The Clean Water Act requires states to create a list of those waters (referred to as "impaired waters," see Fla. Admin. Code R. 62-303.200(7)), and to determine a priority ranking system to address pollution problems in those waters. Next, states must adopt TMDLs for those impaired waters. Finally, states must implement those adopted TMDLs by reducing loading to impaired waters until the water meets the TMDL. Florida's Basin Management Action Plan program which addresses all sources including nonpoint sources, such OSTDS or septic tanks. DEP has presented record evidence showing that it has diligently implemented its responsibilities under the Basin Management Action Plan.

Arguably, the regulatory acts of a government body can constitute an ESA violation, but only where there exists a close connection between the government's conduct and habitat destruction or killing of endangered species. *Aransas Project v. Shaw*, 775 F.3d 641, 659 (5th Cir. 2014). Proximate cause is required, including a demonstration that the cause is reasonably foreseeable. *Id.* at 660. There is no proximate cause when a government

21

merely maintains a permitting system for activities that may cause harm to habitat. *See id.* at 662 ("Texas law generally forbids appropriating water from the state's rivers without a permit. While permits authorize usage, however, they do not compel it." (Citation omitted)). DEP's actions are not the proximate cause of any harm to the protected species.

The opinion of the Eleventh Circuit in *Loggerhead Turtle v. Volusia County*, 148 F.3d 1231 (11th Cir. 1198), addresses issues of standing in the context of an ESA claim predicated on the regulatory acts of a local government. Plaintiffs had alleged that local governments had caused a take of protected sea turtles by authorizing beach driving and beachfront lighting. The *Loggerhead Turtle* opinion noted, in dicta, the decisions of other circuits which had held that the regulatory acts of governments can be deemed an unlawful take of protected wildlife. *Loggerhead Turtle*, 148 F.3d at 1251. The opinion did not, however, address the question of liability under the ESA.

On remand, the district court addressed the question of liability and granted a defense motion for summary judgment on the question of the local government's liability related to the issue of beachfront lighting. The question presented was whether the regulatory scheme acted to prohibit or

limit unlawful conduct, as opposed to authorizing, entitling, or legitimizing the conduct. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.* 92 F. Supp. 2d 1296, 1307 (M.D. Fla. 2000) (footnotes omitted).  Addressing the question and granting a defense motion for summary judgment, the Court explained in reference to the ESA:

> Congress imposed upon federal agencies the responsibility for implementing and enforcing the Act. The Act authorizes the Secretary of the Interior to enter into management and cooperation agreement with the States, whose participation in conservation programs the Act encourages. The Act requires no affirmative conservation action by states or local governments. The Act neither compels nor precludes local regulation; it preempts that which is in conflict. Volusia County cannot be made to assume liability for the act of its private citizens merely because it has chosen to adopt regulations to ameliorate sea turtle takings.

*Id.* at 1308 (footnotes omitted). *Accord, Florida Panthers v. Collier Cnty.*, 213CV612FTM29DNF, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016). In the present case, DEP has diligently acted to prevent harm to the NIRL; the same principle applies here.

Plaintiff's theory fails at the first link in the chain of causation: DEP's actions as a regulatory body. Implementation of its regulatory authority is not a proximate cause of any harm or other take to manatees. The record shows that DEP has not authorized or entitled any party to cause a violation of water quality standards. It has, instead, worked diligently to

restore an impaired water. There is no proximate cause. DEP is entitled to judgment as a matter of law because with no dispute of material fact, it has not violated the ESA.

### C.    DEP is entitled to Eleventh Amendment Immunity.

Unlike the local government in *Loggerhead Turtle*, DEP is a state agency entitled to assert immunity under the Eleventh Amendment. U.S. Const. Amend. XI; *Summit Med. Associates, P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). Plaintiff has attempted to invoke an exception to this rule under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).

The *Ex parte Young* exception requires a showing of an <u>ongoing</u> violation of federal law. *Summit Med. Associates, P.C. v. Pryor*. As alleged in DEP's pending motion to dismiss, Plaintiff has failed to allege any conduct that might conceivably be deemed an ongoing violation of federal law. Furthermore, record evidence submitted with this motion establishes the opposite proposition: DEP is progressively implementing programs to restore the impaired waters. [Homann Declaration at 2-5 ⁋⁋ 5-10; Hess Declaration at 3-4 ⁋ 6]. Plaintiff cannot overcome an immunity defense. In addition to the grounds asserted in the pending motion to dismiss, DEP is entitled to summary judgment based on Eleventh Amendment immunity.

*See Minnesota RFL Republican Farmer Labor Caucus v. Moriarty*, 661 F. Supp. 3d 891, 903 (D. Minn. 2023) (addressing on summary judgment).

**Conclusion**

Based upon the foregoing, DEP respectfully submits that with no genuine issue of disputed material fact, it is entitled to judgment as a matter of law.

WHEREFORE Defendant requests entry of summary judgment in its favor on the Second Amended Complaint.

Respectfully submitted, June 7, 2024.

<div style="margin-left: 40%">

*/s/ Jeffrey Brown*

**JEFFREY BROWN**
Florida Bar No. 843430
Department of Environmental
Protection
390 Commonwealth Blvd., MS 35
Tallahassee, Florida 32399-3000
Telephone:  (850) 245-2242
Jeffrey.Brown@FloridaDEP.gov
Syndie.L.Kinsey@FloridaDEP.gov
DEP.Defense@FloridaDEP.gov

</div>

# CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was

served via electronic mail to the below:

Lesley Gay Blackner
Attorney for Bear Warriors United, Inc.
300 S. Duval Street
Unit 505
Tallahassee, Florida 32301-1740
lesleyblackner@gmail.com

Jessica L. Blome
Attorney for Bear Warriors United, Inc.
Greenfire Law, PC
2478 Adeline St.
Suite A
Berkeley, California 94703
jblome@greenfirelaw.com

Susan M. Bradford
Attorney for Bear Warriors United, Inc.
Greenfire Law, PC
2478 Adeline St.
Suite A
Berkeley, California 94703
sbradford@greenfirelaw.com

on this 7th day of June, 2024.

/s/ Jeffrey Brown
Jeffrey Brown
Assistant General Counsel