UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BEAR WARRIORS UNITED, INC.,**

**Plaintiff,**

v.                                              **Case No.  6:22-cv-2048-CEM-LHP**

**SHAWN HAMILTON,**

**Defendant.**
_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Motion to Dismiss Second Amended Complaint ("Motion," Doc. 64), to which Plaintiff filed a Response (Doc. 65). For the reasons stated herein, the Motion will be denied.

## I.    BACKGROUND

Plaintiff is a not-for-profit corporation that "advocates for respect and protection of Florida wildlife," (Second Am. Compl. ("SAC"), Doc. 59, at 4), and Defendant is the Secretary of the Florida Department of Environmental Protection ("FDEP"), (*id.* 7). This action arises out of FDEP's alleged failure to appropriately regulate sewage discharge into a northern portion of the Indian River Lagoon ("North IRL"), (*id.* at 1–2), specifically the portion that "stretches from Turnbull

Creek to the Melbourne Causeway," (*id.* at 2), that manatees "occupy and travel through." (*id.*).

West Indian Manatees are identified by the United States Department of the Interior as a threatened species, 50 C.F.R. § 17.11, which entitles the species to protection under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. The ESA makes it unlawful to "take" any listed species "within the United States."[1] 16 U.S.C. § 1538. Plaintiff alleges that human sewage from septic tanks and wastewater plants is the primary source of nitrogen enrichment in the North IRL. (Doc. 59 at 17). Plaintiff further alleges that FDEP's regulatory conduct violates the ESA because the sewage has caused "eutrophication and hyper-eutrophication, which in turn causes the obliteration of seagrass and other microalgae food sources manatees require for survival." (*Id.* at 2).

Plaintiff filed this action, bringing counts under the ESA (Count I) and the Declaratory Judgment Act (Count II). (*Id.* at 27–30). Plaintiff demands judgment against Defendant for violating the ESA, as well as declaratory and injunctive relief. (*Id.* at 30). Specifically, Plaintiff seeks an order declaring, *inter alia*, "that the regulatory conduct by [FDEP] constitutes an unlawful 'taking' of a threatened

---

[1] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532. The regulations that implement the statute define the statutory term "harm" to mean "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

species in violation of 16 U.S.C. § 1538(a)(1)(B)," and compelling FDEP to, *inter alia*, "cease its authorization of the discharge of nitrogen from septic tanks and wastewater plants into the North IRL."[2] (*Id.*). Defendant now moves to dismiss Plaintiff's SAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, respectively. (*See generally* Doc. 64).

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

A challenge to Article III standing implicates subject matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). Pursuant to Rule 12(b)(1), a party may move to dismiss the claims against it for "lack of subject-matter jurisdiction." Thus, "[a] motion to dismiss for lack of standing is properly brought under Federal Rule of Civil Procedure 12(b)(1)." *Radenhausen v. USCG*, No. 3:13-cv-268-J-39JRK, 2014 U.S. Dist. LEXIS 198128, at *10 (M.D. Fla. Feb. 13, 2014)

---

[2] After Plaintiff filed suit, Florida enacted Fla. Stat. § 373.469, which prohibits "the installation of new onsite sewage treatment and disposal systems" within the North IRL "where a publicly owned or investor-owned sewerage system is available." Fla. Stat. § 373.469(3)(d)(1) (effective January 1, 2024). And "[w]here central sewerage is not available," the law only authorizes "enhanced nutrient-reducing onsite sewage treatment and disposal systems or other wastewater treatment systems that achieve at least 65 percent nitrogen reduction." *Id.* Since § 373.469 only places requirements on *new* installations, and Plaintiff requests injunctive relief pertaining to *all* "authorization of the discharge of nitrogen," (Doc. 59 at 30), Plaintiff's action has not been mooted by the statute's enactment because there still exists "a live controversy with respect to which the [C]ourt can give meaningful relief." *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1220 (11th Cir. 2016).

(citing *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)); *Parrales v. Dudek*, No. 4:15cv424-RH/CAS, 2015 U.S. Dist. LEXIS 189205, at *11 (N.D. Fla. Dec. 24, 2015). Likewise, Eleventh Amendment immunity is a jurisdictional issue. Edelman v. Jordan, 415 U.S. 651, 678 (1974). "[A] dismissal on sovereign immunity grounds should be pursuant to Rule 12(b)(1) because no subject-matter jurisdiction exists." Thomas v. U.S. Postal Service, 364 F. App'x. 600, 601 (11th Cir. 2010).

