UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BEAR WARRIORS UNITED, INC.,**

      **Plaintiff,**

v.                                                     Case No. 6:22-cv-2048-CEM-LHP

**SHAWN HAMILTON,**

      **Defendant.**
                                /

**ORDER**

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgement ("Plaintiff's Motion," Doc. 91), to which Defendant filed a Response (Doc. 102) and Plaintiff filed Reply (Doc. 109). This cause is also before the Court on Defendant's Motion for Summary Judgment ("Defendant's Motion," Doc. 92), to which Plaintiff filed a Response (Doc. 101) and Defendant filed a Reply (Doc. 108). The Court held oral argument on the matter on November 14, 2024. (Min. Entry, Nov. 14, 2024 Hr'g, Doc. 129). For the reasons set for herein, Plaintiff's Motion will be granted in part and denied in part, and Defendant's Motion will be denied.

I. **BACKGROUND**

The West Indian Manatee that resides in the North Indian River Lagoon ("North IRL") is a listed species under the Endangered Species Act ("ESA"). 50 C.F.R. § 17.11. "[A]ll of the manatees on the Atlantic coast . . . will spend time in the Indian River Lagoon at some time in the year." (de Wit Dep., Doc. 128, at 79). Two Unusual Mortality Events ("UMEs") involving manatees have occurred in the IRL—one from 2011 to 2013, (Dr. Ball Decl. and Report, Doc. 91-38, at 3), and one that began in 2020 and is ongoing, (Fla. Fish & Wildlife Conservation Comm'n: Manatee Mortality Event Along The East Coast, Doc. 91-28, at 2).[1] A UME is "mass mortality. So high numbers of mortality and morbidity in manatee rescues that need further investigation and require a [ ] response." (Doc. 128 at 23). "Researchers attributed this [most recent] UME to starvation due to the lack of seagrasses in the Indian River Lagoon. In recent years, poor water quality in the Lagoon led to harmful algal blooms and widespread seagrass loss." (Doc. 91-28 at 2). It has been estimated that the North IRL lost between 50% to 90% of its historical seagrass cover between 2009 and 2019. (Barile Decl. and Report, Doc. 91-30, at 14).

---

[1] Defendant objects to this as inadmissible hearsay. (Doc. 102 at 18). However, as Plaintiff notes, this document is a record from a government website and is therefore self-authenticating under Federal Rule of Evidence 902(5). (Doc. 109 at 7 (citing *Butler v. Yankellow*, No. 5:22-cv-00149-TES-CHW, 2023 U.S. Dist. LEXIS 130336, at *15 n.3 (M.D. Ga. July 27, 2023))).

The North IRL is an impaired water—that is, a water body that fails to meet water quality standards. (Weaver Decl., Doc. 94, at 3, 6). The Florida Department of Environmental Protection ("FDEP") has "the power and the duty to control and prohibit pollution of air and water." Fla. Stat. § 403.061. As such, FDEP administers the total maximum daily load ("TMDL") program for such impaired waters "to promote improvements in water quality throughout the state through the coordinated control of point and nonpoint sources of pollution." *Id.* at § 403.067(1). As required under the Clean Water Act, the TMDLs have been approved by the United States Environmental Protection Agency ("EPA"). (Doc. 94 at 7).

In administering the TMDL program, FDEP has adopted a Basin Management Action Plan ("BMAP") to reduce nitrogen and phosphorus concentration in the North IRL. ("North IRL BMAP," Doc. 128, at 21–24). "The FDEP 2021 [North IRL] BMAP indicates that [TMDL] exceedances for Total Nitrogen are 58%, and 50% for Total Phosphorus . . . above the pollutant load that the [North IRL] waterbody can assimilate without causing exceedances of State of Florida water quality standards, as outlined in FL Statutes Sec. 316. 'The nutrient TMDLs focus on the water quality conditions necessary for seagrass regrowth at water depth limits where seagrass historically grew in the [North IRL], based on a multi-year composite of seagrass coverage.'" (Doc. 91-30 at 3 (emphasis and footnotes omitted)). FDEP is also updating the BMAP to comply with statutory amendments from the 2020

legislative session. (Homann Decl., Doc. 95, at 3). The BMAPs are "intended to operate as part of an iterative process . . . to expedite the restoration of the water body." (*Id.* at 5).

