UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BEAR WARRIORS UNITED, INC.,**

**Plaintiff,**

**v.**                                                    **Case No. 6:22-cv-2048-CEM-LHP**

**ALEXIS A. LAMBERT,**

**Defendant.**

_____/

**ORDER**

THIS CAUSE is before the Court following a two-day bench trial. Plaintiff alleges that Defendant, Secretary of the Florida Department of Environmental Protection ("FDEP"), promulgated wastewater discharge regulations that unlawfully take manatees in the North Indian River Lagoon ("North IRL") thereby violating the Endangered Species Act ("ESA"). (*See generally* Second Am. Compl., Doc. 59). Plaintiff seeks, *inter alia*, a declaration that FDEP violated the ESA and injunctive relief, including a requirement that FDEP obtain an incidental take permit ("ITP"). At trial, Plaintiff established its claims by a preponderance of the evidence, and judgment will be entered accordingly.

# I.    BACKGROUND

The ESA makes it unlawful "for any person subject to the jurisdiction of the United States to—*take* any [listed] species within the United States." 16 U.S.C. § 1538 (emphasis added). A "person," includes "any officer, employee, [or] agent, . . . of any State," *Id.* § 1532(13), and the West Indian Manatee that resides in the North IRL is a listed species under the ESA, 50 C.F.R. § 17.11. The ESA defines "take" to include actions that "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "[L]ike 'harm,' 'harassment' is only actionable under the ESA if its impact on an endangered animal is sufficiently serious." *PETA v. Mia. Seaquarium*, 879 F.3d 1142, 1149 (11th Cir. 2018), *adhered to on denial of reh'g*, 905 F.3d 1307 (11th Cir. 2018) (cleaned up).[1]

"[A]ctivities not intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary [of the Interior] permits them." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701 (1995). "The plain intent of Congress in enacting [the ESA]

---

[1] The regulations that implement the statute define the statutory term "harass" to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The same regulations define "harm" to mean "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

was to halt and reverse the trend toward species extinction, whatever the cost. Therefore, the [Supreme] Court declined to exclude all indirect action from coverage, recognizing that activities like habitat destruction cause the precise harms that Congress enacted the statute to avoid." *Mia. Seaquarium*, 879 F.3d at 1148–49 (citations and internal quotation marks omitted). "In order for regulatory acts to result in ESA liability, there must be a *close connection* between the liable actor's conduct and habitat destruction or killing of endangered species." *Fla. Panthers v. Collier Cnty., Fla.*, No. 2:13-cv-612-FtM-29DNF, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016) (emphasis added) (citing *Aransas Project v. Shaw*, 775 F.3d 641, 659 (5th Cir. 2014)).

So, "[p]roximate cause and foreseeability are required to affix liability for ESA violations." *Id.* at 656. However, "[p]roximate causation is not a concept susceptible of precise definition." *Sweet Home*, 515 U.S. 687, 713 (1995) (O'Connor, J. concurring). The Supreme Court has "said that proximate causation 'normally eliminates the bizarre,' and ha[s] noted its 'functionally equivalent' alternative characterizations in terms of foreseeability and duty." *Id.* (internal citations omitted). Thus, a finding of "[p]roximate causation depends to a great extent on considerations of the fairness of imposing liability for remote consequences." *Id.* Consider the following example offered by Justice O'Connor that the Court will return to throughout—"the landowner who drains a pond on his

property, killing endangered fish in the process, would likely satisfy any formulation of the principle." *Id.*

"In 1982, Congress amended the ESA to provide exceptions to the strict prohibition on 'takes.'" *Aransas Project*, 775 F.3d at 646 (citing *Sweet Home*, 515 U.S. at 691). Under 16 U.S.C. § 1539(a)(1)(B), the Secretary of the Interior may issue an ITP that authorizes takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." "An ITP is issued by the U.S. Fish and Wildlife Service ("FWS") after the development and approval of a Habitat Conservation Plan ("HCP")." *Aransas Project*, 775 F.3d at 646 (footnote omitted). "HCPs must include, among other things, information regarding the applicant's plan to 'minimize and mitigate' the impacts likely to result from incidental takes." *Id.* (quoting 16 U.S.C. § 1539(a)(2)(A)(ii)).

