1              **UNITED STATES DISTRICT COURT**
                **MIDDLE DISTRICT OF FLORIDA**
2                 **ORLANDO DIVISION**

3                                      :

**BEAR WARRIORS UNITED, INC., A** :
4  **FLORIDA NOT FOR PROFIT**      :
**CORPORATION,**              :
5                                    :

     **Plaintiff,**           :
6                          :   Case No.:
                          :   6:22-cv-2048-CEM-LHP
7  **v.**                          :
                          :   Orlando, Florida
8                          :   March 17, 2025
                          :   8:32 a.m.
9  **ALEXIS A. LAMBERT, IN HER**    :
**OFFICIAL CAPACITY AS SECRETARY**:
10  **OF THE FLORIDA DEPARTMENT OF**  :
**ENVIRONMENTAL PROTECTION,**    :
11                                  :
     **Defendant.**           :
12                                  :

13           **TRANSCRIPT OF BENCH TRIAL, VOLUME 1**
       **BEFORE THE HONORABLE CARLOS E. MENDOZA**
14          **UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21

22  Proceedings recorded by real-time mechanical stenography.
     Transcript produced by computer-aided transcription.

23                 Reported by:
       Suzanne L. Trimble, RPR, WACCR, CRR
24          U.S. Official Court Reporter
     (407) 900-8775 | trimblecourtreporter@outlook.com
25  401 West Central Boulevard, Suite 4600, Orlando, Florida 32801

1

2

3                                    A P P E A R A N C E S

4      For the Plaintiff:              Lesley G. Blackner
                                       Blackner, Stone & Associates
5                                      340 Royal Poinciana Way
                                       Suite 317-377
6                                      Palm Beach, FL 33480

7                                      Jessica L. Blome
                                       Greenfire Law, PC
8                                      2478 Adeline Street
                                       Suite A
9                                      Berkeley, CA 94703

10

       For the Defendant:             Jeffrey Brown
11                                     Kelley F. Corbari
                                       Office of General Counsel
12                                     Florida Department of
                                       Environmental Protection
13                                     3900 Commonwealth Blvd.
                                       MS 35
14                                     Tallahassee, FL 32399-3000

15

16

17

18

19

20

21

22

23

24

25

1

2                          T A B L E   O F   C O N T E N T S

3    PROCEEDINGS                                               PAGE

4                              March 17, 2025

5    TESTIMONY

6    CALLED BY PLAINTIFF

7    RAY BALL
          Direct Examination By Ms. Blome ....................14
8         Voir Dire Examination By Mr. Brown ................18
          Continuing Direct Examination By Ms. Blome .........19
9         Cross-Examination By Mr. Brown ....................39
          Redirect Examination By Ms. Blome .................41
10   MARTINE DE WIT
          Direct Examination By Ms. Blome ...................45
11        Cross-Examination By Mr. Brown ....................85
          Redirect Examination By Ms. Blome ................102
12        Recross-Examination By Mr. Brown .................115
     PETER BARILE
13        Direct Examination By Ms. Blackner ...............116
          Cross-Examination By Mr. Brown ...................216

14

15   OTHER

16   PLAINTIFF OPENING STATEMENT                          7

17   DEFENSE OPENING STATEMENT                            11

18   PLAINTIFF RESTS                                     225

19   COLLOQUY RE: JUDGMENT AS A MATTER OF LAW            225

20

21

22

23

24

25

1

2                                        E X H I B I T S

3        NO.                           MARKED/ADMITTED              PAGE

4    Plaintiff's Exhibits

5    No. 1                             admitted ............117
     No. 2                             admitted ............145
6    No. 3                             admitted ............146
     No. 4                             admitted ............153
7    No. 5                             admitted ............157
     No. 6                             admitted ............138
8    No. 7                             admitted ............162
     No. 8                             admitted ............139
9    No. 9                             admitted ............172
     No. 11                            admitted ............67
10   No. 13                            admitted ............53
     No. 14                            admitted ............59
11   No. 17                            admitted ............73
     No. 18                            admitted ............77
12   No. 19                            admitted ............90
     No. 20                            admitted ............189
13   No. 21                            admitted ............17
     No. 24                            admitted ............156
14   No. 27                            admitted ............126

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          **THE COURTROOM DEPUTY:**  Bear Warriors United v. Alexis

3    Lambert, Case No. 6:22-cv-2048.

4          Counsel, please state your appearances for the record,

5    starting with the plaintiff.

6          **MS. BLACKNER:**  Good morning, Your Honor.  Lesley

7    Blackner for plaintiff.

8          **MS. BLOME:**  And Jessica Blome for plaintiff.

9          **THE COURT:**  Good morning.

10          **MR. BROWN:**  Jeffrey Brown for the defendant.

11          **MS. CORBARI:**  Kelley Corbari for the defendant.

12          **THE COURT:**  All right.  Good morning, everyone.

13    Please be seated.  I understand this is a bench trial, but,

14    typically, when I bring a venire in, I read to them what's

15    called a "statement of the case," to give them an idea of what

16    this is about.  And I think I've been pretty liberal in

17    allowing arguments to veer off into whatever direction counsel

18    wanted them to.

19          But we're here for one specific issue, so what I'm

20    going to do to frame the issue this morning is read you a

21    portion of my order on summary judgment, which is document 134,

22    and these are excerpts from page 16 to 17, which will frame

23    what it is we're here to do during this bench trial.

24          "There must be an ongoing violation of federal law for

25    the Court to be able to grant the relief requested, and

1    defendant disputes that there is ongoing harm or taking of

2    manatees.  Defendant has offered evidence that over the last

3    year manatee mortality in the Indian River Lagoon was at or

4    below baseline conditions.  There were also less than a handful

5    of instances of emaciation among deceased manatees as of Dr. de

6    Wit's deposition.  Dr. de Wit further noted that the unusual

7    mortality events is only ongoing because we are in the process

8    of applying for the closure.

9           "Plaintiff argues that the decrease in manatee deaths

10   is a red herring because Dr. de Wit was unable to answer the

11   question of whether the population decline from the UME could

12   have been caused by the reduced number of manatee deaths [sic].

13   There remains a dispute over this material fact."

14          So, again, I don't know whether or not -- and this is

15   a material fact that continues to be in dispute -- whether or

16   not there's ongoing harm or taking of manatees, and that's what

17   both of you are going to be provided an opportunity to prove or

18   disprove during the course of this bench trial.

19          So starting with this:  Does plaintiff request to make

20   an opening statement?

21          **MS. BLACKNER:**  Yes, Your Honor.

22          **THE COURT:**  How much time would you require for your

23   opening statement?

24          **MS. BLOME:**  Less than 10 minutes.

25          **THE COURT:**  Local rules require that you stand when

1        addressing the Court, and we'll adhere to formality here.

2                So 10 minutes, will that suffice for the defense?

3            **MR. BROWN:**  Yes, Your Honor.

4            **THE COURT:**  All right.  And I will time.  I'll give

5        you a two-minute warning.  The floor is yours.  I would invite

6        you to begin your opening statement.  I won't start the clock

7        until you begin addressing the Court.

8            **MS. BLOME:**  Your Honor, may I approach?

9            **THE COURT:**  Sure.

10           **MS. BLOME:**  May it please the Court.

11               As Your Honor just very succinctly described, the only

12       remaining factual issue in dispute today is whether there is an

13       ongoing risk of manatee takings under FDEP's current regulatory

14       regime.  Plaintiffs will prove that the manatee takings are

15       going to occur in the near, short-term, and long-term future

16       under FDEP's regulatory regime, because FDEP's plans, including

17       the North Indian River Lagoon Basin Management Action Plan are

18       insufficient to protect manatees from harm and harassment in

19       the significantly degraded North Indian River Lagoon.

20               "Take" is defined in the ESA to mean harass, harm, and

21       a variety of other things, but today we'll be focusing on

22       harassment and harm.

23               The definitions of "harm" and "harassment" are

24       instructive and very important in the federal regulations.

25       "Harm" is an act which actually kills -- not intentionally,

1    sorry -- actually kills or injures wildlife.  That may include

2    significant habitat modification or degradation where it

3    actually kills or injures wildlife by significantly impairing

4    essential behavioral patterns, including breeding, feeding, or

5    sheltering.

6           Now, the Court has recognized that harm has occurred

7    in the past due to significant habitat modification or

8    degradation that caused the emaciation of several manatees

9    during the UME event in the North Indian River Lagoon.  Indeed,

10   the Court has already decided the FDEP is responsible for the

11   degradation of the North Indian River Lagoon, the North Indian

12   River Lagoon is important habitat to manatees, and that manatee

13   injury and death have occurred because of the degradation of

14   the lagoon.

15          Plaintiff will show that nothing FDEP has done or is

16   planning to do will change this.  Until FDEP takes

17   responsibility for its actions and develops a habitat

18   management plan, as required by the Endangered Species Act for

19   threatened Atlantic Coast Florida manatees who call the lagoon

20   home, take by harm will continue.

21          Now, the definition of "harass" is also important.

22   "Harass" and the definition of "take" means an intentional or

23   negligent -- so no one has to intend the harm -- act or

24   omission that creates the likelihood of injury to wildlife by

25   annoying it to such an extent that it significantly disrupts

1    normal behavioral patterns, including, but not limited to,

2    breeding, feeding, or sheltering.  This relatively expansive

3    definition of harassment is also important to keep in mind

4    during testimony today.

5          Harassment occurs when a threatened species, like the

6    Florida manatee, is likely going to be annoyed to such an

7    extent that its normal behavioral patterns are disrupted.

8    Plaintiff will demonstrate that FDEP's regulatory regime will

9    continue to disrupt Florida manatees' natural feeding and

10   breeding behaviors and will continue to do so until its

11   degraded habitat is restored.

12         Plaintiff's experts are Dr. Ray Ball, a respected

13   zoologist and veterinarian; and Peter Barile, a renowned expert

14   in Florida marine ecosystems, including the Indian River

15   Lagoon.  Plaintiff will also call Florida Fish and Wildlife

16   Conservation Commission manatee veterinarian, Dr. Martine de

17   Wit.

18         These witnesses will explain that the North Indian

19   River Lagoon is not going to recover anytime soon, that

20   malnourishment in manatees is disruptive to the manatees'

21   natural behaviors, as it can lead to emaciation, which may

22   cause starvation or even death.  Malnourishment alone

23   significantly alters a manatee's feeding and breeding behaviors

24   because it disrupts their efforts to meet daily energy demands.

25   Indeed, manatees must individually consume 700 pounds of

1    nutritionally appropriate vegetation every day to be healthy.

2    Nobody believes the manatees in the North Indian River Lagoon

3    can locate and consume that level of appropriately nutritional

4    vegetation right now or any time in the future.

5         Plaintiff asks the Court to issue an injunction

6    requiring FDEP to obtain an incidental take permit from the

7    U.S. Fish and Wildlife Service so that its sewage regulatory

8    regime is compliant with the Endangered Species Act.  As part

9    of that permitting process, FDEP will be required to work with

10   experts and stakeholders to develop a habitat management plan

11   for the North I.R.L., geared toward manatee recovery and

12   rehabilitation, including seagrass restoration.

13        This process could take many months, so plaintiffs

14   also ask the Court to enter an injunction requiring FDEP to

15   undertake an appropriate supplemental feeding program for

16   manatees in the North I.R.L. and medial monitoring while FDEP's

17   application for that permit is in progress.

18        This is an important case.  The Court will hear

19   testimony this week that manatees have been suffering in the

20   North I.R.L. for at least 10 years in violation of the

21   Endangered Species Act.  Take is likely to continue absent

22   injunctive relief.  There's no sign that it will change.

23        The FDEP has demonstrated that it will not do more,

24   unless the Court intervenes.  In fact, its vigorous defense of

25   the case argues the FDEP is exempt from all these laws.

1          The Court must intervene.  Thank you.

2     **THE COURT:**  Thank you.

3          Is the defense prepared to make an opening statement?

4     **MR. BROWN:**  Yes, Your Honor.

5     **THE COURT:**  All right.  Feel free to proceed.

6     **MR. BROWN:**  Good morning, Your Honor.

7     **THE COURT:**  Good morning.

8     **MR. BROWN:**  To begin, I would respectfully submit that
9     the issues are framed not only by the Court's order but by what
10    the plaintiffs have actually pled.  In the second amended
11    complaint, the plaintiffs have pled a theory that the chain of
12    causation has led to deaths of manatees.  There's no allegation
13    regarding changes in behavior or breeding pattern in the second
14    amended complaint.  We respectfully submit that that should not
15    be considered as part of the case.

16         But to proceed on to the issue described by the Court,
17    the issue, as framed, is whether the plaintiffs can demonstrate
18    an ongoing violation of the Endangered Species Act.  The Court
19    has concluded in its previous order on the motion for summary
20    judgment that the department has violated the Endangered
21    Species Act in the past by failing to control or restrain the
22    conduct of third parties.

23         For whatever inferences that can be drawn from the
24    past, I would ask the Court to consider two things.  First, to
25    the extent that the department's policies can be described as a

 1    regulatory regime, the State of Florida has a different

 2    regulatory regime.  I would point the Court's attention to

 3    Section 373.469 of the Florida statutes, which requires certain

 4    deadlines and certain improvements in pollution control in the

 5    Indian River Lagoon.

 6         First, under section (3)(d)(1) of that statute

 7    beginning January 1st, 2024, the installation of onsite

 8    treatment and disposal systems are prohibited where a publicly

 9    owned or licensed or an investor-owned sewer system is

10    available.  And, second, when such a system is not available,

11    only enhanced-nutrient-reduction systems are allowed to be

12    installed, which will require a 65 percent reduction in the

13    discharge of nutrients.

14         In addition, in the same statute, Florida has enacted

15    a deadline effective July 1st, 2030, where onsite treatment

16    systems must either be retrofitted to an enhanced-nutrient

17    system or to be hooked up to a public system.

18         Finally, under section 403.861 of the Florida

19    statutes, any disposal facilities discharging in the Indian

20    River Lagoon will be required to install advanced-wastewater

21    systems, as defined by statute, which is characterized by low

22    concentration of nitrogen.

23         And, finally, we respectfully submit, based upon

24    discovery and disclosures, the plaintiffs cannot prove ongoing

25    instances of deaths of manatees now or in the future.

1           That concludes my opening statement.

2           **THE COURT:**  All right.  Thank you, Mr. Brown.

3           I would invite the plaintiff to call their first

4    witness.

5           Before we begin that process, I neglected to ask both

6    of you, do either of you wish to invoke the rule of

7    sequestration?  I don't know who your witnesses are, but they

8    could be in the courtroom at this time.

9           Will the plaintiff be invoking the rule?

10          **MS. BLOME:**  No, Your Honor.

11          **THE COURT:**  Will the defense?

12          **MR. BROWN:**  No, Your Honor.

13          **THE COURT:**  All right.  That's fine.  I would invite

14    the plaintiff to call their first witness.

15          **MS. BLOME:**  Plaintiff calls Dr. Ray Ball.

16          **THE COURTROOM DEPUTY:**  Dr. Ball, if you would please

17    come forward to be sworn.  Please raise your right hand.

18       (RAY BALL, witness sworn.)

19          **THE WITNESS:**  Yes, ma'am.

20          **THE COURTROOM DEPUTY:**  Please have a seat in the

21    witness box.

22          **THE COURT:**  All right.  Good morning, Dr. Ball.

23    Please feel free to be seated in the witness chair.  Once

24    seated, please make yourself comfortable with the chair's

25    proximity to the microphone, and then please state your full

*RAY BALL | DIRECT*                                                    14

1    name in the microphone, spelling your last name.

2                **THE WITNESS:**  Ray L. Ball, B-a-l-l.

3                **THE COURT:**  Your witness, counsel.

4                **MS. BLOME:**  Thank you, Your Honor.

5                        **DIRECT EXAMINATION**

6    **BY MS. BLOME:**

7    **Q.**  Dr. Ball, where do you work?

8    **A.**  Currently I'm employed as a visiting professor of biology

9    and animal studies at Eckerd College in St. Pete, and I also

10   have a position as an associate veterinarian at Dade City

11   Animal Clinic in Dade City.

12   **Q.**  And for how long have you had those positions?

13   **A.**  I've been at Eckerd for five years full time, a few years

14   before that as an adjunct, and three years at the Dade City

15   clinic.

16   **Q.**  Will you please briefly describe your experience working

17   with manatees?

18   **A.**  My first experience actually started right out of school.

19   In 1992, I was hired as an associate veterinarian at Midway

20   Animal Hospital in Homosassa, and part of our responsibility

21   was to take care of the animals in the Homosassa Springs State

22   Wildlife Park.  That's Florida animals, manatees included, and

23   a hippo.  I was involved with -- predominantly, just, we had

24   mostly captive manatees, long-term captive manatees there.

25   There would be a few animals that would trickle our way for

*RAY BALL | DIRECT*                                                    15

1    long-term convalescent care.

2         My boss at the time, Mark Lowe -- a great mentor -- he got

3    me involved in some rescues in the area.  We had a couple of

4    deaths of some offspring, and so I got my first taste of

5    manatee necropsies.

6         From there, internship residency, came back to Florida, was

7    at Busch Gardens.  I didn't have as much direct experience, but

8    I was still involved with Dr. Lowe at Homosassa, was involved

9    with Lowry Park Zoo at the time, occasionally some casework

10   there.

11        Busch Gardens at the time was associated -- had a sister

12   park, SeaWorld.  So the veterinarian team would get together

13   weekly, and we'd have calls, so there was always some manatees

14   in there.  And then on a pretty regular basis, the whole

15   veterinarian team would be invited over to see and work on some

16   manatees there.  So it kind of trickled there for a while.

17        And then in 2010, when I went to Lowry Park Zoo, yeah, I

18   was in deep into manatees as that's, you know, one of the, you

19   know, the few federally accredited rehab facilities for

20   manatees.

21   **Q.**  Oh, I didn't realize that.

22        And what's your educational background?

23   **A.**  I graduated from vet school, University of Florida, in

24   1992.  Then, after a year of practice, I went back for an

25   internship at Columbia, South Carolina.  And then did my

*RAY BALL | DIRECT*                                                          16

1    residency in zoo and wildlife medicine at Kansas State

2    University.

3    **Q.**  And do you have any degrees, certificates, or licenses in

4    this type of work?

5    **A.**  I have a residency certificate in zoo and wildlife medicine

6    from Kansas State.  I am a licensed accredited veterinarian.  I

7    have a license to practice in Florida and Georgia.

8    **Q.**  And have you received any awards or other professional

9    recognition for your work?

10   **A.**  Years, years ago in, I think it was, 2001 I actually

11   received an award for introducing a novel analgesic in large

12   cat medicine, something that hadn't been used in the U.S. much,

13   and this is before we had the currently available nonsteroidals

14   that we do now.

15       Then, in 2010 I, actually, won a certificate at an

16   international conference in India regarding elephant health

17   related to Vitamin D and tuberculosis.

18   **Q.**  And have you published any articles in the field of zoology

19   or veterinary medicine?

20   **A.**  I've got what I think is a substantial amount.  Probably

21   the bulk of those are probably manatee health and rhinos,

22   elephants, a lot of giraffe work, a few primates here and

23   there, a smattering of other animals.

24   **Q.**  I'm going to show you what's marked as Exhibit 21 in the

25   binder there in front of you that is marked "Plaintiff's

*RAY BALL | DIRECT*                                                                17

1    Exhibits."  If you would turn to tab 21.

2         And, Dr. Ball, do you recognize this document?

3    **A.**  This appears to be my curriculum vitae.

4    **Q.**  Yes.  And is this an up-to-date version of your C.V.?

5    **A.**  Yeah.  It does look to be so, yes.

6    **Q.**  It appears to be a true and accurate copy of your C.V.?

7    **A.**  Yes, ma'am.

8              **MS. BLOME:**  We would move to admit 21, Dr. Ball's

9    curriculum vitae.

10             **THE COURT:**  Any objection?

11             **MR. BROWN:**  No, Your Honor.

12             **THE COURT:**  Without objection, what's been previously

13   marked as Plaintiff's Exhibit 21 will be admitted and marked.

14   Feel free to proceed.

15        (Plaintiff's Exhibit No. 21 was admitted into evidence.)

16   **BY MS. BLOME:**

17   **Q.**  Dr. Ball, before we move on to a more in-depth discussion

18   of your history with manatees, I would like to, sort of, get an

19   understanding, a shared understanding, of a couple of terms.

20        Are you familiar with the term of "harm" under the

21   Endangered Species Act?

22   **A.**  In vague terms.

23   **Q.**  I'm going to read the definition to you.

24             **THE COURT:**  Just to make sure our record is complete,

25   are you moving to have this witness recognized as an expert in

*RAY BALL | DIRECT*                                                    18

1   this area?

2            **MS. BLOME:**  Yes, Your Honor.

3            **THE COURT:**  Is there any objection from the defense?

4            **MR. BROWN:**  May I voir dire briefly, Your Honor?

5            **THE COURT:**  Yes.

6                      **VOIR DIRE EXAMINATION**

7   BY MR. BROWN:

8   **Q.**  Dr. Ball, do you presently hold a license to treat injured

9   or sick manatees?

10  **A.**  I'm a licensed veterinarian in the state of Florida, so,

11  yes.

12  **Q.**  Has that license ever been suspended?

13  **A.**  No, sir.

14  **Q.**  Were you formally employed by ZooTampa?

15  **A.**  I was.

16  **Q.**  And did that zoo terminate your employment?

17  **A.**  No.  I left.

18  **Q.**  Okay.  What were the circumstances of your departure?

19  **A.**  Quite frankly, kind of, growing weary of the zoo world.

20  **Q.**  Okay.  Was there a controversy concerning your care of sick

21  or injured manatees at ZooTampa?

22  **A.**  I guess that depends on who you ask.

23  **Q.**  Okay.  As reported publicly, what were those circumstances?

24  **A.**  If I remember correctly, there was concerns about

25  euthanizing animals without a proper authorization or

*RAY BALL | CONTINUING DIRECT*

1    knowledge.  There was some concerns about feeding manatees hay.

2    I'm not sure about -- honestly, I haven't looked and thought

3    about that in -- it's been five years now.

4            **MR. BROWN:**  No further voir dire, Your Honor.

5            **THE COURT:**  What is your position on the objection?

6            **MR. BROWN:**  Well, we have no objection to the

7    expertise, as standard.

8            **THE COURT:**  All right.  You may elicit opinion

9    testimony from this witness.

10                **CONTINUING DIRECT EXAMINATION**

11    BY MS. BLOME:

12    **Q.**  Dr. Ball, I'm going to read the definition of "harm" so we

13    have the shared understanding on the record.

14       "Harm" is defined as an act which actually kills or injures

15    wildlife.  Such act may include significant habitat

16    modification or degradation where it actually kills or injures

17    wildlife by significantly impairing essential behavioral

18    patterns, including breeding, feeding, or sheltering.

19       Are you familiar with the definition of "harass" in the

20    Endangered Species Act?

21    **A.**  Again, in very general terms.

22    **Q.**  I'll read that into the record for you as well.

23       The definition of "harass" for the Endangered Species Act

24    means an intentional or negligent act or omission which creates

25    the likelihood of injury to wildlife by annoying it to such an

*RAY BALL | CONTINUING DIRECT*                                    20

1    extent as to significantly disrupt normal behavioral patterns,

2    which include, but are not limited to, breeding, feeding, and

3    sheltering.

4        Now that we understand what we're discussing, I want to

5    think about your employment history in a little bit more

6    detail.

7    **A.**  Okay.

8    **Q.**  So when you were at Homosassa Springs State Wildlife Park,

9    did you get any experience with the feeding or diet of

10   manatees?

11   **A.**  You know, my experience there was pretty comprehensive,

12   especially for a young veterinarian.  I was under the

13   mentorship of Mark Lowe, who had been the manatee veterinarian

14   there for years.  We had regular visits and consultations from

15   Greg Bossart, a very well-renowned marine mammal veterinarian,

16   quite an influence in manatee pathology -- or pathology in

17   general, manatee health.

18       In addition to, you know, the daily care like that, we were

19   closely involved with the staff at Lowry Park Zoo, so, again,

20   we would take some manatees in a convalescent capacity.  We

21   weren't a critical-care facility.  We would help rescue and

22   then maybe even transport critically injured animals to

23   ZooTampa, occasionally to SeaWorld.

24       It was a good introduction.  I learned a lot of the basics

25   there, how to -- the basic care of manatees; you know, the

*RAY BALL | CONTINUING DIRECT*

1    similarities between them and horses; the hindgut fermentation;

2    basic clinical care, how to give a manatee injections, how to

3    get blood samples, how to pass a nasogastric tube, handling

4    basic things like that.

5    **Q.**  Did you have any experience with breeding or reproductive

6    care while you were at the Homosassa state wildlife park?

7    **A.**  No.  As far as I understand, there's still been a

8    moratorium on captive breeding.  It's just simply not allowed.

9    There's a couple of accidents I think I can recall, but there's

10   no organized program for captive propagation.

11   **Q.**  What about at Busch Gardens?  You mentioned you worked at

12   Busch Gardens in Tampa.  Did you have any experience with

13   feeding or diet for manatees there?

14   **A.**  Again, not directly with the manatees.  We had a lot of

15   other big gray things that I took care of, hindgut fermenters,

16   elephants, rhinos, even gorillas, things like this.  I learned

17   a lot of practical and academic methodologies to improve their

18   health and welfare by understanding their digestion and

19   nutrition.  And I think I was able, quite successfully, to

20   relate all that to manatees, when I eventually started working

21   with them full time.

22   **Q.**  And was that at the Lowry Park Zoo, when you started

23   working with them full time?

24   **A.**  It was.

25   **Q.**  Okay.  At Busch Gardens, did you have any, again, any

*RAY BALL | CONTINUING DIRECT*                                                    22

1    experience with breeding or reproductive care?

2    **A.**  No, not firsthand.

3    **Q.**  All right.  At the Lowry Park Zoo, then, will you please

4    describe what it is you learned about feeding and diet you just

5    alluded to?

6    **A.**  We, you know, in that situation dealing with injured

7    animals, they have a high need for energy, so our mainstay was

8    commercially grown produce.  Romaine lettuce was the staple of

9    it.  For a manatee, that's like eating a bag of potato chips.

10   There's a lot of energy in that, and it's quite the opposite of

11   what their natural food is, which is high fiber/low energy.

12   But in a captive care situation, it's ideal.  These animals

13   have wounds and may be even lactating young, if they bring a

14   calf in with them, so they need a readily available,

15   highly-digestible source of energy.

16       That romaine, actually, worked very well, if you keep it to

17   the short period of their recovery.  Beyond that, then it gets

18   to where, okay, now we need to be careful about not putting too

19   much energy into an animal that has a low metabolic rate that's

20   designed to have a seven-to-10-day GI transit that's really

21   designed to pull fiber out of some of the toughest plant

22   material that's probably out there.

23   **Q.**  Did you see any health problems with manatees that were fed

24   that romaine lettuce on a long-term basis?

25   **A.**  You can.  There was really exaggerated -- you know, at

*RAY BALL | CONTINUING DIRECT*

23

1    Lowry Park, we also took care of the manatees at Homosassa,

2    kind of, sort of a homecoming that -- I was involved with that.

3    Obesity is a big problem.  The longer those animals are on a

4    high-energy, very-digestible diet like that, they get to be

5    obese.  We have seen and documented diabetes in some of those

6    longer-held animals.

7        In the short term, it's a very useful tool to get animals

8    to recovery.  In extended periods, there can be some

9    complications, absolutely.

10   **Q.**  You mentioned hindgut fermenters and that your experience

11   is, sort of, grounded in care of hindgut fermenters.  What's

12   that mean?

13   **A.**  For an herbivore, an animal that eats plants, all the

14   energy is mostly in the cell wall.  Okay.  I always -- when I

15   talk about this in class, nutrition class, we always, kind of,

16   use the analogy of a jelly-filled doughnut.  Okay.  It's just a

17   good visual.

18       So the outside, the wall, is where are the cellulose, the

19   hemicellulose.  Those are the indigestible things.  The inside

20   is the gooey stuff.  That's where the sugars and starches are.

21   So to get all that energy out of that cell wall, an animal has

22   to have some part of its GI tract, some part of its gut, that's

23   sort of expanded and can be a fermentation vat and have

24   bacteria, some yeast, different microbes in there.

25       In a rumen in a cow, they do that in their four gut/four

*RAY BALL | CONTINUING DIRECT*

1    stomach.

2        Hindgut fermenters, manatees, gorillas, rhinos,

3    elephants -- it kind of goes on -- rabbits, they do it in their

4    large intestine and colon.  Okay.  And the biology, the

5    nutrition, the physiology, all those things, they run parallel.

6    They really do.  So a horse is our standard model, our

7    reference.  If I'm talking about a gorilla, a tortoise,

8    elephant, rhino, manatee -- they all kind of fit together -- so

9    they take this very tough, fibrous -- indigestible material for

10   you and I and a lot of other animals -- and they break it down,

11   and they can extract the energy that's in that cell wall.

12   **Q.**  So when a hindgut fermenter is consuming lettuce -- or I

13   shouldn't say hindgut fermenter.  Strike that.

14       When a manatee is consuming lettuce, what is happening in

15   their gut that is causing these negative health impacts?

16   **A.**  When you eat lettuce or something that's very digestible

17   like that, you don't have the physical fiber effect and that --

18   for almost every animal, there's that physical fiber effect

19   that really just helps stimulate the gut, keep the gut lining

20   healthy.  Because your gut lining turns over on a regular

21   basis, so it needs that physical stimulation.

22       But in its place, you get high-energy dense food, and that

23   energy comes in the form of soluble carbohydrates, sugars and

24   starch, not really what a hindgut fermenter is really adapted

25   for, and in short terms we can, kind of, push the envelope a

*RAY BALL | CONTINUING DIRECT*

1    little bit, but long-term those things ferment, and they can

2    ferment rapidly, and when that happens, you get -- it's called

3    dysbiosis.  It's, actually, when you change the gut flora.

4    Okay.  You get bacteria that aren't supposed to be there, the

5    bad bugs in your gut.  Clostridium is a big one.  You get a

6    growth, an explosion of that.  That releases toxins.  Those

7    toxins have a deadly effect in animals, and we see that in

8    other animals.

9        I think a good parallel would be when a horse gets into a

10   bag of grain and/or a cow or a ruminant, something like that,

11   and that fermentable material just ferments too fast, and they

12   physically can bloat, but then all that bacteria grows, and you

13   get the toxins as a result.  And that can be fatal in a short

14   amount of time, 48 hours, even.

15   **Q.**  You mention -- or I'm sorry.

16       Are you familiar with the concept of the refeeding

17   syndrome?

18   **A.**  I am.

19   **Q.**  And how so?

20   **A.**  We've seen that, actually, in rhinos, and I've seen it in a

21   couple of captive manatees.

22   **Q.**  Please describe it.

23   **A.**  All right.  It actually happens in people, too.

24       What happens is that you can have an animal that has been

25   in a starvation plane for a while, where they're mobilizing

1    their fat.  So you're extracting energy, basically, from the

2    fat.  Now, all of a sudden, either they're rescued -- and we

3    see this in rescued horses well -- where you switch, and so

4    they're no longer using fat, but they're using a carbohydrate,

5    so sugar or starch that you're feeding to them.  That actually

6    changes the insulin.  Because when you're burning fat, you

7    don't use insulin.  When you get those glucose sources, you're

8    churning out insulin, and that insulin actually changes

9    phosphorus in your blood, and it drops it and drops it quickly,

10   and it drops it enough that terrestrial animals will get weak

11   and pass out.  In the case of a manatee, that results in

12   drowning.

13        We see this in people that have been on intravenous

14   feedings and go to solid food.  You see this -- back in the

15   days of Busch Gardens, we saw some of this in giraffe babies.

16   When we have intravenous feedings and go to solid food, we had

17   to be very cautious about that change.

18   **Q.**  Now, you mention that lettuce is one of the things that can

19   be good in the short-term, but negative in the long-term.  Are

20   there any other types of vegetation that would be bad for

21   manatees to consume?

22   **A.**  Any vegetation that really, kind of, strays from that

23   prototypical high-fiber/low-soluble carbs, sugars and starch,

24   anything that gets away from that, potentially, is going to be

25   detrimental.  Macroalgaes are probably the most common thing I

*RAY BALL | CONTINUING DIRECT*

1    can think of that they would come across in the wild scenario,

2    because manatees are pretty hardy, and they're very adaptable,

3    and they can manage most vascular plants.

4        You'll see them eating Spanish moss at times in small

5    quantities, oak that falls in.  You know, you'll see them

6    grazing on some of the grasses on the sides of the banks and

7    things like that.  We've had success feeding them hay as well,

8    too.

9        But it's these plant materials that don't have a cell wall,

10   and that's one of the big, notable differences between the

11   vascular plants and a macroalgae.  There's no cell wall.  So

12   it's basically just all that gooey stuff that's in the center

13   of that cell.

14   **Q.**  Would you characterize those other plants, including that

15   macroalgae, as nutritionally deficient?

16   **A.**  Yes.  Yeah.

17   **Q.**  What's the manatees preferred forage?

18   **A.**  Predominately, there's a few species of seagrass that they

19   seem to prefer.  It can be local.  I remember in Homosassa

20   there was other species of plants in the river.  Eel grass

21   comes to mind.  I know that they also will eat water hyacinth

22   as well, but the seagrass is probably their preferred natural

23   diet.

24   **Q.**  And would you agree that adequate diet and nutrition are

25   part of a species' natural feeding behaviors?

*RAY BALL | CONTINUING DIRECT*

1          **MR. BROWN:**  Objection, Your Honor.

2          **THE COURT:**  Basis for the objection?

3          **MR. BROWN:**  It deviates from the theory as pled in the

4    second amended complaint.  The theory as pled was related to

5    causing death to manatees, not interruption of feeding or

6    behavioral patterns.

7          **THE COURT:**  What's the response to the objection?

8          **MS. BLOME:**  The interruption of feeding and behavioral

9    pattern is what led to death.

10         **THE COURT:**  Okay.  The objection is overruled.  You

11   can continue.

12   **BY MS. BLOME:**

13   **Q.**  I'll restate the question, Dr. Ball.

14   **A.**  Please.

15   **Q.**  Do you agree that adequate diet and nutrition are part of a

16   species' natural feeding behaviors?

17   **A.**  Absolutely, yeah.

18   **Q.**  And why is that?

19   **A.**  You know, I don't think it's appropriate -- it's actually

20   critical that you have to consider an animal and its

21   environment together.  You can't separate them.  They're not

22   isolated from each other.  That's a very close connection.  And

23   that connection for most animals, that intimate connection, is

24   actually through feeding, and feeding any animal involves the

25   diet and, then, how that animal obtains it and then processes

*RAY BALL | CONTINUING DIRECT*

1    it.  That's sort of the nutrition side.  So diet and nutrition

2    go together.

3        Now, the diet is an intimate reflection of the condition of

4    the environment.  If you have a substandard environment, you're

5    going to have substandard food, nothing appropriate for that

6    animal to assimilate nutrients with.  You should expect health

7    problems there.  For an animal to be properly nourished, it

8    needs to find enough of the right type of diet.  It has to have

9    both of those components.  That's the first step.

10       And, then, it obtains them.  It does all of its processing,

11   its biochemistry, all of those kind of things, and, then, it

12   goes about doing what it does and it's part of its natural

13   history.

14   **Q.**  You did this a little bit, but would you please give us a

15   description of the feeding ecology for the Florida manatees on

16   the Atlantic coast particularly?

17   **A.**  Manatees, you know, they have -- they're very low metabolic

18   organisms, you know, a third of the metabolic rate of an

19   equivalent sized animal.  Their GI tract is designed to extract

20   nutrients where there's not too many nutrients for other

21   animals, and that's that high-fiber diet.  So to accomplish

22   that, they find this diet, and it takes them seven to 10 days

23   to process that.  Okay.  That slow GI time just gives that gut

24   enough time to keep fermenting and extracting those volatile

25   fatty acids, all those other nutrients.