## B.    Failure to State a Claim

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Furthermore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Ordinarily, in deciding a motion to dismiss, "[t]he scope of the review must be limited to the four corners of the complaint." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

## III.    ANALYSIS

Defendant makes five arguments for dismissing the SAC. First, Plaintiff lacks standing because the alleged injuries are not fairly traceable to FDEP's conduct. (Doc. 64 at 16–17). Second, this action is barred by the Eleventh Amendment and the *Ex parte Young* exception does not apply. (*Id.* at 12 (citing *Ex parte Young*, 209 U.S. 123 (1908))). Third, Plaintiff's requested relief violates the anticommandeering doctrine. (*Id.* at 15). Fourth, Plaintiff fails to state a claim because "as a matter of law, FDEP's conduct cannot be the proximate cause" of the alleged harm. (*Id.* at 22). Fifth, and in the alternative, Defendant argues that the Court should refrain from exercising jurisdiction according to the *Burford* abstention doctrine. (*Id.*). The Court will address each argument in turn.

### A.    Article III Standing

To bring a case in federal court, a plaintiff must establish standing under Article III of the United States Constitution. *Lujan*, 504 U.S. at 559–60. To establish Constitutional, or Article III, standing, a plaintiff must show: (1) "that he has

suffered an 'injury-in-fact'"; (2) "a causal connection between the asserted injury-in-fact and the challenged action of the defendant"; and (3) "that 'the injury will be redressed by a favorable decision.'" *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (quoting *Lujan*, 504 U.S. at 560–61).

"The party invoking federal jurisdiction bears the burden of proving standing." *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). As an initial matter, Defendant does not dispute that Plaintiff has alleged an actual or imminent injury-in-fact, which is harm to "Plaintiff members' opportunities to observe, study, contemplate, and enjoy manatees that both migrate through and reside full time in the North IRL." (Doc. 59 at 6–7). The Court agrees, and thus, only the latter two elements are at issue.

Defendant argues that Plaintiff does not have standing because "the alleged injuries are not fairly traceable to FDEP's conduct." (Doc. 64 at 17). Defendant asserts that due to a number of contingencies the SAC requires speculation, including that local governments will authorize new developments which will require the installation of new Onsite Sewage Treatment Disposal Systems ("OSTDS"); "ongoing installation of septic tanks will create a material difference in total nutrient loading"; the discharged sewage of any new installations will travel unimpeded to the North IRL; "the increased loading from those new septic tanks [will] not be offset by loading reductions from the implementation of [the Basin

Management Action Plans ("BMAPs")]," and that this new incremental loading will harm manatees in the North IRL. (*Id.* at 17–18). Defendant also argues that because FDEP assumed responsibility for OSTDS regulation two years after the alleged "tipping point" of the North IRL nutrient pollution, Plaintiff cannot trace the alleged injury to any conduct by FDEP. (*Id.* at 19–20).

There must be "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (1992) (cleaned up). "A showing that an injury is 'fairly traceable' requires less than a showing of 'proximate cause.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)). "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Id.*; *see Focus on the Fam.*, 344 F.3d at 1273 ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes.").

Defendant's first argument relies on the faulty assumption that the alleged injuries can only result by Defendant permitting new OSTDS. However, the SAC alleged that Defendant's failure to regulate the current hyper-eutrophication of the North IRL results in continued harm to manatees, (*see* Doc. 59 at 27–29), and thus,

the alleged injury is not contingent on Defendant permitting new OSTDS, or any of the other argued contingencies. Defendant's second argument incorrectly asserts that for the alleged injury to be fairly traceable to his conduct, FDEP needs to have been responsible for pushing the North IRL to the "tipping point" of its current hyper-eutrophication. But that is not accurate because the SAC alleged that FDEP's failure to regulate efficiently once it assumed control of OSTDS regulation is a continued ESA violation. (*See* Doc. 59 at 25). In other words, Plaintiff alleges that FDEP had the authority and responsibility to prevent an ongoing ESA violation and failed to do so. *See Focus on the Fam.*, 344 F.3d at 1273 (discussing that the alleged injury must be fairly traceable "to the defendant's acts *or omissions*" (emphasis added)). Additionally, a previous state agency's actions that allegedly brought the North IRL to the "tipping point" does not sever the traceability of Defendant's current conduct. S*ee Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998) ("[S]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties.").