FDEP also has regulatory control over wastewater treatment plant discharges. Fla. Stat. § 403.086. Furthermore, FDEP took over administration of the state's regulatory program for onsite sewage treatment disposal systems ("OSTDS") in 2021. (Interagency Agreement, Doc. 97-1, at 5). OSTDS provides treatment for sewage, and some systems discharge varying amounts of nitrogen compounds to groundwater. (Answer, Doc. 115, at 5). FDEP has authority to issue to issue, revoke, and deny permits for OSTDS. Fla. Stat. § 381.0065.

Plaintiff brings two counts against Defendant—alleging FDEP's wastewater discharge regulatory scheme and enforcement thereof unlawfully take manatees in the North IRL in violation of the ESA (Count I) and seek judgment declaring that FDEP violated the ESA under the Declaratory Judgment Act (Count II). Plaintiff and Defendant both move for summary judgment as to both counts.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

### III. ANALYSIS

#### A. Standing

At the outset, Plaintiff asserts that it has standing to bring its claims. (Doc. 91 at 9–13). However, Defendant's Motion does not challenge Plaintiff's standing, (*see generally* Doc. 92), and Defendant only did so in Response to Plaintiff's Motion. "Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1163 (11th Cir. 2009). And although this issue was raised by Defendant during oral argument, "[a]rguments presented for the first time at oral argument are deemed waived." *United States of Am. ex rel. CLJ, LLC v. Halickman*, No. 20-cv-80645-MATTHEWMAN, 2024 U.S. Dist. LEXIS 35307, *32 (S.D. Fla. Feb. 29, 2024). Furthermore, as explained in the Court's September 18, 2024 Order (Doc. 112) addressing Defendant's Motion to Dismiss, Plaintiff has standing to bring its claims.

### B. Eleventh Amendment Immunity

"The Eleventh Amendment provides sovereign immunity to the states to protect them from suit in federal court without their consent." *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016). However, "the Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages." *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1220 (11th Cir. 2000).

Plaintiff seeks only declaratory and injunctive relief against Defendant in his official capacity as Secretary of FDEP. (Am. Compl., Doc. 59, at 1, 30–31). Furthermore, as explained in the Court's September 18, 2024 Order, "Plaintiff's alleged ESA violation claim does not depend on specific past enforcement decisions; instead, it details an ongoing failure of FDEP to efficiently regulate within its authority." (Doc. 112 at 14). Thus, under the *Ex parte Young* exception, this action is not barred by the Eleventh Amendment.

### C. Endangered Species Act Violation

The ESA makes it unlawful "for any person subject to the jurisdiction of the United States to—take any [listed] species within the United States." 16 U.S.C. § 1538. The ESA defines "take" to include actions that "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such

conduct." *Id.* at § 1532(19). The regulations that implement the statute define the statutory term "harass" to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The same regulations define "harm" to mean "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

"[A]ctivities not intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary permits them." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701 (1995). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost. Therefore, the [Supreme] Court declined to exclude all indirect action from coverage, recognizing that activities like habitat destruction cause the precise harms that Congress enacted the statute to avoid." *People for Ethical Treatment of Animals, Inc. v. Mia. Seaquarium*, 879 F.3d 1142, 1148–49 (11th Cir. 2018) (citations and internal quotation marks omitted). "In order for regulatory acts to result in ESA liability, there must be a close connection between the liable actor's conduct and habitat

destruction or killing of endangered species." *Fla. Panthers v. Collier Cnty., Fla.*, No. 2:13-cv-612-FtM-29DNF, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016) (citing *Aransas Project v. Shaw*, 775 F.3d 641, 659 (5th Cir. 2014)).