Plaintiff alleges FDEP's regulation of wastewater discharge into the North IRL is the proximate cause of manatee takings in violation of the ESA. Stated differently, Plaintiff alleges that while FDEP may not purposefully take manatees, such takings nevertheless occur incidental to FDEP's lawful activity. Defendant filed a Motion to Dismiss, which was denied (Doc. 112). The parties then filed cross motions for summary judgment. The Court granted partial summary judgment in favor of Plaintiff. ("Summary Judgment Order," Doc. 134). In the Summary Judgment Order, the Court made the following findings:

> Plaintiff has established (1) FDEP has regulatory authority over the wastewater discharge from wastewater treatment plants and OSTDS; (2) discharges made pursuant to FDEP regulations have resulted in an excess of nutrients in the North IRL; (3) those nutrients led to the death of seagrasses and promoted harmful algae blooms; and (4) previously, the death of seagrasses have caused the taking of manatees under the ESA.

(*Id.* at 16). The only remaining issue for trial is "whether there is an ongoing risk of manatee takings under FDEP's regulatory regime." (*Id.* at 16–17).

## II.    ANALYSIS

### A.    Standing

At trial, Defendant challenged Plaintiff's standing, summarily arguing that Plaintiff bases standing upon emotional harm suffered by individuals who have seen dead manatees and that there is no substantial likelihood that this will occur again. Because standing implicates subject matter jurisdiction and may be raised at any time,[2] the Court will address this argument. Not only is Defendant mistaken as to Plaintiff's basis for standing but Defendant is also incorrect that there is no substantial likelihood that manatee takings will occur again. The evidence presented by Plaintiff has definitively shown otherwise.

"In cases like these, where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can

---

[2] *Church v. Accretive Health, Inc.*, 654 F. App'x 990, 992 (11th Cir. 2016) ("Questions of subject matter jurisdiction may be raised . . . at any time during the pendency of proceedings.").

claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). "The latter approach is known as representational or organizational standing." *Id.* "To invoke it, an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Defendant did not challenge the latter two prongs. Nevertheless, Plaintiff has established these prongs. The interest in preservation of manatees is clearly germane to Plaintiff's purpose as an organization dedicated to wildlife and habitat protection. (*See* Shadix Decl., Doc. 91-2, at 2 ("Our organization's focus is on protecting wildlife and their habitat . . . . Manatees are a special focus for Bear Warriors United supporters and me because manatees are an iconic Florida native species.")). And "when the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary.'" *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (explaining "individual

participation; is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members")). Defendant only contests the first prong—whether the harm suffered by any of Plaintiff's members is sufficient to establish standing on its own.

"The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Hunt*, 432 U.S. at 342 (emphasis added) (quoting *Warth*, 422 U.S. at 511). So, a member "must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

While Plaintiff has presented evidence that its members have suffered emotional harm from, among other things, experiencing the deterioration of the IRL and seeing many dead and decomposing manatees,[3] (*see generally* Shadix Decl., Doc. 91-2; Pflug Decl., Doc. 91-6; Thompson Decl., Doc. 91-7), it also provides

---

[3] The Eleventh Circuit "ha[s] not yet decided in a published opinion whether emotional distress alone is a sufficiently concrete injury for standing purposes." *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n.*, No. 21-14348, 2022 U.S. App. LEXIS 25076, at *9 (11th Cir. Sept. 7, 2022).

evidence that at least one of its members has suffered a financial injury, (*see* Pflug Decl., Doc. 91-6, at 2–3 (describing how he has "lost significant income" and the damage to his kayaking tour business because of pollution and absence of manatees in the IRL)). Thus, at least one of Plaintiff's members has suffered "a type of economic injury, which is the epitome of 'concrete.'" *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019). The evidence presented at trial has also established that Plaintiff's members are like to encounter dead manatees again as discussed below.[4]

Next, the Court turns to the remaining requirements. "The latter two requirements—traceability and redressability—often travel together." *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1200 (11th Cir. 2021). First, traceability. "The causal link may become 'too attenuated' if the injury is 'the result of the independent action of some third party not before the court.'" *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "On the other hand, standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Id.*

---

[4] In fact, Dr. Peter Barile testified to seeing one such dead manatee calf on a run around the IRL in recent months.