*RAY BALL | CONTINUING DIRECT*                                         30

1          Having said that, you know, manatees are very resilient.

2    They can eat a lot of different vascular plants and do well on

3    them.  But they're designed really specifically for that.  So

4    if the habitat changes, in the case of the Indian River and

5    probably other places, where it's replaced with macroalgaes,

6    very digestible, they're going to get that big load of sugars

7    and starches, which are going to lead to the fermentation.

8    It's going to lead to, you know, clostridium toxic growth,

9    bloating, things like that.  Or if that high-fiber resource is

10   gone, then they don't have enough food to begin with.

11   **Q.**   Is malnutrition likely to cause injury to manatees?

12          **MR. BROWN:**  Objection, Your Honor, for the same

13   reason, that the theory as pled was causing death, and we also

14   respectfully submit that this question calls for testimony

15   beyond the expert disclosure and the matters described in his

16   deposition.

17             **THE COURT:**  Would you like to respond to that?

18          **MS. BLOME:**  Well, Your Honor, the theory of the case

19   is that malnutrition and starvation caused death and injury to

20   the animals.  We alleged both harm and harassment.

21             **THE COURT:**  All right.  So I just want to make sure I

22   understand.  He is a graduate from veterinary school from the

23   University of Florida and has a master's degree in wildlife

24   medicine from Kansas State and has worked with manatees since

25   1992 and has been given permission to elicit opinion testimony.

*RAY BALL | CONTINUING DIRECT*

1    And the question is, "Is malnutrition likely to cause injury to

2    manatees?"  And your position is this is outside the scope of

3    his expertise, or, B, this is outside the scope of his expert

4    report.  Is that correct?

5              **MR. BROWN:**  That's correct, Your Honor.

6              **THE COURT:**  All right.  That is an emphatic overrule.

7              **MR. BROWN:**  Thank you, Your Honor.

8              **THE COURT:**  Please continue.

9    **BY MS. BLOME:**

10   **Q.**   Is malnutrition likely to cause injury to manatees?

11   **A.**   Of course.

12   **Q.**   And how so?

13   **A.**   Well, if you look at malnutrition as either not enough food

14   or the wrong kind of food.  So if you don't have enough food,

15   even if, you know, animals are seeking normal food, you're

16   going to end up with the chronic wasting, the starvation,

17   emaciation, those kind of things.  That's detrimental, one, for

18   life.  You don't have energy for immune function.  You

19   certainly won't have enough for reproduction.  If you have only

20   access to foods that you're not adapted to, then you get into

21   the realm of things we were just talking about, very soluble

22   carbohydrates causing clostridium overgrowth, toxins, and

23   death.

24   **Q.**   Would you consider malnutrition to be a chronic condition?

25   **A.**   It can be, yes.

*RAY BALL | CONTINUING DIRECT*

1    **Q.**  How is that?

2    **A.**  That would, actually, fall into the first, sort of,

3    category.  If there is not enough appropriate food or if that

4    food source is and slowly, slowly, slowly being diminished,

5    then that becomes more of a chronic thing, and it could be very

6    subtle.  You might not see it until, all of a sudden, you look

7    at a population and you see all of these manatees are

8    under-conditioned.

9    **Q.**  You've sort of danced around this, but is macroalgae an

10   appropriate food for manatees?

11   **A.**  No, not in the long term, absolutely not.  Can they

12   survive?  Just a very short period.

13   **Q.**  Based on your knowledge, skills, and experience, would you

14   say that manatees experience an interference with their natural

15   feeding behaviors if they eat a diet of macroalgae in the wild?

16        **MR. BROWN:**  Your Honor, respectfully for the record, I

17   would assert the same objection.

18        **THE COURT:**  Sure.  Would you like to respond to the

19   objection?

20        **MS. BLOME:**  Same response as before, Your Honor.

21        **THE COURT:**  I'm going to overrule, but just to give

22   you an idea, because we're in a bench trial, typically I would

23   excuse the injury and allow proffer, if anything was

24   borderline.  I would invite you in your closing arguments to

25   argue to the Court what matters should or should not be

*RAY BALL | CONTINUING DIRECT*

1    considered.  I'm going to overrule the objection, but you're

2    welcome to renew it on your closing argument if you think I

3    should tailor a decision not including information that you

4    believe was inappropriately elicited from witnesses.

5            So it will be overruled for now, but we can take that

6    up later if you wish to do so.

7            Feel free to proceed.

8    **BY MS. BLOME:**

9    **Q.**  Do you remember the question?

10   **A.**  No.

11   **Q.**  Okay.  Based on your knowledge, skills, and experience,

12   would you say manatees experience interference with their

13   natural feeding behaviors if they eat macroalgae in the wild?

14   **A.**  Of course.  The first concern is, are they going to

15   survive, you know, eating it because of the potential explosive

16   nature of consuming this food.  Again, clostridium is a very

17   serious, dangerous side effect, aftereffect of any hindgut

18   animal that gets exposed to these kind of things.

19   **Q.**  And in your opinion, would manatees suffer injury from

20   malnutrition if they continued to eat macroalgae into the

21   future?

22   **A.**  Yes.

23           **MR. BROWN:**  Your Honor, respectfully for the record,

24   may I be deemed to have a standing objection to this line of

25   questions?

*RAY BALL | CONTINUING DIRECT*

1       **THE COURT:**  Certainly.  And that preserves your issue

2   on the record.

3       So the objection is ongoing.  It's overruled, but it

4   is preserved for the record.

5       Feel free to proceed.

6       **MR. BROWN:**  Thank you, Your Honor.

7   **BY MS. BLOME:**

8   **Q.**  In your opinion, will manatees continue to suffer from

9   malnutrition if their primary food source in the future is

10  macroalgae?

11  **A.**  Absolutely.

12  **Q.**  Based on your knowledge, skills, and experience, do

13  manatees experience interference with their natural feeding

14  behaviors if they eat vegetation other than seagrass as their

15  primary source of food in the wild?

16  **A.**  There are other things that they can survive on and do well

17  on.  The water hyacinth, I believe, is a diet that manatees can

18  do well on.  There's eel grass.  There's other vegetation, so

19  it's not exclusively seagrass, but, again, I think that's very

20  location dependent.  And I don't know if I would be the best to

21  qualify that statement.  But there are -- manatees are known to

22  eat a lot of different things.

23  **Q.**  Understood.  Dr. Ball, based on your experience, do you

24  agree that reproduction and lactation are what the Endangered

25  Species Act is referring to when they talk about natural

*RAY BALL | CONTINUING DIRECT*

1    breeding behaviors?

2         **MR. BROWN:**  Objection, Your Honor, beyond the scope of

3    the witness's expertise.

4         **THE COURT:**  Okay.  That's a different objection.  The

5    previous ones were that it was outside the scope of what's been

6    alleged in document 59.

7         What is your response to this objection, that it's

8    outside the scope of his expertise?

9         **MS. BLOME:**  In his expert report he does talk about

10   overbreeding syndrome and other conditions that he has seen and

11   observed in his practice with respect to manatee reproduction

12   and lactation and the energy demands that those activities have

13   on the manatees.  That will be the narrow focus of this.

14        **THE COURT:**  All right.  I'm going to overrule the

15   objection, but I'll let you both know there is a voluminous

16   amount of information.  I'm in real time attempting to pull up

17   the documents that are being objected to, and if I can't

18   confirm that they're in an expert report or were alleged in a

19   complaint, for example, then I will take another direction.

20   But for now, I'm going to allow it as a proffer, and I will

21   consider it, unless I find that it falls outside the scope of

22   the expert report.

23        Anything further, Mr. Brown?

24        **MR. BROWN:**  Yes, Your Honor.  I was vague in my

25   objection.  I apologize.  The gist of my objection, Your Honor,

*RAY BALL | CONTINUING DIRECT*

1    was that the question calls for the witness to offer an

2    interpretation of the Endangered Species Act, which would be

3    beyond the scope of his expertise.

4         **THE COURT:**  I understand.  And with that further

5    specification, would the plaintiff like to respond to the more

6    specific objection?

7         **MS. BLOME:**  Your Honor, I can rephrase the question.

8         **THE COURT:**  All right.  Then the objection will be

9    sustained, and you'll be permitted to rephrase.

10   **BY MS. BLOME:**

11   **Q.**  Would you agree that reproduction and lactation are part of

12   a manatee's natural breeding behavior?

13   **A.**  Yes.

14   **Q.**  And how does diet affect the reproductive biology of the

15   Florida manatee?

16   **A.**  Probably the most important aspect of a diet in breeding

17   biology is, reproduction is a very energy-dominant activity.

18   Males have to seek out females.  Okay.  They will leave feeding

19   grounds.  And this is pretty much true for any mammal, any

20   bird.  So they're leaving feeding to go engage in some other

21   activities.  So that's an energy deficit that they're facing.

22        For females to conceive to cycle, first of all, they have

23   to be in an appropriate nutritional plane to even have normal

24   reproductive cycles and then to conceive and then to carry, you

25   know, a calf.  Especially the late gestation, the energy demand

*RAY BALL | CONTINUING DIRECT*

1    for that female goes up considerably.  And then you get to the

2    point that she has the calf and then there's lactation.  And

3    lactation is the largest normal physiological demand that a

4    mammal can have.  So there's a lot of demands for that manatee

5    to obtain food that's energetically sufficient.

6    **Q.**   The Florida Fish and Wildlife Commission defines a baby

7    manatee as a manatee less than 150 centimeters or 6 feet long.

8    Do you agree with that definition?

9    **A.**   I do.

10   **Q.**   Okay.  And why is that?

11   **A.**   Animals that size, we always, sort of, talk when we're

12   looking at rescuing animals if they're bigger than this they're

13   independent, which means they're independent from their mother.

14   So anything smaller than that is still dependent, and that

15   dependency really gets back to the possibility that that calf

16   is still lactating.

17   **Q.**   And does the feeding ecology of an independent calf, is

18   that about the same as an adult manatee?

19   **A.**   Yeah.  It should be.

20   **Q.**   Okay.  What about a dependent calf that's weaning off of

21   its mother?

22   **A.**   That gets a little trickier because now we're talking about

23   weaning stress.  You know, that animal has to go -- basically,

24   we talk about this, actually, in my class a lot.  That mammal

25   that's lactating is actually a carnivore.  It's eating an

1   animal product, milk.  It's learning, it's adjusting to be a

2   herbivore.  Okay.  That's a whole different set of

3   physiological demands, different enzymes, different gut --

4   there's a lot of things like that.  That's a huge stress.

5       We see animals undergoing this have lots of other health

6   challenges.  It's a time when pathogens will take advantage.

7   There's a lot of energy going into that transition, so the

8   immune function is down.

9       It's been noted that manatees, kind of in that window we're

10  talking about, seem to have more susceptibility to parasites or

11  the parasites cause more damage than they would if we see that

12  same parasite in the adult.

13      We see the same thing in other animals, too.  That weaning

14  stress is a very difficult time period for really all mammals.

15  **Q.**  And if a baby manatee that were weaning was eating a diet

16  of primarily of macroalgae, what would you expect to happen?

17  **A.**  I think it's going to complicate that transition.  It

18  really is.  Going from a diet that has milk, which is lactose,

19  to this, you know, macroalgae, which doesn't have the fiber,

20  which that animal is transitioning to, so it's not going to be

21  prepared as well.

22      Beyond that, I'm not sure what it was.  I know young

23  manatee calves have been noted, and we've seen this firsthand,

24  actually trying to eat algae.  I think they do it because at

25  that young stage it is digestible.  They're not truly hindgut

*RAY BALL | CROSS*

1    fermenters yet.  But I don't know how long those manatees can

2    sustain themselves like that.

3           **MS. BLOME:**  Your Honor, may I have a brief moment to

4    consider with my co-counsel?

5           **THE COURT:**  You may.

6           **MS. BLOME:**  All right.  Plaintiff has nothing further

7    for this witness at this time.

8           **THE COURT:**  All right.  Thank you.

9           Mr. Brown, cross-examination.

10          **MR. BROWN:**  May I consider briefly with counsel, Your

11   Honor?

12          **THE COURT:**  Sure.  Do you want to take a break before

13   you get started?

14          **MR. BROWN:**  Yes, sir.

15          **THE COURT:**  Let's take a no-more-than-10-minute break.

16   If you do need a little bit more, please let me know.  But

17   we'll take a 10-minute break.  Court's at recess.

18       (Recess at 9:20 a.m. until 9:30 a.m.)

19          **THE COURT:**  Please be seated, everyone.

20          And I would invite Mr. Brown to begin his

21   cross-examination.

22          **MR. BROWN:**  Yes, Your Honor.

23                      **CROSS-EXAMINATION**

24   **BY MR. BROWN:**

25   **Q.**  Dr. Ball, have you self-published your memoir?

*RAY BALL | CROSS*                                                              40

1    **A.**  I have.

2    **Q.**  Yes.  And that was called "Omen of the Aardvark"?

3    **A.**  It was.  It is.

4    **Q.**  And that was subtitled, "The Trials and Tribulations of a

5    Rogue Zoo Veterinarian"; is that correct?

6    **A.**  Yes.

7    **Q.**  Okay.  In 2018 did a federal wildlife agency receive

8    reports of malpractice and other misconduct during your

9    employment at the Tampa zoo?

10   **A.**  They did.

11   **Q.**  Okay.  And is it true that seven people filed 45 complaints

12   with federal officials?

13   **A.**  I don't know the numbers, but --

14   **Q.**  Okay.  And were you accused of lying about having

15   permission to euthanize a manatee?

16   **A.**  I'm sorry.  I don't understand.

17   **Q.**  Were you accused of making a misstatement of fact regarding

18   an occasion where you euthanized a manatee?

19   **A.**  I'm still not clear what you're asking.  Did I --

20   **Q.**  Were some of the concerns related to your euthanasia of

21   manatees?

22   **A.**  They were.

23   **Q.**  And were you also accused of making misrepresentations

24   regarding those circumstances?

25   **A.**  I don't remember the accusation, but that wouldn't surprise

*RAY BALL | REDIRECT*                                                          41

1    me.

2    **Q.**  Okay.  And did you have a license suspended as a result of

3    that investigation?

4    **A.**  No.  No, I did not.

5    **Q.**  And was one of those complainants Dr. de Wit?

6    **A.**  I don't know the formality of it.  Possibly.

7    **Q.**  And what was the result of the investigation by the U.S.

8    Fish and Wildlife Service following those complaints?

9    **A.**  As far as I know, there was no substantiation to any of

10   those claims.

11   **Q.**  Is it true that the U.S. Fish and Wildlife Service notified

12   the zoo that there were credible reports requiring an

13   investigation and that you were directed to cease all

14   activities involving manatees?

15   **A.**  That was true.

16   **Q.**  So you were, in fact, directed to cease activities

17   involving manatees?

18   **A.**  Yes.

19          **MR. BROWN:**  Okay.  No additional questions, Your

20   Honor.

21          **THE COURT:**  Thank you.

22          Redirect examination?

23                        **REDIRECT EXAMINATION**

24   **BY MS. BLOME:**

25   **Q.**  Dr. Ball, you said that you were cleared from all

RAY BALL | REDIRECT                                    42

1    charges --

2    **A.**   Right.

3    **Q.**   -- we'll say.  Do you have any understanding of how that

4    investigation concluded?

5    **A.**   Honestly, I don't.  I know there were some independent

6    experts that were brought in and reviewed cases, and basically

7    what I was told is that there was just no validity to any of

8    the things.  I know the service -- Fish and Wildlife Service,

9    did petition the state board to have my license suspended,

10   which didn't go anywhere.  Obviously, my license was never

11   touched.  It was an interesting thing, because, to the best of

12   my knowledge, you don't even need to be a licensed veterinarian

13   in the state of Florida to work on wildlife.

14        **MR. BROWN:**  Your Honor, the --

15        **THE WITNESS:**  So the fact that that happened is --

16        **THE COURT:**  Hold on.  There's an objection.  What's

17   the basis for the objection?

18        **MR. BROWN:**  I move to strike a portion of his answer

19   as nonresponsive and hearsay, describing his recollection of

20   what he was told about the investigation.

21        **THE COURT:**  That's overruled.  He can testify to that.

22        **MR. BROWN:**  Thank you.

23   **BY MS. BLOME:**

24   **Q.**   Would you like to continue your answer or are you done?

25   **A.**   Yeah.  I mean, the accusations and the challenge to my

*RAY BALL | REDIRECT*

1    license was, you know, readily dismissed.  First of all, you

2    know, you actually don't need a license to practice, and the

3    reports that I recall basically didn't find any wrongdoing.

4    **Q.**  And you still work with exotic animals?

5    **A.**  Absolutely, yes.

6    **Q.**  And you still are licensed as a veterinarian in the state

7    of Florida?

8    **A.**  I do, and I actually still do manatee work on an

9    international telemedicine basis quite regularly.

10       Yesterday I had another consultation with some colleagues

11   in a rehab center in Belize.

12   **Q.**  You were recently in Belize?

13   **A.**  I was.  I had a class there in January.

14   **Q.**  And were you teaching folks there about manatees?

15   **A.**  Not so much manatees there.  The focus of my study-abroad

16   programs is ecosystem health.  It's about the interface of

17   people, animals, and environment, and how we all need to be, at

18   least, familiar and versed in each other's world, and

19   integrate, not isolate, and communicate and understand

20   different perspectives; otherwise, there's no possible way to

21   achieve a healthy ecosystem.

22           **MS. BLOME:**  All right.  Thank you.  No further

23   questions.

24           **THE COURT:**  May this witness be excused?

25           **MS. BLOME:**  Yes, Your Honor.

1          **THE COURT:**  Will he be subject to recall?

2          **MS. BLOME:**  No.

3          **THE COURT:**  Will he be subject to defense recall?

4          **MR. BROWN:**  No, Your Honor.

5          **THE COURT:**  All right.  Doctor, you have a nice day.

6     Thank you.

7          **THE WITNESS:**  Thank you.

8          **THE COURT:**  I would invite the plaintiff to call their

9     next witness.

10         **MS. BLOME:**  Yes, Your Honor.  Our next witness is

11    Dr. Martine de Wit.

12         **THE COURTROOM DEPUTY:**  Dr. de Wit, if you would please

13    step forward to be sworn.  Please raise your right hand.

14        (MARTINE DE WIT, witness sworn.)

15         **THE WITNESS:**  I do.

16         **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat

17    in the witness box.

18         **THE COURT:**  All right.  Good morning, Dr. de Wit.  If

19    you would be kind enough to be seated and make yourself

20    comfortable with the chair's proximity to the microphone, and

21    once seated, please state your full name, spelling your last.

22         **THE WITNESS:**  My name is Martine de Wit,

23    M-a-r-t-i-n-e, last name d-e-W-i-t.

24         **THE COURT:**  All right.  Before you get started, I had

25    my -- well, I didn't have them do anything.  They do before I

*MARTINE DE WIT | DIRECT*                                                    45

1    even ask.  So my law clerks, when there was this dispute that

2    arose over the actual allegations in the second amended

3    complaint, sent me the language, and it reads as follows from

4    the second amended complaint.  And I'm reading this to you

5    because I'm going to make my decisions on what I'm going to

6    incorporate into an eventual order based on the context of

7    this.  It reads as follows:  DEP's ongoing authorization of

8    septic tanks and wastewater treatment plants that leach and

9    load nitrogen into the North I.R.L. will:  A, adversely impact

10   manatee feeding; B, adversely impact manatee health; C, cause

11   manatee starvation, suffering, and death; D, cause the

12   extirpation of manatees in the North I.R.L.; E, cause the

13   degradation of manatee habitat; and, D [sic], hinder the

14   recovery of manatees.

15           So those are the allegations that were made in the

16   second amended complaint by the plaintiff, and in that context

17   I'll make my decision.

18           Thank you.  Feel free to proceed with your direct.

19           **MS. BLOME:**  Thank you, Your Honor.

20                     **DIRECT EXAMINATION**

21   BY MS. BLOME:

22   **Q.**  Dr. Martine de Wit, would you please describe your

23   educational background?

24   **A.**  I'm a veterinarian.

25   **Q.**  And where did you get your training to become a

*MARTINE DE WIT | DIRECT*

1    veterinarian?

2    **A.**   I went to vet school at Utrecht University in the

3    Netherlands.

4    **Q.**   Do you have any equivalent U.S. training in veterinary

5    science?

6    **A.**   Yes.  I am licensed by the North America Veterinary

7    Association.

8    **Q.**   Have you had any additional training or education in

9    veterinary science?

10   **A.**   Yes.  I did a residency in avian medicine and surgery, and

11   at the time was board certificated by the American Board of

12   Veterinary Practitioners.

13   **Q.**   So you're authorized to work in the U.S.?

14   **A.**   I am, yep.

15   **Q.**   And where do you work?

16   **A.**   I work for Florida Fish and Wildlife Conservation

17   Commission in St. Pete, Florida.

18   **Q.**   What specific division do you work for?

19   **A.**   I work for the Fish and Wildlife Research Institute.

20   **Q.**   And what's your position there?

21   **A.**   I'm a research scientist.

22   **Q.**   Would you say that you're the Florida manatee veterinarian?

23   **A.**   I would say so, yeah.

24   **Q.**   And why would you say that?

25   **A.**   Because I know my official position is a scientist, it

*MARTINE DE WIT | DIRECT*                                                    47

1    takes a veterinary degree to do this work, so I practice my

2    knowledge on the veterinary medicine in manatees.

3    **Q.**  How long have you been working with manatees in that role

4    with the Florida Fish and Wildlife Commission?

5    **A.**  I have been in the role since 2005.

6    **Q.**  So 20 years?

7    **A.**  Correct.

8    **Q.**  The questions that I'm going to ask you today are grounded

9    in that experience for 20 years with the Florida Fish and

10   Wildlife Commission.

11        So in your role as the research scientist for veterinarians

12   for the state, what would you characterize as the digestive

13   strategy for manatees?

14   **A.**  Manatees are vegetarians.  They eat seagrass, fresh water

15   vegetation, and they need a lot of seagrass or vegetation,

16   about 7 percent of their body weight a day on average.

17   **Q.**  How much in poundage is that?

18        **THE COURT:**  Before we continue, just to make sure I

19   have a clear record, are you seeking leave of Court to have

20   this witness qualified as an expert?

21        **MS. BLOME:**  No, Your Honor.  I'm asking her in her

22   capacity as the manatee research veterinarian.

23        **THE COURT:**  Okay.  And what is your response to that?

24        **MR. BROWN:**  Your Honor, I was objecting to the

25   question on the grounds that it was represented that this

*MARTINE DE WIT | DIRECT*                                                                48

1    witness would be called as a fact witness, which appears to be

2    the reasoning behind the decision not to exclude her testimony

3    for lack of disclosure.  And we submit that the question calls

4    for expert testimony, which was not disclosed.

5          **THE COURT:**  Well, yeah, he's alleging that you're

6    asking general opinion testimony from the witness who didn't

7    submit a report, and, therefore, can only testify as a fact

8    witness, kind of a hybrid of the other type of expert.  How

9    would you respond to that?

10         **MS. BLOME:**  Well, Your Honor, state employees, federal

11   employees, you know, some of their questions and their answers

12   do, kind of -- would have qualified as expertise, if they had

13   been third-party witnesses.  In fact, I think that you'll find

14   that the FDEP witnesses who are offered as fact witnesses are

15   going to offer testimony of a similar regard, because it's

16   impossible to take apart their expertise and training from the

17   role that they have within the government.

18         **THE COURT:**  All right.  I think we're going to have to

19   navigate between facts within the witness's knowledge, based on

20   what she does for a living, and opinion testimony.  In that

21   context, I'm going to table the objection.  I'm going to

22   consider the testimony.  And I'm going to consider it in the

23   context of your witnesses that are going to be testifying as

24   experts -- but not traditional expert, but fact-witness

25   experts, and then I'll make my decision accordingly.  So for

*MARTINE DE WIT | DIRECT*                                                    49

1    now, I'm going to table the objection, understanding what your

2    concerns are.

3            Yes, Mr. Brown.

4        **MR. BROWN:**  I wanted to elaborate briefly.  We have

5    disclosed two witnesses as hybrid witnesses.  I wanted to point

6    out for the record, when we had submitted the expert report, as

7    required of hybrid witnesses, as reflected in the documents

8    attached to the last pleading motion, there was no such report

9    submitted by the plaintiff as to Dr. de Wit.

10       **THE COURT:**  I understand and I appreciate you

11   informing the Court of that.  So we'll continue moving forward

12   in this regard.

13           Feel free to ask your questions.

14       **MS. BLOME:**  Yes, Your Honor, but, briefly, I would

15   like to correct that statement.  There was no expert report

16   submitted for the defendant's designated experts, but they did

17   submit declarations in support of their cross motion for

18   summary judgment.

19       **THE COURT:**  I understand, and the record will reflect

20   that.  Feel free to proceed.

21   **BY MS. BLOME:**

22   **Q.**  In your experience with Florida Fish and Wildlife

23   Commission, would you please describe your observations of the

24   digestive strategy for manatees?

25   **A.**  Manatees are vegetarians.  They eat fresh water vegetation,

*MARTINE DE WIT | DIRECT*                                                    50

1    seagrass, and they eat a lot, about 7 percent of their body

2    weight per day on average.

3    **Q.**   How much is that in pounds, would you say, on average?

4    **A.**   That's about -- on average, adult manatee is 1,000 pounds

5    so, say, 70 pounds per day.

6    **Q.**   In your experience with the Florida Fish and Wildlife

7    Commission, what has happened to manatees who eat a diet of

8    macroalgae?

9    **A.**   Manatees that switch their diet for reasons, say, lack of

10   seagrass, that then have a sudden diet change to algae, are

11   susceptible to an upset in their gut.  The composition of the

12   algae is different than fibrous seagrass, so you have bacteria

13   in their gut that can become toxic as a result of that change

14   of that diet.  So some manatees can actually die from it but

15   not all.  We also have seen that manatees can adapt to algae.

16   **Q.**   Can adapt to macroalgae?

17   **A.**   Macroalgae, correct, yes.

18   **Q.**   So some, but not all, manatees will die from a primary diet

19   of macroalgae in Florida?

20   **A.**   It is possible, yes.

21   **Q.**   And have you made these observations in the North Indian

22   River Lagoon specifically?

23   **A.**   Yes.  We first recognized it in 2013, when we had a

24   mortality event with increased number of mortalities from

25   manatees that had macroalgae in their digestive system, and we

*MARTINE DE WIT | DIRECT*                                                        51

1   researched the cause of that and determined it was from a gut

2   upset, dysbiosis, it's caused from clostridial bacteria.

3   **Q.**   What is the Florida manatees in the North Indian River

4   Lagoon's preferred forage?

5   **A.**   It is seagrass.

6   **Q.**   And in your experience with those manatees in the North

7   Indian River Lagoon, is it important that manatees have access

8   to seagrass?

9   **A.**   Yes.

10  **Q.**   And why is that?

11  **A.**   Because they need to eat.  They need to survive.

12  **Q.**   And is the North Indian River Lagoon specifically, in your

13  experience, important to Atlantic coast manatees' digestive

14  strategy?

15  **A.**   It is.  Especially in the summertime, there are a lot of --

16  historically there have always been a lot of manatees who will

17  spend their summers there because of the abundant seagrass.

18  **Q.**   So abundant seagrass.  Are there any other reasons why the

19  manatees prefer the North Indian River Lagoon?

20  **A.**   In wintertime, it is because of warm water habitat, because

21  of the warm water discharges from the power plant there.  The

22  manatees are subtropical, so in winter normal temperatures are

23  too cold, so they need to seek warm water refuges to stay warm

24  and survive winter.

25  **Q.**   Would you say that all of the manatees on the Atlantic

*MARTINE DE WIT | DIRECT*                                                52

1    coast, in your experience, spend at least some time in the

2    North Indian River Lagoon?

3    **A.**   Most of them, yep.

4    **Q.**   Dr. de Wit, what is your primary job duty for the Florida

5    conservation commission -- or sorry, wildlife and conservation

6    commission?

7    **A.**   I research the health of manatees, and a big part of my job

8    is to do necropsies, which is animal autopsies, on the dead

9    manatees that are found in the state of Florida, and the

10   necropsies give us a lot of information on the health of

11   manatees, causes of death.  And that information can be used by

12   managers with FWC and the service to protect manatees.

13   **Q.**   I want to show you what's been marked as Exhibit 13 in that

14   binder that's called Plaintiff's Exhibits.  Do you recognize

15   this document?

16   **A.**   Yes.

17   **Q.**   What is it?

18   **A.**   It's a necropsy report for a Florida manatee.

19   **Q.**   In your role as the research scientist in charge of these

20   necropsies, are you involved in every necropsy that is done in

21   Florida on a manatee?

22   **A.**   Physically not, but I sign off on every single one of these

23   reports that we have in front of us, so I am involved in all.

24   **Q.**   Yeah.  So you would have signed off on this report --

25   **A.**   I did.

*MARTINE DE WIT | DIRECT*                                                53

1    **Q.**  -- as part of your normal job duties?

2    **A.**  Yes.

3    **Q.**  And if you turn to page 5 of that Exhibit 13, it says,

4    "Necropsy conducted by Dr. Martine de Wit, DVM."

5    **A.**  Yes.

6    **Q.**  Does that indicate you actually conducted this necropsy, or

7    is this possibly another one that you oversaw?

8    **A.**  I conducted the necropsy, yes.

9            **MS. BLOME:**  Okay.  I would move for admission of

10   Exhibit 13.

11           **THE COURT:**  Any objection?

12           **MR. BROWN:**  No objection, Your Honor.

13           **THE COURT:**  Without objection, what's been previously

14   marked as Plaintiff's Exhibit 13 will be admitted and marked.

15   Feel free to proceed.

16       (Plaintiff's Exhibit No. 13 was admitted into evidence.)

17   **BY MS. BLOME:**

18   **Q.**  Dr. de Wit, when you prepare these reports of dead

19   manatees, is body condition a factor that you take into

20   consideration in determining cause of death?

21   **A.**  Absolutely it is, yes.

22   **Q.**  And what's a body condition?

23   **A.**  The body condition on this manatee is emaciated.

24   **Q.**  What's the date of this document?  I see it's March 6,

25   2021.

*MARTINE DE WIT | DIRECT*

54

1    **A.** Yes.

2    **Q.** Is the date of the report the same as the date that you

3    found the manatee?

4    **A.** The day we found the manatee was March 6 of '21, and we did

5    the necropsy on March 8.

6    **Q.** Where's that?  Oh, I see.  Date necropsied on the left-hand

7    side of page 1.

8    **A.** Yeah, and on page 3 as well.

9    **Q.** Can you describe what a body condition score is?

10   **A.** A body condition score is a score we use in live manatees,

11   and it goes from one to five, and it's a bit subjective, but

12   you assess the condition of the animal by looking for, like, a

13   flat belly.  Normally a belly should be round.  It shouldn't be

14   concaved or wrinkled.  The manatee should be nicely round on

15   top.  There should not be a dip in the neck line, which can

16   indicate loss of fat.  You should not see ribs or other

17   skeletal features be pronounced.

18   **Q.** When you are assigning a cause of death to a manatee

19   through the report, how do you document that cause of death?

20   **A.** We do a full necropsy and investigate all organs, gut

21   filling, and use veterinary pathology knowledge to determine

22   why the animal died, what immediately led to the cause of death

23   of this animal, but while we do the necropsy, we sometimes come

24   across findings that are abnormal, so they may be significant

25   but not specifically significant to the cause of death of that

*MARTINE DE WIT | DIRECT*                                                       55

1    single animal.

2    **Q.**   Is every manatee that dies in the Indian River Lagoon

3    subjected to a necropsy?

4    **A.**   No, it's not.

5    **Q.**   And why is that?

6    **A.**   Because the numbers of carcasses have gone up over the

7    years, and, especially, when you deal with these large-scale

8    mortality events, we do not have the resources to necropsy

9    every single manatee, and some of them are in very remote

10   locations where you cannot get to them, but we do make an

11   effort to verify every carcass.

12          **MS. BLOME:**  I would like to move -- did I admit

13   Exhibit 13 already?

14   **BY MS. BLOME:**

15   **Q.**   I would like to have you turn the page to Exhibit 14.  Do

16   you recognize this document?

17   **A.**   Yes.

18   **Q.**   What's this document?

19   **A.**   This is a description of coding that we have started to add

20   to reports related to the starvation event because our normal

21   causes of death do not really reflect which animals died in

22   this unusual mortality event, which ones have evidence of

23   starvation or which ones had possibly gone through starvation.

24          So to help search these data, we added codes in our

25   database, and this document reflects code one, which is we

*MARTINE DE WIT | DIRECT*

1    think it's most probable that this animal died from starvation,

2    and then codes two and three it is possible.

3    **Q.**  So these are new codes that you created for the UME.  Yes?

4    **A.**  Yes.  We have used the code system for other events, like

5    red tide as well.

6    **Q.**  When did the most recent unusual mortality event begin?

7    **A.**  It was declared on December 1, 2020.

8    **Q.**  Just for everyone's benefit, will you please describe what

9    an unusual mortality event is?

10   **A.**  An unusual mortality event for marine mammals is a

11   significant die-off that requires an immediate response.

12   **Q.**  So prior to the December 20 unusual mortality event, how

13   was death by, you know, starvation or emaciation or

14   malnutrition documented?

15   **A.**  It was not documented through coding.  We have gone back

16   before December 2020 and found one case in November of 2020.

17   But before that, it's hard to find a single manatee that did

18   not have access to food.  It's really unusual.  So it's likely

19   those are not well-documented.

20   **Q.**  Would it have been marked as a natural death?

21   **A.**  Not necessarily.  It could also be human-related because

22   manatees can have -- or have no access to food because they

23   are, for example, entrapped after storms or behind a structure

24   and when the water recedes they cannot go back.  If they are

25   entrapped because of a human-related structure, like a wall or

*MARTINE DE WIT | DIRECT*

1    a dam or something, then we will investigate the circumstances

2    and then would assign human-related, if that was determined to

3    be the cause of manatees not having access to food.

4    **Q.**  And referring again to Exhibit 14, are you still using

5    these starvation codes to characterize deaths?

6    **A.**  We would if we see cases, but the last case in this event

7    was two years ago.

8    **Q.**  But the UME is ongoing?

9    **A.**  It's not.  It's about to close, but that paperwork is in

10   the works right now.

11   **Q.**  Yeah.  Can you describe a little bit more about that, the

12   process, the paperwork process?

13   **A.**  Yeah.  So unusual mortality events are declared by the

14   federal government.  You have this working group of experts

15   that reviews applications and then advises NOAA and the U.S.

16   Florida Fish and Wildlife Service whether they think it is

17   necessary to declare an event.

18       So as a stranding organization, when you see something

19   unusual or you have high mortality numbers, then you would

20   apply for the declaration of an event, and the paperwork and

21   the meetings on that usually take a little bit.  So back in the

22   start of this event -- I believe it was declared sometime in

23   March of 2021, and we applied for it in early February.  So it

24   takes a while.

25       And you present updates to this group of experts every

*MARTINE DE WIT | DIRECT*                                                    58

1    year, and once you have your cause and you have wrapped up the

2    investigation and you see improvement in the conditions or in

3    the animals, that you apply for closure of an event.  And so we

4    did that last year.  And it's -- I have seen a draft, but

5    it's -- with everything that's going on in the government right

6    now, I'm not sure what the date is that it will be officially

7    declared closed, but our proposed closure date -- and that is

8    retroactive -- when we stopped seeing the elevated mortality

9    would be April 30th, 2022.

10   **Q.**  Okay.  So if you had found a manatee that suffered from

11   starvation after April 2022 --

12   **A.**  Yes.

13   **Q.**  -- how would you have characterized that in the necropsy

14   report?

15   **A.**  We still call it a UME code.  Even though it is officially

16   closed, it is an easy way to search in your databases.

17   **Q.**  So if you found a manatee that died from starvation today,

18   you would still use these codes?

19   **A.**  If the circumstantial findings are the same as during the

20   peak of this event, we would.  But there are many other causes

21   why manatees can show emaciation and starvation.

22   **Q.**  I want to talk about that.

23        **MS. BLOME:**  But first I want to move to admit

24   Exhibit 14.

25        **THE COURT:**  Any objection?