In *Loggerhead Turtle*, the Eleventh Circuit found that the plaintiff showed sufficient causal connection "to seek to hold [the defendant] liable for 'harmfully' inadequate regulation of artificial beachfront lighting" because the defendant's charter "expressly grant[ed] [the defendant] the authority—and arguably a duty—to 'establish minimum standards . . . for the protection of the environment.'" 148 F.3d

at 1249. The Eleventh Circuit further found that just because third-party municipalities could have enacted more onerous lighting standards "do[es] not sever the 'fairly traceable' connection between [the defendant's] regulatory actions and the [plaintiff's] alleged 'harm.'" *Id.*

Similarly, FDEP is responsible for regulating, permitting, and revoking OSTDS and wastewater treatment facilities. (*See* Doc. 64 at 4). FDEP has designed and implemented remediation plans to address the nutrient pollution problem in the North IRL. (*See id.* at 7, 9). The SAC alleged that FDEP's ongoing failure to use its authority to regulate the sewage more efficiently continues to harm manatees, and thus constitutes an unlawful taking. Therefore, Plaintiff has met its causation requirement for standing purposes because its alleged injury is fairly traceable to Defendant's action or inaction. *See Loggerhead Turtle*, F. Supp. 2d 1296, 1306 (M.D. Fla. 2000) (discussing the difference between the "sufficient causal connection *to seek to hold*" a defendant liable for standing purposes versus the standard for proximate causation (emphasis in original)).

Next, Defendant argues that Plaintiff's alleged injury is not redressable "because a federal court cannot amend state law and confer upon FDEP the authority to deny permits under state law, where state law does not do so." (Doc. 64 at 20). Defendant further argues that "[i]f FDEP were to deny an OSTDS permit based on

regulatory authority it does not have, the applicant's appellate rights would render the denial a futile gesture." (*Id.*).

"[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 43 (1976)). "Redressability is established . . . when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Defendant's redressability argument is limited to one method that is apparently outside of FDEP's statutory authority. However, Plaintiff requests multiple injunctions that are unrelated to the denial of new permits—including for FDEP to "ensure that septic tanks that are old, faulty, or out-of-compliance do not continue to pollute the North IRL," (Doc. 59 at 31); "provide medical monitoring and veterinarian care together with proper nutritional forage to all manatees in the North IRL until such time as sufficient seagrass that will permanently sustain manatees returns to the North IRL," (*id.*); and that the Court "[g]rant such other relief as the Court deems appropriate," (*id.*), to "revive the IRL and prevent further unlawful 'takings,'" (*id.* at 7).

As explained by the Eleventh Circuit in *Loggerhead Turtle*, the Court "need not find constitutional every conceivable remedy within the 'full scope of traditional equitable injunctive powers' available to the district court," but "[r]ather, [the Court] need only find constitutional at least one available remedy that would adequately bring about [Defendant]'s compliance with the ESA." *Loggerhead Turtle*, 148 F.3d at 1254 (quoting *Strahan v. Coxe*, 127 F.3d 155, 170–01 (1st Cir. 1997)). Given the "wide range of effective injunctive relief" in the instant case, the Court can easily conclude that if this Court were to find in favor of Plaintiff, it is likely that fewer protected manatees would be harmed by pollutive sewage. *See Loggerhead Turtle*, 148 F.3d at 1254; *Strahan v. Coxe*, 939 F. Supp. 963, 979 (D. Mass. 1996), *aff'd in part and vacated on other grounds*, 127 F.3d 155 (1st Cir. 1997) ("If the Defendants were to limit further, or ban . . . the use of gillnets and lobster gear in Massachusetts waters, it is likely that fewer endangered whales would be harmed through entanglements."). Accordingly, Plaintiff's alleged injury is redressable, and Plaintiff has Article III standing to bring its claims.

## B.    Eleventh Amendment Immunity

The ESA permits citizens to sue governmental entities "to the extent permitted by the [E]leventh [A]mendment." 16 U.S.C. § 1540(g). "The Eleventh Amendment ordinarily bars a state's citizens from suing the state in federal court." *Dream Defs. v. Governor of Fla.*, 57 F.4th 879, 889 n.5 (11th Cir. 2023) (citing *Summit Med.*

*Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999)). "Moreover, the Eleventh Amendment prohibits suits against state officials where the state is, in fact, the real party in interest." *Summit Med.,* 180 F.3d at 1336. But "[w]hen a plaintiff challenges a state official's action on federal grounds, *Ex [p]arte Young* allows the plaintiff to seek prospective injunctive relief." *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020).

"The *Ex parte Young* doctrine applies only when 'a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past.'" *Nicholl v. Att'y Gen. Ga.*, 769 F. App'x 813, 815 (11th Cir. 2019) (quoting *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000)). "The *Ex parte Young* doctrine is inapplicable when a plaintiff seeks 'to adjudicate the legality of past conduct.'" *Id.* (quoting *Summit Med.*, 180 F.3d at 1337); *see Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1219 ("The availability of this doctrine turns, in the first place, on whether the plaintiff seeks retrospective or prospective relief.").