Plaintiff argues that Defendant has harassed and harmed manatees in the North IRL. (Doc. 91 at 22–27). Defendant counters that Plaintiff has failed to establish proximate cause. (Doc. 92 at 23–24). Plaintiff's chain of causation argument proceeds as follows: (1) FDEP has regulatory authority over the wastewater discharge from wastewater treatment plants and OSTDS; (2) discharges made pursuant to FDEP regulations have resulted in an excess of nutrients in the North IRL; (3) those nutrients led to the death of seagrasses and promoted harmful algae blooms; and (4) deprived of their of a primary food source, manatees have starved, grown emaciated, and an unusual number have died. The first and fourth links are easily disposed of. As Defendant acknowledges, FDEP has broad regulatory control over the wastewater disposal into the North IRL. (Doc. 92 at 5–10, 11–13, 17–18, 20–21; *see also* Doc. 91 at 18–20). Thus, Plaintiff has established the first link. Furthermore, "[r]esearchers attributed [the ongoing manatee] UME to starvation due to the lack of seagrasses in the Indian River Lagoon." (Doc. 91-28 at 2). Therefore, Plaintiff has established the fourth link. The remaining two links are more complicated.

As to the third link, the parties dispute *why* the seagrass has been depleted. Plaintiff avers the cause is nitrogen from wastewater treatment plants and OSTDS that is being released at levels that violate the ESA, which results in hyper-eutrophication. (Doc. 91 at 15). Defendant, on the other hand, argues "adverse effects on seagrasses are the product of 'perturbations' by hurricanes and tropical storms" and anthropogenic climate change. (Doc. 102 at 8). However, Defendant provides no independent evidence to support its theory. Instead Defendant misconstrues the testimony of Plaintiff's expert, Dr. Peter Barile.

Dr. Barile testified and provided numerous scientific sources in support of the contention that there is a "scientific consensus that [eutrophication][2] is a significant driver of loss of seagrasses." (Barile Dep., Doc. 103, at 95). When questioned by defense counsel at his deposition, Dr. Barile also acknowledged that events such as hurricanes can cause seagrass loss. (*Id.*). And it is this statement—taken out of context—that Defendant claims establishes an issue of fact as to the cause of seagrass loss. When taken in context, however, Defendant's characterization of this evidence is plainly incorrect. Specifically, Dr. Barile explained that, while events like hurricanes can temporarily cause a loss of seagrass, if the system is healthy, it can recover and re-grow the grasses without significant long-lasting impacts. (*Id.* at

---

[2] The transcript uses the word "unification," but in context of the discussion, this is clearly a typo and it should be eutrophication.

95–96). But, a eutrophied system does not have the same ability to recover. (*Id.* at 95–97 (explaining that he "would characterize any member lagoon system as hypertrophic to where the nutrients are so high and the loading and the concentrations are so high that they preclude seagrasses to be healthy to withstand other factors that may be minor or maybe shorter term impact")). Indeed, Dr. Barile expressly disagreed with Defendant's characterization of his testimony, stating that defense counsel was attempting to "put words in [his] mouth." (*Id.* at 97). Accordingly, Plaintiff has offered evidence that excess nutrients led to depletion of the seagrass, and Defendant has not submitted any evidence to create an issue of fact. With the third link established, all that remains is the second link—i.e., whether Defendant's regulatory scheme and enforcement thereof is the proximate cause of the increased nutrient content in the North IRL.