At summary judgment, the Court found that FDEP has regulatory authority over the wastewater discharge into the North IRL and discharges made pursuant to its regulations have resulted in an excess of nutrients, causing the death of seagrasses and promoting algae blooms. (*See* Doc. 134 at 16). Plaintiff also established that a lack of seagrasses has caused manatee takings in the past. (*Id.*). In doing so, Plaintiff has sufficiently showed the required "causal connection" necessary to establish Article III standing because FDEP was the proximate cause of the manatee takings that gave rise to this action. *See Loggerhead Turtle*, 148 F.3d at 1249 (finding a "sufficient causal connection" where county defendant had "primary authority to regulate" despite lack of enforcement authority).

Next, redressability. That "prong of the standing doctrine asks whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* at 1253 (quoting *Lujan*, 504 U.S. at 561). Plaintiff seeks a declaration that that Defendant is in violation of the ESA and an injunction requiring Defendant apply for an ITP. Given Plaintiff's evidence, it is apparent that granting the requested relief would result in fewer manatee takings.

"Although 'redressability—like the other prongs of the standing inquiry—does not depend on the defendant's status as a governmental entity[,]' unique constitutional implications exist whenever a federal district court is asked to order a state entity to take regulatory action." *Id.* at 1254 (alteration in original) (quoting

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n. 5 (1998)). The Court "need only find constitutional at least one available remedy that would adequately bring about [FDEP]'s compliance with the ESA." *Id.* (citing *Strahan v. Coxe*, 127 F.3d 155, 171 (1st Cir. 1997)). The Court "has available a wide range of effective injunctive relief," and ordering a state agency to apply for an ITP is included within that equitable power. *Id.* (noting the district court's order that the state agency apply for an ITP was upheld as constitutional on appeal). Plaintiff has standing.

## B.    Anticommandeering Doctrine

Defendant argues that Plaintiff seeks relief that requires a state agency to perform actions on behalf of federal agency, thus violating the anticommandeering doctrine.[5] Defendant raised this argument in the Motion to Dismiss, and the Court previously rejected it at that stage. Once again, the Court finds the argument holds no water, but its reasoning is worth repetition and elaboration here.

"The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the

---

[5] This line of argument was also rejected in *Strahan* in which the First Circuit distinguished the district court ordering the state comply with the ESA. 127 F.3d at 170 ("The district court, in answering the defendants' Tenth Amendment challenge, recognized that the Commonwealth has the choice of either regulating in this area according to federal ESA standards or having its regulations preempted by the federal ESA provisions and regulations. Because, for preliminary injunction purposes, the Commonwealth's regulation of this area is inconsistent with federal ESA standards, this situation falls squarely within the permissible balance of federal and state authority recognized by the *New York* Court and the Commonwealth's regulations are preempted by the federal ESA provisions.).

States, as the Tenth Amendment confirms." *Murphy v. NCAA*, 584 U.S. 453, 471
(2018). The anticommandeering doctrine derives from this reservation of power. As
the Supreme Court explained, "Congress may not simply 'commandeer the
legislative process of the States by directly compelling them to enact and enforce a
federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992)
(quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288
(1981)). However, "[t]he anticommandeering doctrine does not apply when
Congress evenhandedly regulates an activity in which both States and private actors
engage." *Murphy*, 584 U.S. at 475–76. The ESA applies to "*any person* subject to
the jurisdiction of the United States." 16 U.S.C. § 1538 (emphasis added).

"The term 'person' means an individual, corporation, partnership, trust,
association, or any other *private entity*; or any officer, employee, agent, department,
or instrumentality of the Federal Government, of any *State*, municipality, or political
subdivision of a State, or of any foreign government; any *State*, municipality, or
political subdivision of a State; or any other entity subject to the jurisdiction of the
United States." *Id.* § 1532(13) (emphases added). Defining "person" in this manner
"sweep[s] in private individuals and agencies as well as government entities. A
demand that either public or private actors can satisfy is unlikely to require the use
of sovereign power." *Haaland v. Brackeen*, 599 U.S. 255, 281 (2023). Defendants
have not shown that compliance with the ESA, "which applies to both private and

public parties, demands the use of state sovereign authority." *Id.* at 259. So, if FDEP regulations are inconsistent with the federal ESA, they will be preempted. *See Strahan*, 127 F.3d at 170. Therefore, Defendant's nonsensical anticommandeering argument will be rejected.