*MARTINE DE WIT | DIRECT*
                                                                          59

1        **MR. BROWN:**  Excuse me.  No objection, Your Honor.

2        **THE COURT:**  Without objection, what's been previously

3   marked as Plaintiff's Exhibit 14 will be admitted and marked.

4   You may publish.  Feel free to continue.

5        (Plaintiff's Exhibit No. 14 was admitted into evidence.)

6   **BY MS. BLOME:**

7   **Q.**  You just mentioned there were other reasons why a manatee

8   could die of starvation.  What are those other reasons?

9   **A.**  It could be from being blocked off access to food.  We just

10  talked about that when they are entrapped by something.  It

11  could also be not typically primary starvation but when they

12  have an increased metabolism where they have increased energy

13  demands, for example, when they have an infectious disease,

14  they can starve from high energy demands.

15  **Q.**  What about pregnancy?

16  **A.**  Normal pregnancy, no.  Most manatees, if they're healthy,

17  they should be able to eat as much as needed to sustain the

18  pregnancy.  I'm really talking about severe diseases here.

19  Sometimes manatees are chronically injured, where they do not

20  have ideal use of their body.  For example, when there's a

21  chronic infection in their lungs, it may be hard for them to

22  move around or to sink to the bottom or, you know, to behave

23  normally to access food.

24  **Q.**  Dr. de Wit, in your work, have you seen malnourished

25  manatees in the Indian River Lagoon?

*MARTINE DE WIT | DIRECT*

1    **A.**  Yes.

2    **Q.**  Is malnutrition chronic?

3    **A.**  It is, yes.

4    **Q.**  And what do you mean by that?

5    **A.**  Well, manatees, we know that they can go without food for a

6    certain amount of time.  They need to -- especially in cold

7    winters, they have to choose between staying warm and going out

8    to eat, because they really do not have a lot of options to eat

9    in the same place as where the warm water is.  So when it's

10   really cold we have seen manatees that stay put in warm water

11   for up to a month, sometimes a little bit longer, even.  So we

12   know that they can fast if they need to.

13   **Q.**  And would you characterize that fasting as an interference

14   with their natural feeding behavior?

15        **MR. BROWN:**  Objection, Your Honor, again, for the

16   previous reasons stated regarding the disclosure and the form

17   of the pleadings.

18        **THE COURT:**  All right.  Just for a complete record,

19   what's the response to the objection?

20        **MS. BLOME:**  Dr. de Wit is probably the only person who

21   can say what the natural patterns of manatees are in the North

22   Indian River Lagoon on behalf of the State of Florida.

23        **THE COURT:**  Well, I don't think he's objecting to

24   whether or not she's qualified to answer that question.  I

25   think he's objecting to the fact that you're eliciting

*MARTINE DE WIT | DIRECT*

1    testimony and this is no longer just fact witness testimony.

2    How would you respond to that very specific objection?

3            **MS. BLOME:**  I can rephrase.

4            **THE COURT:**  All right.  The objection is sustained,

5    and you're welcome to rephrase.

6    **BY MS. BLOME:**

7    **Q.**  Dr. de Wit, based on your personal observations of the

8    manatees in the North Indian River Lagoon, what would the

9    manatees naturally do if given a full bed of food, available

10   food, in the North Indian River Lagoon?

11           **MR. BROWN:**  Same objection, Your Honor.

12           **THE COURT:**  I feel better about that phrasing, and I

13   certainly will -- in the context of what we've discussed, I

14   will deliberate on that as well.  For now, the objection is

15   overruled.  She can answer that question.

16           **THE WITNESS:**  Under normal circumstances, say, that

17   the water is warm enough for them to swim around and access

18   that food, they would eat it.

19   **BY MS. BLOME:**

20   **Q.**  And what would be -- well, strike that.

21       Have you ever classified a manatee for the UME starvation

22   event that had a full gut?

23   **A.**  Yes.

24   **Q.**  And what was the condition for a manatee having a full gut

25   that died of starvation?

*MARTINE DE WIT | DIRECT*

1          **MR. BROWN:**  Same objection, Your Honor.

2          **THE COURT:**  And this is something that is purely

3     factual, based on her practice.  So the objection is sustained

4     and preserved for the record, but it's overruled.  She can

5     definitely answer that question.

6          **THE WITNESS:**  So we discussed this malnutrition is

7     chronic, and it is more than just having a full gut or not.

8     When you are chronically malnourished, your organs start to

9     give in.  So we see manatees that were just hanging in there

10    but were so wasted in their muscles and other organ functions

11    that they were able, once it warmed up, to reach food, but they

12    were sick enough that the last bite of food did not help them

13    to turnaround that condition.

14    **BY MS. BLOME:**

15    **Q.**  In Exhibit 13 if, you want to turn back, you wrote that --

16    we'll turn back to Exhibit 13, page 1.  In here you say that --

17    somewhere in here you say that the manatee appeared emaciated.

18    What does emaciate mean?

19    **A.**  Emaciate means a very thin body condition.

20    **Q.**  So would --

21    **A.**  So this animal had what we call a peanut-shaped head, so

22    that is the loss of fat in its neck, and the animal was

23    flattened, too, while normally a manatee should be rotund.

24    **Q.**  So an emaciated manatee would present with poor body

25    condition.  Would you say that's true?

*MARTINE DE WIT | DIRECT*                                                      63

1   **A.**  Yes.

2   **Q.**  Okay.  And then you would document it as such in the

3   necropsy?

4   **A.**  Yes.

5   **Q.**  But a malnourished manatee may not necessarily present with

6   poor body condition?

7           **MR. BROWN:**  Objection, leading.

8           **THE COURT:**  I'll allow that leeway because she has

9   been qualified as an expert.  The waters get murky there.  The

10  objection is overruled, but focus on open-ended questions,

11  please.

12          **THE WITNESS:**  I find it hard to really define

13  malnourished.  We stick to emaciated, but you can nourish

14  yourself with wrong food but still look fat if you eat

15  McDonald's every day.  You know, we really cannot go to that

16  level in most of the necropsies that we do.

17  **BY MS. BLOME:**

18  **Q.**  When you say wrong food for humans, you mentioned

19  McDonald's.  What would be the wrong food for manatees in the

20  North IRL?

21          **MR. BROWN:**  Same objection, Your Honor, again, calls

22  for opinion testimony.

23          **THE COURT:**  I think this is well within the scope of

24  who she is and what she does, generally.  So I understand your

25  objection, but, again, I acknowledge these waters are murky,

*MARTINE DE WIT | DIRECT*

1    but she's going to be permitted to answer the question.  The

2    objection is overruled.

3            Please feel free to answer.

4            **THE WITNESS:**  I am not sure if I would consider it the

5    wrong food, but we've seen manatees turn to, like,

6    invertebrates and whether they do that on purpose because

7    they're hungry or they're just rooting the bottom and they eat

8    them by accident.

9            But if you look at manatees in Africa, it's about half

10   of their diet.  So for Florida manatees it may be the wrong

11   food, but it could work out in the end.  The same for sand and

12   sediment, et cetera.

13   **BY MS. BLOME:**

14   **Q.**  You mentioned the 2013 unusual mortality event earlier.

15   Did you find that the manatees who suffered from that gut

16   infection that you were talking about had good or poor body

17   condition?

18   **A.**  They were in good body condition.

19   **Q.**  And why is that -- why would that be?

20   **A.**  Because they still had food available, and also when they

21   switched their diet, that toxin released by the bacteria, it's

22   a very rapid process, so it's more like an acute disease

23   process where one moment they're perfectly healthy and the next

24   they die from their gut infection, so they do not have time to

25   waste away.

*MARTINE DE WIT | DIRECT*

1    **Q.**  I want you to turn to Exhibit 11 in your binder.  Do you

2    recognize this document?

3    **A.**  Yes.  It's the publication we did on this 2013 mortality

4    event.

5    **Q.**  And are you an author on this paper?

6    **A.**  I am the final author, yep.

7    **Q.**  And did you prepare this as part of your normal, you know,

8    job responsibilities for the Florida Fish and Wildlife

9    Commission?

10   **A.**  I did.

11   **Q.**  Why were you involved in the preparation of this

12   investigation and paper?

13   **A.**  Because I was the lead investigator on this event on the

14   manatees, and it was a complicated investigation to come to

15   this cause, so I worked with a lot of experts across the

16   country to come to this diagnosis.

17   **Q.**  And including Dr. Landsberg, who is the first author there?

18   **A.**  Yes.

19   **Q.**  Because he's the first author, whenever I refer to this, I

20   might refer to it as the Landsberg paper.

21   **A.**  Yes.

22   **Q.**  That's all right?

23   **A.**  Yes.

24   **Q.**  This was published in March of 2022 I'm showing at the

25   bottom there of the document?

*MARTINE DE WIT | DIRECT*

1    **A.** Yeah.

2    **Q.** Why did it take so long -- I mean, almost 10 years -- to

3    conclude this investigation?

4    **A.** Yeah.  We were investigating bacteria, and before we got to

5    the bacterial cause, we investigated many components, because

6    you have seemingly healthy manatees with an unusual gut

7    content, but they died on the spot.  So you really are looking

8    for that needle in the haystack, especially when your

9    microscopic examination of the tissue does not give a lot of

10   information away right on the spot.  So we looked at all

11   avenues and then narrowed down our investigation.  And when you

12   get to investigating bacteria in a manatee's gut in postmortem

13   examination in dead manatees that decompose the second that

14   they die, it takes a lot of persistence to get your results.

15   **Q.** And is it Dr. Landsberg?

16   **A.** Yes.

17   **Q.** He [sic] works at Florida Fish and Wildlife Conservation

18   Commission also?

19   **A.** She's retired, yep.

20   **Q.** When you published this study in March of 2022, was that

21   before or after the conclusion of the 2020 UME?

22   **A.** It was -- let me see.  It was during that time.

23   **Q.** Can you just briefly describe, from your personal

24   experience, what the difference between the 2013 UME was and

25   the current, subject to closure but ongoing, UME is?

*MARTINE DE WIT | DIRECT*

1    **A.**   Yeah.  It reflects the whole cascade of what happened in

2    the Indian River Lagoon, and it actually goes back to 2010 when

3    we had two cold mortality events, and since then, the

4    conditions have changed in the Indian River Lagoon, and we saw

5    that loss of seagrass starting early, but at the time

6    macroalgae were taking over, the surface vegetation, so

7    manatees turned to that and then the macroalgae that manatees

8    probably got used to because we saw it in 2013 and not in high

9    numbers afterwards, so they may have adapted to eating

10   macroalgae, but then the macroalgae disappeared as well over

11   the years and then we had our starvation event.  So I would say

12   it's all connected.

13          **MS. BLOME:**  Okay.  I'm going to move for admission of

14   Exhibit 11.

15          **THE COURT:**  Any objection?

16          **MR. BROWN:**  No objection, Your Honor.

17          **THE COURT:**  Without objection, Plaintiff's Exhibit 11

18   is admitted.  Feel free to proceed.

19       (Plaintiff's Exhibit No. 11 was admitted into evidence.)

20   **BY MS. BLOME:**

21   **Q.**  Dr. de Wit, you're not an expert in the available

22   vegetation in the Indian River Lagoon, are you?

23   **A.**  I'm not.

24   **Q.**  So you wouldn't know what's in there now?

25   **A.**  I am not an expert, but I talk to the experts, and I have

*MARTINE DE WIT | DIRECT*

1    heard that vegetation continues to come back in a positive

2    trend.

3    **Q.**  But is there enough there to support the manatees?

4    **A.**  Right now there is, yeah, yeah, because we saw our last

5    starvation case two years ago.  From reports in the field, from

6    our necropsies, from live animals that we've done research

7    captures in, the condition of the animals has much improved.

8    **Q.**  Dr. de Wit, are you familiar with the manatee population

9    along the Florida Atlantic coast?

10        **MR. BROWN:**  Your Honor, I object.  There's no theory

11   alleged in the second amended complaint regarding the effects

12   of the incidents upon the manatee population as a whole.

13        **THE COURT:**  I understand.  I mean, context always

14   plays a role in analyzing data, so I need to listen to what it

15   is to make an informed decision, but your objection is noted,

16   overruled for now, but, if indeed it goes outside the scope of

17   either the fact testimony or the relevance, I won't consider

18   it, but I need to hear what it is.

19        So I'm going to invite you to continue.

20        **THE WITNESS:**  I note the numbers that the population

21   statisticians release based on their models, but I'm not an

22   expert on how they come to the numbers.

23   **BY MS. BLOME:**

24   **Q.**  Do you, in your work, think that you can derive any

25   conclusion about the health of the manatee population based on

*MARTINE DE WIT | DIRECT*                                                69

1    those models?

2    **A.**  There are models, not actual manatee numbers, based on the

3    abundance surveys, but part of the models investigate long-term

4    threats to manatees, so that gives you some information on the

5    health, yeah.

6    **Q.**  But not related to whether manatees are still malnourished

7    in the lagoon?

8    **A.**  No.  No.  If you were just counting bodies from the air --

9    it's counting numbers.

10   **Q.**  In your work, have you seen any impact to breeding or

11   reproduction caused by malnourishment in the Indian River

12   Lagoon?

13          **MR. BROWN:**  Objection, Your Honor, scope of pleadings.

14          **THE COURT:**  What's the response to that?

15          **MS. BLOME:**  We broadly alleged a take underneath the

16   Endangered Species Act, which includes, but is not limited to,

17   feeding, breeding, and sheltering.  And this link is directly

18   to malnourishment and starvation and nothing more.  We won't be

19   going beyond that.

20          **THE COURT:**  All right.  I'm just reviewing the second

21   amended complaint.  I think it's kind of a soup-sandwich, but

22   there's a few degrees of separation, but I think for the

23   limited purpose that counsel represented I'll allow you to ask

24   the question.

25          The objection is overruled.  After this question, I'm

*MARTINE DE WIT | DIRECT*

1    going to invite you to move on.

2    **BY MS. BLOME:**

3    **Q.**  I can't remember that question.  Would you mind reading it

4    back?

5              **THE COURT:**  In your work, have you seen any impact to

6    breeding or reproduction caused by malnutrition in the Indian

7    River Lagoon?

8              **THE WITNESS:**  Yes.  We did see an impact during

9    this -- the peak of this event, that all data indicated

10   reproduction shut down, and there were almost no live calves

11   observed with aerial surveys, from field observations.  Also

12   based on what we found in the carcasses, they were not

13   reproducing at that time.

14   **BY MS. BLOME:**

15   **Q.**  So at the time you're referring to, what years would that

16   be?

17   **A.**  The peak years of our event, which was through or until

18   2022, and we saw reproduction coming back the following year in

19   2023.

20   **Q.**  And what about in 2024?

21   **A.**  Same.

22   **Q.**  And what about currently in the lagoon?

23   **A.**  Its season is just about to start, but one of our manatees

24   that we have in our tagging study, we do telemetry captures,

25   which is manatees that get a satellite tag on them.  We did

*MARTINE DE WIT | DIRECT*                                                                71

1   those in December, and one of those was observed with a live

2   calf, newborn calf last week, so it looks like reproduction is

3   starting again this year.

4   **Q.**  And have you noticed any changes in baby manatee deaths?

5               **MR. BROWN:**  Same objection, Your Honor.

6               **THE COURT:**  That one is overruled.  This will be

7   within the context of her fact testimony.  I don't need to hear

8   a response to it.

9               So I would invite you to answer that question.  Baby

10   manatee deaths.

11              **THE WITNESS:**  Yes.  We saw the baby manatees last

12   year.

13   **BY MS. BLOME:**

14   **Q.**  Have started to die?

15   **A.**  Yep.

16   **Q.**  And have you reached any -- have you done any investigation

17   into why?

18   **A.**  Yeah.  We did necropsies on those calves, and we

19   actually -- or I predicted that those would happen because we

20   always see small calves die as a measure of normal

21   reproduction.  It's probably quite challenging to be born in

22   the water.  You have to swim right away.  And when we had all

23   the manatees shut down in their reproduction during this event,

24   they all, basically, synchronized when they became in better

25   condition and started to reproduce again.  So we believe that

*MARTINE DE WIT | DIRECT*                                                    72

1    the percentage of manatees that was pregnant was probably

2    higher than normal, and you have a certain percentage of calves

3    that won't make it or get aborted.  So it could be just the

4    measure of a calf boom that we had last year because a lot of

5    live calves were observed in the field as well.

6    **Q.**  Would you take a look at Exhibit 24 in that binder in front

7    of you?  I'm sorry, not 24; 17.

8        Do you recognize Exhibit 17?

9    **A.**  Yes.  It is the list of all verified manatee carcasses last

10   year, in 2024.

11   **Q.**  And you posted these findings to the Fish and Wildlife

12   Commission website, right?

13   **A.**  Yep.

14   **Q.**  You personally?

15   **A.**  I do not personally post them.

16   **Q.**  But is this your work product --

17   **A.**  It is, yes.

18   **Q.**  -- Exhibit 17.

19          **MS. BLOME:**  I would move to admit Exhibit 17.

20          **THE COURT:**  Any objection?

21          **MR. BROWN:**  Hearsay, Your Honor.

22          **THE COURT:**  Well, I mean, an expert can rely on

23   hearsay.  It's a pretty wide open door once she's qualified.

24   The objection is going to be overruled and the item admitted as

25   evidence.  Feel free to proceed.  She did say that she played a

*MARTINE DE WIT | DIRECT*

1    role in authoring this, so this is her work.  With that on the

2    record, it's admitted.

3         (Plaintiff's Exhibit No. 17 was admitted into evidence.)

4    **BY MS. BLOME:**

5    **Q.**  In the probable cause of death in the right-hand column of

6    Exhibit 17 -- well, let me just say that this table is titled,

7    "Preliminary 2024 Manatee Mortality Table with Five-Year

8    Summary From January 1, 2024, to December 31, 2024."  So this

9    is for the full year of 2024?

10   **A.**  Yes.

11   **Q.**  Okay.  On the side here it says, "Perinatal less than or

12   equal to 150 centimeters."  Will you please explain what that

13   notation means?

14        **MR. BROWN:**  Objection, Your Honor, calls for

15   speculation.  The witness has not indicated she did this data

16   entry or is familiar with the underlying circumstances.

17        **THE COURT:**  A matter I'm sure you'll capably take up

18   on cross-examination.  So this has been admitted as evidence.

19   The witness testified when the predicate was laid for this

20   document that she played a significant role in its creation.

21   If you believe it's outside the scope of what she knows or did,

22   you're welcome to pursue that on, again, cross-examination.

23   For now, I'm going to let her explain what's in the document.

24        So feel free to proceed.  The objection is overruled.

25   **BY MS. BLOME:**

*MARTINE DE WIT | DIRECT*

1  **Q.** "Perinatal less than or equal to 150 centimeters," in that

2  probable cause.  What does that mean, "perinatal"?

3  **A.** Yeah.  It's cause of death that's, kind of, inherited from

4  the past, and it's not a real cause of death because you don't

5  die from being small.  But it's a category assigned to any

6  manatee that is smaller than five-foot and does not have a

7  human-related cause of death.  If there is a calf that dies

8  from watercraft injuries, we put that in the adult category.

9  **Q.** And where did the data that makes up this table come from?

10 **A.** It's the summary of all the carcass reports all together,

11 so it's the necropsy reports that we just reviewed, all

12 verified, and then added up.

13 **Q.** And you personally oversaw all of those necropsies?

14 **A.** I did.

15 **Q.** And then entered this data into this summary table?

16 **A.** We have a database curator who enters that.  I'm not --

17 **Q.** And do you oversee her?

18 **A.** -- computer savvy enough to work with databases.

19 **Q.** And do you oversee her work entering the information in the

20 database?

21 **A.** Yes.

22 **Q.** Okay.  How many perinatal manatee mortality deaths are

23 reported for 2024?

24 **A.** So this is statewide.  We have 154.

25 **Q.** And would that be an unusual amount of manatee baby deaths?

*MARTINE DE WIT | DIRECT*

1    **A.**  It is the highest on record that we have since we started

2    this data.

3    **Q.**  And does this table reflect perinatal manatee deaths in all

4    of Florida?

5    **A.**  Yes.

6    **Q.**  Where was the highest concentrations of perinatal deaths?

7    **A.**  More than half of these were on the Atlantic coast or in

8    the Indian River Lagoon.

9    **Q.**  Would you say that -- my data shows that that's about 55.

10   Does that sound right?

11   **A.**  I think it was more.

12   **Q.**  Even more.  Okay.  How many perinatal mortalities did the

13   fish and wildlife -- oh, I'm sorry.  Strike that.

14        According to your mortality records, what was the previous

15   record for perinatal mortality deaths?  What year?

16   **A.**  I don't remember.  It was probably 10 years before.

17   **Q.**  Does 2013 sound right --

18   **A.**  Yeah.

19   **Q.**  -- during that red tide event?

20        And how many perinatal mortalities did the Florida Fish and

21   Wildlife Commission report to have occurred in Florida in 2013?

22   **A.**  I don't remember that number.

23   **Q.**  Would 129 sound about right?

24             **MR. BROWN:**  Objection, leading.

25             **THE COURT:**  That is leading.  Do you want to direct

*MARTINE DE WIT | DIRECT*                                        76

1    her to anything she can review?  You're welcome to do so.  The

2    objection is sustained.

3    **BY MS. BLOME:**

4    **Q.**  Let's turn to Exhibit 18.  Now, do you recognize what's

5    marked as Exhibit 18?

6    **A.**  It's the preliminary table from this year until February.

7    **Q.**  The preliminary table.  Why would you say -- why is it

8    marked as preliminary?

9    **A.**  It's just the way that we call it.  We have the

10   year-to-date, which gives the monthly overviews, and the

11   preliminary reflects every verified carcass individually with

12   the summary at the end, but we call preliminary because it's

13   all preliminary data that still needs to go through some QA/QC

14   before we finalize reports.

15   **Q.**  But you recognize this document as your table --

16   **A.**  Yes.

17   **Q.**  -- or your summary table of data?

18   **A.**  Yes.

19   **Q.**  And this is called the Preliminary 2025 Manatee Mortality

20   Table With Five-Year Summary from January 1, 2025, to

21   February 7, 2025.  Do you have data for February 7 to March 17

22   available?

23   **A.**  They should on our website, yep.  It gets updated every

24   week on Wednesday.

25   **Q.**  Every week on Wednesday.  Okay.  This was the most recent

*MARTINE DE WIT | DIRECT*

1    one we found as of --

2    **A.**  It's probably because you have to clear your cache.

3    Sometimes the cookies will prevent the newest PDF to be

4    uploaded.  But posted every week.

5    **Q.**  I'm showing on this table that there has been additional

6    perinatal deaths, and I wonder if you can tell me, based on

7    your personal experience with these reports, how many perinatal

8    deaths have there been in 2025 to date?

9    **A.**  I do not know the number to date, but according to this

10   document, through February 7th it was eight.

11            **MS. BLOME:**  I would like to move to admit Exhibit 18.

12            **THE COURT:**  Any objection?

13        **MR. BROWN:**  No, Your Honor.

14            **THE COURT:**  All right.  Without objection, 18 is

15   admitted and marked.  Feel free to proceed.

16       (Plaintiff's Exhibit No. 18 was admitted into evidence.)

17   **BY MS. BLOME:**

18   **Q.**  And then I would like to show you Exhibit 20.  Do you

19   recognize this document?

20   **A.**  I think it's a print from NOAA's website.  Yeah.

21   **Q.**  Oh, sorry, Exhibit 19, not 20.

22   **A.**  Yep.  Those are the monthly tables.

23   **Q.**  All right.  What does that mean?  What are the monthly

24   tables?

25   **A.**  Sorry.  That's the numbers by county.

*MARTINE DE WIT | DIRECT*

78

1    **Q.**  And do you recognize this document?

2    **A.**  I do, yep.

3    **Q.**  And did you help prepare this document?

4    **A.**  Yeah.

5           **MS. BLOME:**  We would move to admit the Preliminary

6    2025 Manatee Mortality Table by County for January 1, 2025, to

7    February 7, 2025, at Exhibit 19.

8           **MR. BROWN:**  Your Honor, I appreciate your ruling and

9    reasoning on the hearsay objection, but we would submit that

10   although this is material that can be relied upon in expert

11   testimony, the document itself is hearsay and should be

12   excluded.

13          **THE COURT:**  What's your response to that?

14          **MS. BLOME:**  I mean, it's her work.  She prepared it.

15   It's her necropsies, her summary data.  There's no way to

16   get -- I mean, she can be cross-examined on this.  That is the

17   purpose of the hearsay rule.

18          **THE COURT:**  All right.  I want to think about that.

19   That's a little bit different of a tact.  I'm going to allow

20   you to proceed with your examination.  If I subsequently

21   determine that it's inadmissible, then I won't consider the

22   testimony elicited from this witness.  But it would be easier

23   if you could just state the hearsay exception for why it is

24   admissible, rather than having me look for one for you.

25          So he's objecting that it's hearsay, an out-of-court

*MARTINE DE WIT | DIRECT*

1    statement used in court for the truth of the matter asserted.

2    Is there an exception that you would like to cite now?  Why

3    don't you think about that, and I'll let you answer that

4    question later.  I don't know if there is.  There might be.

5    But I don't want to shoot from the hip.

6            So go on ahead and continue, and I'll consider it in

7    that context.

8    **BY MS. BLOME:**

9    **Q.**  Dr. de Wit, how many perinatal deaths have you seen in

10   Brevard County this year, in 2025?

11   **A.**  I don't know to date, but according to this table it was

12   seven early February.

13   **Q.**  And the total on this table you said was eight, so seven of

14   eight have happened in Brevard County as of the date of this

15   document, February 7?

16   **A.**  Yes.

17   **Q.**  All right.  Then I would like to --

18           **MS. BLOME:**  I moved to admit 19 I think.  Did I?

19           **MS. BLACKNER:**  Yes.

20           **THE COURT:**  Okay.  Ann, is 19 in?  Beg your pardon,

21   18, is it in?

22           **THE COURTROOM DEPUTY:**  Yes, 18.

23           **THE COURT:**  Okay.  Feel free to proceed.

24           **MS. BLOME:**  I'll move to admit 19, then.

25           **THE COURT:**  You did, and I'm tabling the objection.

*MARTINE DE WIT | DIRECT*

1          **MS. BLOME:**  Oh, I see.

2          **THE COURT:**  But I'm allowing you to continue with your

3    direct examination using it or incorporating it as part of your

4    direct.

5          **MS. BLOME:**  Understood.

6    **BY MS. BLOME:**

7    **Q.**  Dr. de Wit, you mentioned earlier that the unusual

8    mortality event is subject to closure, but is it technically

9    still ongoing?

10   **A.**  If you consider the federal declaration technical, then I

11   would say it is ongoing.  I would disagree with the

12   practicality of it.

13   **Q.**  Understood.  Dr. de Wit, what is a repeat mortality event?

14   **A.**  A repeat mortality event comes from an unusual mortality

15   event, so it has the same conditions like unusual mortality

16   events, where you have elevated mortality of a cause that a lot

17   of carcasses have in common, but it's a cause that we've seen

18   many times before that is recognized and is expected to happen

19   again, such as red tide.  Red tide events are now considered

20   repeat mortality events.

21   **Q.**  What about cold weather mortality events?  Are those

22   considered repeat mortality events?

23   **A.**  They probably would, but we still have to write the case

24   definition for that.

25   **Q.**  Oh, okay.  So there's some process that happens on your

*MARTINE DE WIT | DIRECT*

1    end?

2    **A.**  Yep.

3    **Q.**  Are there any other repeat mortality events in the North

4    Indian River Lagoon?

5    **A.**  No.

6    **Q.**  Not at this time?

7    **A.**  No.

8    **Q.**  At the Florida Fish and Wildlife Conservation Commission,

9    who is responsible for monitoring manatee health?

10   **A.**  Our manatee necropsy and rescue program is.

11   **Q.**  You're the manager of that?

12   **A.**  I'm part of that, yep.

13   **Q.**  Do you have a supervisor?

14   **A.**  I do.

15   **Q.**  Who is that supervisor?

16   **A.**  Leslie Ward.

17   **Q.**  And is she part of that team as well?

18   **A.**  She oversees all the manatee research section, so, yes,

19   she's part of our team.

20   **Q.**  Who is responsible for monitoring -- sorry.  I already

21   asked you that question.

22   Who is responsible for reporting on threats to manatee

23   health?

24   **A.**  I would report from our observations on the necropsy floor

25   or from observations from our field, and depending on the

*MARTINE DE WIT | DIRECT*

1  circumstances, I would talk directly to my supervisor or to a

2  manager, but if it is, like, a bigger event, then it would be

3  done through my supervisor.

4  **Q.**  What's the Florida Fish and Wildlife Commission's current

5  view on the current threats to manatee health in the North

6  Indian River Lagoon?

7  **A.**  I do not think the FWC has an official statement on that,

8  so it's hard for me to answer that.  We are still in an active

9  phase of monitoring manatee health from the aftermath of this

10  event, so I would say that there is still a heightened alert

11  and a concern based on what happened in the past, but I do

12  think everyone recognizes that things are moving in a positive

13  direction.

14  **Q.**  So would you say that dietary changes are a current threat?

15  **A.**  Sorry.  I couldn't hear.

16  **Q.**  Would you say dietary changes are a current threat to

17  manatee health in the North Indian River Lagoon?

18  **A.**  Yes.  I would say so.

19  **Q.**  What about chronic malnutrition?

20  **A.**  If seagrass goes back to the conditions that we had a few

21  years ago, then that is definitely a threat.

22  **Q.**  On the Florida Fish and Wildlife Commission website there

23  is a weekly update posted.  Do you have any role in posting the

24  weekly updates?

25  **A.**  Of what part of the website is that?

*MARTINE DE WIT | DIRECT*

1   **Q.**  Oh, sorry.  The UME portion of the website.

2   **A.**  At the time, we had a communications team posting those

3   updates.  I don't think they are weekly updates now.  But at

4   the time, I contributed, but response involved many more

5   people, including the management sections and the feeding,

6   supplemental feeding effort.  So I was only a small part of

7   that.

8   **Q.**  What about in April 5, 2023, would you have been involved

9   in preparing a weekly update?

10  **A.**  Yes.  We submit our weekly -- our total numbers every week.

11  **Q.**  I want to read to you a statement from the April 5, 2023,

12  update.  "Fish and Wildlife Conservation Commission researchers

13  expect findings of chronic malnutrition in manatees to persist

14  along the Atlantic coast so long as there remains a seagrass

15  shortage in the Indian River Lagoon."  Do you recall that

16  statement?

17  **A.**  I don't remember it, but it sounds reasonable to me that we

18  made that at that time, because it was the first winter when

19  things were looking much better than the two winters before.

20  We still had, I think it was, less than 10 starvation cases,

21  but we were really at a turning point at that time, but we

22  wanted to be very conservative in our predictions.

23  **Q.**  So do you still agree with that statement that chronic

24  malnutrition in manatees is likely to persist along the coast

25  for the Indian River Lagoon?

*MARTINE DE WIT | DIRECT*                                                84

1    **A.**   At this time, no.  We have seen significant improvement.

2    **Q.**   Okay.

3    **A.**   But it's always a concern and a threat based on the past.

4    **Q.**   So it could always resurface?

5    **A.**   Exactly, yep.

6         **MS. BLOME:**   Okay.  All right.  May I confer with my

7    co-counsel briefly?

8         **THE COURT:**   Yes.

9    **BY MS. BLOME:**

10   **Q.**   All right.  Dr. de Wit, I would like you to turn back to

11   Exhibit 11, and I want to read to you a portion of the report

12   from the executive summary on the first page.

13        It states, "The UME followed a dramatic reduction of

14   seagrass coverage in the I.R.L. due to chronic, nontoxic

15   phytoplankton blooms, with a resultant ecosystem shift to mixed

16   macroalgae dominance."  Do you still agree with that finding?

17   **A.**   Absolutely, yep.

18   **Q.**   You also wrote:  "The results from this eight-year long

19   investigation are indicative that the cause of death in this

20   UME was associated with clostridial infection, initiated by a

21   shift to predominately macroalgal diet."  Do you still agree

22   with that finding?

23   **A.**   Yes.

24   **Q.**   With respect to the 2023 -- well, I guess, it's 2022 UME,

25   2020 to 2022 UME.  The National Oceanic and Atmospheric

*MARTINE DE WIT | CROSS*                                                85

1    Administration lists the cause as, quote, "infection, disease

2    secondary to ecological factors, e.g., change in forage."  Do

3    you agree with that still?

4    **A.**   Change in forage, yeah.

5    **Q.**   All right.  Thank you.

6            **THE COURT:**  Mr. Brown, cross-examination?

7            **MR. BROWN:**  Yes, Your Honor.

8                        **CROSS-EXAMINATION**

9    **BY MR. BROWN:**

10   **Q.**   Can you describe, from your observations, the health of

11   manatees, the Florida manatees in the Indian River Lagoon,

12   during the previous winter, from 2024 to 2025?

13   **A.**   The health is good, and the causes of death and rescue that

14   we have documented are as expected for a normal manatee.

15   **Q.**   Okay.  Can you describe the conditions of manatees during

16   the previous winter, from 2023 to 2024?

17   **A.**   Same.  Manatees were dying from expected causes of normal

18   manatees.

19   **Q.**   In your opinion and from your observations, is there

20   adequate forage in the Indian River Lagoon to maintain the

21   health of manatees?

22           **MS. BLOME:**  Objection, outside of the scope of the

23   expertise.

24           **THE COURT:**  Make sure to stand when addressing the

25   Court.

*MARTINE DE WIT | CROSS*

1          **MS. BLOME:**  I'm sorry.

2          **THE COURT:**  Local rule.  By the book here.

3          What's the response to the objection?  I will say it

4    seems a bit ironic that right out of the gate you're asking for

5    what sounds to me like clearly opinion testimony from someone

6    you objected was not an expert qualified to render such an

7    opinion because they did not give you proper notice of it.

8          So I'll do this.  More information is better.  If I

9    allow you to go down this road where you're eliciting opinion

10   testimony, then redirect I'm going to allow the same.

11         **MR. BROWN:**  Yes, Your Honor.

12         **THE COURT:**  All right.  So the objection is overruled.

13   Door is wide open on redirect.  Feel free to proceed.

14         **MR. BROWN:**  May the witness answer the question?

15         **THE COURT:**  Sure.

16         **THE WITNESS:**  Can you repeat the question, please?

17         **MR. BROWN:**  May I ask the court reporter?

18         **THE COURT:**  In your opinion, and from your

19   observations, is there adequate -- she types words that don't

20   exist, but she's the only one that knows, so I need her to read

21   it back.

22      (The requested portion of the record was read back by the

23   Official Court Reporter.)

24         **THE WITNESS:**  From what I can tell, at the moment

25   there is.

*MARTINE DE WIT | CROSS*

1    **BY MR. BROWN:**

2    **Q.**  Concerning your testimony on the reports of perinatal

3    death, do you have an opinion as to whether those reported

4    instances of perinatal death are caused by the current

5    conditions of forage in the Indian River Lagoon?

6    **A.**  I do not think they are related to the current conditions

7    of vegetation.  From all we can tell, there is enough seagrass

8    to sustain lactation, to sustain pregnancy.  And the higher

9    number of manatee calves that died is probably from lingering

10   effects of previous malnutrition and other factors, such as

11   first-time moms and the natural percentage of normal calf

12   mortality.

13   **Q.**  What is the basis for your opinion that manatees are

14   currently able to sustain adequate lactation?

15   **A.**  Well, we have seen from our small calf investigations most

16   calves last year died around birth or shortly thereafter.  If

17   we have concerns about manatees that are orphaned or abandoned

18   from lack of lactation, we would see that in the necropsies,

19   where you see older calves and emaciated calves, we would get

20   those often reported to us to get rescued as well, and those

21   numbers of those specific cases were still relatively low.

22   **Q.**  I observed in your testimony on direct examination that the

23   general health in manatees appears to be moving into a positive

24   direction.  Can you elaborate upon that?