Defendant first argues that Plaintiff has "not allege[d] any underlying facts, as opposed to legal conclusions, that would suggest an ongoing deficiency in [FDEP's] permitting of wastewater facilities," and that "FDEP's past enforcement

decisions" are not bases for a claim "against a government agency for an alleged
ESA violation." (Doc. 64 at 13–14).

The SAC cited many examples of FDEP's authority to regulate septic tanks
and wastewater plants, (Doc. 59 at 23–25)—including that FDEP has "the power
and the duty to control and prohibit pollution of air and water," Fla. Stat. § 403.061;
shall "[i]ssue such orders as are necessary to effectuate the control of air and water
pollution," *id.* § 403.061(8); shall "adopt rules relating to the location of onsite
sewage treatment and disposal systems, including establishing setback distances, to
prevent groundwater contamination and surface water contamination and to preserve
the public health," *id.* § 381.0065(4)(e); shall ensure that septic tanks "function in a
sanitary manner, do not create sanitary nuisances or health hazards and do not
endanger the safety of any domestic water supply, groundwater or surface water,"
Fla. Admin. Code R. 62-6.005; and shall "[e]stablish a permit system whereby a
permit may be required for the operation, construction, or expansion of any
installation that may be a source of air or water pollution and provide for the issuance
and revocation of such permits," Fla. Stat. § 403.061(15). (*See* Doc. 64 at 4 ("As
framed by the [SAC], FDEP exercises regulatory control over nutrient pollution in
surface waters.")).

The SAC alleged that FDEP has failed "to enforce all of the above laws and
regulations," (Doc. 59 at 25), due to deficiencies in FDEP's regulation of sewage

disposal in the North IRL because "[d]irect discharges of sewage into the North IRL continue from point sources," including "16,171 septic tanks" and "ten wastewater treatment plants," some of which "are extremely outdated, underfunded, [and] operate out of capacity." (*Id.* at 18–19). The SAC further asserts that despite an "excess of 20,000,000 gallons of sewage" discharged into the North IRL since 2020, FDEP continues to permit new septic tanks and fails to "penalize wastewater plants for unauthorized discharges of untreated sewage." (*Id.* at 20). In conclusion, the SAC alleged that FDEP's "continuing authorization of septic tank and wastewater plants to discharge nitrogen into the North IRL" is causing a taking of manatees in the North IRL. (*Id.* at 27).

Plaintiff's alleged ESA violation claim does not depend on specific past enforcement decisions; instead, it details an ongoing failure of FDEP to efficiently regulate within its authority. [3] Thus, Plaintiff alleges the type of claim that is clearly permitted by *the Ex parte Young* doctrine. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction."); *Curling v. Sec'y of Ga.*, 761 F. App'x 927, 933 (11th Cir. 2019)

---

[3] "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).

(explaining that under *Ex parte Young*, complaints may be "premised solely on the State Defendants' inaction" and collecting cases).

Next, Defendant argues that FDEP lacks the authority "to do what Plaintiff[ ] demand[s]," (Doc. 64 at 14–15), because the "process is driven by" remediation plans such as the BMAPs and OSTDS plans, (*id.* at 15). Defendant explains that "[c]onsistent with legislative directives, [FDEP] must accomplish its goals through BMAPs and OSTDS remediation plans." (*Id.* at 9). Defendant asserts that even if FDEP did comply with Plaintiff's demands, its "efforts could not survive an appeal of its agency action," (*id.*).

Tellingly, Defendant does not cite any legal authority for his apparent position that a request for injunctive relief that conflicts with an agency's regulatory plans somehow defeats the applicability of the *Ex parte Young* doctrine. Contrary to Defendant's position, "[a]ll that is required is that the official be responsible for the challenged action." *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988). The parties here agree that FDEP has the statutory authority to promulgate remediation plans to regulate water quality, (s*ee* Doc. 64 at 5–9, 15; Doc. 59 at 25–26), and thus, Defendant's argument that FDEP cannot enact the changes that Plaintiff requests under its current remediation plans bears no merit on the issue of immunity. Plaintiff has sufficiently alleged an ongoing violation of federal law by a state official, and Defendant has not shown why the *Ex parte Young* doctrine does not apply.

## C.    Anticommandeering Doctrine

"The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). The anticommandeering doctrine derives from this reservation of power. As the Supreme Court explained, "Congress may not simply 'commandeer the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)).