First, Defendant argues that "[F]DEP cannot be liable for a violation of the ESA merely because it assumed the OSTDS program on July 1, 2021" because the North IRL's ecological tipping point occurred in 2011, and FDEP "is limited to the 'supervision' of the OSTDS program since it assumed overall responsibility of that program." (Doc. 92 at 19–20). However, it has been established that FDEP has assumed total control over the OSTDS program:

> Effective July 1, 2021, all powers, duties, functions, records, offices, personnel, associated administrative support positions, property, pending issues, existing contracts, administrative authority, administrative rules,

> and unexpended balances of appropriations, allocations, and other funds for the regulation of OSTDS relating to the OSP in the DOH is transferred to the DEP, as more fully described herein.

(Doc. 97-1 at 5). Therefore, Defendant, as current administrator of the OSTDS program, can be held liable for ongoing violations of the ESA as a result of that program.

Next, Defendant argues that "[F]DEP's enforcement responses represented a diligent exercise of enforcement discretion," (Doc. 92 at 16), and that "Plaintiff cannot point to any instance where [F]DEP's supervision has been inadequate, or where any alleged omission in its supervision has caused harm to a protected species," (*id.* at 20). Defendant also asserts that it has complied with its obligations to regulate point source discharges under the Clean Water Act because it "implemented its responsibilities under the [BMAP]." (*Id.* at 21). However, in making these arguments, Defendant misapprehends FDEP's duties under the ESA.

"This case . . . involves a regulatory entity that exerts control over the use of something that allegedly takes protected wildlife. . . . [And] the regulatory entity purports to make lawful an activity that allegedly violates the ESA." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1251 (11th Cir. 1998). FDEP is "vested with broad authority to regulate" wastewater discharge under state law. *Id.* at 1253 (quoting *Strahan v. Coxe*, 127 F.3d 155, 159 (1st Cir. 1997)).

Plaintiff alleges that those discharges unlawfully take a listed species—the West Indian Manatee.

Under the ESA, "the liability determination depends on whether a risk of taking exists if [FDEP] compl[ies] with all applicable laws and regulations in place, not whether it is possible to avoid a taking if the laws and regulations are followed." *Animal Prot. Inst., Ctr. for Biological Diversity v. Holsten*, 541 F. Supp. 2d 1073, 1079 (D. Minn. 2008); *see also Strahan*, 127 F.3d at 164 ("[W]hereas it is possible for a person licensed by Massachusetts to use a car in a manner that does not risk the violations of federal law suggested by the defendants, it is not possible for a licensed commercial fishing operation to use its gillnets or lobster pots in the manner permitted by the Commonwealth without risk of violating the ESA by exacting a taking."). So, even if FDEP has complied with all other federal laws, its actions may nevertheless still violate the ESA. Thus, the question before the Court is the following: Does there still exist a risk that a manatee taking could occur even if all activity was conducted pursuant to existing FDEP regulations under the Clean Water Act?

"[P]roximate cause principles inject a foreseeability element into the statute." *Sweet Home*, 515 U.S. at 713 (O'Connor, J. concurring). "The causation [alleged] here, while indirect, is not so removed that it extends outside the realm of causation as it is understood in the common law." *Strahan*, 127 F.3d at 164. Here, hyper-

eutrophication of the North IRL was not an unpredictable event. *Cf. Aransas Project*, 775 F.3d at 658–59 ("Nowhere does the court explain why the remote connection between water licensing, decisions to draw river water by hundreds of users, whooping crane habitat, and crane deaths that occurred during a year of extraordinary drought compels ESA liability."). Unlike the extraordinary conditions in *Aransas Project*, eutrophication from OSTDS and wastewater treatment plant discharges can be predicted as a function of population growth and is not solely caused by natural weather events. (*See* Doc. 103 at 97).

Any argument that Defendant's "regulatory scheme acts to prohibit, restrict, and limit [manatee taking], not to authorize, entitle, or legitimize it" is also misleading. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 92 F. Supp. 2d 1296, 1307 (M.D. Fla. 2000). That is because FDEP "has not issued regulations to assist in the avoidance of [manatee] takings." *Holsten*, 541 F. Supp. 2d at 1080. The BMAP—on which Defendant relies to argue that liability should not be imposed, (Doc. 92 at 21, 23)—does not once refer to manatees. (*See generally* Doc. 128). This is unlike *Loggerhead Turtle*, which Defendant claims is analogous, because the ordinance at issue there was specifically drafted to comply with the county defendant's duties under the ESA. 92 F. Supp. 2d at 1307.