### C.    Ongoing Risk of Manatee Takings

At trial, the parties presented evidence to answer the only question remaining after the Court's Summary Judgment Order: Is there an ongoing risk of manatee takings in the North IRL? The answer is clearly "yes."[6]

Under FDEP's regulatory regime, it will take *at least a decade* for the North IRL to even "start seeing recovery."[7] (Pl.'s Ex. 9). This is due to the previously and currently permitted discharge of legacy pollutants via wastewater into the North IRL. These legacy pollutants caused the death of seagrasses—the manatee's natural forage—and the proliferation of harmful macroalgae. Legacy pollutants, as their name suggests, persist in the environment and cause harmful effects long after they have entered the system. As explained by Dr. Peter Ball and Dr. Martine de Wit, the

---

[6] Not only was Plaintiff able to establish by a preponderance of evidence that an ongoing risk exists but it also presented sufficient evidence to establish causation once more. Defendant presented no evidence to the contrary. In fact, the testimony of Defendant's witnesses bolstered Plaintiff's case.

[7] Dr. de Wit, "Florida's manatee veterinarian," testified that she believed the situation in the North IRL was getting better. But she did not have any data or concrete explanation for this belief. Regardless, "better" is a relative term. Out of the fire, into the frying pan.

conditions stemming from the introduction of these legacy pollutants in the North
IRL have caused manatee takings in the past.

Plaintiff asserts that there is an ongoing risk of takings because manatees
suffer an ongoing risk of harm or harassment under these conditions. *See* 16 U.S.C.
§ 1532(19). Under the ESA, "harm" or "harassment" "is only actionable under the
ESA if its impact on an endangered animal is sufficiently serious." *Mia. Seaquarium*,
879 F.3d at 1149. But "harassment" can nevertheless arise from *negligent* acts. 50
C.F.R. § 17.3. As explained more thoroughly below, the effects of legacy pollutants,
particularly causing the absence of seagrasses, have a sufficiently serious impact on
manatees in the North IRL to rise to the level of harm or harassment.

### 1.    *Healthy Manatees Require Seagrasses*

Dr. Ball, a veterinarian who has worked with manatees since 1992, testified
that because of their hindgut fermenters, manatees require a healthy diet of high-
fiber, slow-digesting foods like seagrasses. Dr. de Wit testified that most manatees
on the Atlantic Coast spend some time in the IRL and that seagrass is their preferred
forage. She explained that, generally, manatees require around 70 pounds of seagrass
or freshwater vegetation per day. And Dr. Ball cautioned that if manatees consume
too much macroalgae—which is highly digestible, providing a rush of sugars and
starches—then they will suffer adverse health effects. For example, they can be
afflicted by the growth of clostridium and other toxic bacteria in the gut. In fact, a

study authored in part by Dr. de Wit traced the cause of the 2013 manatee unusual mortality event ("UME") to a lethal clostridial infection. (*See* Pl.'s Ex. 11).

Dr. Ball went on to testify that dietary changes can affect manatee reproduction because pregnancy has high energy demands. And for manatee calves weaning off mother's milk, eating macroalgae complicates the transition to high-fiber food like seagrasses.[8]

It is no wonder then that in recent years, the lack of seagrass and abundance of macroalgae in North IRL affected manatee breeding and reproduction, with almost no live calves begin found from 2020 to 2022. While there was return of manatees observed with calves in 2023 and 2024, 2024 was also marked by a spike in manatee calf mortality. Of these unusual perinatal manatee deaths, the highest concentration was in Brevard County, home of the North IRL, where the previous record for such deaths was set during the last UME in 2013. The Court does not find credible Dr. de Witt's speculation that this could have been caused by a higher percentage of pregnant manatees in the North IRL given the abundance of evidence connecting the lack of seagrass with manatee mortality and breeding problems.