25   **A.**  Yes.  We do examinations of manatees that are caught for

*MARTINE DE WIT | CROSS*

1    telemetry studies in December, and the last two Decembers,

2    particularly, those manatees were in excellent body condition,

3    and we observed several pregnancies among the adult females as

4    well.  So to me, those were excellent news in a positive -- it

5    was excellent news compared to what we saw in the years before.

6    **Q.**  Can you please turn to the binder that has a yellow cover

7    and look at the document?  It's on your right-hand side, the

8    Defendant's Exhibit No. 24.  It's a different notebook.

9    **A.**  Can you repeat?

10   **Q.**  Are you looking at Defendant's Exhibit No. 24 right now?

11   It's in the --

12              **MR. BROWN:**  May I approach the witness, Your Honor?

13              **THE COURT:**  You may.

14   **BY MR. BROWN:**

15   **Q.**  Can you please explain what defense or EP 24 is?

16   **A.**  This is the form that we filled out to apply for closure of

17   the starvation events that we submitted at the end of last

18   year.

19   **Q.**  Did you participate in the preparation of this form?

20   **A.**  Yes, I did.

21   **Q.**  And do you concur with the observations and recommendations

22   in this form?

23   **A.**  I do.

24              **MR. BROWN:**  The department moves to move into evidence

25   Defendant's Exhibit 24.

*MARTINE DE WIT | CROSS*                                                    89

1          **THE COURT:**  All right.  Are you planning on calling

2     this witness in your case in chief?

3          **MR. BROWN:**  No, Your Honor.

4          **THE COURT:**  All right.  For the purposes of judicial

5     economy, does the plaintiff have any objection to my allowing

6     this witness to introduce exhibits by laying the predicate on

7     cross and admitting them, with the knowledge that he's not

8     calling this witness on his case in chief, which he could?  Any

9     objection on that basis?

10         **MS. BLOME:**  No objection.

11         **THE COURT:**  All right.  Your lack of a procedural

12    objection.  Now substantively, do you have any objection to

13    this document coming in as moved?

14         **MS. BLOME:**  Yes, Your Honor.  Objection for hearsay.

15         **MR. BROWN:**  Your Honor, I would observe that the

16    plaintiffs had filed their exhibit lists and that the

17    plaintiffs did not advise of a hearsay objection on that list.

18         **THE COURT:**  Well, I mean, certainly, for efficiency

19    sake, that would be preferred, but it's not a waiver.  So

20    Defense Exhibit 24, tell me again what this is.

21         **MR. BROWN:**  This is the Florida Fish and Wildlife

22    Commission -- the Florida Fish and Wildlife's recommendation

23    for the closure of the UME.

24         **THE COURT:**  Okay.  Let me read you -- by the way, I'm

25    ready to make a decision on Plaintiff's Exhibit 19.  So let me

*MARTINE DE WIT | CROSS*                                                          90

1    read you the rule, and my very capable law clerks found a case

2    directly applicable to the dispute at hand.  Federal Rule of

3    Evidence 803(8) is a hearsay exception for public records.  A

4    record or statement of a public office is admissible if, A, it

5    sets out the office's activities, a matter observed while under

6    a legal duty to report but not including any criminal case, a

7    matter observed by law enforcement personnel, or in a civil

8    case or against the government in a criminal case, factual

9    findings from a legally authorized investigation, and the

10   opponent does not show the source of information or

11   circumstances indicating a lack of trustworthiness.

12        And there's a case from the Eleventh Circuit styled

13   *United States v. Rivera-Soto*, 451 F. App'x 806 at page 807,

14   Eleventh Circuit, 2011.  Under Federal Rule of Evidence 803(8).

15   "Documents are generally not excluded as hearsay if they are

16   records, reports, statements, or data compilations in any form

17   of public agencies which set forth the activities of the agency

18   or matters observed pursuant to a legal duty to report, unless

19   circumstances indicate a lack of trustworthiness."

20        So with that as my background, I'm going to go on

21   ahead and admit what was moved into evidence as Plaintiff's

22   Exhibit 19, which was a monthly mortality table broken down by

23   county.

24        (Plaintiff's Exhibit No. 19 was admitted into evidence.)

25             **THE COURT:**  Based on my reading there, is there

*MARTINE DE WIT | CROSS*

1   anything further from the plaintiff before I make a ruling on

2   Defense Exhibit 24?

3       **MS. BLOME:**  Yes, Your Honor.  We did note our

4   objection for hearsay and lack of foundation in our exhibit

5   list that was filed with the court.  But the foundation seemed

6   to have been laid with Dr. de Wit testifying to her familiarity

7   with the document.

8           As to the hearsay exception, we would just add that

9   this document has been long available to the defendants, and

10  they did not produce it to us in discovery, so we did not have

11  an opportunity to call any witnesses, do any discovery,

12  cross-examine anybody, or, you know, consult with our experts

13  in connection with this document.  It's a brand-new document

14  that's never been --

15      **THE COURT:**  So you're saying it was never produced in

16  discovery?

17      **MS. BLOME:**  Correct.

18      **THE COURT:**  I want you to take a moment to think about

19  that because we're moving on to what's being alleged is a

20  discovery violation, and now the matter turns to whether or not

21  you've been prejudiced by the lack of disclosure, and I'm not

22  saying they have been prejudiced, and I'm not saying there was

23  any intent behind not providing this to you, but now the

24  analysis is whether or not you've been prejudiced to the extent

25  where the most severe penalty would be available, and that's

*MARTINE DE WIT | CROSS*

1    not permitting it to be introduced at all.  There are a lot of

2    remedies that we get to before that.

3         But I'm going to take a break to let you think about

4    that, because it's not just a matter of whether they provided

5    it to you.  It's whether or not you've been prejudiced; you

6    could have found it on your own; you should have been able to

7    find it; it's buried in there.  So there are a lot of different

8    approaches that can be taken.  So I want you to get your sea

9    legs on this.  And I'll hear brief argument when we return in

10   ten minutes and we continue moving forward.

11        Is there anything further from plaintiff before we

12   take our break?

13        **MS. BLOME:**  Yes, Your Honor.  We did do document

14   production requests to the state.

15        **THE COURT:**  Well, again, I'm going to hear argument on

16   this when I return.

17        **MS. BLOME:**  Yes.  Right.

18        **THE COURT:**  Anything further from defense?

19        **MR. BROWN:**  On this topic, Your Honor?

20        **THE COURT:**  I don't need to hear anything else on this

21   topic.  I'm going to let you collect your thoughts.  I'm going

22   to let her elaborate further on the objection, and let you

23   respond to her further elaborated objection.

24        So that being the case, we'll start out 10-minute

25   break.  Court's in recess.

*MARTINE DE WIT | CROSS*                                                93

1          (Recess at 10:50 a.m. until 11:03 a.m.)

2          **THE COURT:**  If the plaintiff would like to further

3    elaborate on the objection briefly, I'll give you the

4    opportunity now.

5          **MS. BLOME:**  Yes, Your Honor.  Thank you.  We maintain

6    our objection to the admissibility of this document because it

7    was not produced in discovery.  We also do not believe that

8    qualifies for the hearsay exception because it is not an

9    official government document, that it bears the insignia of the

10   Florida Fish and Wildlife Commission, is dated, or signed.  It

11   is what appears to be an update to something that was

12   previously submitted.  If you look at the top of page 2,

13   there's a little blue header notation that says, "Updated in

14   December 2023."  So we're not even sure if this is the final

15   document.

16         And we don't know of the context of where it was

17   obtained.  It was not available on the website.  It was not

18   produced to us in discovery to Dr. de Wit in our subpoena that

19   we sent to her for documents related to the UME, nor was it

20   produced by the Florida Department of Environmental Protection

21   in response to document requests to it, nor was it produced by

22   the National Oceanic and Atmospheric Administration when we

23   submitted documents requests to it.  So we truly do not know

24   what it is, where it came from, or why it exists.

25         We were deprived of opportunity to engage with our

*MARTINE DE WIT | CROSS*

1   experts on this document while discovery was ongoing, such that

2   we could have impeached its credibility and determined the

3   answers to those questions.  And we weren't able to ask

4   Dr. de Wit about it in her deposition, either, so anything that

5   she might say is going to be a complete surprise to plaintiff

6   today.

7           **THE COURT:**  All right.  Response.

8           **MR. BROWN:**  Your Honor, this is unusual, but part of

9   my argument -- I believe it may be appropriate to ask a few

10  follow-up questions of the witness, and I do not want to

11  suggest an answer based upon the argument that I'm about to

12  make to the Court.  May I ask a few follow-up questions to the

13  witness?

14          **THE COURT:**  All right.  Again, the case I cited:

15  "Documents were generally not excluded as hearsay if they are

16  records, reports, statements, or data compilations in any form

17  of public agencies which set forth the activities of the agency

18  or matters observed pursuant to a legal duty to report, unless

19  the circumstances indicate a lack of trustworthiness."  So in

20  the Eleventh Circuit, the door is wide open here.  I don't

21  think there has to be a stamp.  I think the predicate needs to

22  be laid that it purports -- it is what it purports to be.

23          I'm not going to make a decision at this time, but I

24  will say I think -- it looks to me like this probably comes in.

25  I want to hear more about it, but I'm not making a decision

*MARTINE DE WIT | CROSS*                                                    95

1    yet.  I'm just going to absorb the information.  And I'll let

2    you know where I'm at once he finishes with his

3    cross-examination.  All right.  So that's one part of the

4    analysis, the hearsay component.

5            With regard to what seems to be, kind of, a passive

6    allegation that's turned into an active allegation of a

7    discovery violation, just so I can measure the amount of

8    prejudice here, it seems to me that you knew of this document

9    before today.  Is that a fair statement?  Were you completely

10   surprised when he pulled out Defendant's Exhibit 24 here today,

11   or had you seen it prior to today?

12       **MS. BLOME:**  Your Honor, he sent it to us, I believe,

13   last week as an addition to his exhibit list.  That was the

14   first time we saw it.

15       **THE COURT:**  I understand.  So you knew of it as of

16   last week.  So I would tell you this.  The most severe remedy

17   available to you for a discovery violation is the

18   inadmissibility of what was not provided via discovery.  That

19   is a very severe remedy that you would be seeking, and there

20   are a lot of remedies that fall short of that, for example,

21   more time to prepare.  A more severe remedy is to reopen

22   discovery and allow you to question, for example, this witness

23   with this additional evidence in a limited amount of additional

24   discovery.  Those are all things I could have done prior to

25   today, certainly, if you knew of it last week.

*MARTINE DE WIT | CROSS*

1            I'm not saying you've done anything wrong.  I'm just

2    saying for future reference if you're going to ask for a very

3    severe remedy, it needs to be a situation where:  I have never

4    seen this before; I had no chance of ever seeing this prior to

5    today; or at the moment that they serve you with their defense

6    exhibit list, to at least voice concerns at that point, because

7    now my hands are tied.  It would be worse if I had a jury here,

8    and I would be more limited on what I could do.

9            So I'm going to allow him to continue with his

10   cross-examination.  If you want to request a remedy -- look, if

11   your remedy is, it shouldn't come in, then stick with your

12   guns.  I don't blame you for that.  But if upon hearing the

13   cross-examination there's some other remedy that you would

14   seek, maybe open the door a little wider on redirect or let you

15   lead on redirect with this document, those are all available.

16   But I'm just really reluctant in this circumstance, based on

17   the fact that you knew of this last week, to use a guillotine

18   when something a little bit less severe can be used.

19            Your objection is noted and preserved.  I'm going to

20   allow you to cross-examine this witness.  I'm not making a

21   ruling on the admissibility at this point, but I will tell you,

22   in terms of the public records objection, I need to hear a

23   little bit more, but I don't think you get there unless there's

24   a lack of trustworthiness in the document they're presenting.

25   So I think that's a dead end.  The question is whether or not

*MARTINE DE WIT | CROSS*

1    you've been treated unfairly with this being provided to you so

2    close to the bench trial.

3            So feel free to proceed.  We'll talk a little bit more

4    about this after lunch.

5            **MR. BROWN:**  Your Honor, again, I misled you on my

6    response.  The question I was to ask the witness was concerning

7    the timing of the production of the document.

8            **THE COURT:**  I mean, I don't need to hear that.  I

9    mean, if you want to ask that question, you're welcome to do

10   so, but I would just -- the door is wide open beyond.  Go on

11   ahead and continue with your cross.

12   **BY MR. BROWN:**

13   **Q.**  Do you recall having a Teams conference with me on

14   February 25th of this year?

15   **A.**  Yes.

16   **Q.**  Okay.  Do you recall sending a DEP exhibit to my email

17   address on the day before that meeting?

18   **A.**  I think it was after, but --

19   **Q.**  On or about the time of that meeting, did you send that

20   document to me?

21   **A.**  I did.

22   **Q.**  Had I ever spoken to you about that document?

23   **A.**  No.  I do want to correct.  When you say "this document,"

24   because that update, December 23, that is not in my document.

25   It should be December 24th.

*MARTINE DE WIT | CROSS*

1    **Q.**  Thank you, Dr. de Wit.  Had you had a similar opportunity

2    to discuss your testimony last month with the plaintiffs?

3    **A.**  No.

4    **Q.**  Did they ask to do so?

5    **A.**  No, they did not.

6         **MR. BROWN:**  May I confer with counsel, Your Honor?

7         **THE COURT:**  Sure.

8    BY MR. BROWN:

9    **Q.**  You had alluded, in your previous testimony, to the UME

10   being deemed over, retroactive in April 2022.  Can you

11   elaborate upon that?  What are you referring to?

12   **A.**  Yeah.  We applied for a closure, and because the elevated

13   mortality stopped in April 2022, we determined that as the end

14   date, not the date that we were submitting this document.  So

15   it was really on the data that were previously collected.

16   **Q.**  Are you familiar with the process whereby internally the

17   federal agency declares an end to the UME?

18   **A.**  I am familiar with what I see from my end.

19   **Q.**  Yes.

20   **A.**  And so what I know is that we fill out this form.  We

21   submit that to a representative from NOAA, and this gets

22   consulted with a working group.  And then we were informed that

23   the working group agreed a closure was appropriate, and, then,

24   there are internal discussions at a higher level in NOAA,

25   between NOAA and the U.S. Fish and Wildlife Service, who is

*MARTINE DE WIT | CROSS*

1    going to write a closure letter.

2    **Q.**  Now, you had referred in your testimony to seeing a draft.

3    Can you elaborate upon what you were testifying about?

4    **A.**  Yeah.  A colleague from the U.S. Fish and Wildlife Service,

5    from the regional field office, I believe was tasked with

6    writing the closure letter for some of the leads within the

7    service, and that draft was sent out while I was overseas

8    sometime last week.

9    **Q.**  Okay.  Please refer to DEP Exhibit 24.  Do you see -- I

10   want you to look at a series of numbers on the lower right-hand

11   corner.  Do you see its -- we call them Bates stamps.  Do you

12   see a number at the beginning of the document that uses number

13   DEP 883?

14   **A.**  Yep.

15   **Q.**  Please turn to, within the same exhibit, the page marked

16   DEP 00888.  Can you explain what that page depicts?

17   **A.**  This is a graph that reflects carcass numbers between

18   November 2020 and August 2024, and each bar represents the

19   number of carcasses found each day.

20   **Q.**  And can you please turn to page DEP 889, and tell me what

21   that refers to?

22   **A.**  Those are also carcass numbers per week, and the blue line

23   are the carcasses that were found on the Atlantic coast for the

24   unusual mortality event.  And to compare them to what you would

25   expect for normal mortality if there was no starvation in this

*MARTINE DE WIT | CROSS*

1    case, we have the red line.  That is calculated from normal

2    years where we have, what we call, baseline mortalities of

3    manatees that all have died from watercraft injuries or cold

4    spells or expected causes.  This is shown when the manatee

5    mortality numbers were elevated above the red baseline.

6    **Q.**  Please refer to Plaintiff's Exhibit 16, and in the lower

7    left-hand part of the exhibit there are notations on the page

8    number, and I ask you to move to page 3.

9    **A.**  I'm not sure if I'm in the right document.

10         **MR. BROWN:**  May I approach the witness, Your Honor?

11         **THE COURT:**  You may.

12   **BY MR. BROWN:**

13   **Q.**  Can you explain what the bar chart on page 3 reflects?

14   **A.**  This bar chart is the number of verified carcasses for each

15   week, and each bar is divided by causes of death with color

16   codes.

17        **MR. BROWN:**  I have no additional questions for this

18   witness, Your Honor.

19        **THE COURT:**  All right.  Thank you.  Feel free to be

20   seated at the counsel table.

21        All right.  So here's where I'm at with plaintiff,

22   trying to mitigate what's going on here.  I've got two options

23   in terms of logistics here.  We can break for lunch now to give

24   you more time to prepare for redirect of this witness and we'll

25   wrap up after lunch, or you can continue marching forward now.

*MARTINE DE WIT | CROSS*

1    We'll take the same amount of break for lunch.

2          Which would you prefer?

3          **MS. BLOME:**  Yeah.  Let's take a break now.  Thank you,

4    Your Honor.

5          **THE COURT:**  All right.  And how many more witnesses?

6    I think you have one more after this; is that correct?

7          **MS. BLOME:**  Yes, Your Honor.

8          **THE COURT:**  All right.  And based on the pace thus

9    far, I think it would be wise, if you could, to have one or

10   more of your witnesses ready this afternoon.  I think we're

11   going to get to at least one of them.

12         **MR. BROWN:**  Yes, Your Honor.

13         **THE COURT:**  It is 11:15.  Let's be back here at 12:45.

14   An hour and a half should be enough for lunch, and then we'll

15   continue marching forward.

16         All right.  Enjoy your lunch, everyone.  I'll see you

17   in an hour and a half.

18      (Recess at 11:18 a.m. until 12:48 p.m.)

19         **THE COURT:**  Defense, ready to proceed?

20         **MR. BROWN:**  Yes.

21         **THE COURT:**  Feel free to proceed.

22         **MS. BLOME:**  Thank you, Your Honor.  Plaintiff will

23   take you up on the offer to, if needed, lead Dr. de Wit and

24   possibly impeach her, in lieu of additional discovery or

25   exclusion of defendant's exhibit.

*MARTINE DE WIT | REDIRECT*                                                    102

1        **THE COURT:** As long as it doesn't get out of hand, I'm

2   fine with that, and you certainly don't need to lead to

3   impeach.  You're invited to do so.

4        **MS. BLOME:** Thank you.

5                         **REDIRECT EXAMINATION**

6   BY MS. BLOME:

7   **Q.**  Dr. de Wit, the Florida Fish and Wildlife Commission does

8   not decide when the UME ends, does it?

9   **A.**  No.  We ask for it.

10  **Q.**  And you have to ask the National Oceanic and Atmospheric

11  Administration, correct?

12  **A.**  And the U.S. Fish and Wildlife Service.

13  **Q.**  And neither of those entities have ended the UME, correct?

14  **A.**  Not at this time.

15  **Q.**  In fact, you testified that it can take years to

16  investigate a cause of a UME before it can be closed, correct?

17  **A.**  No.  An investigation and the research on the cause can go

18  way past the closure of a UME.  The 2013 one I believe we kept

19  open because of the investigation, not because of the numbers,

20  but some were also in support of closing it.  At the time, we

21  just, you know, thought it was more appropriate to keep it open

22  because we still didn't know the exact cause.

23  **Q.**  Understood.  I would like you to return to Exhibit 24 in

24  the Florida Department of Protection binder.

25       **THE COURT:** Are you stretching your legs, or do you

*MARTINE DE WIT | REDIRECT*

1    want to object?

2          **MR. BROWN:**  Your Honor, I have an extremely unusual

3    request.

4          **THE COURT:**  Well, I mean, you have to say something or

5    else it just looks like you're stretching your legs.  So are

6    you objecting?

7          **MR. BROWN:**  Your Honor, I wanted to advise the Court

8    that I just received a copy of the declaration of the end of

9    the UME.

10         **THE COURT:**  Well, I mean, I don't know what you're

11   trying to tell me.

12         **MR. BROWN:**  What I'm trying to say is there is new

13   evidence that has just been released that the federal

14   government has terminated the UME.

15         **THE COURT:**  Let me ask you this, because this is not

16   an open mic.  Wouldn't it be a good idea to present that in

17   your case in chief?

18         **MR. BROWN:**  I just received it, Your Honor.

19         **THE COURT:**  I don't doubt that you received it, but

20   there will be the portion of trial you get to present evidence

21   and call witnesses.  Wouldn't it be appropriate to present that

22   at that time?

23         **MR. BROWN:**  I did not know the timing when this would

24   come out, Your Honor.

25         **THE COURT:**  Well, I understand that, but do you

*MARTINE DE WIT | REDIRECT*

1   understand how trial works?

2              **MR. BROWN:**  Yes, Your Honor.

3              **THE COURT:**  All right.  Wait until you present

4   evidence and then present it.  I don't need to get updates on

5   what's being published in the media in the middle of a trial.

6              **MR. BROWN:**  And I appreciate that, Your Honor.

7              **THE COURT:**  Okay.

8              **MR. BROWN:**  I wanted to avoid unfair surprise, and I

9   apologize.

10             **THE COURT:**  Well, I don't know how she could accuse

11  you of unfair surprise.  If that's being published by an

12  independent agency, then both of you would be finding out

13  simultaneously, but thank you for your cautionary approach.

14             Please continue.

15  **BY MS. BLOME:**

16  **Q.**  In the yellow binder, Dr. de Wit, we'll look at Exhibit 24

17  again, and this is FDEP's Exhibit 24.  All right.  Let's turn

18  to page 2 of this document.  Actually, it's page 3, where

19  section 12 appears or paragraph 12.

20      In this document, which you testified you assisted in

21  preparing, you state, "The unusual environmental conditions

22  that led to the UME are no longer applicable."  Do you see that

23  there?

24  **A.**  Yes.

25  **Q.**  You go on to state that, quote, "The unusual environmental

*MARTINE DE WIT | REDIRECT*

1    conditions that contributed to the UME" -- "have become

2    persistent."  Correct?

3    **A.**  "Or have become persistent," yes.

4    **Q.**  Let's turn back to page 1 of this document.  On the

5    executive summary of page -- oh, I'm sorry.  I guess we're on

6    page 2.  Page 2, on the executive summary of this document, you

7    state, quote, "The high mortality event was caused by

8    starvation due to lack of forage in the Indian River Lagoon

9    where for over a decade phytoplankton blooms fueled by excess

10   nutrient loading have led to excessive seagrass losses."

11   Correct?

12   **A.**  Yes.

13   **Q.**  You still agree with this statement; isn't that true?

14   **A.**  Yes.

15   **Q.**  You also state -- let's go back to page 3 in this statement

16   about the conditions under which the UME was declared -- that,

17   quote, "Seagrass is slowly recovering in some key areas but not

18   recovered."  Correct?

19   **A.**  Yes.

20   **Q.**  In fact, less than 5 percent of historic seagrass remains

21   in the North Indian River Lagoon; isn't that true?

22   **A.**  I don't see that, "less than 5 percent," here.

23   **Q.**  How often do you visit the North Indian River Lagoon?

24   **A.**  Not often.  I don't monitor the seagrass myself.

25   **Q.**  And you're not an expert in the habitat of the North Indian

*MARTINE DE WIT | REDIRECT*

1    River Lagoon, correct?

2    **A.**   No.

3    **Q.**   You cannot say what the predominant plant availability is

4    in the Indian River Lagoon as of today, can you?

5    **A.**   I don't know.

6    **Q.**   You've not performed any seagrass assessments in the

7    lagoon, correct?

8    **A.**   No.

9    **Q.**   Who do you rely on for credible information related to

10   seagrass recovery in the North Indian River Lagoon?

11   **A.**   The St. Johns River Water Management District.

12   **Q.**   And why do you rely on that body?

13   **A.**   Because they are one of the primary researchers to do the

14   seagrass surveys in that area, and we have a good collaboration

15   with them.  We do field trips with them, and they provide us

16   with their recent findings.

17   **Q.**   Who told you that the seagrass was returning to the Indian

18   River Lagoon?

19   **A.**   The researchers from the St. Johns River Water Management

20   District, my colleagues in ecology who follow the manatees that

21   we track for telemetry.

22   **Q.**   But they wouldn't say that seagrass has returned to

23   historic levels, correct?

24   **A.**   Not historic levels, but it is coming back in the important

25   areas for manatees.

*MARTINE DE WIT | REDIRECT*

1    **Q.**  Coming back but not fully recovered, correct?

2    **A.**  It is my understanding it's not like it was 20, 30 years

3    ago.

4    **Q.**  Right.  Dr. de Wit, I want to show you the 2013 mortality

5    table that I was looking for during my direct examination of

6    you.

7          **MS. BLOME:**  And to do that I'll have to just step over

8    here and connect my computer to the screen.  Is that all right,

9    Your Honor?

10         **THE COURT:**  I can't intelligently answer that

11   question.  I'll rely on my courtroom deputy.

12         **MS. BLOME:**  Yes.  I troubleshoot it with her, so I

13   think --

14         **THE COURT:**  She knows the system better than I.  She

15   says, Yes, it will work.

16   **BY MS. BLOME:**

17   **Q.**  All right.  Do you see this document on your screen in

18   front of you, Dr. de Wit?

19   **A.**  Yes.

20   **Q.**  This is the 2013 final manatee mortality table by county

21   from January 1, 2013, to December 31, 2013.  Do you recognize

22   this document?

23   **A.**  Yes.

24   **Q.**  You testified earlier that you had been the head research

25   manatee vet since 2010, so in 2013 would you have been the

*MARTINE DE WIT | REDIRECT*

1    person who prepared the data that went into this document?

2    **A.**  Yes, and since 2005, actually.

3    **Q.**  2005, wonderful.  And on this document you see that the

4    perinatal deaths amounted to 129 of a total of 830 deaths in

5    Florida for that year.

6    **A.**  Correct.

7    **Q.**  Yeah.  And of those deaths, 52 occurred in Brevard County?

8    **A.**  Correct.

9    **Q.**  What's important in Brevard County with respect to the

10   North Indian River Lagoon?

11   **A.**  We considered it birthing grounds for manatees.  Brevard

12   County is popular by manatees to give birth in, like, small

13   creeks, et cetera.  So we've always seen the highest perinatal

14   mortality in this county.

15   **Q.**  Is this level of mortality here noted of 52 deaths in

16   Brevard County a normal number in 2013?

17            **MR. BROWN:**  Objection, leading.

18            **THE COURT:**  I told her she could lead a bit, so I'm

19   going to give her leeway.  And I want to be clear for the

20   record that the reason I'm doing this as a remedy for plaintiff

21   is because I did allow on cross-examination opinion testimony

22   to be elicited from this witness.  So in the spirit of

23   fairness, I think this is a way to make sure everyone gets the

24   same opportunity.  So for that reason, the objection is

25   overruled, but she can always disagree with the leading

*MARTINE DE WIT | REDIRECT*

1      question.

2              So feel free to proceed.

3          **THE WITNESS:**  The number is on the high side, but it

4      fluctuates year by year.  Here, we always had, like, one year

5      higher and next year lower.

6      **BY MS. BLOME:**

7      **Q.**  But this is a little different, isn't it, because this was

8      part of that UME?

9      **A.**  Yeah.

10         **MR. BROWN:**  Your Honor, I ask that the witness be

11     allowed to finish her answer.

12         **THE COURT:**  Yes.  And you would be doing a great favor

13     to my court reporter to just make sure that you're not speaking

14     over each other.  The objection is sustained.  Please let her

15     finish her answer.  Feel free to proceed.

16         **THE WITNESS:**  It was not part of the UME because these

17     calves did not meet our case definition of eating the

18     macroalgae.  It is -- we hypothesized that there was a link,

19     but we could never prove anything because a lot of these calves

20     were too decomposed to tell a cause of death.

21              One theory that I had at the time was dysbiosis from

22     eating the macroalgae affected large animals that may have been

23     eating a lot because of higher energy demands.  So we have

24     pregnant females, lactating females, and so it is possible that

25     some of these calves that contributed to the higher number were

*MARTINE DE WIT | REDIRECT*

1  orphaned calves because their moms passed away.  And we tried

2  to follow-up with genetics matches, but were never able to

3  prove that hypothesis.

4  **BY MS. BLOME:**

5  **Q.**  Thank you.  And then, hopefully lastly, Dr. de Wit, you

6  testified that you spoke with Mr. Brown, FDEP'sFlorida

7  Department of Environmental Protection counsel on February 25th

8  of this year.  Is that true?

9  **A.**  Yes.

10  **Q.**  What did you discuss with Mr. Brown?

11  **A.**  I was on a Teams meeting with him, and our counsel was

12  there as well, and he asked for an update on where we are with

13  the UME at this time.  So at that time, I believe I relayed

14  that the closure had been requested and the paperwork was

15  pending on that.

16  **Q.**  And did Mr. Brown provide you with any information during

17  that conversation you did not already know?

18  **A.**  No.

19  **Q.**  Did he provide you with any documents that you had not

20  previously seen or reviewed before that conversation?

21  **A.**  I think I was -- and that was in the email asking for a

22  meeting.  I think I was sent the order.  I think you call it

23  "the order," Your Honor, with what you wrote describing what

24  this is about.  So I had not seen that before.  So that was

25  provided to me at the time.

*MARTINE DE WIT | REDIRECT*

1    **Q.** And you reviewed that in advance of your testimony today?

2    **A.** Some of it.  It's difficult language for me to understand

3    so --

4    **Q.** You testified --

5    **A.** -- I glanced through it.

6    **Q.** Oh, sorry.  Yeah.  You testified that you gave Mr. Brown

7    what has been marked as Exhibit 24 after that February 25th

8    conversation, correct?

9    **A.** Yeah, by request.

10   **Q.** But you didn't produce that to plaintiff in response to

11   their February 8th subpoena, did you?

12   **A.** It was not requested in the subpoena.

13   **Q.** The subpoena requested all documents related to the UME.

14   **A.** But that box was empty.

15   **Q.** The box?

16   **A.** Yeah.  Because I thought that we had provided the documents

17   that you had requested from us already.

18   **Q.** But this document existed in February 2024?

19   **A.** Yes, it did.

20        **MS. BLOME:** All right.  I'll have a moment to confer

21   with my co-counsel.

22        **THE COURT:** Sure.

23        **MS. BLOME:** Nothing further at this time.

24        **THE COURT:** All right.  May this witness be excused?

25        **MS. BLOME:** From our perspective, yes, Your Honor.

1        **THE COURT:**  Will she be subject to recall?

2        **MS. BLOME:**  No, Your Honor.

3        **THE COURT:**  Anything further from defense on this

4    witness?

5        **MR. BROWN:**  Your Honor, this is an unusual

6    circumstance.  I received the document during the course of her

7    cross-examination, and I would ask leave to, based upon that

8    newly issued evidence, to ask questions of this witness.

9        **THE COURT:**  About that release.  All right.  Let me

10   ask you this.  Are you just going to attempt to use this

11   witness to lay a predicate to admit that?

12       **MR. BROWN:**  In part, Your Honor, yes.

13       **THE COURT:**  Now, this is very unusual because you're

14   asking to conduct a sur cross-examination on information that

15   opposing counsel is not yet aware of and that you just received

16   now.

17       **MR. BROWN:**  Yes, Your Honor.

18       **THE COURT:**  And I would imagine the witness hasn't

19   seen yet, either.

20       **MR. BROWN:**  Yes, Your Honor.

21       **THE COURT:**  So I'm going to deny that request, but

22   during one of the breaks when we're through with the witnesses,

23   we can have a discussion on whether or not I can take judicial

24   notice of said document.  There are other ways to do this.  But

25   I want to be clear on something.  I do agree with you that if

1  circumstances outside of this courtroom have changed and that

2  information will aid the trier of fact in making informed

3  decisions, then I need to have that information, but I'm just

4  reluctant to allow you to question a witness who hasn't read it

5  or hasn't reviewed it yet and opposing counsel who doesn't have

6  the information to cross-examine that witness on it yet.

7          So if you two want to work together a plan of action

8  and maybe tackle this tomorrow, I would be open to suggestions,

9  but for now, this information is not yet ripe, hasn't been

10  provided to opposing counsel, no one has had a chance to

11  prepare this, and I don't want people shooting from the hip in

12  here.

13          **MR. BROWN:**  I have a follow-up again, Your Honor.

14          **THE COURT:**  Sure.

15          **MR. BROWN:**  I don't wish to suggest something to the

16  witness.

17          **THE COURT:**  You mean a follow-up --

18          **MR. BROWN:**  The topic of this document, we're

19  intending to connect it together.

20          **THE COURT:**  Let me hear what your question is, without

21  the answer from the witness.

22          **MR. BROWN:**  May I approach the bench, so that I don't

23  give the answer to the witness?

24          **THE COURT:**  That's fine.  You can just say it out

25  loud.  You can say it out loud.

1          **MR. BROWN:**  Your Honor, the witness testified that she

2     had reviewed a draft, I believe, of this document.  I could be

3     mistaken.  I could have mistaken her testimony.  And I was

4     going to ask this witness if this newly released document is

5     consistent with what she saw before.

6          **THE COURT:**  And with that question, would that end

7     your need to question this witness any further?

8          **MR. BROWN:**  Yes, Your Honor.

9          **THE COURT:**  Do you want to be heard on that?  That

10    seems pretty innocuous and reasonable to me.

11         **MS. BLOME:**  I've never even seen the draft or their --

12         **THE COURT:**  He's not going to introduce the document.

13    He's not going to read it into the record.  He's simply going

14    to ask her if the document that's been released is consistent

15    with what she prepared.  It's not coming in front of me, unless

16    we clear a few more hurdles.

17         Do you want a chance to review that on his computer

18    before he asks the question?

19         **MS. BLOME:**  Sure.

20         **THE COURT:**  I can give you a break.  How long is it?

21         **MR. BROWN:**  Two pages, Your Honor.

22         **THE COURT:**  All right.  Let's take a 10-minute break.

23    You review that.  Let me know when you're ready.

24         **MS. BLOME:**  It's fine, Your Honor.  It's just a

25    one-page document.

*MARTINE DE WIT | RECROSS*

1    **THE COURT:**  Okay.  And, again, to be clear, it's not

2    being introduced as evidence.  He's not laying a predicate with

3    this witness.  It's not going to be read to me.  He's simply

4    going to, I guess, begin a process of building a predicate by

5    asking her if that's consistent with what she anticipated was

6    going to be the final document.

7           You can ask your question.

8           **MR. BROWN:**  May I approach the witness, Your Honor --

9           **THE COURT:**  Sure.

10          **MR. BROWN:**  -with my laptop?

11                        **RECROSS-EXAMINATION**

12   BY MR. BROWN:

13   **Q.**   Dr. de Wit, I'm showing you an electronic copy of a

14   document that was part of the previous colloquy and ask if this

15   is consistent with the draft you previously reviewed?

16   **A.**   Just to clarify, I did not review the draft.  I saw that

17   there was a draft, but it came out as I was in international

18   travel, so I did not have access to properly review.

19          **MR. BROWN:**  Thank you, Your Honor.

20          **THE COURT:**  All right.  May this witness be excused,

21   from a defense perspective?

22          **MR. BROWN:**  Yes, Your Honor.

23          **THE COURT:**  All right.  Ma'am, you have a very nice

24   day.  You're excused from your subpoena.  Thank you.

25          **THE WITNESS:**  Thank you.

*PETER BARILE | DIRECT*

1      **THE COURT:**  I would invite the plaintiff to call their

2   next witness.

3      **MS. BLACKNER:**  Plaintiff calls Dr. Peter Barile.

4      **THE COURT:**  Dr. Barile, if would you please come

5   forward to be sworn.

6      (PETER BARILE, witness sworn.)

7      **THE WITNESS:**  Yes, I do.

8      **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat

9   in the witness box.

10      **THE COURT:**  Thank you.  Please have a seat in the

11   witness box.  Good afternoon, sir.  Once seated, please make

12   yourself comfortable with the chair's proximity to the

13   microphone, and then please state your full name into that

14   microphone, spelling your last name.

15      **THE WITNESS:**  Dr. Peter Barile.  My last name is

16   spelled B-a-r-i-l-e.

17      **THE COURT:**  All right.  Your witness, counsel.