Defendant argues that Plaintiff's request for injunctive relief violates the anticommandeering doctrine because the "ESA cannot be interpreted to compel FDEP . . . to implement that piece of federal legislation by regulating private parties." (Doc. 64 at 15). In *New York v. United States*, the Supreme Court struck down a federal law's "take title" provision, which required states to accept ownership of waste or regulate according to Congress' instructions. 505 U.S. at 175. Similarly, in *Printz v. United States*, the Court held that a federal statute's requirement state and local law enforcement conduct background checks on prospective handgun purchasers unconstitutionally commandeered state officers to execute federal laws. 521 U.S. 898, 933 (1997). However, the anticommandeering

doctrine does not bar federal laws that "'regulate[ ] state activities,' rather than 'seeking to control or influence the manner in which States regulate private parties.'" *Reno v. Condon*, 528 U.S. 141, 150 (2000) (quoting *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988)).

"The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). "[E]xamination of the language, history, and structure of the legislation . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174. The ESA imposes a general obligation on all "persons," making it unlawful to take any listed species.16 U.S.C. § 1538. The term "persons" includes "any officer, employee, agent, department, or instrumentality of . . . any State, municipality, or political subdivision of a State" and "any State, municipality, or political subdivision of a State." *Id.* § 1532(13). But the ESA, unlike the federal laws at issue in *Printz* and *New York*, places no obligation on states to enact or administer a federal regulatory program. "The Act requires no affirmative conservation action by states or local governments. The [ESA] neither compels nor precludes local regulation; it preempts that which is in conflict." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 92 F. Supp. 2d at 1308; *see Fla. Panthers v. Collier Cnty., Fla.*, No. 2:13-cv-612-FtM-29DNF, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016) ("Enforcement of

the ESA . . . is the responsibility of federal agencies, not local governments."). Thus, the ESA does not raise Tenth Amendment concerns.

Defendant's argument is best understood to be that the Court cannot grant Plaintiff's requested injunctions because the Court lacks the authority to compel FDEP to comply with the ESA by regulating private individuals. But "[t]his is an affirmative defense, and is not so clearly set forth on the face of the [Second] Amended Complaint that dismissal would be justified." *Fla. Panthers*, 2016 WL 1394328, at *15 (denying Tenth Amendment portion of a motion to dismiss); *see Friends of the Everglades, Inc. v. S. Fla. Water Mgmt. Dist.*, No. 02-80309-CIV-ALTONAGA/Turnoff, 2005 WL 8156105, at *8 (S.D. Fla. Nov. 29, 2005) (discussing Tenth Amendment argument as an affirmative defense which "depends, in part, upon resolution of the proper characterization of the [defendant]'s activities").

It is premature for the Court to consider the effects of granting Plaintiff's requested injunctions, in part because the requested injunctions are merely contained in the SAC's prayer for relief and are not essential to either claim. "If the Court finds for [Plaintiff] on the merits, it can craft an injunction that orders [Defendant] to stop violating the ESA, but avoids" violating the Tenth Amendment. *Seattle Audubon v. Sutherland*, No. cv06-1608MJP, 2007 WL 1300964, at *14 (W.D. Wash. May 1, 2007) (holding that the Tenth Amendment does not bar the plaintiffs' ESA action on

summary judgment); *see also Pac. Rivers Council v. Brown*, No. cv 02-243-BR, 2002 WL 32356431, at *11 (D. Or. Dec. 23, 2002) (holding that the Tenth Amendment does not bar the plaintiffs' ESA action on motion to dismiss).

### D.    Failure to State a Claim

Defendant argues that the SAC fails to state a claim because "as a matter of law, FDEP's conduct cannot be the proximate cause of the harm alleged by [ ] Plaintiff." (Doc. 64 at 22). Defendant asserts that "intervening contingencies are beyond the government entity's control," (*id.* at 21), such as "the increased number of residences with septic tanks," (*id.* at 22).

In reference to Section 9 of the ESA, the Supreme Court stated that "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions," *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 (1995), but that Congress "had in mind foreseeable rather than merely accidental effects on listed species," *id.* at 700. Justice O'Connor explained that the ESA "is limited by ordinary principles of proximate causation, which introduce notions of foreseeability." *Id.* at 709 (O'Connor, J., concurring). There is "no indication that Congress, in enacting [the ESA], intended to dispense with ordinary principles of proximate causation." *Id.* at 712. Justice O'Connor further explained that "[p]roximate causation is not a concept susceptible of precise definition," but it "depends to a great extent on considerations of the fairness of imposing liability for

remote consequences."[4] *Id.* at 713. Courts continue to rely on Justice O'Connor's concurrence for analyzing causation in ESA cases.[5] *See e.g.*, *Aransas Project v. Shaw*, 775 F.3d 641, 657 (5th Cir. 2014); *Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 493–94 (E.D. Cal. 2018); *Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 562 (D. Md. 2009); *Seattle Audubon*, 2007 WL 1300964, at *11.