Then, Defendant argues that the instant case is distinguishable from other cases where courts have found violations of the ESA because those cases involved

governmental entities authorizing the placement of physical objects that resulted in prohibited takings. (Doc. 108 at 1). And because no structures are at issue here, there can be no finding of proximate causation. Although this argument was first raised in a Reply, the Court need only look as far as Justice O'Connor's concurrence in *Sweet Home* to reject this argument. 515 U.S. at 713 (O'Connor, J. concurring) ("At the same time, the landowner who drains a pond on his property, killing endangered fish in the process, would likely satisfy any formulation of the principle."). If FDEP authorizes any action that harasses or harms a protected species, even though no physical structure was placed, it could fairly be found in violation of the ESA.

Accordingly, it appears that Plaintiff has established the second link insofar as it references past takings of manatees.[3] However, under the doctrine of *Ex parte Young*, there must be an *ongoing* violation of federal law for the Court to be able to grant the relief requested. And Defendant disputes that there is ongoing harm or taking of manatees. (Doc. 92 at 3). Defendant has offered evidence that over the last year, manatee mortality in the IRL was at or below baseline conditions. (*See* Doc.

---

[3] Arguably, Plaintiff has done so by providing evidence that "a recent State of Florida Water Management District resolution indicated that 'human wastewater including septic tanks is the major source of excess nitrogen in the Indian River Lagoon and is underestimated in past nutrient loading models.'" (Doc. 91-30 at 4 (citing S. Fla. Water Mgmt. Dist. Resol. No. 2016-0712)). Furthermore, the reduction of nutrients in the North IRL is estimated to fall short of FDEP's goals. (IRL BMAPs Annual Meeting, Doc. 91-24, at 38). And neither side has produced evidence that a third party's intervention is the reason for the excess nutrients in the North IRL. Taken with Defendant's argument that all FDEP regulations have been complied with, the Court can infer that all wastewater released into the North IRL is in compliance with the Clean Water Act.

93 at 88–89). There were also "less than a handful" of instances of emaciation among deceased manatees as of Dr. de Wit's deposition. (*Id.* at 89). Dr. de Wit further noted that the UME is only ongoing "because we are in the process of applying for the closure." (*Id.*). However, Plaintiff argues that the decrease in manatee deaths is a "red herring" because Dr. de Wit was unable to answer the question of whether the population decline from the UME could have caused the reduced number of manatee deaths. (Doc. 101 at 19). There remains a dispute over this material fact.

D.   **Established Facts**

Federal Rule of Civil Procedure 56(g) states: "If the court does not grant all the relief requested by [a motion for summary judgment], it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." As set forth at length above, most of the facts of this case are not in dispute. Plaintiff has established (1) FDEP has regulatory authority over the wastewater discharge from wastewater treatment plants and OSTDS; (2) discharges made pursuant to FDEP regulations have resulted in an excess of nutrients in the North IRL; (3) those nutrients led to the death of seagrasses and promoted harmful algae blooms; and (4) previously, the death of seagrasses have caused the taking of manatees under the ESA. As such, the only remaining issue of fact for the jury is whether there is an ongoing risk of

manatee takings under FDEP's regulatory regime. Therefore, Plaintiff's Motion will be granted in part and denied in part, and Defendant's Motion will be denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment (Doc. 91) is **GRANTED in part**.

    a. The facts set forth in Section III.D are treated as established in this case.

    b. The Motion is otherwise **DENIED**.

2. Defendant's Motion for Summary Judgment (Doc. 92) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on December 18, 2024.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record