---

[8] Dr. Ball did note that calves are generally more able to eat macroalgae without immediate ill effects because their hindgut fermenters are not yet fully developed. But in the long term, the same problems will occur.

2.    *Macroalgae Growth is Caused by Legacy Pollutants*

Dr. Peter Barile is an environmental scientist who studies the effects of macroalgae on water systems, including the North IRL. He testified that the presence of macroalgae is an indicator of the presence of legacy pollutants—here, nutrients such as nitrogen, phosphorus, and carbon. (*See also* Pl's Ex. 4 at 2 ("For effective restoration, resource managers must reduce [nitrogen]-loading to the IRL to diminish [harmful algal blooms] and increase light availability.")). During the wet season, he explained that there is significant mobilization of human wastewater, containing those nutrients, from OSTDS (septic tanks) and wastewater treatment plants that support algal blooms throughout the IRL. (*See also* Pl.'s Ex. 5 at 2 ("linking [harmful algal] blooms to the influence of human waste")).

Dr. Barile has reviewed FDEP documents on how nutrient loads affect seagrasses and participated in Basin Management Action Plan ("BMAP") meetings. He explained how nutrient enrichment leads to a reduction of light and how that translates into seagrass loss and the replacement of seagrasses by macroalgae like *Caulerpa prolifera*. Dr. Barile expects *Caulerpa prolifera* to be dominant in the IRL going forward. Because macroalgae can access nutrients better than seagrasses, he explained they can therefore outcompete seagrasses for nitrogen. He compared the threat of macroalgae to seagrasses—even at low nutrient levels—to the threat of an invasive species. (*See id.* ("Macroalgae are often the first responders to increased

nutrient availability . . . .")). Dr. Barile testified that seagrasses are down to 1% coverage from their 1943 baseline. (*See also* Pl.'s Ex. 9 at 1). This has been facilitated by nutrient pollution from human waste that also promotes macroalgae growth, making the state of the North IRL exceedingly hard to reverse.

Dr. de Wit appeared to disagree with Dr. Barile, claiming that seagrass in the IRL was returning in a positive trend and was enough to support the manatees. But her testimony in this regard was self-contradictory. For example, she acknowledged that the seagrass was not at the historic levels of 20 or 30 years ago. That level too was a far cry from the IRL's baseline. (*See also* Pl.'s Ex. 3 at 6). And her testimony at trial was in stark disagreement with her former statement that there remains a seagrass shortage in the IRL, which she acknowledged. Additionally, Dr. de Wit had no information about whether manatees were still malnourished, and state experts at St John's River Water Management District have provided information publicly that indicates Dr. de Wit's testimony is incorrect. (*See, e.g.*, Pl.'s Ex. 9 at 1 ("it could take 12–17 years to start seeing recovery")). Moreover, Dr. Barile credibly testified that even if all nutrients ceased to enter the IRL, seagrasses would only return after at least a decade because of the sheer level of legacy nutrients present in the lagoon. In his opinion, extensive nutrient loading and pollution in the North IRL is continuing to result in significant habitat modification and/or reduction that would harm manatees by destroying seagrasses—their primary food source. *See* 50 C.F.R.

§ 17.3 (defining harm to "include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, *feeding* or sheltering" (emphasis added)). Considering the overwhelming evidence presented by Plaintiff to the contrary, the Court does not find Dr. de Wit's testimony credible that seagrasses have recovered to a level that could sustain the manatee population.

What all this means is that FDEP would have to reduce nutrients entering the IRL to a low enough level and for a long enough time for nutrients to cycle out of the system to allow seagrasses to return at significant levels. Conversely, if FDEP does not reduce nutrient levels, there will continue be harmful algal blooms and, in turn, no seagrass recovery and more manatee takings.