18                    **DIRECT EXAMINATION**

19   BY MS. BLACKNER:

20   **Q.**  Hello, Dr. Barile.  Can you please give the Court your

21   current address?

22   **A.**  Yes, my work address is 1570 Anglers Drive, and that's in

23   Palm Bay, Florida.

24   **Q.**  Where are you employed?

25   **A.**  I'm a senior scientist with Marine Research & Consulting,

*PETER BARILE | DIRECT*

1    Incorporated.

2    **Q.**  Where is that, again?

3    **A.**  It's in Palm Bay, Florida.

4    **Q.**  What is your profession?

5    **A.**  I'm an environmental scientist and environmental

6    consultant.

7    **Q.**  Dr. Barile, you'll see plaintiff's exhibit book there --

8    plaintiff's exhibit book.  If you would look at Exhibit 1,

9    Plaintiff's Exhibit 1.

10   **A.**  Yes.

11   **Q.**  Do you recognize this document?

12   **A.**  Yes.  It's a copy of my CV, curriculum vitae.

13   **Q.**  Is this a fair and accurate copy of that, your CV?

14   **A.**  Yes, it appears so.

15   **Q.**  Does this CV lay out your education and your professional

16   experience?

17   **A.**  Yes, it does.

18          **MS. BLOME:**  I move to admit Exhibit 1 into evidence,

19   Your Honor.

20          **THE COURT:**  Any objection?

21          **MR. BROWN:**  No, Your Honor.

22          **THE COURT:**  Plaintiff's Exhibit 1 is admitted and

23   marked.  Feel free to proceed.

24       (Plaintiff's Exhibit No. 1 was admitted into evidence.)

25   **BY MS. BLACKNER:**

*PETER BARILE | DIRECT*                                                      118

1    **Q.**  All right.  Dr. Barile, I would like to discuss with you

2    your academic training and go through your education.  Can you

3    discuss your master's degree, where you obtained it and what it

4    concerned?

5    **A.**  Yes.  I have a marine biology degree from Florida Tech in

6    Melbourne, 1993, and I looked at primary species, the Florida

7    queen conch.  That is an herbivore down in the Florida Keys,

8    and I, actually, was an employee at the time of the predecessor

9    of Florida DEP, the Department of Natural Resources, while I

10   did my master's work studying the ecology of queen conch in the

11   Florida Keys.

12   **Q.**  When did you complete your master's?

13   **A.**  1993.

14   **Q.**  And then in 1994, what happened?

15   **A.**  I was awarded a Knauss Marine Policy Fellowship in

16   Washington, DC, to work on science policy development of agency

17   initiatives on marine biodiversity, coral reefs, and harmful

18   algae blooms.  I also aided in the administration of the

19   National Science Foundation's proposal review process.

20   **Q.**  And when did you begin your Ph.D.?

21   **A.**  1996.

22   **Q.**  And where did you obtain your Ph.D.?

23   **A.**  From Florida Tech.

24   **Q.**  And what was the focus of your doctoral studies?

25   **A.**  Looking at sources, land-based sources, of nutrient

*PETER BARILE | DIRECT*                                                           119

1    pollution, natural and unnatural sources at scales from local

2    to regional to global levels and their linkages to the ecology

3    of macroalgae on coral reefs in the Bahamas.

4    **Q.**  At the time that you were obtaining your doctoral degree at

5    FIT, what was your relationship with Harbor Branch

6    Oceanographic Institute?

7    **A.**  Yeah.  So I obtained my degree at Florida Institute of

8    Technology with Harbor Branch Oceanographic as an affiliate

9    organization, where I was actually an active researcher at

10   Harbor Branch Oceanographic and, actually, did my research

11   science for my degree and as a research assistant at that time

12   at Harbor Branch in Fort Pierce, Florida.

13   **Q.**  Who did you assist at Harbor Branch?

14   **A.**  I was a student of Dr. Brian Lapointe.

15   **Q.**  And what was the focal point of your doctoral studies?

16   **A.**  To examine land-based sources of pollution as they relate

17   to the ecology of coastal ecosystems, including coastal

18   Florida, and looking at how the nutrients, either natural or

19   unnatural sources, contribute to algal overgrowth of coral reef

20   ecosystems, seagrass ecosystems and how they cause cascading

21   food-web impacts in these ecosystems.

22   **Q.**  And specifically, what was the subject matter of your Ph.D.

23   dissertation?

24   **A.**  It was examining these biogeochemical or nutrient linkages

25   as they supported algae blooms on coral reefs in the Bahamas,

*PETER BARILE | DIRECT*

1    and that was the topic of my dissertation, but that was amongst

2    a lot of different studies that I did in Florida at the same

3    time.

4    **Q.**  During this period when you were obtaining your education,

5    were you also studying the Indian River Lagoon?

6    **A.**  Yes, I did.  In fact, Florida Institute of Technology is

7    located in Melbourne, Florida, along the Indian River Lagoon,

8    and I've spent quite a bit of time, going back to my

9    bachelor's, doing studies on the Indian River Lagoon.  Several

10   of them are published.

11   **Q.**  Did you continue at Harbor Branch after you completed your

12   Ph.D.?

13   **A.**  Yes, I did.  I was awarded a postdoctoral fellowship soon

14   after achieving my Ph.D. through FIT and continued on at Harbor

15   Branch Oceanographic, as it says in the CV, from 2002 to 2005.

16   **Q.**  And what was the focus of your postdoc work?

17   **A.**  Examining land-based sources of pollution, particularly on

18   the east coast of Florida, as they related to algae blooms and

19   coral reef and seagrass systems.

20   **Q.**  How many published studies did you and your advisor,

21   Dr. Brian Lapointe, publish together during that period?

22   **A.**  The number -- the publications are listed.  I believe it's

23   10 to 15.

24   **Q.**  And what did they all concern?

25   **A.**  They certainly related to, again, this phenomena of

*PETER BARILE | DIRECT*

1    alterations of land uses, changes in nutrient loads going to

2    coastal ecosystems and overgrowth of macroalgae in these

3    ecosystems and cascading food-web impacts.  We published on

4    that extensively.

5    **Q.**  Dr. Barile, how many total studies have you published on

6    the subject of aquatic ecosystems and impacts to aquatic

7    ecosystems?

8    **A.**  I think the number is 20-plus.

9    **Q.**  Okay.  Dr. Barile, when did you start your business Marine

10   Research & Consulting, Inc.?

11   **A.**  Soon after the completion of my postdoctoral fellowship,

12   and, actually, that was following the hurricanes of 2004 where

13   Harbor Branch Oceanographic took direct hits of two hurricanes,

14   by the way.  At that time, my fellowship ended, and I started

15   doing consulting at that time.

16   **Q.**  Can you tell the Court what your consulting work entails?

17   **A.**  Yeah.  So I do technical assessments on coastal aquatic

18   ecosystems, water quality, benthic ecology, health of reefs,

19   assessing pollution sources.  I also do some science policy

20   work, where I have been consulted by leadership at the county

21   level, but also the Florida legislature, to brief leadership on

22   the issues of nutrient pollution and impacts on coastal

23   ecosystems here along the coast of Florida.

24   **Q.**  Dr. Barile, have you published any studies in peer-reviewed

25   journals specifically addressing the Indian River Lagoon?

*PETER BARILE | DIRECT*

1    **A.**  Yes, I have.  There are several.

2    **Q.**  Dr. Barile, how long have you been studying the lagoon?

3    **A.**  I hate to admit this, but since I was a teenager.  My first

4    publication was in 1986, and that's showing you how old I am.

5    That's about 40 years.

6    **Q.**  What was that publication about?

7    **A.**  It was assessing a stochastic stormwater event, a large

8    deluge of freshwater pollution into lagoon and cascading

9    impacts on a hard clam fishery in the lagoon.

10   **Q.**  Who is Diane Barile?

11   **A.**  Diane Barile is my mother.  She is a former faculty member

12   in coastal zone management at Florida Tech.  I think she had

13   nearly 90 graduate students.  So I was lucky to grow up in a

14   place as beautiful as the Indian Lagoon.  She helped get it

15   classified as an NEP, estuary of national significance, and it

16   was a great place to grow up as a student and learn about

17   coastal ecosystems.  But she spent her career largely studying

18   the east coast of Florida and the Indian River Lagoon.

19   **Q.**  Dr. Barile, can you please discuss your studies and

20   research concerning herbivory on marine plants and algae, and

21   explain to us what you mean by herbivory?

22   **A.**  Yes.  So I have a few publications where we were really

23   interested in knowing that coral reefs and seagrass systems

24   were being heavily impacted by nutrient pollution, land-based

25   sources of pollution, and how this blooms of macroalgae was

*PETER BARILE | DIRECT*

1   affecting other organisms.  Would they eat it?  Would they

2   prefer it?  So I've done controlled studies where I have used

3   marine herbivores, which are plant eaters, vegetation, and seen

4   preferences for different types of vegetation, different

5   biochemical -- or types of biochemistry of the algae themselves

6   and see if there's feeding preferences or changes in feeding

7   rates.  I've also done field studies where we have put

8   literally cages out to assess what herbivores along the whole

9   food chain, whether they are sea turtles or manatees or conch,

10  whatever they are, and what they're eating and what they're

11  not, and I've done field-scale assessments and I've done

12  laboratory experimental assessments in this area.

13  **Q.**  All right.  I would like to ask you about your knowledge of

14  the natural history of the lagoon from 1943 through the

15  present, and I would like to ask why is 1943 an important date

16  in understanding the natural history of the lagoon?

17  **A.**  1943, very interestingly, was during World War II, where

18  the Banana River Air Force Station would do flyovers practicing

19  aerial photography.  In fact, they did pictures of Indian River

20  Lagoon, and the water was so clear, they actually could, in

21  recent history, take these photographs and discriminate what

22  were the extent of seagrasses in what is classified as a

23  natural state at that point, where population of Florida was so

24  low that this is what they classify as the natural baseline of

25  what seagrasses were in the lagoon, those photographs taken in

*PETER BARILE | DIRECT*

1    1943 of the Indian River Lagoon.

2    **Q.**   So is it fair to say that the understanding of the extent

3    of seagrass in the lagoon in 1943 constitutes the government,

4    the state, the federal government's determination of what

5    constitutes a healthy lagoon?

6          **MR. BROWN:**   Objection, leading, and also calls for,

7    essentially, legal opinion beyond the witness's expertise.

8          **THE COURT:**   I have to admit the question was a little

9    wordy.   I didn't quite understand it.

10          **MS. BLACKNER:**   I'm sorry, Your Honor.

11          **THE COURT:**   I'm going to sustain it, but invite you to

12    restate your question and make it open-ended.

13          **MS. BLACKNER:**   Can you read back my question to me?

14       (The requested portion of the record was read back by the

15    Official Court Reporter.)

16    **BY MS. BLACKNER:**

17    **Q.**   Dr. Barile, is the 1943 baseline accepted among experts and

18    government as the proper baseline for the lagoon?

19    **A.**   Yes.   The St. Johns River Water Management District has

20    established 1943 as the baseline for healthy seagrass

21    ecosystems in the Indian River Lagoon.   That's correct.

22    **Q.**   All right.   Dr. Barile, now I would like to turn to

23    Plaintiff's Exhibit 27, and I would like to ask if you

24    recognize this report.

25    **A.**   Is this tab three or tab --

*PETER BARILE | DIRECT*

1   **Q.**  It's tab 27, the last one.

2   **A.**  Yes.  I do recognize this.

3   **Q.**  Is this a fair and accurate copy?

4   **A.**  It looks to be, yes.

5   **Q.**  What is the title of this report?

6   **A.**  This is a publication I was the author on titled,

7   "Widespread Sewage Pollution of the Indian River Lagoon System,

8   Florida, Resolved by Spatial Analysis of Macroalgae

9   Biochemistry."

10  **Q.**  You wrote this report?

11  **A.**  Yes, I did.  I completed the study and wrote the report and

12  had it published.  It was published in the journal Marine

13  Pollution Bulletin in March of 2018.

14          **MS. BLACKNER:**  Your Honor, I would like to move this

15  into evidence as Plaintiff's Exhibit 27.

16          **THE COURT:**  Any objection?

17          **MR. BROWN:**  Hearsay, Your Honor.  There is no

18  foundation as to the public record exception, neither, or any

19  other applicable exception.

20          **THE COURT:**  I would indicate that he has laid the

21  predicate.  I understand.  Out-of-court statement used in court

22  for the truth of the matter asserted.  I think it has an

23  indicia of reliability.  In laying the predicate, plaintiff has

24  indicated that this is this witness's publication.  For that

25  reason -- and certainly you can question the witness on it --

*PETER BARILE | DIRECT*

1   I'm going to overrule the objection and allow what's been

2   presented as Plaintiff's Exhibit 27.  It's admitted.  You may

3   proceed.

4        (Plaintiff's Exhibit No. 27 was admitted into evidence.)

5        **MS. BLACKNER:**  Thank you.

6   **BY MS. BLACKNER:**

7   **Q.**  Dr. Barile, what is this study about?

8   **A.**  This study assessed along the whole Indian River Lagoon

9   system, from the very southern terminus in Palm Beach County

10  all the way up to the northern portion in Volusia County, near

11  Daytona Beach or New Smyrna Beach.

12       It assessed the multitude of what could be natural or

13  unnatural sources of nutrients that were coming from the

14  watershed from different land uses as they impacted water

15  quality, and I used macroalgae and assessed their biochemistry

16  as a, what's known as, a bioindicator, where the algae, in

17  general, in the water portion of the lagoon they are, are going

18  to be very good indicators for the water quality as they

19  integrated over time.

20       So by assessing the macroalgae and the tissue biochemistry,

21  we understand quite a bit about the sources of where nutrients

22  are coming from in the different portions of lagoon over space

23  and time.

24  **Q.**  How did you conduct this study?

25  **A.**  So I set up an array.  I sampled 70 to 75 stations.  I

*PETER BARILE | DIRECT*                                                    127

1    think 70 were within lagoon itself, and there were more in the

2    tributaries, so I could understand what was coming into lagoon

3    through tributaries.  And, basically, I had this array of study

4    stations, and I looked at them in one year, I believe it was

5    2013, and then another year, in 2014.  So knowing a little bit

6    about the rainfall and knowing about the land uses and nutrient

7    resources, I could assess what sources of nutrients were

8    supporting algae blooms and polluting lagoon in different

9    portions of lagoon from, literally, Palm Beach County almost

10   150 miles up to about Daytona, within the scope of Indian River

11   Lagoon.

12   **Q.**  What do you mean by "nutrients"?

13   **A.**  So, specifically, I assessed nitrogen, phosphorus, and

14   carbon.  Nitrogen and phosphorus are two nutrients identified

15   by the State of Florida and the DEP as primary pollutants to

16   the Indian River Lagoon, through their TMDL and their BMAP

17   assessments, which I presume I'm going to speak about later.

18   But those are the two primary nutrients that support algae

19   blooms and lead to the death of seagrasses.

20   **Q.**  So what was your conclusion in this study?

21   **A.**  That particularly during wet seasons, that we were seeing

22   significant mobilization of human wastewater either coming from

23   septic tanks or from wastewater treatment facilities that were

24   dumping into lagoon.  The primary nitrogen source supporting

25   these macroalgae across most of lagoon, with only a few

*PETER BARILE | DIRECT*                                                128

1    exceptions in some almost unimpacted places near NASA, where

2    there aren't residences, by and large, sewage pollution was

3    supporting these seaweed blooms, these algae blooms, throughout

4    most of the Indian River Lagoon.

5    **Q.**  In this report you discuss manatees.  Can you share with us

6    what your conclusions were with respect to manatees and other

7    herbivores in the IRL?

8    **A.**  Sure.  I believe there were a couple places.  Okay.  So the

9    first page here, Exhibit 27, page 2, would you like me to read

10   it?

11            **MS. BLACKNER:**  If the Court will allow.

12            **THE COURT:**  He's got Plaintiff's Exhibit 2.  Is that

13   what he referenced?

14            **THE WITNESS:**  Exhibit 27, page 2.

15            **THE COURT:**  Give me just a moment.  Is 27 admitted?

16            **MS. BLACKNER:**  Yes.

17            **THE COURT:**  Then he can read it.

18            **MS. BLACKNER:**  Excuse me, Your Honor?

19            **THE COURT:**  Then he is permitted to read it.

20   **BY MS. BLACKNER:**

21   **Q.**  Yes.  Dr. Barile, any portion you wish to read out.

22   **A.**  Okay.  There were two sections.  So here's the first

23   section, in the bottom paragraph, on the first page, in the

24   left column.

25       It states:  "In 2011, the northern Indian River Lagoon

1    superbloom was a predictable ecological phase-shift" -- with a

2    citation -- "to a toxic phytoplankton-dominated system, which

3    followed the loss of seagrass and benthic macroalgae and

4    occurred, simultaneously, with the die-offs of manatee,

5    dolphins, seabirds, and periodic fish kills."

6        There was another section.  Let's see.  Okay.  On

7    Exhibit 27, page 16, just above section 17, I will read the

8    last sentence before section 17.

9        And it states that:  "Further sewage-driven blooms of

10   phytoplankton and macroalgae were reported to produce toxins

11   and resulted in toxin accumulation and die-offs of marine

12   mammals, including manatees, that have consumed these bloom

13   species in the central lagoon area."

14       Those are two examples where I spoke about manatees in this

15   study.

16   **Q.**  In this report/study you also discussed Tampa Bay and

17   Sarasota Bay.  Can you explain why you include a discussion

18   about Tampa Bay and Sarasota Bay in this report?

19   **A.**  Yes.  Both the Tampa Bay and Sarasota Bay and the Indian

20   River Lagoon were targeted for nutrient reductions, reduction

21   of sewage to reduce the nutrients so that conditions would be

22   provided where macroalgae -- you would stop feeding them with

23   the excess nutrients and then, as such, start the recovery of

24   seagrasses.

25       Very interestingly, in Tampa Bay and Sarasota Bay, dating

*PETER BARILE | DIRECT*                                                    130

1    back to the early 1980s, there was a law called the

2    Grizzle-Figg Act, and it required local utilities to

3    significantly reduce nutrients from wastewater plants, convert

4    the facilities to advanced wastewater treatment, and also

5    required mitigation of polluting septic tanks, which occurred

6    in the Sarasota Bay area.  As a result, water quality improved

7    so significantly in Tampa Bay and Sarasota Bay, within decades

8    of that retrofit of wastewater facilities and nitrogen

9    reductions, that seagrasses actually returned to very high

10   levels, to levels up to the 1950s, which was the baseline.

11        But very interestingly, at the same time in the Indian

12   River Lagoon, we did have an Indian River Lagoon Act in 1990

13   that, likewise, called for the same mitigation strategy as

14   Tampa and Sarasota Bay, where municipal wastewater discharges

15   were called to be mitigated and facilities retrofitted to

16   advanced wastewater treatment to remove nutrients and also

17   called for the identification and mitigation of septic tanks

18   that were identified as polluting within the watershed of the

19   Indian River Lagoon.  That did not happen at the same time that

20   the Tampa Bay and Sarasota Bay were restored.

21        So as well as the conditions improved in Tampa Bay and

22   Sarasota Bay, the conditions got worse in the Indian River

23   Lagoon, and so it's a very, I think, unfortunate fate that we

24   did so good in Tampa Bay and Sarasota Bay but not the Indian

25   River Lagoon.

*PETER BARILE | DIRECT*

1    **Q.**  All right.  Now, Dr. Barile, could you discuss your

2    ecosystem-wide approach to understanding the Indian River

3    Lagoon, as well as other aquatic systems, and the linkages

4    between land uses, land-based sources of pollution, water

5    quality impacts, harmful algal blooms, seagrass loss, and

6    impacts to the food web?

7    **A.**  Absolutely.  In fact, I will use -- Exhibit 27, page 14, as

8    an example, and in this figure 10 it shows within the watershed

9    of the Indian River Lagoon -- in fact, in this case, this is a

10   portion of the central lagoon where the black dots are

11   literally residences, and that's within the city of Palm Bay,

12   that are all on septic tanks.  I believe it's over 30,000

13   residences on septic tanks.

14        And, essentially, I assessed the vegetation within the

15   canal system.  There are 300 miles of canals.  But you can see

16   the one that's red going in the middle, on the top of figure

17   10, where I assessed the nitrogen sources going into lagoon.

18   And that signature was of septic tank effluence.  It was very

19   clear that the land uses of high residential development on

20   septic tanks was contributing human-source nitrogen that was

21   being incorporated into the vegetation, and, indeed, that

22   tributary was leading to the Indian River Lagoon.

23        And, yes, so the linkage between land-based sources, from

24   documented sources, such as residences on septic tanks, impacts

25   on biological resources and water quality and then blooms of

*PETER BARILE | DIRECT*

1  macroalgae and their impact, that's widely known and reported

2  on seagrasses, were addressed in this study. It is a

3  source-sink study looking at nutrients, literally, from

4  residences that are polluting all the way into the biome of the

5  Indian River Lagoon.

6  **Q.** Dr. Barile, what courses have you taught in connection with

7  the ecology of the Indian River Lagoon, including its natural

8  history and its current status?

9  **A.** I've taught a couple of them, both at the graduate level,

10  and one of them was called, "Eutrophication in the Marine

11  Environment." And eutrophication is the process of nutrient

12  over-enrichment. We described, as I mentioned in the study,

13  these biogeochemical forces, nitrogen and phosphorus, and then

14  how that pollution problem is expressed in changes in adjacent

15  surface waters.

16      So, for example, in the Indian River Lagoon, we saw, as a

17  result of excess nitrogen and phosphorus coming into the

18  system, that macroalgae became overabundant. They overshaded

19  seagrasses. They changed the food web profoundly. So this is

20  the broad area of expertise that I've studied but also taught

21  in graduate courses.

22  **Q.** Dr. Barile, are you familiar with Florida Department of

23  Environmental Protection water quality targets as they relate

24  to seagrasses restoration goals for the northern Indian River

25  Lagoon?

*PETER BARILE | DIRECT*                                                    133

1    **A.**  Yes, I am.

2    **Q.**  Can you summarize the scope of your ongoing research and

3    professional activities to keep current on government and

4    academic studies, policies, and laws relating to systemic

5    impacts of pollution to the lagoon and other marine ecosystems?

6    **A.**   Yes.  I review documents from the Department of

7    Environmental Protection, as well as the St. Johns River Water

8    Management District.  I'm very aware of the associations

9    between these two state agencies and their models based on

10   nutrient loads, how it affects water quality, and how that

11   translates to seagrass health.  So there's a lot of science.

12   There are a lot of documents that I've reviewed.  And I have

13   participated in State of Florida, water management district,

14   and DEP BMAP meetings for decades, as these regulations were

15   developed, scientifically as the targets were developed, when

16   the State of Florida, the DEP, and the district got together

17   and said, Well, these are the nutrient levels that we believe

18   need to be reduced to bring seagrasses back.  In fact, they

19   have a model of that relationship.

20   **Q.**  Dr. Barile, could you discuss your work serving as an

21   expert for certain members of the Florida legislature relating

22   to the Clean Waterways Act?

23   **A.**   Yes.  So I was asked by then Senate Majority Leader Debbie

24   Mayfield to brief the incoming Governor Ron DeSantis on the

25   problem of the Indian River Lagoon.  Senator Mayfield brought

1      the incoming Governor Ron DeSantis to Melbourne.  And I had the

2      opportunity to brief him on, literally, this study, this Barile

3      2018 study.  He saw these graphs.

4           **MR. BROWN:**  Your Honor, two objections.  First, the

5      witness is exceeding the scope of the question, and, second, it

6      appears the witness is preparing to testify as to a hearsay

7      statement.

8           **THE COURT:**  Would you like to respond to that?

9           **MS. BLACKNER:**  Yes, Your Honor.  I'm in the process of

10     qualifying Dr. Barile as an expert, and this is part of his

11     broad experience in science, policy, et cetera.

12          **THE COURT:**  All right.  So here's the dilemma.  You've

13     laid enough of a predicate where one could reasonably ask that

14     I permit you to elicit opinion testimony from this witness, and

15     because he is a Rule 702 expert witness who submitted a report,

16     he can testify as to anything he relied on, even hearsay, in

17     reaching his opinion, but he has not yet been permitted to give

18     an opinion.

19          So if you would do me the favor of asking that he be

20     recognized as an expert, I can weigh objections, and then we

21     can move on to the next phase.

22          **MS. BLACKNER:**  All right.  Yes, Your Honor.  At this

23     time I would like to qualify Dr. Barile as an expert.

24          **THE COURT:**  All right.  She's asking the Court

25     recognize the witness as an expert.

*PETER BARILE | DIRECT*

1          **MS. BLACKNER:**  Well, I would like to have the Court

2     recognize Dr. Barile as an expert on the IRL ecosystem, which

3     encompasses the relationship between land uses, land-based

4     sources of pollution, water quality, harmful algae blooms,

5     impacts to seagrass, and the food web, which includes

6     herbivores such as the manatees.

7          **THE COURT:**  That sounds like a two- or three-page

8     diploma he was issued.  I think what you're asking for is he be

9     recognized as an expert in the area of marine biology, which

10    would encompass everything you just mentioned.  Is that what

11    you're asking?

12         **MS. BLACKNER:**  Yes, Your Honor.  I just want to make

13    sure we get it all in.

14         **THE COURT:**  No.  That's fine.  We're all aware of what

15    he's going to be testifying to.  There won't be surprises

16    today.

17         So with that request, is there any objection from the

18    defense?

19         **MR. BROWN:**  I'm sorry, Your Honor?

20         **THE COURT:**  Is there any objection from the defense as

21    to this witness being qualified as an expert in the area of

22    marine biology?

23         **MR. BROWN:**  No, Your Honor.

24         **THE COURT:**  All right.  Without objection, you may

25    elicit opinion testimony, and I would indicate for the record

*PETER BARILE | DIRECT*

1    that because he's a Rule 702 witness, he can rely on anything,

2    including hearsay, in reaching his conclusions.

3         So now moving forward to the objection, based on him

4    being qualified as an expert, the objection is overruled.  You

5    can ask him that question now.

6         **MS. BLACKNER:**  All right.

7         **THE COURT:**  Let me guess.  You want me to repeat the

8    question for you.

9         **MS. BLACKNER:**  Yes.  I'm getting older.  My memory is

10    starting to lapse.

11         **THE COURT:**  I don't remember it either.  By the way,

12    when she reads back the questions, we're not on the record.  So

13    I'm going to ask my court reporter to read the question back,

14    and we'll continue moving forward from there.

15         (The requested portion of the record was read back by the

16    Official Court Reporter.)

17         **THE WITNESS:**  Yes.  So in August of 2018, I was

18    brought in by Senator Mayfield, the then senate majority leader

19    of the Florida Senate, and for a briefing of then Congressman

20    Ron DeSantis in Melbourne to give him a briefing on the status

21    of the Indian River Lagoon and the impacts, particularly

22    related to wastewater, sewage, and septic tanks and their

23    impact on the lagoon.

24         I've also been consulted by several members of the

25    Brevard County Legislative Delegation, including members of the

*PETER BARILE | DIRECT*

1    house and the senate to provide consultation, both in briefings

2    in their offices but also in public on these topics.

3    **BY MS. BLACKNER:**

4    **Q.**  Dr. Barile, are you familiar with the Florida Department of

5    Environmental Protection's water quality targets as they relate

6    to seagrass restoration goals?

7    **A.**  Yes, I am.

8    **Q.**  In the North IRL?

9    **A.**  Yes.

10   **Q.**  Let's see.  I would like for you to look at Plaintiff's

11   Exhibit 6.  Do you recognize this document?

12   **A.**  Yes, I do.

13   **Q.**  What is this?

14   **A.**  It's titled the "Indian River Lagoon Basin, North Indian

15   River Lagoon Basic Management Action Plan."

16   **Q.**  And what is the date of that document?

17   **A.**  February 2021.  And it was produced by the Florida

18   Department of Environmental Protection.

19   **Q.**  Have you reviewed this document?

20   **A.**  Yes, I have.

21   **Q.**  Is this a fair and accurate copy?

22   **A.**  I believe so.

23        **MS. BLACKNER:**  Your Honor, plaintiff would like to

24   move this document into evidence as Plaintiff's Exhibit 6.

25        **THE COURT:**  Any objection?

*PETER BARILE | DIRECT*                                              138

1              **MR. BROWN:**  No objection, Your Honor.

2              **THE COURT:**  All right.  And just so I can further

3     elaborate -- I'm not trying to coach both sides up -- but there

4     is an interesting dichotomy between hearsay relied upon by an

5     expert during his testimony.  He can testify as to anything he

6     relied in coming to his opinion, but that doesn't mean that

7     every document gets in as hearsay.  So there isn't an

8     objection, so I'll admit it, but keep that in mind moving

9     forward.

10             What's been marked as Plaintiff's Exhibit 6 will be

11    admitted without objection.  You may proceed.

12         (Plaintiff's Exhibit No. 6 was admitted into evidence.)

13    **BY MS. BLACKNER:**

14    **Q.**  All right.  Did you participate in the meetings and

15    development of this BMAP?

16    **A.**  In this case, I reviewed documents.  So this was the 2021

17    final plan that I reviewed and became aware of.

18    **Q.**  Did you participate in the summer 2024 stakeholder meeting

19    for updating the IRL BMAP for 2025?

20    **A.**  Yes, I did.  In fact, I believe the date was the 25th of

21    April, 2024.

22    **Q.**  All right.  I would like you to turn to Plaintiff's

23    Exhibit 8.  Do you see it?

24    **A.**  Yes, I do.

25    **Q.**  What is this document?

*PETER BARILE | DIRECT*                                                    139

1    **A.**  These are slides from that meeting that I participated in,

2    which was a webinar.  There was no formal presentation

3    available to the public in terms of having a copy, so I

4    literally did screenshots of the slides from this meeting, and

5    I produced them here as this document.

6    **Q.**  Who put this meeting on?

7    **A.**  The Florida DEP BMAP coordinator for the Indian River

8    Lagoon.

9          **MS. BLACKNER:**  Plaintiff would like to move this

10   document, Exhibit 8, into evidence.

11         **THE COURT:**  Is there any objection to the admission of

12   Plaintiff's Exhibit 8?

13         **MR. BROWN:**  No, Your Honor.

14         **THE COURT:**  All right.  Without objection, Plaintiff's

15   Exhibit 8 is admitted and marked.  Feel free to proceed.

16      (Plaintiff's Exhibit No. 8 was admitted into evidence.)

17   **BY MS. BLACKNER:**

18   **Q.**  Okay.  Dr. Barile, could you explain for us how your

19   academic and professional experience extends to how land uses

20   and watersheds relate to land-based sources of pollution?

21         **MR. BROWN:**  Objection, beyond the scope of his

22   expertise.  The witness has not been tendered -- or there's no

23   predicate for this witness to serve as an expert in the area of

24   land-use controls.

25         **THE COURT:**  What's the response to the objection?

*PETER BARILE | DIRECT*

1      **MS. BLACKNER:**  Well, Your Honor, we went through his

2   academic background and his 30-year career, in which he has

3   studied, explored, and explained how land uses, i.e., septic

4   tanks and sewage plants -- these are land uses -- result in

5   eutrophication in aquatic bodies.  That's what we mean by "land

6   uses."  We mean the installation of septic tanks and sewage

7   plants.

8      **THE COURT:**  I think when he is making an objection

9   that this question is outside of the witness's scope of

10  expertise, he's not saying that he doesn't know what he's

11  talking about.  He's, obviously, qualified far beyond what's in

12  the report.  But, remember, in the context of this bench trial,

13  he can only testify about what's been disclosed as his

14  potential testimony to opposing counsel.

15      So what he's arguing is, this isn't in his expert

16  report; he can't testify to it.

17      **MS. BLACKNER:**  It was in his expert report, Your

18  Honor.

19      **THE COURT:**  All right.  So I misunderstood your

20  objection.  So it's in the expert report.  You're on notice

21  that he was potentially going to testify about this, so what is

22  the objection?

23      **MR. BROWN:**  Your Honor, that was not the intent of my

24  objection.  I apologize if --

25      **THE COURT:**  Don't apologize.  I'm the one that got it

*PETER BARILE | DIRECT*

1    wrong.  Go on ahead.

2         **MR. BROWN:**  To state it simply, counsel is asking

3    questions that would be asked of a land-use expert, and no

4    predicate has been laid, but with the understanding that she's

5    clarified her meaning as to what she's talking about when she

6    said "land use," I withdraw the objection.

7         **THE COURT:**  All right.  Thank you.

8         Feel free to proceed.

9         **MS. BLACKNER:**  Thank you.

10   **BY MS. BLACKNER:**

11   **Q.**  Dr. Barile, does your academic and professional experience

12   extend to the impacts of septic tanks and sewage plants as they

13   relate to coastal and estuarian water quality?

14   **A.**  Sure.  Let me just clarify to the Court.  I just went

15   through a 2018 study that outlined my assessment of septic

16   tanks in the Indian River Lagoon watershed and following those

17   pollutants into lagoon.  And I'm recognized as an expert in

18   this area.  And I'm having a hard time understanding why that's

19   confused at this point.

20      And, yes, I agree with your statement that that is within

21   my area of expertise, and, by the way, I am consulted as an

22   expert by leadership of the State of Florida on this very

23   topic.

24         **THE COURT:**  Well, just so we can clarify, I don't

25   think anyone was doubting your qualifications.  This was a

*PETER BARILE | DIRECT*

1    discovery issue that I wanted to make sure wasn't going to be a

2    wrinkle.  Regardless of what you can testify to, your report

3    has to have the information so the other side is on notice of

4    what's going to be the subject of your testimony.  It turns

5    out, they are on notice, so there's no issue.  It was my

6    misunderstanding.

7           So feel free to proceed.

8           **MS. BLACKNER:**  To be fair, Your Honor, there may be a

9    little confusion when the term "land use" is used, because in

10   the normal context, people think of it as zoning or that sort

11   of thing.

12          **THE COURT:**  I understand.

13          **MS. BLACKNER:**  In our case we mean the installation of

14   septic tanks and the sewage plants.

15          **THE COURT:**  And that's fine.  The only thing I was

16   ensuring was that opposing counsel was placed on notice that

17   this was going to be the subject of his testimony.  They have

18   been, so you're welcome to proceed.

19          **MS. BLACKNER:**  All right.  Thank you, Your Honor.

20   **BY MS. BLACKNER:**

21   **Q.**  Dr. Barile, can you explain what the St. Johns River Water

22   Management District is?

23   **A.**  Yes.  It's a regional taxing authority within the state of

24   Florida that, in this case, with respect to the Indian River

25   Lagoon, they are responsible for studying and assessing the

*PETER BARILE | DIRECT*                                             143

1    resources associated with the lagoon, and that would include

2    the submerged aquatic vegetation, whether it's the macroalgae

3    or the seagrasses.  So any factors that would impact the lagoon

4    with respect to algal overgrowth, whether it's phytoplankton

5    toxicology blooms, seaweed blooms, toxic seaweed blooms as they

6    affect seagrasses and pollutants that support those blooms and

7    impact seagrasses are the target interest of that agency, with

8    respect to the eastern coast of Florida.  They're also

9    responsible and active inland with water resources, water

10   quality, and water quantity within the rest of, for example,

11   St. Johns, within that basin that they have authority for.  So

12   they're responsible for areas of the marine environment, as

13   well as inland coastal lakes, aquifers, groundwater, and such.

14   **Q.**  Dr. Barile, I would like you now to look at Plaintiff's

15   Exhibit 2.  Can you identify this document?

16   **A.**  Yes, I can.  And back to your earlier question, this is an

17   excerpt from a study by Robert Virnstein in 1989, and this is a

18   map produced by the St. Johns River Water Management District.

19   You can see their emblem in the legend.

20       And going back to your earlier statements about 1943, this

21   map shows the changes from 1943 to 1992 in terms of acreage of

22   seagrass along the lagoon.  What's interesting about it is it

23   shows different portions of the lagoon with a plus in green and

24   a minus in red colors of the seagrass coverage within those

25   zones.  So you can see for the very urbanized portions of the

*PETER BARILE | DIRECT*

1    lagoon Vero Beach, Palm Bay, Melbourne, Cocoa, Titusville, and

2    even up toward Ponce de Leon Inlet in Volusia County, we see

3    seagrass loss on the order of 50 to 60 to 80 percent.  And this

4    is back in 1982.