The district court in *Loggerhead Turtle* applied these principles of proximate causation to an ESA violation claim on summary judgment.[6] *See generally* 92 F. Supp. 2d at 1306–08. There, the plaintiffs attempted to hold a county defendant liable for its alleged "*affirmative* acts of adopting and enforcing an ineffective artificial beachfront lighting ordinance [as] a proximate cause of the harm to and mortality of sea turtles." *Id.* at 1306 (emphasis in original). The county ordinance banned all artificial beachfront lighting because artificial light interfered with

---

[4] In the context of the ESA, Justice O'Connor wrote that "[t]he farmer whose fertilizer is lifted by a tornado from tilled fields and deposited miles away in a wildlife refuge cannot, by any stretch of the term, be considered the proximate cause of death or injury to protected species occasioned thereby. At the same time, the landowner who drains a pond on his property, killing endangered fish in the process, would likely satisfy any formulation of the principle." *Sweet Home*, 515 U.S. at 713 (O'Connor, J., concurring).

[5] The Supreme Court was not asked to apply causation to the facts in *Sweet Home* but recognized that "[i]n the elaboration and enforcement of the ESA, . . . all persons who must comply with the law will confront difficult questions of proximity and degree; for, as all recognize, the [ESA] encompasses a vast range of economic and social enterprises and endeavors." 515 U.S. at 708 (majority opinion).

[6] "The Eleventh Circuit left questions of 'proximity and degree' and the 'standard for causation for . . . liability' for resolution by" the district court on remand. *Loggerhead Turtle*, 92 F. Supp. 2d at 1306 (quoting *Loggerhead Turtle*, 148 F.3d at 1252 & n.24).

protected sea turtles' nesting process, but residents violated the ordinance such that takings still resulted. *Id.* at 1306–07. The court held that although the sea turtles were "taken" in violation of the ESA, the county could not be held "liable for takings because its beach residents [were] not turning off their lights in compliance with the [county's] ordinance." *Id.* at 1307. Put differently, the defendant could not "be made to assume liability for the act of its private citizens merely because it has chosen to adopt regulations to ameliorate sea turtle takings." *Id.* at 1308.

Important to the Eleventh Circuit in *Loggerhead Turtle* was that the defendant's ordinance "did not permit an act otherwise unlawful." *Id.* at 1307 (citing *Defs. of Wildlife v. Adm'r, Env't Prot. Agency*, 882 F.2d 1294, 1300–01 (8th Cir.1989)). Nor did the ordinance "license an act in expressly a manner likely to result in an ESA violation." *Id.* (citing *Strahan*, 127 F.3d at 163–64 (1st Cir.1997)). And the county "specifically drafted its sea turtle ordinance to be consistent with the ESA." *Id.* The court also noted that the plaintiffs' "case [was not] based upon the [defendant's] failure to enforce the sea turtle protection ordinance, nor [did the plaintiffs'] contend that an alleged failure to enforce the ordinance would violate the ESA." *Id.*

In support of Defendant's position that an intervening cause exists such that he cannot be held liable for takings that result from sewage discharge, Defendant cites to *Aransas Project*, in which "the issue [was] whether [the state commission

defendant's] issuance of water permits 'proximately caused' the unusual crane deaths." 775 F.3d at 660. The Fifth Circuit in *Aransas Project* found that there was "a long chain of causation . . . between the [the defendant's] issuance of permits to take water from the rivers and cranes' mortality," *id.*, including an "outlier" condition of a drought, *id.* at 662, which the "defendants had no reason to anticipate," *id.* at 661. The Fifth Circuit summarized that "[f]inding proximate cause and imposing liability on the State defendants in the face of multiple, natural, independent, unpredictable and interrelated forces affecting the cranes' estuary environment goes too far." *Id.* at 663.