### 3.    *FDEP's Remediation Efforts in the North IRL*

FDEP administers the total maximum daily load ("TMDL") program for waters like the North IRL that are considered impaired under the Clean Water Act. As required by the Clean Water Act, the TMDLs have been approved by the United States Environmental Protection Agency ("EPA"). And the BMAP works to reduce nitrogen and phosphorus concentration in the North IRL to meet the state's TMDL goals. FDEP is also updating the BMAP to comply with statutory amendments from the 2020 legislative session. However, nowhere does the BMAP address manatee mortality.

The thrust of Defendant's argument at trial continued to be that FDEP's compliance with the Clean Water Act absolved it from compliance with the ESA. Defendant's witness Nathan Hess provided testimony as to FDEP's enforcement of regulations to ensure compliance with the Clean Water Act. Defendant's argument here is plainly incorrect. For example, returning to Justice O'Connor's hypothetical from her *Sweet Home* concurrence, the landowner draining his own pond and harming the endangered fish within is in violation of no law other than the ESA. Whether Defendant was unable to understand the ESA's legal framework despite the Court's explanation in its Summary Judgment Order, (Doc. 134 at 12–13), or deliberately attempted to obfuscate the law for Court is a distinction without a difference. The argument must be rejected.

Defendant's witnesses Kent Weaver, Moira Homann, and Kimberly Duffek detailed the efforts that FDEP was undertaking to comply with the Clean Water Act through the BMAP and its forthcoming update. (*See also* Pl.'s Ex. 6; Def.'s Ex. Nos. 7, 9, 14). However, Mr. Weaver also agreed that remediation efforts would take between 12 and 17 years as estimated by the St. Johns River Water Management District. These efforts, perhaps not so much admirable as legally required, are imperative to reverse the damage done to the North IRL. Compliance with the Clean Water Act, however, is just one piece of the regulatory puzzle the state must solve. FDEP also "has the choice of either regulating in this area according to federal ESA

standards or having its regulations preempted by the federal ESA provisions and
regulations." *Strahan*, 127 F.3d at 170.

Near the end of trial, the Court took judicial notice[9] of the existence of a letter
that purportedly declared the end of the current UME. Dr. de Wit also testified that
the UME was in the process of being closed and the last necropsy that showed
manatee emaciation occurred two years ago. (*See* Def.'s Ex. 24). Defendant believed
this letter was a proverbial smoking gun establishing that manatee takings were no
longer occurring. But even assuming the UME has ended, that would not move the
needle in FDEP's favor. The existence of a UME proximately caused by a defendant
is likely sufficient to establish a taking under the ESA. However, absence thereof is
insufficient to show that *no* taking is occurring. Consider once again the landowner
who drains a pond on his property taking the endangered fish inside it. No UME has
occurred. Yet he has still violated the ESA. Furthermore, "[a]*ny taking and every
taking*—even of a single individual of the protected species—is prohibited by the
Act." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 896 F. Supp. 1170, 1180
(M.D. Fla. 1995).

---

[9] "Federal Rule of Evidence 201 permits a court to 'judicially notice a fact that is not subject
to reasonable dispute because it . . . can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned.'" *Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 651
(11th Cir. 2020) (quoting Fed. R. Evid. 201(b)(2)).

This is the quintessential case in which an ITP should be required. As Defendant's witnesses testified, FDEP is taking important, necessary steps to remediate the polluted waters of the IRL. But that is not enough. The North IRL is in such a deteriorated state that the required remediation will take many years, as the state itself has acknowledged. And during that remediation, wastewater discharged pursuant to FDEP's regulations will continue to indirectly take manatees in the North IRL. *See Sweet Home*, 515 U.S. 687, 700–01 (majority opinion) ("No one could seriously request an 'incidental' take permit to avert § 9 liability for direct, deliberate action against a member of an endangered or threatened species . . . ."). There is a definitive causal link between FDEP's wastewater regulations and an ongoing risk of manatee takings. While FDEP's efforts continue, added protection for the manatees is needed. FDEP must obtain an ITP.

### III. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff is entitled to injunctive relief requiring Defendant apply for an incidental take permit.

2. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant, declaring that Defendant is in violation of the Endangered Species Act.

3. **On or before April 25, 2025**, Plaintiff is directed to file a proposed

injunction detailing the relief it seeks.

**DONE** and **ORDERED** in Orlando, Florida on April 11, 2025.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record