5        So our understanding presented to us by the St. Johns River

6    Water Management District in this document in 1989 and by this

7    map that compared 1943 to 1992 is there was widespread loss in

8    the lagoon in the majority of the area.  There was just a few

9    places where seagrasses increased or maintained, what would

10   have been construed as the historic coverage.

11       The one exception is Sebastian Inlet.  But I characterize

12   that in my Barile 1999 study, which, I guess, I will discuss

13   later, that that area receives a lot of fresh water and

14   nutrient discharge from the Sebastian watershed, and, oddly

15   enough, where there were no seagrasses there previously around

16   the inlet, which was a varied marine system.  It actually has

17   seen an expansion of seagrasses around Sebastian inlet, but,

18   otherwise, we see large-scale loss of seagrasses, again,

19   through much of the Indian River Lagoon, from the Vero Beach

20   area, largely, all the way up to Volusia County.

21   **Q.**  Is this diagram recognized as establishing the baseline

22   from 1943?

23   **A.**  There were several documents, including this one, that used

24   1943 seagrass coverage as a baseline of the historic extent of

25   seagrasses in the Indian River Lagoon system.  So, yes, in this

*PETER BARILE | DIRECT*

1    example it does use 1943 as the historical baseline for

2    seagrass coverage.

3    **Q.**  And this exhibit is two pages.  The second page is a blowup

4    of the same diagram.

5    **A.**  Yes.

6         **MS. BLACKNER:**  Plaintiff would like to move Exhibit 2

7    into evidence, Your Honor.

8         **THE COURT:**  Any objection?

9         **MR. BROWN:**  No objection, Your Honor.

10        **THE COURT:**  Without objection, Plaintiff's Exhibit 2

11   is admitted and marked.  Feel free to proceed.

12       (Plaintiff's Exhibit No. 2 was admitted into evidence.)

13   **BY MS. BLACKNER:**

14   **Q.**  Now I would like to turn to Exhibit 3, Plaintiff's

15   Exhibit 3.  Can you identify this document?

16   **A.**  Yes.  This is a set of presentation slides from the

17   St. Johns River Water Management District, presented by Lori

18   Morris on behalf of the St. Johns River Water Management

19   District.  It is their "Indian River Lagoon Seagrass Update" in

20   2023.

21   **Q.**  All right.  Is this a fair and accurate copy of this

22   document?

23   **A.**  Yes.

24        **MS. BLACKNER:**  Plaintiff would like to move this

25   document into evidence as Plaintiff's Exhibit 3.

*PETER BARILE | DIRECT*

1      **THE COURT:**  Any objection?

2            **MR. BROWN:**  No objection, Your Honor.

3            **THE COURT:**  All right.  Without objection, Plaintiff's

4      3 is admitted and marked.  Feel free to proceed.

5            (Plaintiff's Exhibit No. 3 was admitted into evidence.)

6            **MS. BLACKNER:**  Thank you.

7      BY MS. BLACKNER:

8      **Q.**  Now, Dr. Barile, I would like to go through this document

9      with you.  Can you explain for the Court what we see on this

10     first page?

11     **A.**  Okay.  So past the cover page, I'm assuming the first page

12     is this figure titled, "Modeled Chlorophyll Satellite Images,"

13     from September 30, 2011, with several images through

14     October 15, 2020.

15     **Q.**  Now I would like to go to the next page.

16     **A.**  Before you go, I'll just describe what this is.

17     **Q.**  Okay.

18     **A.**  These images are showing chlorophyll levels.  These are

19     phytoplankton, in some cases toxic phytoplankton, blooms.  And

20     on the legend on the right, the color code tells you the

21     concentration of chlorophyll.

22         And just to put this in perspective, the threshold or the

23     value that is normal or natural or, quote, unimpacted is about

24     5 micrograms per liter.  And we're seeing values over -- I'm

25     looking closely -- over 100 micrograms per liter.  So we're

*PETER BARILE | DIRECT*

1    looking at way, way over, you know, multitudes of factors over

2    what is natural.  So these are very significant blooms along

3    much of lagoon, from the central lagoon in the Melbourne area

4    at the bottom, all the way through the northern lagoon, where

5    it says "Indian River Lagoon" on the left panel, and then

6    Banana River Lagoon is that waterway on the right side, and

7    then the Mosquito Lagoon is on the top right.

8        But they all experienced very heavy blooms in this period,

9    2011, 2012.  There appear to be in January of 2015 not a lot of

10   blooms, but, indeed, a few months later, you get into the

11   spring system and then throughout, you know, those years into

12   2020, very, very significant chlorophyll phytoplankton blooms

13   along most of lagoon at that point.  And I will leave it at

14   that.

15   **Q.**  What does this diagram or -- a diagram show for the

16   northern Indian River Lagoon for October 15th of 2020?

17   **A.**  This is a very, very intense phytoplankton bloom.  This is

18   scale red, which shows that these values were extremely high,

19   over 100 micrograms per liter.  This water looked like --

20   either like a chocolate Yoo-hoo or a green -- you know, I don't

21   know, a St. Patrick's Day milkshake.  It was that color.  It

22   was disgusting.  At that time, there were fish kills.  There

23   were marine mammal die-offs.  There were noxious algae in the

24   lagoon.  So that was a severe event at that point.

25   **Q.**  All right.  Can we turn to the next page?

*PETER BARILE | DIRECT*

1    **A.**   Yes.

2    **Q.**   Can you describe what this page shows?

3    **A.**   Yes.  It's a little bit busy, but I would suggest that we

4    focus on the green bars, and on the left you can see what would

5    be the seagrass extent in hectares in 1943, and that's up

6    around 40,000 hectares.  And you see some oscillation, some

7    increases through the early 2000s, but then you see this big

8    crash where we saw those algal blooms and a huge crash down to

9    2011, very interestingly, some slight increases from 2011

10   through 2015, and then just a monumental crash.

11       Referring back to that previous slide where you see those

12   phytoplankton blooms, they were involved with reducing light,

13   nutrients-involved significant loading, and just huge crashes

14   of seagrasses during that period associated with those algal

15   blooms.

16       And then if you go all the way to the right, you see in

17   2021 seagrass coverage going down to about 10,000 acres or

18   less, and then in 2022 and 2023, I don't see any seagrass total

19   coverage.  The acreage is so low, I don't believe they're

20   reporting a significant extent, in terms of thousands of

21   hectares.

22   **Q.**   How much seagrass coverage do they show in 2020?

23   **A.**   That may have been a date where they did not survey.  So

24   many of these --

25   **Q.**   Okay.

*PETER BARILE | DIRECT*

1    **A.**  -- surveys are done biannually.

2    **Q.**  But since 2021, there's virtually no seagrass in the

3    lagoon?

4    **A.**  In this graph it shows a paucity, correct, negligible.  And

5    I think that there are more slides that speak specifically

6    to -- this is total extent for the whole Indian River Lagoon,

7    so we're going to see, I think, other maps that are more

8    specific to seagrass coverage during that time.

9    **Q.**  All right.  This report covers various parts of the lagoon,

10   but if we could just skip to the northern IRL.

11   **A.**  Sure.  So moving from that page, one, two, three slides

12   further, it says, "North Indian River Lagoon," and, again, this

13   says, "St. Johns River Water Management District," at the

14   bottom.  And there is a graph on the right showing percent

15   cover of seagrass coverage in the northern Indian River Lagoon.

16   And, by the way, on the bars on the bottom, that specifies the

17   different species of seagrasses.

18       And so going back further in time, for example 1998, you

19   see a little bit of red.  That's Ruppia maritima.  And then you

20   see green, and that's called Syringodium filiforme, and that

21   actually is called "manatee grass."  That's one of the

22   preferred seagrasses by manatees, obviously, per the name.

23       But we go on further in time, and you see the loss of

24   diversity in terms of the plethora of colors that are going

25   away, and you just see dominance by HW.  That's Halodule

*PETER BARILE | DIRECT*

1  wrightii. That actually is the most stress-tolerant seagrass.

2  But if you look at 2015 and then moving to 2016, 2017, and

3  2018 in the Indian River Lagoon, we're going from what was

4  25 percent cover down to single digits. And by 2020 through

5  2023, we're in negligible numbers. I think I see maybe 1 to

6  3 percent cover at all between 2019 and 2023.

7  So, again, this document was the 2023 update, so this was

8  the latest, and this is showing that, you know, we're looking

9  at five years with almost no seagrass in the northern Indian

10 River Lagoon. And this is the official report by the experts,

11 that Dr. de Wit relied on also, from the St. Johns River Water

12 Management District.

13 **Q.** On this same page, what does it mean, less than 10 percent

14 and 80 percent of more of Caulerpa?

15 **A.** Yes. So on that slide what that is showing, when it says,

16 "less than 10 percent," that's less than 10 percent seagrass

17 coverage. And under it, in smaller font, it says, "Greater

18 than 80 percent Caulerpa," and Caulerpa is a macroalgae that

19 has replaced seagrasses throughout a large portion of the

20 Indian River Lagoon.

21 In fact, from the photographs on the very left, those are

22 the sparse seagrasses, and on the right, right under the word,

23 "North Indian River Lagoon," that is a huge bloom of Caulerpa.

24 It literally takes over. You can see a couple little seagrass

25 blades. But this is a harmful algal bloom event where this

*PETER BARILE | DIRECT*

1    Caulerpa has just taken over and replaced seagrasses.

2        So in summary, the Indian River Lagoon and the northern

3    portion of the lagoon has seen precipitous seagrass loss in the

4    single digits and replacement largely by this Caulerpa

5    macroalgae.

6    **Q.**   And, again, when was this study -- or this presentation

7    made?

8    **A.**   This was at the end of 2023.  In fact, I think it was made

9    a presentation to -- there's an FWC manatee -- maybe an annual

10   meeting, and Lori was invited to come in and talk about the

11   status of the Indian River Lagoon seagrasses to update the

12   manatee experts with the FWC.

13   **Q.**   Dr. Barile, can you explain why this document is important

14   to understanding the future of seagrass coverage in the

15   northern IRL?

16   **A.**   Sure; several processes.  Number one, as I testified to

17   earlier, the role of land-based sources of pollution, septic

18   tanks, wastewater.  The significant load of nitrogen and

19   phosphorus has direct impacts on seagrass viability.

20       It does a couple things.  When you add those nutrients, it

21   creates those phytoplankton blooms.  That reduces light, and if

22   you don't have adequate light going down to the bottom of the

23   lagoon, seagrass will not live.

24       Alternatively, that macroalgae does very well in low-light

25   conditions.  By the way, we've study Caulerpa around the world.

1    It loves sewage.

2        So while seagrasses have done very poorly in the condition

3    of the lagoon being heavily polluted and excess wastewater

4    nutrients coming in, ironically this Caulerpa algae has

5    proliferated during this condition.  So we've seen seagrass

6    loss and replacement of macroalgae throughout the northern

7    Indian River Lagoon, and this has been going on for about

8    10 years, heavily.

9    **Q.**  Dr. Barile, I would like you to look at Plaintiff's

10   Exhibit 4.  Do you recognize it?

11   **A.**  Yes, I do.

12   **Q.**  Can you read the title?

13   **A.**  Yes.  The title is:  "Nutrient Over-Enrichment and Light

14   Limitation of Seagrass Communities in the Indian River Lagoon

15   an Urbanized Subtropical Estuary."

16   **Q.**  Is this a fair and accurate copy of this report?

17   **A.**  Yes, it is.  In fact, I have reviewed this study and was

18   brought in as an expert reviewer as it was being published.  I

19   am familiar with the authors of it.  They are at Harbor Branch

20   Oceanographic Institution, where I was formerly a postdoctoral

21   fellow.

22        **MS. BLACKNER:**  I would like to introduce this into

23   evidence, Your Honor, as Exhibit 4.

24        **THE COURT:**  Any objection?

25        **MR. BROWN:**  No objection, Your Honor.

*PETER BARILE | DIRECT*

1          **THE COURT:**  All right.  Without objection, Plaintiff's

2    Exhibit 4 is admitted and marked.  You may proceed.

3          **MS. BLACKNER:**  Thank you.

4    (Plaintiff's Exhibit No. 4 was admitted into evidence.)

5    **BY MS. BLACKNER:**

6    **Q.**  What is this study about?

7    **A.**  I think the best way to encompass the study, it literally

8    is describing the process of eutrophication, nutrient

9    over-enrichment into the Indian River Lagoon estuary, and it

10   describes the processes of escalating nutrient enrichment and

11   how that's translated to seagrass loss and replacement by

12   nondesirable components of the food web.

13   **Q.**  Why is this study important for understanding the future of

14   seagrass recovery in the northern Indian River Lagoon?

15   **A.**  Well, it certainly does an excellent job at relating,

16   number one, the resources of nutrients.  It does use stable

17   isotope methods.  But it also does a great job at showing this

18   relationship of nutrient over-enrichment and reduction of light

19   and how that translates to seagrass loss and replacement of

20   seagrasses by macroalgae, such as Caulerpa.

21   **Q.**  I would now like to bring your attention to Plaintiff's

22   Exhibit 24.  And do you recognize this?

23   **A.**  Yes, I do.  This is the -- I believe it's called the

24   graphical abstract from this study that you just had me present

25   or read about.  And so this is a -- I think it's great -- it's

 1      a great graphical abstract showing this relationship in the top

 2      panel of a residence maybe, you know, one home with a septic

 3      tank, where, maybe at low density, you have low nitrogen and

 4      low -- that's dissolved inorganic nitrogen, and soluble

 5      reactive phosphorus.  And a natural -- you can see a lot of

 6      trees, so presumably under, you know, low population you have

 7      some mitigation of stormwater with a lot of vegetation,

 8      low-level enrichment from just a few number of septic tanks,

 9      not an overabundance, and you see, again, this depiction of

10      what the lagoon would be like under natural conditions.

11          That Kd is a metric for measuring light attenuation and the

12      ability of light to reach the bottom.

13          But graphically, I think for the untrained eye or the

14      average person, it's very good because it shows -- you can see

15      seagrass is very abundant.  You see lots of fish.  You see

16      filter feeders, such as clams in there and some oysters right

17      near the surface.  But you see a lot of seagrass.  You see that

18      the water is clear.  And just very few -- under the big fish

19      near the bottom, you see what looks like one tuft of seaweed

20      under fish, but largely showing that seagrasses were dominating

21      the ecosystem under lower nutrient-loading conditions.  So this

22      presents more of the natural or less impacted enrichment

23      scenario.

24          When you move down, you see more homes.  You see elevated

25      dissolved inorganic nitrogen load.  You see more stormwater.

*PETER BARILE | DIRECT*

1    You see less trees, less vegetation.  That's attenuating

2    nutrients.  You see less seagrasses when you go to the water.

3    It's green, not just because it's St. Patrick's Day.  There's

4    no fluorescein dye in it.  But it's green because there's

5    phytoplankton, and so you see fish kills.  You see lots of

6    seaweed, the macro, that's the brown stuff on the bottom.  And

7    then you see fewer seagrasses.  And then it also says on the

8    right, "The light attenuation is more severe.  The light

9    doesn't come deeper.  So, therefore, you wouldn't expect to see

10   seagrasses extending deeper into the lagoon, and you would see

11   the accumulation of muck."  So this would be an accelerated --

12   an elevated nitrogen loading scenario.

13        And then under the bottom plot, you see more homes.  You

14   see a wastewater plant.  You see a condo on the left, lots of

15   people, more residences.  This is the excessive nutrient

16   loading scenario where excessive dissolved inorganic nitrogen,

17   both through the groundwater coming -- either stormwater from

18   sewage plants or stormwater runoff from high levels of

19   residences and low vegetation attenuation would lead to even

20   more decreases in seagrasses, more abundance of seaweeds, and

21   macroalgae, more fish kills, less light getting to the bottom.

22        Essentially, it looks dark, and this is the lagoon that we

23   see now.  There's not enough light coming to the bottom for

24   seagrasses to live.  These are the conditions that have been

25   reported for the lagoon over the past decade or so:  The water

*PETER BARILE | DIRECT*

1  getting dirtier, fewer and fewer seagrasses, more macroalgae,

2  more fish kills, and then, as we know, impacts on the water

3  food web, manatees and dolphins, that have been reported also.

4      This is the classic nutrient over-enrichment escalation

5  scenario that I think is a very good visual for those of us to

6  envision how escalating nutrients cause cascading impacts in

7  food webs, loss of seagrasses, and increase macroalgal and

8  microalgal phytoplankton blooms, as they lead to seagrass

9  die-off in the Indian River Lagoon.

10        **MS. BLACKNER:**  Your Honor, plaintiff seeks to move

11  this diagram into evidence as Exhibit 24.

12        **THE COURT:**  Any objection?

13        **MR. BROWN:**  No objection, Your Honor.

14        **THE COURT:**  All right.  Exhibit 24 will be admitted

15  and marked.  Feel free to proceed.

16      (Plaintiff's Exhibit No. 24 was admitted into evidence.)

17  **BY MS. BLACKNER:**

18  **Q.**  Okay.  Now, Dr. Barile, if you could look at a document

19  marked as Plaintiff's Exhibit 5.  Can you read the title of

20  that document?

21  **A.**  Yes.  This is titled:  "The Green Macroalgae Caulerpa

22  Prolifera Replaces Grass in a Nitrogen-Enriched,

23  Phosphorus-Limited, Urbanized Estuary."

24      In fact, that title is referring to the Indian River

25  Lagoon.

*PETER BARILE | DIRECT*

1    **Q.**  And when was this published?

2    **A.**  December of 2023.

3    **Q.**  And is this a fair and accurate copy?

4    **A.**  I believe so, yes.

5        **MS. BLACKNER:**  Plaintiff would like to move this study

6    into evidence as Plaintiff's Exhibit 5.

7        **THE COURT:**  Any objection?

8        **MR. BROWN:**  No objection, Your Honor.

9        **THE COURT:**  Without objection, Plaintiff's 5 is

10   admitted and marked.  Please proceed.

11       (Plaintiff's Exhibit No. 5 was admitted into evidence.)

12   **BY MS. BLACKNER:**

13   **Q.**  All right.  Dr. Barile, this study was written by Dr. Brian

14   Lapointe.

15   **A.**  Yes.  He was a coauthor.  That's correct.

16   **Q.**  And he was your Ph.D. advisor?

17   **A.**  That's correct.

18   **Q.**  Can you explain what this study is about?

19   **A.**  Yes.  This study shows how escalating nutrient enrichment,

20   as I just showed in the previous diagram, causes this -- caused

21   by this excess nitrogen enrichment results in this cascading

22   loss of seagrasses and replacement by the green macroalgae

23   Caulerpa prolifera.  And this study used several different

24   methods sourcing nitrogen, linking ammonium and nitrogen

25   sources, these authors believe were the result of sewage

*PETER BARILE | DIRECT*

1   enrichment and how they cascaded to changes in coverage of

2   seagrass versus the overgrowth of this Caulerpa that I

3   described from the St. Johns River Water Management District

4   previous article.

5   **Q.**  Dr. Barile, why is this study important to understanding

6   the future of seagrass in the North IRL?

7   **A.**  So Caulerpa prolifera is of a group, the Caulerpas, that

8   have the physiological ability to access nutrients better than

9   seagrasses.  So even at low levels of nutrients, once this

10  species comes in, it will outcompete seagrasses for nitrogen.

11       So, in all fairness, this is not unlike any other invader,

12  where this Caulerpa -- what was naturally found in the lagoon

13  in a very cryptic manner, in fewer places at lower density --

14  has now overgrown large portions of lagoon.  As I showed in the

15  district map, it's taken over 80 percent of the coverage on the

16  bottom and reduced seagrasses down to single digits.

17       So we've heard about invasive species around the state of

18  Florida, what a problem it is to get rid of boa constrictors,

19  once they've invaded.  In the same way, in the Indian River

20  Lagoon when we have a species that's been facilitated by human

21  intervention, in this case nutrients pollution, we have enabled

22  this Caulerpa to take over seagrass beds.  It is very hard to

23  reverse this, exceedingly hard, once this macroalgae that

24  outcompetes seagrasses, to return back to that original

25  historic, pristine condition where nutrients have been reduced,

*PETER BARILE | DIRECT*                                                    159

1    potentially, for a long enough time to cycle out of the system

2    to where seagrasses would come back and water clarity would

3    return.

4        So in the state of lagoon, of being polluted with dark

5    water, all of these cascading food-web impacts, we expect

6    Caulerpa prolifera to be the dominating macrophyte in the

7    Indian River Lagoon moving forward.

8    **Q.**  Historically, how many species of seagrass were in the

9    Indian River Lagoon?

10   **A.**  I would have to refer back to that district document, but I

11   think I saw seven of them.

12   **Q.**  All right.  Now I would like to move to Exhibit 7.  If you

13   could look at this document for Exhibit 7 and tell the Court

14   what that is.

15   **A.**  Yes.  This is the TMDL, total daily maximum daily load

16   report authored by the Florida Department of Environmental

17   Protection.  "Nutrients and Dissolved Oxygen TMDLs for the

18   Indian River Lagoon and Banana River Lagoon," authored by

19   Xueqing Gao in March of 2009.

20   **Q.**  And what is this report about?

21   **A.**  This report was developed by the St. Johns River Water

22   Management District and the DEP to develop a pollution-load

23   model that related nutrient loads to seagrass viability.  In

24   particular, as I spoke about before, the loads that are

25   necessary to increase water clarity and increase seagrass

*PETER BARILE | DIRECT*                                            160

1    depth-limit growth in the lagoon.

2        As I said, there's a very strong, technical relationship

3    between nutrient loadings, in this case characterized as

4    pollutants, that these are not just contaminates.  The state

5    acknowledges that we have nutrients loading as pollutants at

6    high levels and that there needs to be a reduction of them in

7    order to restore seagrasses in the lagoon.

8        So this document outlines the process of which the State of

9    Florida, the district in charge of seagrasses, and the DEP,

10   responsible for regulating nutrient loads, work together to

11   develop this model and a plan to address nutrient loads as they

12   relate to seagrasses.

13   **Q.**  Does this report mention manatees?

14   **A.**  It doesn't, as far as I know.

15   **Q.**  Why is this TMDL important to the future of seagrasses in

16   the lagoon?

17   **A.**  Because it outlines a model and, literally, nitrogen and

18   phosphorus reductions that are necessary in a model, in a

19   curve, that are necessary to bring back seagrasses --

20   specifically seagrass depth limits into lagoon.

21       So, essentially, these would be the steps and the goals.

22   If we reduce nutrients this much, we can expect this amount of

23   seagrass recovery.  So, again, it outlines a direct

24   relationship between nutrient-pollution-load reduction and what

25   would be the resulting seagrass recovery based on this model.

*PETER BARILE | DIRECT*

1    **Q.**  All right.  Now I would like to turn to Plaintiff's

2    Exhibit 8.

3    **A.**  Before you do, I have one more comment.

4    **Q.**  All right.

5    **A.**  This document and this model was developed on data from

6    1999 to 2006.  The land use that was used to create the

7    nutrient-loading model here was from land use around the lagoon

8    in the watershed from the year 2000.  That's 25 years ago.  Our

9    population in the state of Florida has increased from about

10   16 million, at that time, to about 23 million, at that time.

11   So, essentially, we've had a 30 percent explosion in population

12   and land use changes in the state since this document and this

13   model was developed.

14       So I can tell you, I have concerns about the credibility of

15   this model and this plan moving forward, based on the data that

16   was used to develop it.

17   **Q.**  Now we'll turn to Plaintiff's Exhibit 8.

18       **MS. BLACKNER:**  Your Honor, I believe we already

19   entered this into evidence, Exhibit 8.

20       **THE COURT:**  Let me look at my list.

21       **THE COURTROOM DEPUTY:**  8 was, Your Honor, not 7.

22       **THE COURT:**  8 was admitted?  I don't see it.  Oh, 8

23   has been admitted.  Correct.

24       **MS. BLACKNER:**  And we did enter Exhibit 7, and there

25   was no objection, correct?

*PETER BARILE | DIRECT*

1          **THE COURT:**  You did not enter that.  You did not seek

2     to admit that.  Is that what you're doing now?

3          **MS. BLACKNER:**  Yes.

4          **THE COURT:**  Any objection?

5          **MS. BLACKNER:**  I'm sorry.  I would like to enter

6     Exhibit 7.

7          **THE COURT:**  Any objection?

8          **MR. BROWN:**  No objection, Your Honor.

9          **THE COURT:**  All right.  7 is admitted and marked.  Now

10    it's in evidence.  Feel free to proceed.

11        (Plaintiff's Exhibit No. 7 was admitted into evidence.)

12    **BY MS. BLACKNER:**

13    **Q.**  So now we come to Exhibit 8, which was already entered into

14    evidence.

15         **THE COURT:**  Correct.

16         **MS. BLACKNER:**  Yes.

17    **BY MS. BLACKNER:**

18    **Q.**  Dr. Barile, if you could go through this document, which we

19    have marked as Exhibit 8, and what is this document?

20    **A.**  Yes.  This was the presentation by the Florida Department

21    of Environmental Protection, as I stated earlier, on the 25th

22    of April, 2024, as far as I recall, that outlined what's the

23    upcoming basin management action plan update for the Indian

24    River Lagoon.  So there was some interest in --

25        And by the way, just as a commentary that's included here

*PETER BARILE | DIRECT*

1  in this slide, action by the Florida legislature through the

2  Clean Waterways Act has required the DEP to update their BMAPs,

3  instead of every 10 years, every five years.  And so I believe

4  the justification for this was a new requirement, as it says in

5  this first slide, to incorporate the Clean Waterways Act

6  requirements as they relate to updating BMAPs and the projects

7  and the stakeholder projects in this process moving forward.

8  **Q.**  And this BMAP update includes the seagrass evaluation?

9  **A.**  It would because the BMAP projects are designed to reduce

10  nutrients to achieve the TMDL load reductions that would, in

11  theory, bring back seagrasses, that's correct.

12  **Q.**  Can you look at the second page of the document?

13  **A.**  Yes.

14  **Q.**  Can you review that page?

15  **A.**  So this is Exhibit 8, page 2?

16  **Q.**  Yes.

17  **A.**  Okay.  So it says, "Where are the other water quality

18  data?"  And it says, Dataset from around 1980; special

19  projects; ambient monitoring; many, many parameters; also

20  submitted to the Florida DEP and the USGS.

21  **Q.**  And why is that important?

22  **A.**  Because now you have several different agencies involved

23  with contributing data to help characterize water quality

24  within the watershed and within lagoon itself.  I think the

25  idea is, in this slide, to show an example where all the data

*PETER BARILE | DIRECT*

1    is being stored together in one portal.

2    **Q.**  Okay.  Can you turn to page 3?

3    **A.**  Yes.

4    **Q.**  Can you review this page for us?

5    **A.**  Yes.  So this is titled:  "Upcoming BMAP Update, Entity

6    Milestones for the Northern Indian River Lagoon," and you see

7    two graphs.  One on the left is for totally nitrogen estimated

8    projects reductions.  On the right is northern Indian River

9    Lagoon total phosphorus estimated project reductions.  And the

10   bar on the left is cumulative total nitrogen reduction.  And on

11   the bottom it shows the years.  And then as the graph goes from

12   2013 to 2035, you see the graph, which in the past years is

13   denoting what those estimated project reductions have achieved.

14       Okay.  So what this is showing is, by 2023 we've seen a

15   slow but positive recovery of nutrient-load reductions based on

16   these projects.  And it also shows the five-year milestone in

17   2025.  And then, further, it shows the ten-year milestone.  And

18   then, ultimately, the dot on the very end, in 2035, is the

19   total reductions required in the model to bring seagrasses

20   back.

21       So, in theory, if the stakeholders and the projects and the

22   BMAP reduce nutrients and the projects kept reducing more and

23   more nutrients, you would want to achieve these goals of

24   nutrient reductions necessary to bring seagrasses back.  So

25   those goals are part of the BMAP, showing what has been

*PETER BARILE | DIRECT*                                                          165

1    achieved in nutrient reductions versus what are kind of the

2    aspirational goals moving forward.

3    **Q.**  And what does this graph show with respect to the future?

4    **A.**  What it shows also is a dotted line that looks like it's

5    kind of horizontal for total nitrogen and total phosphorus.

6    And I'll read this into the record because it is hard to read.

7    It reads:  "Unverified estimated reduction from planned and

8    underway projects."  And what it is showing is that the

9    nutrient-load reductions that were, kind of,

10   escalating/accelerating are, kind of, flatlining, and, in fact,

11   they're flatlining for both nitrogen and phosphorus in this

12   model -- unverified but this is their predicted nitrogen

13   reductions -- that do not appear to meet their goal for 2030,

14   which is the next dot up from 2025.

15       So this is kind of important, because if the goal of the

16   BMAP is to reduce nutrients necessary to bring seagrasses back,

17   it looks like, for the foreseeable future, that the department

18   does not predict that it will be reducing either nitrogen or

19   phosphorus adequately to meet their water-quality goals,

20   nutrient-reduction goals to bring seagrasses back.

21   **Q.**  All right.  Can we turn to the next page --

22   **A.**  Yes.

23   **Q.**  -- page 4?

24   **A.**  Yes.

25   **Q.**  Can you explain this diagram?

*PETER BARILE | DIRECT*                                                166

1    **A.**  This is showing the seagrass extent, very similar to the

2    previous district presentation.  You can see that this is a

3    slide from the St. Johns River Water Management District.  They

4    participated in the meeting, on behalf of the DEP, to show

5    current seagrass coverage in the lagoon and extent.

6        And what I see here on the left is seagrass extents for

7    2021 and 2023.  I don't see any seagrasses denoted in this

8    graph in the northern Indian River Lagoon.  I see some in the

9    Mosquito Lagoon, but that's not -- that's outside of the BMAP.

10   I also see on the graph, to the right, which is seagrass

11   extent, again, for this whole portion of lagoon, which I see is

12   the central lagoon, all the way up through the Mosquito Lagoon.

13   It shows the historical extent in 1943 at about 30,000 acres

14   and those values coming down to around 9,000 hectares in 2021

15   and 2023.  So these are all-time-low seagrass coverage.

16       And also, where it says, "mean transect length," that black

17   dotted line, that describes the length of seagrasses from some

18   point nearshore, extending offshore.  So, in theory, if the

19   lagoon was getting healthier and the nutrients were being

20   reduced, you would have more light penetration deeper in

21   lagoon, and the main transect length of deep-depth seagrass

22   growth would be extending out into lagoon.

23       And, again, it's at a very low level.  It says transect

24   length hovering between 40 and 60 meters between 2019 and 2023.

25   So these are all-time lows for the extent of seagrass into the

*PETER BARILE | DIRECT*

1    lagoon during the recent period.

2    **Q.**  Dr. Barile, does this document predict -- well, in this

3    document does DEP predict it will meet its BMAP goal for total

4    nitrogen and phosphorus load reduction by 2030?

5          **MR. BROWN:**  Objection, lack of foundation as to DEP's

6    intent or purpose in the formulation of that document.

7          **THE COURT:**  Response to that objection?

8          **MS. BLOME:**  Well, Your Honor, Dr. Barile went through

9    and just described what he observed in this document, which DEP

10   produced itself, on page 3, and they project out into the

11   future.  They project out to 2030, and they project to 2035.

12         **THE COURT:**  All right.  She's eliciting testimony from

13   the witness as to what his interpretation is of the document, a

14   matter you can take up on cross if you disagree.

15         On that basis, the objection is overruled.  The

16   witness can answer the question.

17         **MS. BLACKNER:**  All right.  Would you like to read the

18   question back?  Thank you.

19    (The requested portion of the record was read back by the

20   Official Court Reporter.)

21         **THE WITNESS:**  No.  DEP states here their estimated

22   reduction from planned and underway projects does not meet the

23   goals of nutrient reductions to bring seagrasses back, either

24   by 2030 and does not project well for 2035.  So it looks like a

25   flatlining and no significant increase in nutrient reductions

*PETER BARILE | DIRECT*

1    for the foreseeable future moving forward.

2    **BY MS. BLACKNER:**

3    **Q.**  Dr. Barile, what does this mean for the foreseeable future

4    for the northern Indian River Lagoon?

5    **A.**  These are not conditions that the St. Johns River Water

6    Management District anticipates the water quality will be

7    adequate for seagrass recovery, based on the TMDL model,

8    knowing that the district and the DEP have a model and

9    agreement about what nutrient-load reductions are needed to

10   achieve seagrass recovery and regrowth.

11   **Q.**  Based on the remainder of this report, what are the trends

12   for the central Indian River Lagoon?

13   **A.**  Which page is that?  Sorry.

14   **Q.**  Hold on just a second.  That would be page 12.

15   **A.**  Okay.  Very good.  I see it.  Also, for the central Indian

16   River Lagoon, with respect to nitrogen, there also appears to

17   be a flatlining where the FDEP explains that the unverified but

18   estimated reduction from planned and underway projects appears

19   to flatline.  They have achieved their 2025 milestone, but this

20   graph indicates that the department does not anticipate

21   achieving their 2030 goal for nutrient reductions necessary for

22   bringing seagrasses back in the central lagoon, as an addition

23   to the northern lagoon.

24   **Q.**  Dr. Barile, why is this report important for manatees that

25   occupy the northern Indian River Lagoon?

*PETER BARILE | DIRECT*

1    **A.** Well, we have a BMAP regulatory structure that is providing

2    nitrogen-load and water-recovery data and estimates for not

3    only the northern lagoon but also the central lagoon, and there

4    was another slide for the Banana River Lagoon.

5        Let me just add, to finish this one on the central lagoon,

6    there does appear that the department estimates in their model

7    an uptick in their load reductions for 2030 that may meet their

8    2030 goal.  Whereas, it does not appear to meet the goal for

9    nitrogen in the left panel, it may do that for total

10   phosphorus.  This is important.  And, I believe, on page 8 you

11   see the trends for the Banana River Lagoon, and they're very

12   similar.

13       So what this speaks to is that the stakeholders in the

14   watershed, whether it's around the northern lagoon or the

15   central lagoon or the Banana River Lagoon, whether they are

16   polluting wastewater plants or cities that have excess

17   stormwater nutrients coming out or too many homes on septic

18   tanks that need to be mitigated, these loads are not being

19   reduced quick enough to meet the department's goals for 2030.

20       So this flatlining, outside of that one trend for the

21   central lagoon, appears to also hold for the Banana River

22   Lagoon, where the department does not predict in their model

23   that they're achieving reductions based on their BMAP projects.

24   **Q.** And, again, why is this report important to understanding

25   the future of manatees in the northern Indian River Lagoon?

*PETER BARILE | DIRECT*

1    **A.**  I think it's a very simple, now that I've gone through

2    technically all of this, to understand the relationship and

3    deduce that if the Florida DEP cannot do its part in reducing

4    nutrient loading, then the other agencies, the St. Johns River

5    Water Management District, and the public at large, cannot

6    expect seagrass recovery that were the goals of the DEP, and as

7    it relates to manatees I think it's very intuitive, but I will

8    explain it.  If you don't reduce nutrient loads, you will

9    continue to have harmful algae blooms, whether it's

10   phytoplankton blooms or macroalgae blooms.  Those macroalgae

11   blooms will dominate under these poor water quality conditions.

12       We do not anticipate seagrass recovery, and, therefore,

13   manatees will not have access to the seagrasses they would in a

14   restored system, and they will continue to have macroalgae as

15   the primary benthic diet on the bottom of the lagoon.  You will

16   expect -- we would expect to have, under these flatlining

17   conditions, to have macroalgae being the dominant benthic

18   dietary item for manatees moving forward.

19   **Q.**  All right.  Now I would like you to turn to the document

20   plaintiffs have marked as Exhibit 9.  Can you identify this

21   document?

22   **A.**  Yes.  This is a poster produced by the St. Johns River

23   Water Management District for, I believe it was called, the

24   Manatee Jubilee or some manatee event in 2022, and it's titled:

25   "Where Has All The Seagrass Gone in the Indian River Lagoon,

*PETER BARILE | DIRECT*

1    and Why Are The Manatees Hungry?"