Defendant also cites to *Florida Panthers* for support, where the court found that the county defendant's policies did "not authorize conduct that result[ed] in a tak[ing] of the Florida panther" because the county's "land clearing authorizations and single family home building permits simply authorize the clearing and building if the landowner otherwise complies with federal law." 2016 WL 1394328, at *22 (emphasis in original). Thus, for a taking to have occurred, "a third party must violate [the county's] regulations and the ESA." *id.*, and the court held that a third party's violation is not conduct that the defendant could be held liable for, *id.*

The *Florida Panthers* court summarized that "[i]n order for regulatory acts to result in ESA liability, there must be a close connection between the liable actor's conduct and habitat destruction or killing of endangered species." 2016 WL

1394328, at *22 (citing *Aransas Project*, 775 F.3d at 659). As examples of
regulatory action that has been held to have such direct consequences, the Fifth
Circuit in *Sierra Club v. Yeutter* held that the federal agency defendant's
authorization of "clearcutting" timber removal resulted in a taking of red-cockaded
woodpecker because "it certainly impair[ed] the [woodpecker's] 'essential
behavioral patterns, including . . . sheltering.'" 926 F.2d 429, 438 (5th Cir. 1991)
(quoting 50 C.F.R. § 17.3). And in *Strahan*, the First Circuit held that the state
agency defendant's authorization of certain fishing traps—with awareness that
protected whales were likely to be harmed by the traps—resulted in a taking of the
whale that violated the ESA. These two cases are distinguishable from the others
already discussed because "[t]he regulations or licensing . . . concerned actions that
directly killed or injured species or eliminated their habitat." *Fla. Panthers*, 2016
WL 1394328, at *22.

    In the instant case, Plaintiff alleges that the manatee takings are caused by
Defendant's inefficient regulation of sewage and his permitting of sewage discharge
into the North IRL. Unlike in *Aransas Project*, in which "multiple, natural,
independent, unpredictable and interrelated forces" impacted a protected species'
environment, 775 F.3d at 663, Plaintiff contends that manatee takings are the
foreseeable result of current regulations and that FDEP is aware of the pollution
problem, as reflected by its remediation plans, (Doc. 65 at 10–11). Although

Defendant argues that the increase of residents along the North IRL is an "intervening contingency" to sever causation, population increase is unlike an unpredictable weather event because population is trackable, predictable, and gradual. Additionally, unlike in *Loggerhead Turtle* and *Florida Panthers*, in which takings could only result from third parties' violations, Plaintiff contends FDEP's regulations *as followed* are resulting in takings. In other words, Plaintiff alleges that individuals are in the chain of causation simply by operating their OSTDS as permitted by FDEP. In that sense, the instant case is most like *Sierra Club* and *Strahan*, because Plaintiff alleges that Defendant's regulations are directly killing manatees.[7] Thus, Plaintiff's allegations do not fall short as a matter of law because Defendant can be the proximate cause of the alleged ESA violation. Accordingly, Plaintiff has not failed to state a claim.

### E.    *Burford* Abstention

Finally, Defendant argues that the Court should abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315, 320 (1943), to avoid federal interference with FDEP's administrative processes. (Doc. 64 at 22–23).

---

[7] Defendant explains that the FDEP is "simply achieving the goal of nutrient reduction through a separate set of regulatory tools, consistent with its legislative authority," (Doc. 64 at 22), and argues that "there is no claim that it is deficient in the implementation of the BMAP for the North IRL," (Doc. 64 at 21). But this is directly contradicted by the many allegations in Plaintiff's complaint that Defendant's regulations, regardless of the regulation tool, are insufficient and resulting in takings.

"Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)).

The decision to abstain under *Burford* "balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem and retaining local control over difficult questions of state law bearing on policy problems of substantial public import." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (citations and quotations omitted). "This balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" *Id.* (quoting *Colo. River*, 424

U.S. at 813); *see Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (emphasizing that *Burford* abstention is a "narrow doctrine").

Defendant argues that timely and adequate review is available through administrative challenges pursuant to Florida's Administrative Procedure Act. (Doc. 64 at 23 (citing Fla. Stat. § 120.569(1))). Defendant further argues that "Florida and FDEP have enacted a complex program to address the underlying problem – nutrient pollution in surface waters," and thus, "the Court should abstain from jurisdiction in order to allow the State to pursue its ongoing efforts in the restoration of the [IRL]." (*Id.* at 24).