2    **Q.**  Is this a fair and accurate representation of this diagram?

3    **A.**  Yes.  I have seen this.  Yes.

4        **MS. BLACKNER:**  Your Honor, plaintiff would like to

5    move this document into evidence as Plaintiff's Exhibit 9.

6        **THE COURT:**  Any objection?

7        **MR. BROWN:**  Your Honor, this may be a category of

8    document that an expert in his field would reasonably rely

9    upon.  There's no foundation as to that.  But in any case,

10   although the witness may rely upon the document in expressing

11   an expert opinion, the document itself is hearsay, and I

12   respectfully object on hearsay grounds.

13       **THE COURT:**  Would the plaintiff like to respond to the

14   objection?

15       **MS. BLACKNER:**  Well, Dr. Barile has relied upon this

16   to continue his investigation into the lagoon, to understand

17   the current conditions, and it's been part of his ongoing

18   mastery of the ecology of the lagoon.

19       **THE COURT:**  Remember, there are two different aspects

20   to this.  He can testify as to anything he relied upon in

21   reaching his opinion, so he could testify about this and what's

22   in this, but to admit it -- by the way, the reason they do this

23   is because you don't want an expert coming in here trying to

24   introduce a treatise the size of a phone book because they

25   relied upon it in rendering their testimony.  This is a little

*PETER BARILE | DIRECT*                                                      172

1    different.

2         I will read you again the *United States v.*

3    *Rivera-Soto*, 451 F. App'x 806 at page 807.  Under Federal Rule

4    of Evidence 803(8), "Documents are generally not excluded as

5    hearsay if they are records, reports, statements, or data

6    compilations in any form of public agencies which set forth the

7    activities of the agency or matters observed pursuant to a

8    legal duty to report, unless circumstances indicate a lack of

9    trustworthiness."

10        I am comfortable that this does not have a

11   lack-of-trustworthiness problem, and I think it falls squarely

12   within the exceptions cited by the *Rivera-Soto* case, so for

13   that reason the objection is preserved for the record.  But

14   there is a hearsay objection to this.  The document is admitted

15   over the objection.

16        You may proceed.

17     (Plaintiff's Exhibit No. 9 was admitted into evidence.)

18        **MS. BLACKNER:**  Yes.  Thank you, Your Honor.

19        **THE COURT:**  Forgive me.  My staff is asking for a

20   comfort break.

21        **MS. BLACKNER:**  Oh, okay.

22        **THE COURT:**  Let's take a 10-minute break, and then

23   we'll continue moving forward.

24        Sorry about that, Suzie.

25        We'll pick up where we left off.  Court's in recess.

*PETER BARILE | DIRECT*

1          (Recess at 2:37 p.m. until 2:49 p.m.)

2              **THE COURT:**  I would invite counsel to continue with

3      the examination.

4              **MS. BLACKNER:**  Thank you, Your Honor.

5      **BY MS. BLACKNER:**

6      **Q.**  Dr. Barile, we were discussing Exhibit 9.

7      **A.**  Yes.

8      **Q.**  Yes.  And who produced this exhibit?

9      **A.**  Yeah.  You can see the emblem on the right side.  That's

10     the emblem of the St. Johns River Water Management District.

11     **Q.**  And, again, St. Johns River Water Management District is

12     the Florida agency charged with reporting on seagrass?

13     **A.**  They are responsible for the conservation of seagrasses and

14     monitoring and assessing their health.

15     **Q.**  All right.  Can you discuss this document?

16     **A.**  Yes.  It's a very busy graphic here.  Again, this was a

17     poster size.  It's reduced down to small.  So I'll do my best

18     to describe it.

19          On the left, we've seen this little graph before, and that

20     is the historic -- the green bars on the left, 1943, indicating

21     about 30,000 acres of seagrass coverage and then changes

22     historically going down, rising up to the '80s, as those red

23     arrows show, some very extreme crashes in seagrasses around

24     that 2010 time, and little bit of recovery, as I pointed out

25     before, from 2012 to 2015, and then another marked crash more

PETER BARILE | DIRECT                                                    174

 1    recently, from 2016 through 2020.  At this time -- I believe

 2    this was produced in 2022.

 3        It also shows that same graphic, that image of those

 4    phytoplankton blooms, and, actually, it shows and lists them

 5    as:

 6        The super bloom.

 7        The first brown tide.

 8        No blooms in 2015.

 9        The 2016 says, "brown tide" and "a major fish kill."

10        The next one is pretty interesting.  It says, February 19,

11    2019, and it shows that these phytoplankton blooms are

12    demarked, as it says under there a period following Hurricane

13    Irma in 2017 in which there were sewage spills.

14        The next one outlines these blooms, significant blooms,

15    again over 100 micrograms per liter.  In October 15, 2020,

16    again, showing this relationship of how these blooms, which are

17    the result of nutrient-loading events, events like Hurricane

18    Irma and sewage dumping and as they relate -- and the DEP and

19    district are involved with, relating to seagrass coverage.

20        Showing some pictures there in the middle of what

21    40 percent seagrass coverage looks like and then less than

22    1 percent seagrass coverage and then showing on the right the

23    map seagrasses of the Banana River Lagoon from 1984 through

24    2019, and, basically, what we're seeing is the loss of

25    seagrasses, as we've seen in the previous slides, from, you

*PETER BARILE | DIRECT*                                          175

 1    know, potentially, you know, high coverage to almost

 2    nonexistent -- very, very sparse amounts of seagrasses by 2019

 3    in lagoon.

 4         So this is the district saying, you know, these are the

 5    conditions happening.  We've got phytoplankton blooms.  We've

 6    got mass seagrass loss in these important areas, and then it

 7    lists the take-home messages.  I'll go through ones on the left

 8    just to repeat what the district has put out publicly here.

 9         It says:  Too many nutrients equals too much chlorophyll,

10    and that's the issue.

11         The nutrient budget is complex.

12         The next bullet down:  New sources of chlorophyll equal

13    different species.  They're blooming, and they're bad actors.

14         The bullets under there say:  The players have changed,

15    meaning the different types of phytoplankton.

16         Many of them are smaller.

17         They're fast growing.

18         They like organic nitrogen and phosphorus.  Very technical

19    there -- bypassing the microbial loop.

20         And the brown tide has a resting stage, meaning if it gets

21    another pulse of nutrients, it's there, and it will bloom

22    again.  The district is insinuating here that, these resting

23    stages of these blooms are there, and whenever we get a big

24    event of nutrient loading, the probability is we will see more

25    blooms again that kill more seagrasses.

1        The take-home messages on the right:  Why do these events

2   matter?  Because restoration is underway and planned.  I

3   believe they're referring to seagrass restoration.

4        There are St. Johns River Water Management District

5   projects and cost-share that include revenue from the Brevard

6   County sales tax to restore lagoon and the Indian River Lagoon

7   council grants.

8        In summary, the St. Johns River Water Management District

9   says in this poster, "Based on the rate of increase during 2013

10  to 2015" -- and that's that slide, if you look at the seagrass

11  map on the top left.  That small little seagrass recovery that

12  occurred from 2013 to 2015, based on that rate -- "it could

13  take 12 to 17 years to start seeing seagrass recovery."

14       This is the St. Johns River Water Management District and

15  their map and their understanding of the environmental

16  conditions and their prediction about how long it's going to

17  take for seagrasses to start recovering in the Indian River

18  Lagoon using their own words.

19  **Q.**  Dr. Barile, a previous witness from FWC testified that

20  seagrass is recovering in the northern Indian River Lagoon.

21       Do you agree with that assessment?

22  **A.**  No.  I don't know where she heard that.  She alleges she

23  heard it from the St. Johns River Water Management District.  I

24  know who these same people are.  We've seen their presentation,

25  and those experts have shown us publicly that they're not

*PETER BARILE | DIRECT*                                                      177

1    coming back.  In fact, the seagrass coverage in the northern

2    lagoon and places like the Banana River Lagoon and the central

3    lagoon are so low, they are, like, in 1 to 3 percent.  They're

4    historically low, and they've been that way for a long time.

5         So within the BMAP areas, there is no evidence of seagrass

6    recovery, and based on the water-quality-load reductions that

7    the DEP predicts, we just cannot expect seagrasses to recover

8    in these BMAP portions of lagoon anytime soon.

9    **Q.**  Dr. Barile, what does it mean in this diagram with the

10   photos:  Percent cover, greater than 40 percent; percent cover,

11   less than 1 percent?

12   **A.**  So that is showing they have some quadrats there, and

13   they're actually assessing the number of blades-per-unit area

14   and saying on the bottom of the lagoon that the seagrasses are

15   covering 40 percent of the bottom.

16        So referring back to those slides that we went over earlier

17   where the district said there was less than 10 percent, and

18   those images to the right, they present some images that say

19   that is an example of percent cover less than 1 percent.  We

20   saw some other slides where the district said the Caulerpa was

21   80 percent coverage.

22        That means that the bottom is, literally, paved with only

23   20 percent of the area showing a little bit of sand in between

24   the big mass of macroalgae growing in the lagoon; at the same

25   time, single digit percent covers of seagrasses in those areas.

*PETER BARILE | DIRECT*

1    **Q.**  And you expect that to continue?

2    **A.**  All the evidence that I've gone through here today suggests

3    that this is an ongoing trend that is going to continue into

4    the near future, yes.

5    **Q.**  Dr. Barile, now I would like to turn to Plaintiff's

6    Exhibit 10, which I can't even read.  Can you read it?

7    **A.**  No.

8            **MS. BLACKNER:**  It's in gobbledygook.  I'm sorry, Your

9    Honor.  Something must have happened with the printing.

10           **MS. BLOME:**  Is it the Aarin-Conrad?

11           **MS. BLACKNER:**  Yes, Aarin-Conrad.

12           **MS. BLOME:**  We can plug it in.

13   **BY MS. BLACKNER:**

14   **Q.**  Can you see the screen, Dr. Barile?

15   **A.**  Yes, I can.

16   **Q.**  Let's see.  Do you recognize this document?

17   **A.**  I do.  It's titled:  "Evidence of a Dietary Shift by the

18   Florida Manatee in Indian River Lagoon Inferred from Stomach

19   Content Analysis."

20   **Q.**  Is this a fair and accurate copy?

21   **A.**  As far as I know.  This one is not in a font or a form I

22   can understand, but what I see on the screen looks accurate as

23   to the copy that I've seen and reviewed in the past.

24           **MS. BLACKNER:**  Your Honor, we will get a corrected

25   version of this to the Court.

*PETER BARILE | DIRECT*                                          179

1          **THE COURT:**  All right.

2          **MS. BLACKNER:**  I'm sorry we didn't catch that.

3   **BY MS. BLACKNER:**

4   **Q.**  When was this study published?

5   **A.**  In 2022.  I think if we scroll up to the top it might be

6   listed there, the exact date.  I believe it was spring of 2022.

7          **MS. BLACKNER:**  All right.  Plaintiffs seek to move

8   this document into evidence as Plaintiff's 10.

9          **THE COURT:**  Any objection?

10          **MR. BROWN:**  Same objection as before, Your Honor.

11          **THE COURT:**  That it's hearsay?

12          **MR. BROWN:**  Yes, Your Honor.

13          **THE COURT:**  All right.  Well, this is a little

14   different.  Who is the creator of this document?  Because the

15   hearsay exception you got everything else in was that it was

16   data from public agencies.  Who created this document?

17          **MS. BLACKNER:**  This is a peer-reviewed study that was

18   published in an elite journal, Estuarian, Coastal and Shelf

19   Science.

20          **THE COURT:**  All right.  So the operative question here

21   is -- Federal Rule of Evidence 803(8) was the basis upon which

22   all of the governmental documents were admitted as evidence.

23          The objection from the defense is that this is

24   hearsay, an out-of-court statement used in court for the truth

25   of the matter asserted.

*PETER BARILE | DIRECT*

1          **MS. BLACKNER:**  No.

2          **THE COURT:**  So the question to you is, how is this

3     non-hearsay, or how is this an exception to the hearsay rule?

4          **MS. BLACKNER:**  Your Honor, it's not being used for the

5     truth of the matter asserted, but it's offered for the expert,

6     Dr. Barile's reliance upon it.  It's yet another study that he

7     has cited to and relied upon in the scope of his work, and he

8     cited to this report in his expert report.

9          **THE COURT:**  Well, the obvious response to, it's not

10    being introduced for the truth of the matter asserted is, then,

11    how is it relevant?  Any tendency to make a fact in dispute

12    more or less likely.  I think it's hearsay.  I don't think

13    you've listed an exception that it gets in under.

14          However, as I indicated previously, he can testify as

15    to any matters he relied on in reaching his expert opinion.  So

16    while I'm not admitting the document, he can go over the

17    document with you and testify as to what's on it and why he

18    agrees or disagrees with it and how it helps him formulate his

19    opinion, but the document, per se, is not yet admissible

20    because there's not an exception cited by the plaintiff to make

21    it so.

22          So the objection is sustained.  You can ask him

23    whatever you want about this article.

24          **MS. BLACKNER:**  Okay.

25    **BY MS. BLACKNER:**

*PETER BARILE | DIRECT*                                          181

1    **Q.**  Are you familiar with this document --

2    **A.**  Yes, I am.

3    **Q.**  -- Dr. Barile?

4    **A.**  And, by the way, this is part of the peer-reviewed

5    literature.  As a scientist, my practice is to familiarize

6    myself with studies that are related to my area of expertise.

7    In fact, I read this article and, you know, have made the Court

8    aware that, as part of my expertise, in my report, that this is

9    an area of interest and understanding, and so, therefore, I

10   feel very comfortable discussing it today.

11            **THE COURT:**  And that's fine.  I mean, I don't need to

12   engage in a discussion with your witness about what his

13   position is.  Just ask the question.  I have made my ruling.

14   Let's not do that again.

15   **BY MS. BLACKNER:**

16   **Q.**  What does this publication discuss?

17   **A.**  Okay.  If you could scroll up to the abstract.

18            **MR. BROWN:**  Objection, Your Honor.  The question as

19   framed appears -- not relating to his testimony, but appears to

20   be an effort to ask the witness merely to publish the article,

21   and I believe, consistent with the Court's ruling, I believe it

22   would be appropriate to lay a foundation as to how this witness

23   had relied upon or used this document in his testimony.

24            **THE COURT:**  I understand your objection, but it's

25   overruled.  He can continue to testify.

*PETER BARILE | DIRECT*                                                    182

1          **THE WITNESS:**  Yes.  Please scroll up the abstract, and

2     I'll describe it.  Very good.

3          So this study -- these authors of the study did some

4     assessment of the gut contents, using microhistological

5     analysis, examined the diet of manatees over two periods; a

6     previous period of 30 years compared to a more recent period --

7     so the past was 1977 versus through 1989.  That's the previous

8     period, as the authors state, as pre-seagrass-die-off versus a

9     more recent period looking at the stomach contents of manatees

10    in 2013 through 2015, a time denoted as post-die-off.  And so

11    there was a comparison over the gut contents of what plants

12    were in those gut contents between those two periods.

13         What this study shows is that in the more recent period the

14    stomach contents, during the post-seagrass-die-off period,

15    these manatees largely had algae, macroalgae, in their guts and

16    had lower amounts of seagrasses, so it was about 50 percent

17    macroalgae and followed by about 30 percent seagrass,

18    34 percent seagrasses, and about 3 percent vascular plants.

19         Compared to the previous less pollution, less

20    nutrient-impacted lagoon in the past, from 1977 to 1989, where

21    the manatees and their gut contents -- they have experienced a

22    45 percent decline in seagrass consumption and an increase in

23    74 percent macroalgae consumption between these two periods.

24         So irrespective of the body length or age, this seems to be

25    a trend in what manatees are consuming in the less polluted

*PETER BARILE | DIRECT*                                            183

1    lagoon in '77 through '89 versus the more pollution-impacted

2    and macroalgal-dominated period of 2013 to 2015.

3    **BY MS. BLACKNER:**

4    **Q.**  Is it now accepted knowledge that seagrass is no longer the

5    dominant forage for manatees that occupy the Indian River

6    Lagoon?

7              **MR. BROWN:**  Objection, leading.

8              **THE COURT:**  What's your response?  Well, I mean, is it

9    now accepted knowledge that seagrass is no longer the dominant

10   forage --

11             What is that word, Suzanne?

12             I'm making sure because sometimes she uses code to

13   type out letters.  All right.  So that's an open-ended

14   question.  A leading question would say, Isn't it true that, or

15   would you agree with me that.  So I think that's open ended

16   enough.  The objection is overruled.

17             You can ask the question.  It can be answered.

18             **THE WITNESS:**  Please repeat the question.

19             **THE COURT:**  That's okay.  I'm with you.

20             Suzanne.

21        (The requested portion of the record was read back by the

22   Official Court Reporter.)

23             **THE WITNESS:**  Several of these lines of evidence are

24   indicative that macroalgae is the primary prey item for

25   manatees in this portion of lagoon that was assayed in these

*PETER BARILE | DIRECT*                                                184

1    studies.

2         This study also -- let's see.  Yeah, it indicates that

3    there is a lack of seagrass diet, so the presumption here is

4    that the lagoon has experienced this shift, lack of seagrasses,

5    more macroalgae, and it's been reflected in their diets of

6    consuming more macroalgae, yes.

7    **BY MS. BLACKNER:**

8    **Q.**  Have you seen any evidence that would support an assertion

9    that seagrass is returning to the North IRL?

10   **A.**  As I spoke in an answer previously, the St. Johns River

11   Water Management District's data, that both Dr. de Wit and I

12   rely upon, have indicated that seagrasses have not recovered in

13   the northern Indian River Lagoon.  In fact, those coverages are

14   exceedingly low, at 1 to 3 percent.

15   **Q.**  And that's the current level of seagrass in the northern

16   Indian River Lagoon?

17   **A.**  That's my understanding, yes.

18   **Q.**  All right.  Now we turn to Plaintiff's Exhibit 11.  Can you

19   identify this document?

20   **A.**  Yes.  I am very familiar with this research study, as I was

21   the previous one.  It is entitled:  "Novel Lethal Clostridial

22   Infection in Florida Manatees:  The Cause of the 2013 Unusual

23   Mortality Event in the Indian River Lagoon."  That's the title.

24   It was authored by Jan Landsberg and several authors, including

25   Martine de Wit, and it was published in March of 2022, about

*PETER BARILE | DIRECT*

185

1    the same time as the other study was reported.

2           **THE COURT:**  Ms. Blackner, I would remind you that this

3    has already been admitted.

4           **MS. BLACKNER:**  Yes, Your Honor.

5    **BY MS. BLACKNER:**

6    **Q.**  What is this report about?

7    **A.**  This report, as Dr. de Wit also stated, is a summary report

8    resulting from the autopsies -- I'm sorry, the necropsies of

9    manatees, showing this event where the manatees were primarily

10   foraging on macroalgae and the pathologies associated with

11   consumption of primarily macroalgae that resulted in this UME

12   event in 2013.

13   **Q.**  Can you explain why this report is important for

14   understanding what happened to manatees during the 2013 UME?

15   **A.**  Sure.  Again, I think what's important for us all to

16   understand is that manatees had historically consumed

17   seagrasses, and to be provided this diet that was not

18   consistent with their historical dietary preferences, it caused

19   some very significant pathologies resulting in death.

20   **Q.**  I would like you to read from this report, Dr. Barile, the

21   conclusion, I believe.

22   **A.**  Which portion of it?

23   **Q.**  The conclusion on page 17.

24   **A.**  All of it?

25   **Q.**  Maybe just the first paragraph.

1      **A.**  Okay.  Very good.  "The suite of clostridial virulence

2      factors and toxins identified here, likely caused by a shift to

3      a predominantly macroalgal diet, appears to play a significant

4      role in the mortality of manatees, primarily in the Indian

5      River Lagoon, but also elsewhere.  Concern for manatee health

6      and survival warrants further investigation as to the primary

7      causative factors, other as-yet undetermined contributing

8      factors, bacterial source origins, and links to dramatic

9      ecosystem functional changes and stressors.  Potential

10     exogenous sources of clostridiales are unknown, but numerous

11     wastewater-treatment plants, sewage-disposal systems,

12     agriculture activities, and agricultural operations near the

13     Indian River Lagoon could be of concern."

14     **Q.**  Now, Dr. Barile, is this report the definitive explanation

15     of what happened to manatees during the 2013 UME?

16     **A.**  It is my understanding -- in fact, I believe this article

17     is referenced on the National Marine Fisheries Service's site

18     for explanation of the 2013 event, and, certainly, the

19     statement of change in forage was implicated for this most

20     recent UME also, so change in forage, as described in the

21     previous Allen paper and the pathologies described in this

22     paper, have absolutely been cited by NOAA and National Marine

23     Fisheries Service as causes of these two UMEs.

24     **Q.**  Why is this report relevant and important to the current

25     status of manatees in the North IRL now and into the future?

*PETER BARILE | DIRECT*

1    **A.**   The implication would be if seagrasses remain to be

2    ecologically irrelevant, existing at 1 to 3 percent levels in a

3    system that's dominated by macroalgae, as we saw Caulerpa from

4    the district, it suggests that manatees will continue to eat

5    primarily macroalgae as their primary diet item moving forward.

6    So the implications is that problems, dietary problems, and

7    pathologies associated with a diet primarily composed of

8    macroalgae are suggestive that manatees will continue to suffer

9    from malnutrition.

10   **Q.**   Dr. Barile, can you review some of the health problems that

11   resulted from this macroalgae-based diet that's discussed in

12   this paper?

13   **A.**   I can certainly read what their findings are.  In the first

14   page, about halfway down, it states:  "The case definition

15   included carcasses in good nutritional condition with

16   multiorgan congestion or wet lungs consistent with drowning

17   without trauma.  The gastrointestinal compartments of manatee

18   carcasses were filled with diverse macroalga species, and the

19   contents were notably more fluid than usual.  Gross intestinal

20   findings included blebbing of segmental thickening of the wall.

21   Microscopic lesions were primarily intestinal, including

22   necrosis, edema, hemorrhage, mucosa-associated lymphoid

23   changes, and inflammation, sometimes associated with

24   Gram-positive bacterial rods."

25   **Q.**   Can you translate that for us?

1      **A.**  These authors list these conditions as pathologies

2      associated with manatee mortality as a result of the dietary

3      change that they experienced during this UME.

4      **Q.**  Going back to the Allen paper, which I believe is

5      Exhibit 10, did that report also find negative health

6      implications for manatees that consume macroalgae beyond simply

7      death?

8      **A.**  I would have to read out of that, but they certainly imply

9      it in the beginning that the mortality event that was occurring

10     when we studied it, this portion of time between 2013 and 2015,

11     with these pathologies and the diets that these manatees --

12     again, what was in their gut contents were very different than

13     historical and natural diets consumed by manatees historically.

14     **Q.**  All right.  I would like to direct your attention to

15     Exhibit 20, Plaintiff's Exhibit 20.  Do you recognize this

16     document?

17     **A.**  Yes.  I've reviewed the NOAA website for active and closed

18     unusual mortality events.  Yes, I've seen this.

19              **MS. BLACKNER:**  Your Honor, I don't recall if this has

20     been moved into evidence or not already.

21              **THE COURT:**  Ann?

22              **THE COURTROOM DEPUTY:**  It has not.

23              **THE COURT:**  Not yet.

24              **MS. BLACKNER:**  Not yet.  Okay.  Plaintiff seeks to

25     move this into evidence as Exhibit 20.

*PETER BARILE | DIRECT*                                              189

1          **THE COURT:**  Is there any objection to the admission of

2     Plaintiff's Exhibit 20?

3          **MR. BROWN:**  Hearsay, for the record, Your Honor.

4          **THE COURT:**  All right.  Tell me what it is again.

5     There's a hearsay objection.

6          **MS. BLACKNER:**  This is a printout from the NOAA

7     website on active and closed unusual mortality events.

8          **THE COURT:**  All right.  I'll indicate for the record

9     the objection is noted and preserved for the record.  This

10    would fall under 803(8), being a public agency, and there being

11    no articulated concern over a lack of trustworthiness.  Over

12    the objection, it's admitted and marked.  You may proceed.

13         (Plaintiff's Exhibit No. 20 was admitted into evidence.)

14    **BY MS. BLACKNER:**

15    **Q.**  Dr. Barile, looking at the second page -- no.  Let's see

16    the second page.  No.  It's actually the first -- let's see.

17    It's No. 58.  Right, on the third page.  Excuse me.

18    **A.**  Yes.  I recognize Exhibit 20, page 3, and number 58 on the

19    left column.

20    **Q.**  Right.  And the cause, "Infectious disease secondary to

21    ecological factors, e.g., change in forage," that is the report

22    by Dr. Jan Landsberg and Dr. de Wit?

23    **A.**  Yes.  My understanding is that little icon on the bottom

24    links the Landsberg study as the cause that NMFS indicates for

25    the 2013 manatee UME on the Florida east coast.  So where it

*PETER BARILE | DIRECT*                                                190

1    says, "Infectious disease secondary to ecological factors,

2    e.g., change in forage," it does utilize the Landsberg, et al.

3    2022 cause of the 2013 UME as the citation for this cause as

4    listed by the National Marine Fisheries Service.

5    **Q.**  And this report, this study that is the definitive

6    explanation for why this 2013 UME happened, what years did it

7    include necropsies of manatees for?

8    **A.**  So the Landsberg paper, going back to that -- and I may not

9    have said this previously, but those necropsies for that study,

10   the Landsberg 2022 study, were accomplished from 2012 through

11   2019.

12   **Q.**  Okay.  And now we turn to the 2021 -- or the 2020 UME,

13   which is exhibit -- which is also Exhibit 20.

14   **A.**  I see it as page 1.

15   **Q.**  Okay.

16   **A.**  No. 71, year declared 2021.

17   **Q.**  What is the avowed cause of that 2021 UME?

18   **A.**  The NOAA National Fisheries Service lists the cause of the

19   2021 Atlantic, Florida manatee UME as:  "Malnutrition secondary

20   to ecological factors including, e.g., change in forage."

21   **Q.**  So since this UME was declared, has forage improved for the

22   manatees in the northern Indian River Lagoon?

23   **A.**  I don't think the evidence suggests that it's improved.  I

24   think the change started in 2010, as Martine de Wit stated

25   earlier.  It has continued from the past to the present, and

*PETER BARILE | DIRECT*

1   the scientific evidence that I have reviewed from the St. Johns

2   River Water Management District today indicates that, based on

3   the nutrient-loading predictions moving forward, that we cannot

4   expect this negative change in forage to be mitigated and end

5   in the near future.

6   **Q.**   How do you connect the 2013 UME with the 2021 UME?

7   **A.**   Well, as stated here on page 3 of Exhibit 20, this

8   statement of change in forage is listed for both the 2013 UME

9   as well as the 2021 UME.  So NOAA Fisheries is acknowledging

10  that these ecological conditions and these factors have,

11  obviously -- and this change in forage have been problematic

12  and leading to UMEs in both 2013 and this most recent one

13  declared in 2021.

14  **Q.**   Is this change in forage continuing?

15  **A.**   It exists right now.  We do not see -- again, I showed you

16  the St. Johns River Water Management District slide for 2023.

17  In the northern Indian River Lagoon it showed us that there was

18  80 percent Caulerpa cover, and I believe the number they said

19  less than 10 percent, but on the other graph it showed maybe 1

20  to 3 percent seagrass coverage.  So you have 80 percent

21  macroalgae and 1 to 3 percent seagrasses.  This change in

22  forage has started in the past, and it continues, through the

23  data that we've seen from the State of Florida, into the

24  present.

25  **Q.**   What about the near future?

*PETER BARILE | DIRECT*                                                    192

1    **A.**  Based on our understanding of the slow rate of improvement,

2    of lack of progress in the BMAP to mitigate nutrient loading,

3    the district, as I read in their previous poster, the State of

4    Florida, St. Johns River Water Management District does not

5    anticipate seagrasses starting to grow back for 12 to 17 years.

6    I think their opinion is valid, and I agree with it.

7    **Q.**  What impacts do you expect to occur to manatees in the

8    North IRL resulting from a lack of adequate seagrass forage

9    currently and into the future?

10   **A.**  Based on these past two studies that I reviewed here, when

11   those manatees are primarily consuming macroalgae as their

12   primary diet, it causes malnutrition.  It causes -- it is the

13   result of a change in forage.  These are negative impacts on

14   the manatee.  So if these are the conditions moving forward,

15   malnutrition as a result of this change in forage, we would

16   expect that to continue into the future.

17   **Q.**  And, again, does the scientific evidence indicate that

18   seagrass is the natural healthy forage for manatees in

19   unpolluted conditions?

20   **A.**  Yes.  Based on that Allen study looking at manatee gut

21   contents in the 1970s through the 1980s, their primary diet was

22   seagrasses, and so our presumption was that was a less polluted

23   lagoon during that time.  The presumption, based on the data

24   and the scientific evidence, is that we are in a state of

25   escalated nutrient pollution in the system, and we have

*PETER BARILE | DIRECT*

1  experienced this change in forage, and this is showing up in

2  the gut contents of these manatees when they're autopsied --

3  I'm sorry, necropsied, as dead and/or mortalities in these

4  events.

5  **Q.**  All right.  Dr. Barile, going back to Plaintiff's

6  Exhibit 24, the diagram of a eutrophic versus non-eutrophic

7  estuary system, is it your opinion that excessive nutrient

8  loading and sewage pollution in the North Indian River Lagoon

9  is continuing to result in significant habitat modification

10 and/or destruction?

11 **A.**  Yes.  The State of Florida, the St. Johns River Water

12 Management District in their model and then showing up in the

13 BMAPs for the Indian River Lagoon are very prescriptive in the

14 scientific evidence that there's a linkage between excess

15 nutrient loading, excess phytoplankton, lack of light coming

16 down, lack of seagrass growth, and more seaweeds, macroalgae

17 becoming more prominent.  So we're seeing this admitted through

18 agency documents, following what's described by the leading

19 scientists on the progressions and the expected consequences of

20 excess nutrient loading.

21 **Q.**  Dr. Barile, how often do you currently go out onto the

22 Indian River Lagoon?

23 **A.**  I go out there routinely.  I am born in this region, have

24 grown up and been a professional scientist for decades, and so

25 I have, you know, reports, experiences, data, scientific

*PETER BARILE | DIRECT*                                                194

1    studies extending far in the past, and, you know, as a

2    scientist, I routinely go back into lagoon and, you know, have

3    visual, if nothing else, to what I see now versus what I've

4    seen in the past.  These are the kind of things that a

5    scientist does.  We routinely look at our subjects, our

6    patients.  In my case, it's looking at an ecosystem.

7    Q.   Recently, on February 29th of this year, 2025, you were

8    jogging right alongside the northern Indian River Lagoon.

9    Could you describe for the Court what you saw?

10        **MR. BROWN:**  Objection, Your Honor, no disclosure

11   whatsoever as to this evidence.  This would have been an

12   appropriate subject for an update to an expert report.

13        **THE COURT:**  What's the response to that?

14        **MS. BLACKNER:**  Well, Your Honor, discovery closed out,

15   I believe, April or May of last year.

16        **THE COURT:**  Well, the purpose of having defined

17   discovery dates is so as to not -- I'm not saying you're doing

18   this intentionally, but we don't want opposing counsel ambushed

19   by testimony they had no idea was coming out.  And I don't

20   blame him as a scientist for going out there and observing the

21   ecosystem.  But their concern is they had no idea this

22   testimony was coming and discovery will never close if you keep

23   sending your experts out to gather more information.

24        Would you like to respond to the objection this is not

25   properly disclosed in discovery?

*PETER BARILE | DIRECT*

1        **MS. BLACKNER:**  Well, it was disclosed, Your Honor.  We

2     have the Bates stamp on the exhibit list.  So it was turned

3     over to --

4        **THE COURT:**  Tell me specifically what you mean, "It

5     was disclosed."  What is "it"?

6        **MS. BLACKNER:**  Could I confer with counsel?

7        **THE COURT:**  You can confer with counsel.

8        **MS. BLACKNER:**  It's a picture that Dr. Barile took of

9     a dead baby manatee this past month.

10       **THE COURT:**  So is that a photo that was provided to

11    opposing counsel in discovery?

12       **MS. BLACKNER:**  It was provided to opposing counsel.

13       **THE COURT:**  All right.  Is opposing counsel in

14    disagreement with that?

15       **MR. BROWN:**  For clarification, I would inquire whether

16    counsel is referring to the exhibit exchange that took place.

17       **THE COURT:**  Show him the photo.

18       **MS. BLACKNER:**  We have it listed, Your Honor.

19    Exhibit 12.

20       **THE COURT:**  All right.  Show him the photo, please.

21       **MS. BLACKNER:**  May I approach the bench?

22       **THE COURT:**  I don't need to see it.  I just need to

23    know if counsel is still claiming he's never seen that before.

24       **MR. BROWN:**  Your Honor, based on the representation of

25    counsel, I am advised that this document was disclosed within

*PETER BARILE | DIRECT*

1  the past month as part of a supplemental disclosure.  However,

2  that's not the only applicable disclosure requirement, because

3  the expert disclosure rules, I respectfully submit, would have

4  required a disclosure -- not only the disclosure of the exhibit

5  without an explanation but also an update to the expert report

6  as to how that exhibit will relate to his testimony.

7          **THE COURT:**  Would you like to respond to that?

8          **MS. BLACKNER:**  We disclosed this photo to Mr. Brown

9  and his fellow counsel and --

10         **THE COURT:**  No.  I understand.  And he's acknowledging

11  you disclosed it.  His claim is that the disclosure would have

12  required an updated expert report.  I'm not sure that's

13  correct, but I need to make sure I understand the issue as it's

14  articulated, so I can find a solution to this problem.  He's

15  not denying that you disclosed it to him, and now his objection

16  is that he claims it should have been accompanied by an updated

17  expert report.  I'm not sure that's correct, but I want to make

18  sure, before we begin searching for a solution to this, that I

19  have the issue properly identified.  So that seems to be the

20  case.

21         Here's what I'm going to do.  I'm going to permit you

22  to move forward on this questioning without yet admitting the

23  photo, because it's a little different.  I mean, Mr. Brown, you

24  told me you had never seen it before.  You didn't know anything

25  about what he's testifying to.  That has evolved into a very

*PETER BARILE | DIRECT*                                                197

1   different position now.  You have seen it.  You're just

2   claiming it should have been accompanied by an updated expert

3   report.  That's not initially what you said.

4        **MR. BROWN:**  Your Honor, may I explain the context that

5   I intended?  I acknowledge that I received this photograph

6   without any explanation or context as to how this would relate

7   to the testimony of any witness.

8        **THE COURT:**  Here's what I would tell you.  I'm not in

9   the business of trying to figure out what you intended.  I'm in

10  the business of interpreting your words verbatim, and that's

11  not what you said.  Now, you might have intended something

12  else.  But I may say, The sky is blue, and then when I'm

13  questioned on it, No, I meant it was green.  So I can only go

14  by your words, and that's what I'm going on now.

15       So in order to avoid this minefield, maybe what you

16  should have done is said, I'm going to invite you to take a

17  look at what's been previously marked as plaintiff's exhibit

18  whatever.  What is that?  And then try to move it into

19  evidence.  It was a red herring when you opened it up with,

20  "Weren't you jogging by the northern IRL a few weeks ago?  Tell

21  me what you saw," because I think that caught him by surprise.

22       That's where we're at now.  I understand what the

23  objection is.  I'll have an answer for you very soon.  But for

24  now, please continue with your questioning.  I'm tabling the

25  objection.

*PETER BARILE | DIRECT*                                                 198

1          **MS. BLACKNER:**  All right, Your Honor.

2          **THE COURT:**  Do you want my court reporter to read back

3     the question to you?  I think you need to rephrase that

4     question.

5          **MS. BLACKNER:**  All right.  Yes, Your Honor.

6          **THE COURT:**  So we can move this along, why don't you

7     ask him to take a look at what's been previously marked as

8     plaintiff's exhibit and then go from there.