As an initial matter, the Court doubts that administrative challenges provide an "adequate review" of an ESA violation claim. The Seventh Circuit explored the adequacy of the review required to warrant *Burford* abstention,[8] and held that "[t]he state must offer some forum in which claims may be litigated, and this forum must stand in a special relationship of technical oversight or concentrated review to the evaluation of those claims." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 504 (7th Cir. 2011) (citation omitted). Thus, "judicial review by state courts with specialized expertise is a prerequisite to *Burford* abstention." *Id.* (reversing abstention because "[s]uits brought under Indiana's environmental laws are heard in courts of general

---

[8] The Eleventh Circuit has not ruled on the adequacy of the review required for *Burford* abstention, and thus, the Court looks to its sister courts of appeal for persuasive instruction.

jurisdiction throughout the state"). The Seventh Circuit found important that in *Burford*, a specialized state court heard appeals from state commission decisions, thus warranting federal abstention. *Id.* In the present case, no specialized court exists in Florida to provide an appeal of a challenge to FDEP's regulatory actions. *See* Fla. Stat. § 120.68 (judicial review under Florida's Administrative Procedure Act)

Nevertheless, even if adequate state-court review existed, "[t]he *Burford* abstention doctrine allows a federal court to dismiss a case only if it presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Siegel*, 234 F.3d at 1173. Since no questions of state law have been presented, the Court will only consider the second reason for abstention.

The Florida Legislature recently enacted a statute entitled the Indian River Lagoon Protection Program, effective July 1, 2023, which states that the IRL "is a critical water resource of this state which provides many economic, natural habitat, and biodiversity functions that benefit the public interest, including fishing, navigation, recreation, and *habitat to endangered and threatened species* and other flora and fauna." Fla. Stat. § 373.469(1)(a)(1) (emphasis added). The Florida Legislature further found that "[t]he expeditious implementation of the . . . [North

IRL BMAP] . . . [is] necessary to improve the quality of water in the [IRL] ecosystem and to provide a reasonable means of achieving the total maximum daily load requirements and achieving and maintaining compliance with state water quality standards." *Id.* § 373.469 (1)(a)(5). Lastly, the Florida Legislature intends for Florida "to protect and restore surface water resources and achieve and maintain compliance with water quality standards in the [IRL] through the phased, comprehensive, and innovative protection program." *Id.* § 373.469(1)(b).

Florida has therefore initiated a state administrative process "with respect to a matter of substantial public concern." *New Orleans Pub. Serv.*, 491 U.S. at 361. However, "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* (quoting *Colo. River*, 424 U.S. at 816). And "there is . . . no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Id.* at 363 (quoting *Zablocki v. Redhail*, 434 U.S. 374, 380 n.5 (1978)). Rather, abstention is required only if federal review "would disrupt a state's effort, through its administrative agencies, to achieve uniformity and consistency in addressing a problem." *Siegel*, 234 F.3d at 1173.

Defendant did not explain how federal review of this case would disrupt
FDEP's efforts to achieve uniformity in addressing the water quality problems that
Florida faces. In *Siegel*, when declining to abstain from hearing the appeal under
*Burford*, the Eleventh Circuit noted that the "case [did] not threaten to undermine
Florida's uniform approach to manual recounts" because "the crux of Plaintiffs'
complaint is the absence of strict and uniform standards for initiating or conducting
such recounts." *Siegel*, 234 F.3d at 1173. In *BT Investment Managers, Inc. v. Lewis*,
the former Fifth Circuit held that *Burford* abstention was improper where the
"appellants focus[ed] their attack upon a single statute whose possible invalidation
could scarcely be expected to disrupt Florida's entire system of banking regulation."
559 F.2d 950, 955 (5th Cir. 1977).[9] Additionally, the *Lewis* court "discern[ed] no
overriding state interest, special state competence, or threat to Florida's
administration of its own affairs that would warrant denying appellants access to
their chosen federal forum and relegating their various federal claims to the courts
of Florida." *Id.*; *see also Rindley v. Gallagher*, 929 F.2d 1552, 1557 (11th Cir. 1991)
(holding *Burford* abstention inappropriate where "[n]o overriding state interests or
special competence or threat to administrative integrity is implicated by [the
plaintiff's] requested invalidation or modification of section 445.225(4)").

---

[9] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding
that this Court is bound by the decisions of the former Fifth Circuit handed down by the close of
business on September 30, 1981).

Similarly, Florida's efforts to achieve water quality standards are already neither uniform nor consistent because FDEP promulgates BMAPs unique to each area of concern. *See* Fla. Stat. § 373.469(3) ("The [IRL] Protection Program consists of the Banana River Lagoon [BMAP], Central [IRL BMAP], [North IRL BMAP], and Mosquito Lagoon Reasonable Assurance Plan."). Thus, there is no fear that federal review of FDEP's regulatory conduct as to the North IRL would disrupt an overarching policy of consistency within Florida. Furthermore, at this point, the extent that any state policy might be overturned by a decision of this Court is extremely unclear. Accordingly, the Court declines to abstain under *Burford* and Defendant's Motion to Dismiss is due to be denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** that Defendant's Motion to Dismiss Second Amended Complaint (Doc. 64) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on September 18, 2024.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record