9          **MS. BLACKNER:**  Yes.  Thank you, Your Honor.

10         **THE COURT:**  Sure.

11    BY MS. BLACKNER:

12    **Q.**  Dr. Barile, can you look at the photo that was previously

13    marked as Plaintiff's Exhibit 12?

14    **A.**  Yes.

15    **Q.**  Can you tell us what that is?

16    **A.**  Yes.  This is a photograph that I took on the morning of

17    February 9th while going on my weekly run along the northern

18    Indian River Lagoon in the Merritt Island area.

19    **Q.**  What did you do when you saw this carcass?

20    **A.**  Well, obviously, I'm a professional scientist.  I do

21    studies on lagoon, but in this instance, I was going for a

22    morning jog, and I smelled something horrible.  In many cases,

23    I can tell whether there's an algae bloom, rotting algae, but

24    this was -- this was really bad, and it stopped me, and I

25    walked to the water's edge to see what it was, and at that

*PETER BARILE | DIRECT*

1  point, I took a picture of it.  It was -- as you see, I was

2  upset by seeing it.  It was not something I expected on a

3  Sunday morning jog.

4  **Q.**  And what is this?

5  **A.**  This is a --

6  　　　　**MR. BROWN:**  Objection, vague.

7  　　　　**THE COURT:**  I mean, he took the photo.  I think

8  there's maybe no one else on the planet better situated to tell

9  us what's on there.  So the objection is overruled.  He can

10  answer.

11  　　　　**THE WITNESS:**  Yes.  As a marine biologist who has

12  lived along the Indian River Lagoon for 50-something years, I

13  identified it as a dead young manatee.

14  **BY MS. BLACKNER:**

15  **Q.**  Did you call this dead manatee in to the FWC?

16  **A.**  I did.  I took a picture of it, and then I noticed exactly

17  where it was located, along the Merritt Island portion of the

18  northern lagoon.  And, yes, I reported it to the FWC.  They

19  have a wildlife alert phone number.  I called it in.

20  **Q.**  And what were you told?

21  　　　　**MR. BROWN:**  Objection, hearsay.

22  　　　　**THE COURT:**  How would you like to respond to that?

23  　　　　**MS. BLACKNER:**  I can rephrase that, Your Honor.

24  　　　　**THE COURT:**  All right.  Feel free to rephrase.

25  **BY MS. BLACKNER:**

*PETER BARILE | DIRECT*

1    **Q.** What happened then?

2    **A.** I --

3        **MR. BROWN:** Objection, Your Honor, both hearsay and

4    lack of disclosure as to the expert report issue.

5        **THE COURT:** I understand, and your objection is

6    ongoing. I'll make an eventual decision on whether or not I'll

7    rely on this, but in terms of the hearsay objection, it's the

8    same question formed differently, attempting to elicit the same

9    response. So I'm going to listen to it and then make a

10   determination. So your last question was, "What happened

11   next?"

12       **THE WITNESS:** As said previously, I called the FWC, to

13   their wildlife alert. I discussed -- I left my phone number

14   and a description, and a biologist from the FWC called me back.

15   And they said, "Yes, we are aware of this manatee. We saw it,

16   and we pulled it onshore. We do not plan to necropsy it. We

17   are aware of it. You're not the only person that's reported

18   it. We plan to leave it there. It should rot in a couple

19   days, and it will be gone. Don't worry about it."

20       That was the characterization of my conversation with

21   the FWC biologist when he returned my call about my reporting

22   of this event.

23       **MR. BROWN:** Your Honor, do I understand that I'm

24   deemed to have a standing objection?

25       **THE COURT:** You are, and I've not made a decision. I

*PETER BARILE | DIRECT*                                          201

1    appreciate it.  We'll treat this as a proffer, and I will

2    deliberate over it and let you know what my decision is on the

3    statement, but I wanted to get it on the record.

4            Feel free to continue.

5    **BY MS. BLACKNER:**

6    **Q.**  How did you characterize this manatee?

7    **A.**  Well, I'm a bit over six-foot tall.  And I looked at it,

8    and it appeared to be about my size or possibly plus or

9    minus -- a little bit bigger or maybe a little bit smaller.  I

10   deemed it to be a young manatee.

11   **Q.**  Have you observed other dead manatees in the lagoon?

12   **A.**  I have.

13   **Q.**  Are you aware of FW reports on manatee mortalities for 2024

14   and 2025?

15   **A.**  Yes.  I have seen the data.  It's a publicly available

16   website, and I have observed, and, as a scientist and as a

17   member of the public, I've had the ability to look at the data

18   that the FWC makes publicly available on its manatee mortality

19   and statistics website that's made publicly.  Yes, I've seen

20   those data.

21   **Q.**  What do you observe with respect to 2024 and 2025 baby

22   manatee mortality numbers?

23           **MR. BROWN:**  Objection, Your Honor.  It relates to the

24   expert disclosure issue.

25           **THE COURT:**  Would you like to respond to that?

*PETER BARILE | DIRECT*

1          **MS. BLACKNER:**  He obtained this information from a

2     state website.

3          **THE COURT:**  All right.  I have to ask rhetorically --

4     and I'm trying not to smile when I ask you this -- are you

5     saying, as a representative of the State of Florida, that you

6     were caught off guard with FWC statistics that are published

7     and put online?  You're being treated unfairly because you had

8     no idea that was out there?

9          **MR. BROWN:**  Your Honor, again, this relates to

10     disclosure of opinions that would be formed upon those

11     subsequent data, not the data themselves.

12          **THE COURT:**  Well, I mean, he's testifying about the

13     data.  That's what she's asking him about.  Look, it's a

14     prejudicial standard.  So what we're trying to do is avoid

15     parties being ambushed in a civil trial.  That's why we require

16     that so much discovery be turned over and expert reports be

17     finalized.

18          However, in this particular instance, your objection

19     is to a discovery violation.  They didn't turn over your own

20     statistics to you that they found online that you published.

21     Do you see the problem with that objection?  I can't foresee

22     how you would be prejudiced by that coming in.

23          Now, if it's your objection you don't want him opining

24     as a 702 expert on that, that's a different objection.  She's

25     simply asking him what's on there.

*PETER BARILE | DIRECT*

1    **MR. BROWN:**  Your Honor, and I am anticipating that his

2    response would include that opinion.

3         **THE COURT:**  All right.  Well, let's see how this

4    unfolds.  If it morphs into an opinion that wasn't included in

5    an expert report, I certainly would entertain an objection.

6         You can ask him about what's on that particular

7    document.

8         **MS. BLACKNER:**  Yes.  Thank you, your Honor.

9    **BY MS. BLACKNER:**

10   **Q.**  Did you review the mortality numbers for 2024 and 2025?

11   **A.**  Yes, I did.  Yes.

12   **Q.**  Can you discuss them?

13   **A.**  Sure.

14        **MR. BROWN:**  Same objection, Your Honor.

15        **THE COURT:**  Well, "discuss" is an ambiguous term.  So

16   do you want him to relay what's on there, or are you asking him

17   to opine what's on there?

18        **MS. BLACKNER:**  I would ask that Dr. Barile give his

19   opinion about the numbers.

20        **THE COURT:**  I don't know what that means.  Is he going

21   to tell us what the numbers are?  See, these are two different

22   questions:  What are the numbers?  And what do they mean to

23   you?  What are the numbers? are him relaying factual

24   information that they're not going to be able to object to.

25   Asking him, What they mean to you? and they might be wrong on

*PETER BARILE | DIRECT*                                                204

1    their objection, but that's a different objection.

2           So why don't you ask him first, so we have a clean

3    record, what those numbers are, and then we'll move on to the

4    second part when you want him to explain what they mean.

5    **BY MS. BLACKNER:**

6    **Q.**  Okay.  Dr. Barile, do you remember the numbers of the

7    mortality numbers for manatees for 2024 and 2025?

8    **A.**  Off the top of my head I could not recite the precise

9    numbers, but I do have some numbers and statistics that I do

10   recollect from that site.

11       The data that I recall was that 2024 was the top year for

12   perinatal manatee mortalities.

13           **MR. BROWN:**  Objection, Your Honor.

14           **THE COURT:**  What's the basis for the objection?

15           **MR. BROWN:**  First, he's not responding to the

16   question.  He's going on to an opinion that was not solicited

17   by the question, and he is going into the opinion portion that

18   I anticipated.

19           **THE COURT:**  Well, I have to tell you that what he's

20   about to testify to is probably at the heart of this entire

21   trial, and you really don't want me to hear what he's going to

22   say.  So I really need to hear what he's going to say so I can

23   determine whether or not it's coming in.

24           Your objection is noted and it's preserved, but this

25   is really the whole morning leading up to this point.  This is

*PETER BARILE | DIRECT*                                                    205

1    the decision I need to make based on what he's letting me know

2    are in those numbers.  So the objection is noted.  It's

3    overruled for now.

4         If you want to sharpen your swords and come in and

5    reargue this when you've had a chance to process this dispute,

6    you're welcome to do so, but, for now, I'm going to hear what

7    he has to say on this.

8         The objection is overruled.  He can answer the

9    question.

10        **THE WITNESS:**  I recall seeing a number on the website

11   that 2024 was the -- in terms of numbers of dead perinatal

12   manatee mortalities, was the top year ever, and I believe that

13   number, if I'm correct, was 159 for the year 2024.  And I

14   believe I did see the numbers for January and February 2025.

15   Those numbers were also very similar to the other UME years and

16   the months corresponding.  So I am familiar with these

17   perinatal manatee mortality data.  They are very high.

18        I also recall looking at the 2013 perinatal manatee

19   mortality data.  That was also a high year.  I believe it was

20   129 perinatal manatee mortalities in 2013.  It was the second

21   highest year compared to 2024.

22        So, in summary, I observed on the FWC's manatee

23   mortality statistics website that the two highest years for

24   manatee perinatal mortalities were 2013 and 2024, and actually

25   2024 was higher than 2013.  I believe this testimony has

*PETER BARILE | DIRECT*                                                          206

1    already been repeated by Dr. de Wit, very similar to what I've

2    just said here.

3    **BY MS. BLACKNER:**

4    **Q.**  Dr. Barile, what do you mean by "perinatal"?

5    **A.**  That's a classification.  As Dr. de Wit and, I believe,

6    Dr. Ball testified to earlier, it classifies a young manatee

7    within years of age that, in all likelihood, is going to be

8    associated with a parent.  It is a, quote, baby, that is not

9    off on its own feeding as an adult.  And that size of

10   150 centimeters corresponds to about five feet or less, and

11   that's the classification that is on the FWC's manatee

12   mortality and statistics website.

13   **Q.**  All right.  Now, Dr. Barile, I would like to read you two

14   legal definitions from the Code of Federal Regulations from 50

15   CFR, Section 17.3.  First, I would like to read the definition

16   of "harm."  U.S. Fish and Wildlife Service regulations define

17   "harm" in the definition of "take" as -- here we go -- "an act

18   which actually kills or injures wildlife.  Such act may include

19   significant habitat modification or degradation where it

20   actually kills or injures wildlife by significantly impairing

21   essential behavioral patterns including breeding, feeding, or

22   sheltering."

23       And now the regulatory definition of "harass."  "Harass"

24   for ESA purposes is, quote, "An intentional or negligent act or

25   omission which creates the likelihood of injury to wildlife by

1    annoying it to such an extent as to significantly disrupt

2    normal behavioral patterns, which include, but are not limited

3    to, breeding, feeding, or sheltering."

4        Now, Dr. Barile, based on your knowledge, skills, and

5    experience, is the northern IRL habitat so degraded that it is

6    causing actual harm to federally threatened manatees by

7    significantly impairing essential behavioral patterns,

8    including feeding?

9            **MR. BROWN:**  Your Honor --

10           **THE WITNESS:**  Yes.

11           **THE COURT:**  There's an objection coming.  What's the

12   objection?

13           **MR. BROWN:**  Objection, first, as previously raised,

14   and, second, even considering the paragraph 48, which you had

15   alluded to in the second amended complaint, there's no

16   allegation as to the modification of behavior, as alluded to in

17   the question, and, also, this is an extensive compound

18   question.

19           **THE COURT:**  I think you're right for the wrong

20   reasons.  This question invites the witness to invade the

21   province of the trier of fact.  The question you're asking is

22   the question that the trier of fact must answer, not this

23   witness.  He can testify to what he's observing or what his

24   opinions are about what's going on there.  But you literally --

25   and I don't use that word very often.  I don't like it.  But

*PETER BARILE | DIRECT*

1   you literally asked him the question that if we had a jury

2   here, I would be asking the jury, and that you're going to be

3   asking me to decide on.

4          The question invites the juror [sic] to invade the

5   province of the trier of fact, and it's completely

6   inappropriate.  So I'm going to sustain the objection on those

7   grounds.  You can't ask him that.  That's what you're trying to

8   convince me of.

9          **MS. BLACKNER:**  You're right, Your Honor.

10         **THE COURT:**  I appreciate you affirming my decision.

11         **MS. BLACKNER:**  And now you know why I got a C in

12  evidence.  Okay.

13         **THE COURT:**  No.  Don't be hard on yourself.  That's

14  fine.

15         **MS. BLACKNER:**  I would like --

16         **THE COURT:**  I think this is an important enough matter

17  where I want a very clear record on both sides, and that's why

18  I'm so engaged with both of you.

19         Don't try to find another way to ask that question.

20  That question is going to cause a problem.  That is what you're

21  going to be arguing on your closing argument.  You're going to

22  be telling me what the definitions are, and how you believe you

23  can marshal all of the evidence and testimony you've put before

24  the Court in trying to prove that you've met your burden by

25  establishing that the conduct alleged by your witnesses matches

*PETER BARILE | DIRECT*

 1    the legal definition of the terms you're trying to satisfy.

 2    That's what you do on closing.

 3          It's like asking a witness, Who do you think killed

 4    him?  Based on your testimony, who do you think caused the

 5    death?  That's for the jury to decide.

 6          So I'm going to invite you to steer clear of that move

 7    forward with your other questions.  If you have no more, we can

 8    certainly end it there.

 9          **MS. BLACKNER:**  I just have few more questions, Your

10    Honor.

11          **THE COURT:**  Sure.  Go on ahead.

12    **BY MS. BLACKNER:**

13    **Q.**  Dr. Barile, why are manatees and other marine mammals

14    referred to as, quote, "sentinels of the sea"?

15    **A.**  Yes.  My colleague at Harbor Branch Oceanographic

16    Institution, Gregory Bossart, has published and shared with us

17    as colleagues that he considers manatees as, quote, "sentinels

18    of the sea," because they are subjected to pollution, harmful

19    algal blooms, all of these problems that have led to impacts on

20    their health and mortalities.  And Dr. Bossart, who I consider

21    a colleague, also understands and reflects that impacts on

22    marine mammals, there's a parallel to us as we're mammals, that

23    if we're frequenting the same waters that, for example, toxins

24    from harm of algal blooms, pathogens from sewage dumping, all

25    of that stuff, if we're mammals in the same water as a dolphin

*PETER BARILE | DIRECT*                                                    210

1    or a manatee that's frequenting these waters, they are

2    sentinels for not only their health but the public health of

3    humans.

4         **MS. BLACKNER:**  Your Honor, I don't recall if

5    Exhibit 12 was entered.

6         **THE COURT:**  Ann, was Exhibit 12 admitted?

7         **THE COURTROOM DEPUTY:**  No, Judge.  You reserved

8    ruling.

9         **THE COURT:**  I don't see it on here at all.  Is that

10   the photo?

11        **THE COURTROOM DEPUTY:**  Yes.

12        **THE COURT:**  All right.  So the photo of what has been

13   described as a young dead manatee is Plaintiff's Exhibit 12.

14   You're correct.  I haven't made a decision on that.  But you've

15   moved it into evidence, so you're not waiving anything at this

16   point.  I need to do a little bit of research to decide whether

17   or not that's coming in.  But that's on my unfinished business

18   list.  So you've done everything you need to do to get it in at

19   this point.  I just need to make a decision based on the

20   objection asserted by opposing counsel.

21        **MS. BLACKNER:**  All right.  I just have a few more

22   questions.

23        **THE COURT:**  All right.

24   **BY MS. BLACKNER:**

25   **Q.**  Dr. Barile, what conclusions do you draw, if any, from your

*PETER BARILE | DIRECT*

1    review of the perinatal mortality data you reviewed for

2    manatees for 2024 and 2025?

3            **MR. BROWN:**  Objection, lack of disclosure.

4            **THE COURT:**  I don't even know what specifically you're

5    asking about.  The objection is overruled.  Look, because we

6    don't have a jury here, I can hear it in the form of a proffer.

7    If you think it's objectionable, I won't consider it, but I

8    need to hear what he's going to answer, because that was a very

9    broad question that you asked.  I have no idea where you're

10   headed with this.  So he can answer the question.

11           **THE WITNESS:**  You're going to have to repeat it.  I'm

12   sorry.

13           **THE COURT:**  Dr. Barile, what conclusions do you draw,

14   if any, from your review of the perinatal mortality data you

15   reviewed for manatees for 2024 and 2025?

16           **THE WITNESS:**  It's obvious as a scientist there were

17   high levels of perinatal deaths during both of these UME events

18   in 2013 and 2021 and that these deaths of perinatal manatees

19   have extended into 2024 and 2025.  So my conclusion is, it is

20   clear by the evidence that there are high levels of perinatal

21   manatee mortality events during UME events.

22   **BY MS. BLACKNER:**

23   **Q.**  Do you anticipate these high levels of mortality to

24   continue?

25           **MR. BROWN:**  Objection, calls for speculation and as

*PETER BARILE | DIRECT*

1    previously.

2            **THE COURT:**  All right.  Remember to stand when

3    addressing the Court.

4            I understand.  So the objection is to speculation.

5    What is the response?

6            **MS. BLACKNER:**  Well, he's going to give his expert

7    opinion.

8            **THE COURT:**  Right.  I mean, we're talking --

9            **MS. BLACKNER:**  We're past his prologue.

10           **THE COURT:**  We're talking tomato/tomato.  Your

11   speculation is her educated guess, based on his expert

12   testimony.  Yes, I think that's what expert opinions are, are

13   educated guesses, based on the interpretation of data.

14           So based on that, the objection is overruled.  He can

15   answer.  It's his opinion.

16           **MS. BLACKNER:**  Thank you.

17           **THE WITNESS:**  It's clear from the evidence that this

18   change in forage has impacted the health.  It's caused

19   malnourishment and death in manatees.  If these conditions

20   continue to exist, which I've made a case for and the State of

21   Florida has admitted to, I don't see any reason why we could

22   not expect manatee mortalities to continue at a high level in

23   the future.

24           **MS. BLACKNER:**  Okay.  One second, Your Honor.

25   **BY MS. BLACKNER:**

*PETER BARILE | DIRECT*                                                213

1   **Q.**  Dr. Barile, based on your knowledge, skills, and

2   experience, is the North Indian River Lagoon extremely degraded

3   and hypereutrophic?

4   **A.**  Yes.  Several lines of evidence, including the NOAA

5   estuarine eutrophication surveys own reporting, that I did

6   report in my expert report, suggests that the Indian River

7   Lagoon is hypereutrophic with respect to chlorophyll levels and

8   the nutrient loads that support them.  So from that

9   classification as being hypereutrophic, it's my expert opinion

10  that hypereutrophication equals a degraded estuarine system,

11  so, yes.

12  **Q.**  Dr. Barile, is it likely that this hypereutrophic

13  degradation will continue into the foreseeable future?

14  **A.**  The Florida DEP's own data suggests that they are not

15  mitigating nutrient loads adequately and quick enough to

16  mitigate the macroalgal blooms and cause a result in seagrass

17  recovery quick enough in the near future.  So their own data

18  shows that through 2030 we cannot expect the water quality

19  improvements that would result in the recovering of the health

20  of the northern Indian River Lagoon.

21  **Q.**  Dr. Barile, is it your opinion that the North Indian River

22  Lagoon is so eutrophic that it's harmful to manatees?

23  **A.**  From the standpoint of the St. Johns River Water Management

24  District's reporting of an ecologically irrelevant level of

25  seagrasses, 1 to 3 percent coverage, which is way below

*PETER BARILE | DIRECT*

1  historic levels, and an overgrowth of macroalgae and the

2  evidence that suggests that manatees are in a state of

3  malnutrition when they're eating a diet primarily of

4  macroalgae, I would say that the northern Indian River Lagoon

5  and the present composition of macroalgae dominating, from a

6  dietary standpoint of forage, is detrimental to manatees.  Yes.

7  **Q.**  Does the hypereutrophic state of the lagoon interfere with

8  manatee feeding?

9        **MR. BROWN:**  Objection as to the scope of the

10  pleadings.

11        **THE COURT:**  I mean, I think we're just going in

12  circles now.  You keep asking the same question in different

13  ways.  I mean, the point has been expressed, I think asked and

14  answered.  He's answered this question over and over again

15  throughout his testimony.  I'm very clear on what the answer to

16  this question is.  In fact, the last three questions that you

17  asked, I already knew what the answers were because he's

18  already offered testimony in the record.

19        **MS. BLACKNER:**  I just wanted to double --

20        **THE COURT:**  Double and triple?

21        **MS. BLACKNER:**  Yeah.

22        **THE COURT:**  Objection is sustained.  Feel free to

23  continue.

24        **MS. BLACKNER:**  No, Your Honor.  I don't think

25  plaintiff has further questions.

1          **THE COURT:**  All right.  Thank you.  Is the defense

2     ready for their cross-examination?

3          **MR. BROWN:**  May I have a brief break, Your Honor?

4          **THE COURT:**  Yes.  We're going to end this at 4:30

5     today, so I'm going to give you some time to get started.  Do

6     you think you're going to go more than half an hour because, if

7     at all possible, I think the witness's time is valuable, if we

8     can finish today, we'll go beyond 4:30 so he doesn't have to

9     come back tomorrow.  Do you have any idea how lengthy your

10    cross is going to be?

11         **MR. BROWN:**  It's going to be much less than

12    30 minutes, Your Honor.

13         **THE COURT:**  Okay.  So here's what we'll do.  On my

14    to-do list, Defense Exhibit 24 was not admitted, but was moved

15    into evidence, and I'm going to admit it at this time over the

16    plaintiff's objections.

17         So the only two objections we have left are the

18    Plaintiff's Exhibit 12, which is the photo that was brought up

19    on direct examination, and the perinatal mortality comparison

20    that was testified to.  I'll have an answer on both of those in

21    the very near future.

22         Doctor, we're going to try to finish today so you

23    don't have to come back.

24         **MR. BROWN:**  May I briefly elaborate upon Exhibit 12

25    and my objection?

*PETER BARILE | CROSS*

1    THE COURT:  It hasn't come in.

2        MR. BROWN:  I understand that.  I wanted to --

3        THE COURT:  In order to preserve this expert's time,

4    we can take that up when he's gone.

5        MR. BROWN:  Yes, Your Honor.

6        THE COURT:  We can do it tomorrow morning or today,

7    but it won't be admitted until I hear from you again.

8        MR. BROWN:  Yes, Your Honor.

9        (Recess at 4:00 p.m. until 4:10 p.m.)

10        THE COURT:  Mr. Brown, I would invite you to begin

11    your cross-examination.

12                    **CROSS-EXAMINATION**

13    BY MR. BROWN:

14    Q.  Were you here during the testimony of Dr. de Wit?

15    A.  Yes, I was.

16    Q.  Okay.  And did you hear her testimony about the increase in

17    manatee births within the previous two years?

18    A.  I don't recall two years, but I believe, if she was

19    referring to some of the statistics, maybe it was 2024,

20    possibly.

21    Q.  Okay.  And would you agree with me that, based upon her

22    testimony, manatee births have increased in recent years as

23    well?

24    A.  So I don't know if I would agree with you.  If that was her

25    testimony and that's her opinion, you know, that's certainly

*PETER BARILE | CROSS*                                                                217

1    her opinion.

2    **Q.**  Okay.  Would you agree with me that if there's an increase

3    in the number of births of manatees, you would also expect to

4    see an increase in perinatal deaths, simply based upon the

5    emergence of newborn manatees?

6    **A.**  That's possible.

7    **Q.**  Have you conducted analysis to compare the birth rate with

8    the death rate during the previous two years?

9    **A.**  In all fairness, I don't even think the state has, and if

10   they haven't, I certainly haven't.

11   **Q.**  So the answer is no, for clarification?

12   **A.**  I have not done that.  That's correct.

13   **Q.**  By way of background, can you explain the significance of

14   the Grizzle-Figg Act?

15   **A.**  Yes.  So in the late 1970s it was understood that the Tampa

16   Bay and Sarasota Bay systems were becoming hypereutrophic.

17   They were spotlighted on the show 60 Minutes about these nasty

18   algal blooms and how sewage-polluted that they were.  So this

19   law was advanced to mitigate the sewage dumping, the nutrient

20   loading, so as to stop the algal blooms and recover seagrasses.

21   So there were actions with respect to wastewater infrastructure

22   and utilities under that act.

23   **Q.**  Can you explain what the term "advanced wastewater system"

24   refers to?

25   **A.**  Well, "system" is very broad.  I think, you know, maybe

*PETER BARILE | CROSS*                                                         218

1    there's a more appropriate term.  Advanced wastewater

2    treatment, and I can certainly address that, and that would be

3    either a secondly treated wastewater system that is upgraded to

4    remove more nutrients, or in the case of a septic tank, they

5    have advanced wastewater septic tanks that can reduce more

6    nutrients versus a conventional septic tank.  So those are two

7    examples of advanced wastewater treatment.

8    **Q.**  Just by way of background, are you familiar with the term

9    "nitrogen cycle"?

10   **A.**  Absolutely.  I have a Ph.D. in environmental sciences.

11   Yeah.

12   **Q.**  Can you explain the steps along the lines by which nitrogen

13   compounds in human waste are converted into gaseous nitrogen?

14   **A.**  Absolutely.  If I had a grease board, I would literally

15   draw all of them out, the speciation from organic nitrogen to

16   ammonium, ammonification converting to nitrate.  Yes.  I study

17   that, and I actually teach that also.

18   **Q.**  So, typically, you would expect to see an initial

19   degradation of ammonium and ammonia, NH4 and NH3, to nitrite;

20   is that correct?

21   **A.**  That wouldn't be initial.  That would be something that

22   would happen during processing.

23   **Q.**  Okay.  So what would be the first step, then, in the

24   nitrogen cycle chemically?

25   **A.**  So that would be conversion of organic matter to ammonium.

*PETER BARILE | CROSS*                                                    219

1   **Q.**  Okay.  Thank you for that clarification.

2   **A.**  Yes.

3   **Q.**  And chemically what is the next step in the nitrogen cycle?

4   **A.**  Well, listen, you know, the nitrogen cycle, in and of

5   itself, may be separate than what you're referring to

6   potentially under a treatment scenario.

7        So to answer your question, in a treatment situation, they

8   alter low oxygen conditions and then high oxygen conditions to

9   get this conversion of nitrogen to ammonium and then under more

10  iteration, to nitrify that ammonium into nitrate and nitrite.

11  **Q.**  Nitrate is typically the final step in the nitrogen cycle

12  before N2; is that correct?

13  **A.**  So in terms of treatment, yes.  That would be the

14  processing that would be done in a conventional treatment

15  plant, was to get nitrification, yes.

16  **Q.**  And what do you mean by "a conventional treatment plant"?

17  **A.**  For example, a secondary treatment plant that does aeration

18  and achieves nitrification.  Yes.

19  **Q.**  So can you explain the process by which nitrate, NO3, is

20  converted into N2 gas and is effectively treated?

21  **A.**  Sure.  In a wastewater system under tertiary treatment,

22  they would have a basin where they let it settle, and under low

23  oxygen conditions you would get conversion of nitrate into gas

24  and vented off.  Yes.

25       So under an advanced scenario, that would be the process of

*PETER BARILE | CROSS*

1    removing nitrogen from the waste stream.

2    **Q.**   Okay.  And from your recollection, does the Grizzle-Figg

3    Act require the wastewater facilities to reduce their

4    concentrations to specific concentrations of nitrogen and

5    phosphorus?

6    **A.**   Yes.  My understanding was that they were required to go to

7    advanced wastewater treatment to achieve advanced nitrogen

8    reduction, yes.

9    **Q.**   Would you agree with me that under the Grizzle-Figg Act

10   that the required level for advanced wastewater treatment would

11   be 3 milligrams of nitrogen per liter?

12   **A.**   Correct.

13   **Q.**   And how would that compare to the concentration of nitrogen

14   in an untreated stream?

15   **A.**   So they may come in at 50 milligrams per liter, some order

16   of magnitude higher than that.  So through several different

17   basins and several different levels of treatment, you would

18   achieve that reduction down.  Yes.

19   **Q.**   Okay.  And are you aware that effective July 1st of this

20   year wastewater treatment systems in the state of Florida

21   within the Indian River Lagoon are required to achieve advanced

22   wastewater treatment at a concentration of 3 milligrams per

23   liter?

24   **A.**   Yes.  And I'm also aware that they were asked to do that in

25   1990, as a result of the Indian River Lagoon Act, and they

*PETER BARILE | CROSS*

1   never did.  So we're just really way down the road.  But, yes,

2   I am aware that that is the goal of the present policy, yes.

3   **Q.**  And the "Indian River Lagoon Act," which act are you

4   referring to?

5   **A.**  That was the Indian River Lagoon Act of 1990, and I believe

6   that advanced wastewater treatment was a requirement in that

7   act, and a parallel Grizzle-Figg was that the idea was to get

8   these wastewater treatment facilities to achieve advanced

9   removal of nutrients so that there was less nitrogen/phosphorus

10  entering receiving waters adjacent.  Yes.

11          **MR. BROWN:**  Okay.  May I confer briefly with my

12  client, Your Honor?

13          **THE COURT:**  You may.

14  **BY MR. BROWN:**

15  **Q.**  Are you familiar with the term "legacy nutrients"?

16  **A.**  Sure.

17  **Q.**  And what does that refer to?

18  **A.**  Well, I think it is a term that's been used by many to

19  implicate nutrients that have entered the system that have not

20  cycled out.

21  **Q.**  Okay.

22  **A.**  I'm sorry.  A surface water system, like the Indian River

23  Lagoon or a lake or something like that, where nutrients have

24  entered and they still remain.

25  **Q.**  I want you to assume, as a hypothetical, that all

*PETER BARILE | CROSS*

1    anthropogenic inputs of nitrogen and nutrients into the Indian

2    River Lagoon were completely ceased.  Would you expect seagrass

3    to return immediately?

4    **A.**  Not immediately, no.

5    **Q.**  Do you have any opinion as to the time frame under that

6    scenario in which they would return?

7    **A.**  There is evidence from Tampa Bay and Sarasota Bay that

8    we're looking at, at least, a decade or so before those

9    nutrients cycle out of the system.  So there are examples of

10   restored estuaries where, when you stop the loading, there is a

11   period of time that the system takes to recover.  So you would

12   not expect an immediate recovery.

13          **MR. BROWN:**  No additional questions on cross, Your

14   Honor.

15          **THE COURT:**  Thank you, Mr. Brown.

16          Any redirect examination?

17          **MS. BLACKNER:**  No, Your Honor.

18          **THE COURT:**  All right.  May this witness be excused?

19          **MS. BLACKNER:**  We may call --

20          **THE COURT:**  So you have him as a potential rebuttal

21   witness, is what you're telling me?

22          **MS. BLACKNER:**  Yes.  Yes, Your Honor.

23          **THE COURT:**  All right.  Thank you.

24          Doctor, you remain under subpoena, but I wish you a

25   good afternoon.  Thank you, sir.

1          **THE WITNESS:**  Thank you, sir.

2          **THE COURT:**  All right.  I'm not going to have you call

3     any additional witnesses, but there are a couple of matters I

4     need to take up with you.  So feel free to be seated.

5          We'll go first with, there is an unresolved objection

6     to Plaintiff's Exhibit 12, which is the photo of a young dead

7     manatee.  So this is a collision of two very different things,

8     and that's why I needed a little bit of time to think about

9     this.  That's fact witness testimony offered from an expert who

10    wasn't submitted as a fact witness.  Moreover, I don't believe

11    that the photo of the young dead manatee, nor the subsequent

12    phone call to FWC and that discussion, in any way was relied

13    upon by Dr. Barile in making his expert opinion; therefore, the

14    objection as to Plaintiff's Exhibit 12 will be sustained.  I do

15    not believe it has any tendency to make a fact in dispute any

16    more or less likely.  And I can't be any more transparent than

17    that.  It just doesn't move the ball either way.  So

18    Plaintiff's Exhibit 12 isn't coming in.

19         In terms of the perinatal young/baby manatee mortality

20    comparisons -- all right.  This is a little more complicated,

21    but this is where I'm at -- I'm putting my cards on the

22    table -- if you want to submit legal authority -- I don't need

23    to hear arguments and I don't need anyone citing me rules of

24    evidence.  We reviewed that thoroughly.  So if you have any

25    legal authority that would point us in a definite direction, we

1    haven't found any yet, I would invite you to submit it to the

2    Court.

3        But here's where I'm at:  I do not believe there was a

4    change in methodology.  I think simply plugging in the 2024 and

5    2025 numbers into methodology already contained in the expert

6    report removes the need to file an amended expert report.

7        Even if one were to conclude that an updated expert

8    report were required, I do not believe the prejudicial effect

9    is enough -- I believe it's minimal, if there was any prejudice

10   at all.  And, although, this isn't an exact parallel, this

11   seems akin to damages experts employing the same methodology to

12   account for an increase in damages based on the passage of time

13   or subsequent medical expenditures as we head towards trial.

14       So I think he employed the same methodology, and he

15   used numbers from 2024 and 2025 in the same methodology that

16   was already contained in the expert report, and those numbers

17   were available to both sides and published by the State of

18   Florida.

19       So that's where I'm at now.  I'm inclined to consider

20   that, but I am always yearning for someone to present me with

21   legal authority that would remove any doubt.

22       So that's up for debate.  If you want to sharpen your

23   swords and find some legal authority that gets us to the right

24   answer, I more than welcome it, but I think this is the right

25   answer.  And I've been wrong before, so I'm happy to be wrong

1      again.

2              So having said that, is there anything further from

3      the plaintiff before we end the session today?

4              **MS. BLACKNER:**  No, Your Honor.

5              **THE COURT:**  Anything further from the defense before

6      we end the session?

7              **MR. BROWN:**  Your Honor, the defendant will move under

8      52(c) for a judgment on partial findings.  Would you prefer to

9      take that up now or tomorrow morning?

10             **THE COURT:**  What we can do is have your witnesses

11     ready tomorrow morning at 9:00, and at 8:30, we will meet and

12     handle this issue.

13             Am I hearing the magic words from plaintiff, that

14     plaintiff rests?

15             **MS. BLACKNER:**  Yes, Your Honor.

16             **THE COURT:**  All right.  The plaintiff has rested, so

17     you're looking for some sort of Rule 50 relief.  They're going

18     to be asking for it.  On what specific matters are you seeking

19     judgment as a matter of law?

20             **MR. BROWN:**  Your Honor, I would submit, based upon the

21     evidence submitted, that the plaintiffs cannot establish an

22     ongoing violation because there are missing links, so to speak,

23     in the chain of causation.  Do you wish to hear argument now on

24     that?

25             **THE COURT:**  No.  I just wanted for you to point me in

1    the direction.  We'll hear it tomorrow morning, and then just

2    have your first witness ready to go at 9:00, and I will

3    consider those arguments tomorrow morning.

4              Is there anything further from the defense?

5         **MR. BROWN:**  No, Your Honor.

6         **THE COURT:**  All right.  Have a good evening, everyone.

7    Please be ready to get started at 8:30 tomorrow morning.

8    Witnesses are going to get called starting at 9:00 a.m.  Have a

9    great evening.

10             (WHEREUPON, this matter was concluded at 4:24 p.m.)

11                      *      *      *

12                  **CERTIFICATE OF REPORTER**

13   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-titled matter.

14

15   s/Suzanne L. Trimble                    5/16/25
     Suzanne L. Trimble, RPR, WACCR, CRR       Date

16   U.S. Official Court Reporter

17

18

19

20

21

22

23

24

25