1              **UNITED STATES DISTRICT COURT**
               **MIDDLE DISTRICT OF FLORIDA**
2                   **ORLANDO DIVISION**


3                                    :
    **BEAR WARRIORS UNITED, INC., A** :
4   **FLORIDA NOT FOR PROFIT**        :
    **CORPORATION,**                  :
5                                    :
          Plaintiff,                 :
6                                    :    Case No.:
                                     :    6:22-cv-2048-CEM-LHP
7   v.                               :
                                     :    Orlando, Florida
8                                    :    March 18, 2025
                                     :    8:32 a.m.
9   **ALEXIS A. LAMBERT, IN HER**     :
    **OFFICIAL CAPACITY AS SECRETARY**:
10  **OF THE FLORIDA DEPARTMENT OF**  :
    **ENVIRONMENTAL PROTECTION,**     :
11                                   :
          Defendant.                 :
12                                   :

13            **TRANSCRIPT OF BENCH TRIAL, VOLUME 2**
            **BEFORE THE HONORABLE CARLOS E. MENDOZA**
14             **UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21
    Proceedings recorded by real-time mechanical stenography.
22  Transcript produced by computer-aided transcription.

23                        Reported by:
                Suzanne L. Trimble, RPR, WACCR, CRR
24              U.S. Official Court Reporter
             (407) 900-8775 | trimblecourtreporter@outlook.com
25    401 West Central Boulevard, Suite 4600, Orlando, Florida 32801

1

2                             A P P E A R A N C E S

3      For the Plaintiff:              Lesley G. Blackner
                                        Blackner, Stone & Associates
4                                       340 Royal Poinciana Way
                                        Suite 317-377
5                                       Palm Beach, FL 33480

6                                       Jessica L. Blome
                                        Greenfire Law, PC
7                                       2478 Adeline Street
                                        Suite A
8                                       Berkeley, CA 94703

9

        For the Defendant:             Jeffrey Brown
10                                      Kelley F. Corbari
                                        Office of General Counsel
11                                      Florida Department of
                                        Environmental Protection
12                                      3900 Commonwealth Blvd.
                                        MS 35
13                                      Tallahassee, FL 32399-3000

14

15

16

17

18

19

20

21

22

23

24

25

1                    T A B L E   O F   C O N T E N T S

2    PROCEEDINGS                                              PAGE

3                           March 18, 2025

4    CALLED BY DEFENDANT

5    KENNETH WEAVER
          Direct Examination By Mr. Brown ....................13
6          Cross-Examination By Ms. Blome ....................35
          Redirect Examination By Mr. Brown .................44
7    MOIRA HOMANN
          Direct Examination By Ms. Corbari .................49
8          Cross-Examination By Ms. Blome ....................79
          Redirect Examination By Ms. Corbari ...............92
9    NATHAN HESS
          Direct Examination By Mr. Brown ...................104
10         Cross-Examination By Ms. Blome ...................107
          Redirect Examination By Mr. Brown .................114
11   KIMBERLY DUFFEK
          Direct Examination By Ms. Corbari ................117
12         Cross-Examination By Ms. Blome ...................136
          Redirect Examination By Ms. Corbari ..............140

13

14   OTHER

15   MOTION RE:  JUDGMENT ON PARTIAL FINDINGS                   5

16   COLLOQUY RE: DEFENSE EXHIBIT 25                           98

17   COLLOQUY RE: DEFENSE EXHIBITS 18, 19, AND 20            100

18   COLLOQUY RE: DEFENSE EXHIBITS 18, 19, AND 20            116

19   DEFENSE RESTS                                            142

20   RENEWED MOTION RE:  JUDGMENT ON PARTIAL FINDINGS        142

21   PLAINTIFF CLOSING ARGUMENT                               145

22   DEFENSE CLOSING ARGUMENT                                 159

23   PLAINTIFF REBUTTAL CLOSING ARGUMENT                      165

24

25

1

2                                    E X H I B I T S

3        NO.                              MARKED/ADMITTED              PAGE

4     Defendant's Exhibits
      No. 1                              admitted .............14
5     No. 3                              admitted .............31
      No. 4                              admitted .............31
6     No. 5                              admitted .............32
      No. 6                              admitted .............51
7     Nos. 7 and 8                       admitted .............55
      No. 9                              admitted .............78
8     No. 14                             admitted .............136
      Nos. 18, 19, and 20                admitted .............117
9     No. 25                             admitted .............100

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2          THE COURTROOM DEPUTY:  Bear Warriors United, Inc.

 3   v. Alexis Lambert, Case No. 6:22-cv-2048.

 4          THE COURT:  Good morning, everyone.

 5          So when we last departed, the defense was preparing to

 6   make a Rule 50 JMOL argument.  I would invite you to make that

 7   argument.

 8          MR. BROWN:  Your Honor, if I may, I would request that

 9   we take up the department's -- or I would request judicial

10   notice of the UME determination letter so that it may be

11   considered as part of the universe of facts as part of my

12   motion.

13          THE COURT:  All right.  You will begin presenting

14   evidence as soon as I hear the JMOL argument.  Let's tackle

15   that, and then we'll talk about what it is you want to

16   introduce as evidence.

17          MR. BROWN:  Yes, Your Honor.  The department moves

18   under Rule 52(c) of the Federal Rule of Civil Procedure for

19   judgment on partial findings on the grounds that plaintiffs

20   cannot maintain their claim.  I'm mindful of your instructions

21   not to repeat arguments, but, if I may, I would like to

22   reiterate previous arguments for the record.  May I do so?

23          THE COURT:  What arguments do you want to reiterate?

24          MR. BROWN:  I want to reiterate, very concisely and

25   briefly, the standing argument and the anti-commandeering
```

1    argument.

2              **THE COURT:**  Concisely.  Go on ahead.

3              **MR. BROWN:**  Yes, Your Honor.  We respectfully submit

4    that judgment should be entered in favor of the department

5    because the plaintiffs, based upon their pleadings, inherently

6    would violate the anti-commandeering doctrine because they are

7    essentially seeking to require a state agency to perform

8    actions on behalf of a federal agency.

9              Second, as to standing, we respectfully submit that

10   the plaintiff's case was predicated upon a narrow claim of

11   standing, particularly that two of the members had suffered

12   emotional harm as a result of being aware of manatee deaths.

13   We submit that, based upon the record, there is no substantial

14   likelihood of such an event occurring in the near future.

15             That would conclude matters as it relates to

16   preservation, and I would like to proceed with my argument as

17   to the issues framed by the Court.

18             I would ask the Court to consider the chain of

19   causation in this case.  To summarize briefly, the department

20   has had regulations in place and has taken regulatory actions.

21   A third party, in partially responding to requirements of the

22   department and other state and local agencies, has caused

23   pollution to the Indian River Lagoon.  That pollution, in turn,

24   has caused a response in algae, and evidence shows, and the

25   Court has found in the past, that this has led to manatee

1    deaths.  We respectfully submit that, based upon the evidence

2    submitted, plaintiffs cannot maintain two elements -- or any of

3    the elements of that chain of causation.

4         Specifically as to the department actions, there was

5    no evidence presented that the department in its present and

6    future regulatory regime would lead to manatee deaths.  Based

7    upon statutory requirements and the progress of the basin

8    management action plan, the waters are improving, not

9    degrading.  And as you heard the testimony of Dr. de Wit,

10   Florida's manatee -- well, Dr. de Wit, things are getting

11   better, to paraphrase.  And the plaintiffs have presented no

12   evidence whatsoever supporting the proposition that the present

13   or future regulatory regime will lead to this chain of

14   causation.

15        Furthermore, we respectfully submit that based upon

16   the testimony of plaintiff's witness, Dr. de Wit, the present

17   conditions of the Indian River Lagoon are not related to any

18   current harm to manatees.  You recall specifically -- you may

19   recall specifically the question asked of Dr. de Wit, Does the

20   present forage conditions -- I'm paraphrasing -- seagrass

21   conditions in the Indian River Lagoon relate it to any harm,

22   including the allegations regarding the perinatal deaths?  And

23   the evidence is clear and I believe undisputed that there's no

24   present or potential future harm that would cause manatee

25   deaths as alleged in the complaint.

1    For that reason, I ask that judgment be entered in

2    favor of the department.  That concludes my motion.

3    **THE COURT:**  All right.  Thank you for your argument.

4    Would the plaintiff like to be heard?

5    **MS. BLOME:**  Yes, Your Honor.

6    **THE COURT:**  So the crux of the matter is a statement

7    that Mr. Brown just made, specifically, "Plaintiffs have

8    presented no evidence whatsoever supporting the proposition

9    that the present or future regulatory regime will lead to

10   causation."  Do you stand in opposition to that statement?

11   **MS. BLOME:**  Yes, Your Honor.

12   **THE COURT:**  All right.  I would invite you to begin

13   your argument.

14   **MS. BLOME:**  Well, you know, Your Honor, we didn't have

15   any advance notice of this, but we do have a very extensive

16   closing argument prepared, so a lot of that will be addressed

17   in the closing argument in detail.

18   **THE COURT:**  I mean, the only thing you have to

19   overcome now is if the Court places your evidence and facts

20   most favorable to you, whether or not a reasonable trier of

21   fact could find in your favor.  So that's really the focus

22   here.  You can save as much as you want for your closing

23   argument.  But if you just want to focus on the Rule 50 JMOL,

24   feel free to do so.

25   **MS. BLOME:**  Sure.  So Dr. Barile testified, I think

1    quite convincingly, that the presence of algal options in the

2    lagoon to such an extent caused an actual molecular breakdown

3    in the manatee gut that is problematic for their nutrition.

4         I disagree with Mr. Brown's characterization of

5    Dr. de Wit's follow-up testimony.  She did not say

6    unequivocally that the perinatal deaths that we're seeing in

7    the lagoon are unrelated to the condition of the lagoon.  She

8    presented a hypothesis, which she then very much qualified and

9    stated that that was not something she could say for certain,

10   and that would be under investigation.

11        Plaintiff's theory of the case was presented by

12   Dr. Barile.  We believe that the evidence shows that there is a

13   very much high probability, in fact, significant likelihood

14   that the perinatal deaths are related to the ongoing UME.

15        Whether the UME is actually, in fact, closed or not,

16   the UME had a catastrophic impact on these manatees.

17   Dr. de Wit testified that they are potentially reproducing en

18   masse, such that their mothers are not able to get the nutrient

19   load that they need and birthing smaller babies, which is

20   possibly causing the perinatal deaths.  It's also possible,

21   according to Dr. Ball, that the babies are experiencing weaning

22   stress as a result of the lack of seagrass and the availability

23   of algal blooms in the lagoon.

24        Dr. Barile testified that even the state admits it's

25   own -- you know, its own scientists admit that the lagoon will

1    not be recovered fully or even partially for another 15 to

2    17 years and possibly beyond that.  The BMAP is a 30-year plan.

3    And the department most recently updated everybody and told

4    them that they were not in compliance and on target to meet any

5    of their goals.  And you might recall that beautiful flatlining

6    graph that is absolutely devastating for seagrass in the

7    lagoon, but, admittedly, great for plaintiff's position.

8         The habitat is degraded.  It will continue to cause

9    chronic malnutrition conditions for the manatees in the lagoon,

10   whether they're hobbling along in starvation mode or in some

11   sort of -- I think Dr. de Wit called it a -- I can't remember

12   the word she used, but she said they could go 30 days without

13   food, but that wasn't healthy.

14        That State of being is not natural.  And the state of

15   being that is not natural has been caused by the regulatory

16   regime of the state of Florida, managed and supervised by the

17   state.

18        I would also like to point out that the Court has

19   already issued a ruling on causation, and so to the extent that

20   there hasn't been -- you know, I think we've presented

21   sufficient evidence to demonstrate that there's still ongoing

22   causation, but the Court has already issued its ruling twice on

23   standing and once on causation, so it's not something that

24   plaintiff was asked to present evidence on today, and so they

25   did not.

1           I think that's -- can you think of anything else?

2           I'll say one more thing.  Dr. Barile on his

3    cross-examination testified about the fact that if you were to

4    withdraw all of the inputs into the lagoon today and you

5    stopped any sewage output of any sort -- untreated, treated, et

6    cetera -- that there would still be legacy pollutants in the

7    lagoon, and that that would then take another 10 years to clean

8    up.

9           While that over-fertilization is happening and the

10   eutrophication continues, manatees, all the while, do not have

11   their native forage available to them.  So that was really

12   strong evidence that in the very best conditions we are still

13   looking at 10 years before full recovery of the lagoon.  And

14   there's no -- that was a hypothetical.  There's actually not

15   going to be a complete withdrawal of the nutrients from sewage

16   in the lagoon.  That would be very difficult to accomplish.

17          And so what the state needs to do and what FDEP needs

18   to do is very clear.  Under the Endangered Species Act, they

19   need to obtain what's called an "incidental take permit," that

20   allows them to continue taking manatees subject to their

21   planned regulatory regime, but in line with and accompanied by,

22   betrusted by, a habitat management plan for those manatees.

23          We think that that would include feeding, medical

24   monitoring, some effort to ensure that this clearly ongoing

25   problem doesn't happen again in the future, with respect to the

1    actual animals, if we could prevent another mass die-off

2    through this habitat management therein.  The ESA says we have

3    to.

4         Thank you.

5         **THE COURT:**  Thank you.  The Court finds that the

6    plaintiff has been heard fully on this contested matter.  The

7    Court cannot find that a reasonable jury, in this case trier of

8    fact, would not have a legally sufficient evidentiary basis to

9    find for the plaintiff.  The Rule 50 motion is denied.

10        I indicated that your witness needed to be here at

11   9:00 to begin their testimony, so I don't expect that they're

12   here yet, but, Mr. Brown, if you would be so kind, when do you

13   think your witness is going to be here ready to go?

14        **MR. BROWN:**  My witness is ready to go, Your Honor.

15        **THE COURT:**  All right.  Is the plaintiff ready to

16   proceed?

17        **MS. BLOME:**  Yes, Your Honor.

18        **THE COURT:**  And to prepare you, there's, I think, a

19   high school in the building today, and they arrive at 9:15.

20   This is the only show in town today.  So when they arrive, I

21   think we're going to take a moment, and I may give them a brief

22   summary of what this is about, and they'll stay and listen for

23   however long they want.

24        All right.  So we'll take a break.  When they start

25   coming in, we'll give them a quick summary and then we'll

*KENNETH WEAVER | DIRECT*                                                    13

1    continue moving forward.

2            So, Mr. Brown, I would invite you to call your

3    witness.

4            **MR. BROWN:**  The department calls Ken Weaver as its

5    first witness.

6            **THE COURTROOM DEPUTY:**  Mr. Weaver, if you would please

7    come forward to be sworn.  Please raise your right hand.

8        (KENNETH WEAVER, witness sworn.)

9            **THE WITNESS:**  I do.

10           **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat

11   in the witness box.

12           **THE COURT:**  All right.  Good morning, Mr. Weaver.

13   Once seated, please make yourself comfortable with the chair's

14   proximity to the microphone, and if you would be so kind,

15   please state your full name into the microphone, spelling your

16   last name.

17           **THE WITNESS:**  Yes, Your Honor.  Full name is Kenneth

18   Charles Weaver.  Last name is spelled W-e-a-v-e-r.

19           **THE COURT:**  Your witness, Mr. Brown.

20                         **DIRECT EXAMINATION**

21   BY MR. BROWN:

22   **Q.**  Mr. Weaver, can you tell me your current employment?

23   **A.**  I am the deputy director of the Division of Environmental

24   Assessment and Restoration with the Florida Department of

25   Environmental Protection.

*KENNETH WEAVER | DIRECT*                                                14

1   **Q.**  Is it also known as DEAR, D-E-A-R, the acronym?

2   **A.**  The division is also known as DEAR, yes.

3   **Q.**  Okay.  Now, what is the function of that division?

4   **A.**  It's largely in the name.  We are charged with water

5   quality assessment, evaluation, looking at restoration.  So we

6   address -- monitor the water quality across the state, organize

7   that data into databases, analyze the data to find waters that

8   aren't meeting standards, and then, ultimately, come up -- work

9   either through our own programs or through stakeholders'

10  restoration plans and projects.

11  **Q.**  Okay.  Can you please refer to Plaintiff's [sic] Exhibit 1,

12  which is in the notebook in front of you?

13  **A.**  I found it, yes.

14  **Q.**  Okay.  Can you identify Defendant's Exhibit 1 for the

15  record?

16  **A.**  Yes.  It is my current curriculum vitae or CV.

17  **Q.**  Okay.  And is that a true, current, and accurate copy?

18  **A.**  Yes, it appears to be.

19       **MR. BROWN:**  The department moves into evidence DEP

20  Exhibit 1.

21       **THE COURT:**  Any objection?

22       **MS. BLOME:**  No, Your Honor.

23       **THE COURT:**  All right.  It will be admitted and

24  marked.  Feel free to proceed.

25     (Defendant's Exhibit No. 1 was admitted into evidence.)

*KENNETH WEAVER | DIRECT*                                                     15

1    **BY MR. BROWN:**

2    **Q.**  Did you begin your professional career with the Department

3    of Environmental Protection?  Excuse me.  Can you first tell me

4    the first date of employment with the Florida Department of

5    Environmental Protection?

6    **A.**  Yes.  It was back in March of 1998.

7    **Q.**  Okay.  Referring to your resume, and I'm talking about the

8    positions that are described on page 1 and 2 and beginning in

9    March 1998, can you summarize the general field of interest in

10   those first two positions as an environmental consultant and

11   environmental specialist III?

12   **A.**  Yes.  So I started in the department working in the -- what

13   was called the Everglades technical support section and

14   primarily working on water quality standards, evaluations,

15   looking at the effects of phosphorus enrichment in the

16   Everglades; ultimately working with the team that developed the

17   numeric phosphorus criterion for the Everglades, as well as

18   some other standards developments, dissolved oxygen.

19       As I, sort of, worked up in the agency, I was tasked with

20   developing numeric nutrient standards, numeric nutrient

21   criteria for the whole state.  We were required by EPA

22   determinations to develop numeric nutrient criteria.  So I

23   worked -- I led a technical advisory committee, led a lot of

24   the technical evaluations to develop those standards.  So it

25   was really looking at water quality and the effects on the

*KENNETH WEAVER | DIRECT*

1   natural environment.

2   **Q.**   So moving on, can you describe your responsibility as a

3   program administrator from September of 2020 to May of 2022?

4   **A.**   Yes.  So I was the program administrator over the water

5   quality evaluation and TMDL program, which is the program that

6   is tasked with reviewing our impaired waters, doing our 303(d)

7   list under the Clean Water Act, as well as developing total

8   daily maximum loads.  And so I led those staff.  I supervised

9   the staff in that program, not only as administrator, but also

10   provided technical and scientific guidance, based on my

11   experience.

12   **Q.**   And can you tell me, generally, what a water quality

13   criterion is?

14   **A.**   So water quality criterion -- let's see.  What's the

15   simplest way to put it?  So we set water criteria to protect

16   the uses, the designated uses of a water body:  Fishing,

17   swimming, the support of aquatic life.  In the Clean Water Act,

18   a lot of times you talk about fishable/swimmable.

19       So you take parameters, water quality constituents,

20   phosphorus, nitrogen, dissolved oxygen, other toxicants, and

21   through a scientific analysis determine a level that will not

22   cause issues to those designated uses, so cause impairments to

23   the designated use, fully protect the designated use as

24   supporting a healthy population of fish and wildlife.

25   **Q.**   Okay.  And has there been one specific water quality

*KENNETH WEAVER | DIRECT*

1  criterion that has been the focus of your responsibilities

2  within the last two decades?

3  **A.**  I've worked on quite a few, but the largest part of my

4  career has been working on numeric nutrient criteria.  That

5  sort of then worked its way into the total daily maximum loads,

6  but it's primarily nutrient criteria, nutrients.

7  **Q.**  Briefly, can you summarize your educational background

8  following high school?

9  **A.**  Sure.  Back after -- so I received a Bachelor of Science

10  degree from the state university of New York at Geneseo in

11  biology.  Got a lot of foundational work, got a lot of math and

12  statistics I've relied on over the years.

13      And subsequently went to the state university of New York

14  at Brockport and received a master's degree in aquatic ecology,

15  focused a lot with my major advisor on nutrient dynamics in the

16  Great Lakes or Finger Lakes region.

17  **Q.**  Have you been recognized as an expert witness in previous

18  administrative proceedings?

19  **A.**  Yes, I have.

20      **MR. BROWN:**  Your Honor, Dr. Weaver [sic] has been

21  disclosed.

22      **THE WITNESS:**  Excuse me.  I do not have a doctorate.

23      **MR. BROWN:**  Oh, Mr. Weaver.  Didn't mean to -- okay.

24  Dr. Weaver has been disclosed as a hybrid witness.  His

25  disclosure is included as an attachment to plaintiff's motion

*KENNETH WEAVER | DIRECT*

1    in limine.  I would ask that Mr. Weaver --

2              **THE WITNESS:**  Thank you.

3              **MR. BROWN:**  -- be recognized as an expert in the field

4    of water quality standards, aquatic ecology, and related

5    statistics with the qualification that his testimony would be

6    limited to what you would expect from a hybrid witness.

7              **THE COURT:**  Any objection from the plaintiff?

8              **MS. BLOME:**  No, Your Honor.

9              **THE COURT:**  All right.  You may elicit opinion

10   testimony from this witness.

11             **MR. BROWN:**  Okay.

12   **BY MR. BROWN:**

13   **Q.**  Can you explain, in general terms, what a narrative

14   nutrient criteria is?

15   **A.**  Sure.  So our "criteria," water quality criteria, they made

16   it be numeric, typically.  Think of a number -- 10 micrograms

17   per liter in the Everglades for phosphorus.

18      A "narrative" is a statement that really maybe describes

19   the condition you're looking for, and at times it was developed

20   when the response to the variable, the parameter, was more

21   complex than we could work out.

22      So for "nutrients," the state long-term, and we still do

23   have this on the books, had a narrative standard of no case

24   show the nutrient -- the concentrations of nutrients in a body

25   of water be altered as to cause an imbalance in flora and

*KENNETH WEAVER | DIRECT*

1    fauna.  So it's a statement of the condition that we expect in

2    the water body.  Again, we don't want to raise nutrients to a

3    level that's going to cause the flora or fauna -- plants and

4    animals that live in the water -- to respond in a way that

5    would be deleterious.

6    **Q.**  Okay.  Can you explain how the development of numeric

7    criteria took place in the state of Florida?

8    **A.**  So it was a long -- like I said, the EPA in the -- I'm not

9    remembering the exact dates, but early 2000s directed the

10   states to develop numeric nutrient standards to fully implement

11   the Clean Waterways Act.  DEP Florida, like other states, began

12   that process.  We're making significant progress.

13       It did end up -- so EPA, a group of stakeholders,

14   interested parties, did feel that Florida was taking too long,

15   and they challenged EPA, and EPA ultimately came with a

16   mandatory-duty case, and said if they didn't develop numeric

17   nutrient criteria before we did -- let me correct, Florida

18   didn't develop numeric nutrient criteria before they did, then

19   they would do it.

20       We subsequently began working, very actively, with EPA,

21   sort of a collaborative process, and developed a criteria over

22   a few years.  And, ultimately, by 2014 all lakes, springs,

23   streams, estuaries had specific numeric nutrient criteria.

24   **Q.**  Is there a general set of default numeric criteria for

25   certain types of water bodies?

*KENNETH WEAVER | DIRECT*                                              20

1    **A.**  So our numeric nutrient criteria, based on the scientific

2    bases underlying the criteria, are set up in a hierarchical

3    fashion.  So streams have one set of criteria that apply

4    regionally.  Then lakes have another set of criteria.  Springs

5    have their own set.  And then estuaries are not as general

6    because estuaries are all unique, and we develop site-specific

7    estuary nutrient criteria.  So each estuary has its own

8    criteria, so not general criteria.

9    **Q.**  Okay.  In this case, is there a specific numeric criterion

10   for the Indian River Lagoon?

11   **A.**  Yes, there is.

12   **Q.**  Okay.  And is that derived from a total maximum daily load

13   or a TMDL?

14   **A.**  Yes.  The phosphorus and nitrogen numeric nutrient criteria

15   were developed directly from the TMDL.  There was a chlorophyll

16   criterion, so numeric criteria, nutrient criteria include both

17   the stressor variables, totally nitrogen, total phosphorus, as

18   well as the response variability, chlorophyll.  And so as part

19   of that effort to develop numeric nutrient criteria, we did go

20   in after the fact, looked at the conditions, and develop a

21   chlorophyll criterion, but the TN and TP were developed based

22   on -- directly from the TMDL.

23   **Q.**  Can you please refer to the plaintiff's notebook and switch

24   to -- this is a plaintiff's exhibit --

25   **A.**  I'm sorry.

*KENNETH WEAVER | DIRECT*

1    **Q.**  -- plaintiff's Exhibit 6?

2    **A.**  Yes.

3    **Q.**  This has been admitted into evidence.  I would ask you to

4    explain for the record the context and background for this

5    document.

6    **A.**  So this is the 2021 Indian River Lagoon -- North Indian

7    River Lagoon Basin Management Action Plan.  So it's our

8    previous or our existing basin management action plan for the

9    North Indian River Lagoon.

10   **Q.**  Can you refer, please, to Defendant's Exhibit 3?

11   **A.**  Absolutely.  Okay.  Okay, yes.

12   **Q.**  Can you explain, generally, what this document is?

13   **A.**  Yes.  I do not recall previously inspecting this document,

14   but it appears to be an update document, a presentation given

15   by --

16   **Q.**  I withdraw the question.

17       Can you please refer to Defendant's Exhibit 3?

18   **A.**  Oh, defense.  Yes.

19   **Q.**  Okay.  Can you identify what this document is?

20   **A.**  Yes.  It is a portion of Chapter 62-304, Florida

21   Administrative Code, which provides our TMDLs, which are

22   adopted by rule, and it's specifically Section 520 that

23   deals -- that lays out the adopted TMDLs for the Indian River

24   Lagoon.

25   **Q.**  Can you explain, in particular, what subsections 3 through

1    8 are of this rule?

2    **A.**   Yes.   Sections 3 through 8 provide the adopted TMDL, so

3    total maximum daily loads, for segments of the Indian River

4    Lagoon that were adopted.   They include both the TMDL, as well

5    as load allocations, so it's all adopted by rule.

6    **Q.**   Referring to page DEP 87, that's the first page of

7    Defendant's Exhibit 3, please refer to paragraph 3 and explain,

8    in plain terms, what this refers to.   So the beginning of

9    paragraph, paragraph 3, before subparagraph A?

10   **A.**   Are you talking about the "Indian River Lagoon above Max"?

11   **Q.**   Yes.

12   **A.**   Okay.   This lays out -- it specifies that the TMDL for this

13   segment of the Indian River Lagoon, so they were segmented,

14   provides a load, an annual load, that shall not exceed more

15   than 177,220 pounds per year of TN and 9,320 pounds per year of

16   TP.   That's the total load that can enter the bay and still

17   have the bay -- or, I'm sorry, that segment of the lagoon still

18   attain standards.   That's a protective level.

19        Then the subparagraphs talk about the waste load

20   allocation, subparagraph A --

21   **Q.**   Let me --

22   **A.**   Okay.   Sure.

23   **Q.**   Can you explain what TN and TP refer to?

24   **A.**   Sure.   TN is total nitrogen, so it's the -- and TP is total

25   phosphorus.

*KENNETH WEAVER | DIRECT*                                              23

1   **Q.**  Okay.  So this load is expressed in terms of max; is that

2   correct?

3   **A.**  That's correct.  That's how TMDLs are typically expressed.

4   **Q.**  And moving on to subparagraph A, can you explain what this

5   subparagraph refers to, with an emphasis on explaining what a

6   WLA is?

7   **A.**  Yes.  So the waste load allocation, WLA, is a portion of

8   the TMDL -- TMDL is the sum of different sources -- and a waste

9   load allocation is given out -- a portion of that total TMDL is

10  given to point dischargers, wastewater facilities, maybe it's a

11  wastewater plant, industrial facility.  And each TMDL has to

12  have a waste load allocation, and that's the maximum amount

13  that any of those facilities can get in their permit.

14      In this case, it says the waste load allocation is not

15  applicable.  That's because at the time the TMDL was set there

16  was no point discharges discharging to the Indian River Lagoon

17  into this segment, so there was no want to give that waste load

18  allocation.  So they did not get a waste load allocation.

19      It also means that going forward there can be no new point

20  discharges into this segment because there's no waste load

21  allocation for them to take from.

22  **Q.**  Okay.  Can you explain what the requirements in subsection

23  3(b) of the rule refer to?

24  **A.**  Sure.  So 3(b) talks about waste load allocations subject

25  to NPDES or for MS4 dischargers, which are municipal separate

*KENNETH WEAVER | DIRECT*                                                    24

1    storm sewer systems, as well as stormwater.  In stormwater,

2    these are sources that cannot -- are not collected into a

3    discrete location.  They're difficult to measure, to monitor

4    and measure in the environment and really get a handle on and

5    determine what -- through compliance, what their actual loads

6    are.

7        So we typically will tell, for the waste load allocation

8    for MS4 and stormwater, the load allocation, that it's a

9    percent reduction.  So it's a reduction relative to a baseline

10   period.  In this case, it was a baseline period of -- a 30-year

11   baseline period from 1975 through 2005.  So they have to reduce

12   based on that baseline period by a certain percentage.

13   **Q.**  Okay.  Before I go on to subsection three, can you explain

14   what a "nonpoint source" is as contrasted to a "point source"?

15   **A.**  Sure.  So under the Clean Waterways Act, point sources

16   typically get a national pollutant discharge elimination system

17   or an NPDES permit.  They are really -- you know, historically

18   we thought of it's a discharge from, like, a wastewater plant

19   that comes out of a discrete location, a pipe or maybe a

20   diffuser.  The way I like to think of it is not just that the

21   source is coming in a place, but it's easy for us, as a

22   regulatory agency, to require -- or to go collect samples.

23   That's going to very clearly characterize what's coming from

24   that source.  So it's a point, and it can be easily

25   characterized.

*KENNETH WEAVER | DIRECT*                                                    25

1      Contrast that to stormwater, which is really -- happens

2      after rainfall events, large water.  The water runs off the

3      landscape in a diffuse pattern at multiple locations.  In some

4      places, it may be collected, but it's still so diffuse that

5      it's difficult to really characterize that through monitoring,

6      what the load or what the concentrations are coming off.  So we

7      treat that differently, because we can model what's coming off

8      the landscape in a general sense, but it's more difficult to

9      directly monitor it.

10     **Q.**  Can you explain the context of a -- explain what a basin

11     management action plan, in the context of TMDL implementation.

12     **A.**  Sure.

13     **Q.**  Let me --

14     **A.**  Yeah.  It was a rather broad question.

15     **Q.**  I'll withdraw the question.

16     **A.**  Yeah.

17     **Q.**  What is the purpose of a basin management action plan, as

18     developed by the State of Florida?

19     **A.**  Sure.  Let me talk a little bit about what a basin

20     management action is and relative to TMDL.  And I read recently

21     in some guidance/training that a TMDL, like this, provides the

22     math and the path to water-body restoration, and under the

23     TMDL, that path, because TMDLs are not self-implementing, I

24     think of it as rather narrow.  And what conceptually the BMAP

25     starts to do is it widens that path and brings more things in.

*KENNETH WEAVER | DIRECT*

1    So under a TMDL, kind of getting at your stormwater, we can

2    through the waste load allocation get at wastewater plants.  We

3    can give them waste load allocation that end up in permit

4    limits.

5        There are less controls at the federal level for

6    stormwater.  We don't have a comparable program where we can

7    start putting these waste load allocations in the permits.

8        What the BMAP does is it starts bringing in those

9    stakeholders and identifying actual projects, adding

10   requirements.  We're working on fertilizer requirements for

11   stakeholders, adding in requirements to deal with agriculture

12   that are not generally dealt with with a TMDL.  So, again, it's

13   widening that path and giving us more tools, more regulatory

14   teeth, to actually go after and work with stakeholders -- we

15   try to work collaboratively with stakeholders -- but to work

16   with stakeholders to actually end up achieving not just the

17   waste load allocation, but the stormwater load allocations as

18   well, to lead us to a path of success.

19   **Q.**   And would that also be a means to address nutrient

20   discharges from septic tanks or off-site treatment disposal

21   facilities?

22   **A.**   Yes.  Again, the TMDL -- and I know the Clean Waterways

23   Act.  We have limited regulatory authority over septic systems,

24   onsite sewage treatment systems.  And through the BMAP and some

25   of the recent legislative changes, we're able to do more to

*KENNETH WEAVER | DIRECT*                                                    27

1    encourage folks to actually push, upgrade, or get people off

2    septic and more into central sewer or into enhanced nutrient

3    reducing systems that will help address, in particular,

4    nitrogen for the enhanced nutrient reducing systems.

5    **Q.**  Can you explain what a biological end point is?

6    **A.**  A biological end point, and going back to the standards or

7    TMDL, is really a tool we use when we're developing a water

8    quality criterion, or an TMDL end point would be what's your

9    goal for the water body, and it's really -- it's something we

10   can measure.  So I like to say, since it's simple,

11   chlorophyll -- and typically in lakes we have a chlorophyll

12   target, which measures the algal biomass, so the amount of

13   algae that's growing in the water, of 20 micrograms per liter.

14   That's the end point.  That's what we're trying to get back to.

15   And then we design the TMDL or the standard to attain that

16   level through various statistical or modeling exercises.  But

17   the goal of the TMDL or the BMAP or standard is to maintain the

18   end point.

19   **Q.**  Might there be occasions where a TMDL would have a primary

20   end point and a secondary end point?

21   **A.**  Yes.

22   **Q.**  Okay.  Are there biological end points for the Indian River

23   Lagoon numeric nutrient criteria?

24   **A.**  Yes.  Ultimately, the end points are to meet the seagrass

25   targets that were set in the TMDL.

*KENNETH WEAVER | DIRECT*                                                28

1    **Q.**   Okay.  Why would there be no biological end point for

2    manatees in the Indian River Lagoon?

3    **A.**   For the TMDL, is that your question?

4    **Q.**   Yes.

5    **A.**   So having worked on developing criteria for many years, you

6    know, ultimately we are trying to protect the whole ecosystem.

7    What is challenging is that typically, though, we'll look at --

8    so you have the stressor, the nutrients, and the response, and

9    you want to look at some response that's as close to the

10   stressor as possible, so it's a direct a connection as

11   possible.

12        As you move up into higher levels -- so that's why we

13   typically look at chlorophyll or seagrass, things at the base

14   of the food web that are directly responding to the nutrients.

15   As you work up, there become more compounding factors.  A

16   manatee or a fish move around.  They may be affected by other

17   factors, such as a cold snap that would, you know, confound our

18   analysis.  So it's very difficult to come up with that

19   relationship because, typically, those higher levels are

20   affected by other things, disease, cold snaps.

21   **Q.**   For the record, can you explain the significance of

22   chlorophyll concentration when considering the nutrient

23   conditions?

24   **A.**   Chlorophyll, again, is an indirect but very strong measure

25   of the amount of algae in the water, and typically we are

*KENNETH WEAVER | DIRECT*

29

1    trying to control the amount of algae.  It's either a

2    nuisance -- it causes harmful alga blooms where there'll be

3    algae species that produce toxins.  In the case of Indian River

4    Lagoon, excess algae, too much green stuff in the water, has

5    affected the attenuation, the light that actually was getting

6    down into the lagoon, going through the water, and then

7    indirectly affecting the seagrass because they don't receive

8    sufficient light.

9    **Q.**  Okay.  Finally returning to DEP Exhibit C, can you explain

10    what Paragraph 3(c) is intended to -- refers to?

11    **A.**  Okay.  Yes.  So Paragraph 3(c) is the load allocation for

12    nonpoint sources.  So it talks about that they should be

13    reduced for 35 percent for total nitrogen, 47 percent for total

14    phosphorus, based on 2000 land use and that 30-year average

15    rainfall of 1975 through 2005.

16        So that is the amount DEP says, in order for the TMDL to be

17    attained, stormwater has to reduce total phosphorus/total

18    nitrogen going into this segment, in order for the TMDL to be

19    attained.

20    **Q.**  Were you present during the testimony of Dr. Barile

21    yesterday?

22    **A.**  I was.

23    **Q.**  Did you hear Dr. Barile express concern about the timing of

24    the assumptions on land use in the development of the TMDL?

25    **A.**  I did.

*KENNETH WEAVER | DIRECT*                                                    30

1    **Q.**  Do you share that concern, sir?

2    **A.**  I do not.

3    **Q.**  Why is that?

4    **A.**  Knowing -- well, for several reasons.  First, I think the

5    basis -- the purpose of the TMDL is to determine the maximum

6    load that the water body can receive and still meet standards,

7    still attain its use.  The change in the land use doesn't alter

8    that response in the water body.  It's actually within the

9    water body.  Changes in land use could affect what's running

10   off through stormwater into the lagoon.  That has likely

11   changed over time.

12        Where it doesn't concern me is that we are continuing

13   through the BMAP, our basin management action plan.  Through

14   that adaptive management process, we update that information as

15   part of the BMAP, and then we work with stakeholders and say,

16   Now given this amount of land use changes, you're now given

17   this amount of land use changes, you know, the target you need

18   to meet, the amount of load allocation you need to meet has

19   changed.  Through the BMAP, we update that, again, through our

20   adaptive management.  So I would say the TMDL is just a piece

21   of the puzzle that leads to restoration.

22   **Q.**  So you've described the subsections within paragraph 3 in

23   the rule, that's that DEP Exhibit 3.  Would the same

24   explanation apply to the other portions of the rule?

25   **A.**  Yes.

 1              **MR. BROWN:**  The department moves into evidence DEP

 2   Exhibit 3.

 3              **THE COURT:**  Any objection?

 4              **MS. BLOME:**  No objection.

 5              **THE COURT:**  Defense Exhibit 3 is admitted and marked.

 6   Feel free to proceed.

 7       (Defendant's Exhibit No. 3 was admitted into evidence.)

 8   **BY MR. BROWN:**

 9   **Q.**  Mr. Weaver, can you please refer to Defendant's Exhibit 4?

10   **A.**  Yes.

11   **Q.**  Can you explain what DEP Exhibit 4 is?

12   **A.**  So this is a letter from EPA, at the time director James --

13   or Jim Giattina.  We received it.  DEP received it on

14   November 24, 2009, and what it is, is it's part of the review

15   process.  All our TMDLs have to go to EPA for their review and

16   approval.  And this was a letter sent to the administrator at

17   the time, Jan Mandrup-Poulsen.  Just EPA approving the TMDL,

18   accepting it as meeting the requirements of the Clean Water

19   Act.

20              **MR. BROWN:**  The department moves into evidence DEP

21   Exhibit 4.

22              **THE COURT:**  Any objection?

23              **MS. BLOME:**  No, Your Honor.

24              **THE COURT:**  All right.  It's admitted and marked.

25       (Defendant's Exhibit No. 4 was admitted into evidence.)

*KENNETH WEAVER | DIRECT*                                             32

1    **BY MR. BROWN:**

2    **Q.**  Can you please refer to DEP Exhibit 5?

3    **A.**  Yes.

4    **Q.**  Can you explain what DEP Exhibit 5 is?

5    **A.**  Yes.  So I have to do a little background here.  So the way

6    Florida set up our numeric nutrient criteria, TMDLs, because

7    they're meant to meet protected designated use, can also be

8    submitted as water quality standards, the criteria, the

9    applicable criteria.  You asked that question before.

10       That is done separately.  There's a separate group in EPA

11   that reviews standards and TMDLs.  The standard needs to be

12   approved first, typically, through the process.  And this

13   letter was a letter from, again, James Giattina to the

14   secretary of the Department of Environmental Protection

15   approving -- it's the concurrence letter approving the water

16   quality standard, so it effectively approved the TMDL for the

17   Indian River Lagoon as the criterion, the numeric nutrient

18   criterion, for those segments of the Indian River Lagoon.

19           **MR. BROWN:**  The department moves into evidence DEP

20   Exhibit 5.

21           **THE COURT:**  Any objection?

22           **MS. BLOME:**  No, Your Honor.

23           **THE COURT:**  Defense Exhibit 5 will be admitted and

24   marked.

25       (Defendant's Exhibit No. 5 was admitted into evidence.)

*KENNETH WEAVER | DIRECT*                                                33

1    **BY MR. BROWN:**

2    **Q.**  During the development of the TMDL for the Indian River

3    Lagoon, did the department collaborate with EPA on the

4    development of the biological end points?

5    **A.**  Yes.

6    **Q.**  Okay.  So that being the case, if it were necessary for the

7    department to -- I'll withdraw the question.

8       Do you recall Dr. Barile's testimony regarding the

9    experience of restoration in Tampa Bay?

10   **A.**  Yes, I do.

11   **Q.**  Okay.  While you were listening to his testimony, did you

12   recall previously reviewing data regarding seagrass restoration

13   in Tampa Bay?

14   **A.**  Yes.

15   **Q.**  Okay.  How would that experience be compared to the effects

16   that would be expected to occur in the Indian River Lagoon

17   during the restoration process?

18   **A.**  Well, thinking back at Dr. Barile's testimony, I think, on

19   one of the points is in the Tampa Bay is one of the -- I'm

20   sorry -- success stories both in Florida and nationally.

21   Dr. Barile, you know, did talk about Grizzle-Figg, which went

22   into effect in 1972, and then it was a long path to

23   restoration.  Interestingly, I believe those targets that were

24   developed for Tampa Bay as a part of a reasonable assurance

25   plan were met in 2006, and then we saw seagrass -- the target

*KENNETH WEAVER | DIRECT*

1    was 38,000 acres for Tampa Bay -- was not attained until 2014.

2    So I think the moral of the story is that it can be a long path

3    to restoration, even after we meet the targets.

4    **Q.**  A related question.  When the loading targets of the TMDL

5    are met, do you expect the immediate recovery of the

6    seagrasses?

7    **A.**  Unfortunately, no.

8    **Q.**  Okay.  Why is that?

9    **A.**  The biological response takes time.  There may be legacy

10   loads within the -- within the system, so additional nutrients

11   that have built up over the decades of overloading the system

12   with nutrients, so that builds up in the sediments or builds up

13   in the watershed, and that is slowly released over time, and so

14   you have that continued stressor.  It also takes time for the

15   biology, the grasses, to move back in and recolonize.  Again,

16   it's a delayed process.

17   **Q.**  If the TMDL and the BMAP are implemented as planned, do you

18   expect the seagrasses in the Indian River Lagoon to be restored

19   to a healthy and unimpaired condition?

20   **A.**  Yes.  That is the objective of the TMDL.

21   **Q.**  And do you expect that to happen?

22   **A.**  Yes.

23           **MR. BROWN:**  I have no additional questions on direct.

24           **THE COURT:**  Thank you.

25           Cross-examination?

*KENNETH WEAVER | CROSS*

1          **MS. BLOME:**  Yes, Your Honor.

2                        **CROSS-EXAMINATION**

3      **BY MS. BLOME:**

4      **Q.**  Good morning, Mr. Weaver.

5      **A.**  Good morning.

6      **Q.**  You are not a manatee veterinarian, are you?

7      **A.**  That's correct.

8      **Q.**  Nor trained in manatee recovery?

9      **A.**  That's true.

10     **Q.**  You are not trained in manatee rehabilitation?

11     **A.**  No.

12     **Q.**  Nor an expert in manatee habitat?

13     **A.**  No.

14     **Q.**  Manatee forage?

15     **A.**  No.

16     **Q.**  Nor seagrass?

17     **A.**  That's correct.

18     **Q.**  Who do you rely on for information regarding seagrass

19     recovery?

20     **A.**  So in the Indian River Lagoon, it would be the St. Johns

21     River Water Management District collects those data, yes.

22     **Q.**  And do you rely on the district's studies and work product

23     in your own work?

24     **A.**  Yes.

25     **Q.**  How so?

*KENNETH WEAVER | CROSS*

1    **A.**  Well, that's a rather broad -- even the TMDL was originally

2    based on water management district work, you know, rely on

3    them.  The water management district collects data, water

4    quality data within the lagoon, as well as other water bodies.

5    They, again, do the seagrass mapping.  That is really an

6    important part of our -- so as we measure success of the BMAP.

7    I think maybe that gets to the heart of your question.  We rely

8    on their data to look at the success of the seagrass

9    restoration.

10   **Q.**  The St. Johns River Water Management District believes it's

11   going to take 12 to 17 years to start seeing recovery of

12   seagrass in the Indian River Lagoon, correct?

13   **A.**  Correct.

14   **Q.**  And you have no reason to doubt that?

15   **A.**  I have no reason to doubt that.  Yes, ma'am.

16   **Q.**  You have not done any work in your role of restoration of

17   FDEP related to Indian River Lagoon seagrass restoration

18   specifically, have you?

19   **A.**  Just as it relates to the TMDL and BMAP, as we've

20   discussed, but that's correct.

21   **Q.**  Nothing geared toward the replanting of seagrass?

22   **A.**  No.

23   **Q.**  Or seeding seagrass?

24   **A.**  No.

25   **Q.**  Or transplanting seagrass?

*KENNETH WEAVER | CROSS*                                                37

1    **A.**   No.  Other than being aware of those programs, no.

2    **Q.**   And nothing about the success of seagrass competition with

3    other vegetation in the Indian River Lagoon?

4    **A.**   Other than reading the literature foundations, no, I have

5    not.

6    **Q.**   But the Florida Department of Environmental Protection

7    knows how to restore seagrass, correct?

8    **A.**   Yes.

9    **Q.**   In fact, they have seagrass restoration projects in the

10   Shoal and Widgeon -- for Shoal and Widgeon in the Tampa Bay

11   lagoon?

12   **A.**   That's correct.

13   **Q.**   Or Tampa Bay, not lagoon.

14   **A.**   Yeah.

15   **Q.**   And for some -- let's see.  Related to protecting seagrass

16   from scarring from boat and watercraft activity.  That's

17   correct?

18   **A.**   That I'm aware of, yes.

19   **Q.**   Well, are you familiar with the Office of Resilience and

20   Coastal Protection within FDEP?

21   **A.**   To a degree, yes.

22   **Q.**   They work with other agencies to improve seagrass

23   protection in ways we just discussed, correct?

24   **A.**   Correct.

25   **Q.**   They know how to augment habitat recovery through proven

*KENNETH WEAVER | CROSS*

1    scientific restoration techniques, correct?

2    **A.**  Yes.

3    **Q.**  And increased public awareness of the importance of

4    seagrass.  Those are some of their functions, correct?

5    **A.**  Correct.

6    **Q.**  Have you consulted with them in any way on the BMAP?

7    **A.**  I have not.  Moira Homann may have.

8    **Q.**  Ms. Homann may have?

9    **A.**  Ms. Homann, yes.

10   **Q.**  Do you know of any FDEP plans to study manatee

11   rehabilitation in the Indian River Lagoon?

12   **A.**  I'm not aware, no.

13   **Q.**  Do you have any knowledge of an FDEP plan to implement a

14   manatee feeding program in the Indian River Lagoon?

15   **A.**  Again, no.

16   **Q.**  No plans to study or monitor manatee health to determine

17   whether your BMAP is sufficiently helping the manatee recovery

18   in the lagoon?

19   **A.**  I am not aware of such study, no.

20   **Q.**  As the restoration manager, have you ever on behalf of FDEP

21   consulted with the Florida Fish and Wildlife Commission about

22   manatee health in the lagoon?

23   **A.**  Not with -- not directly about the lagoon, no.

24   **Q.**  Not manatee recovery?

25   **A.**  Yes.  I've had some -- some conversations over the years.

*KENNETH WEAVER | CROSS*

1   **Q.**  Please describe those.

2   **A.**  Well, I think it's been -- I think, to really characterize

3   it as very, very general.  I may retract my answer.  I know a

4   specific.  I know it's come up in conversations, but I don't

5   think anything too specific.

6   **Q.**  Maybe casual conversation?

7   **A.**  Maybe casual, yes, ma'am.

8   **Q.**  Is that the same answer for manatee recovery?

9   **A.**  Yes.

10   **Q.**  And manatee habitat restoration?

11   **A.**  Yes.

12   **Q.**  Or seagrass restoration?

13   **A.**  Correct.

14   **Q.**  What about with the United States Fish and Wildlife

15   Service?  Have you had any conversations with anyone there

16   about those topics?

17   **A.**  We have had conversations about endangered species with the

18   services.  Usually that is in consultation with EPA.

19   **Q.**  When you say "services," do you also mean the NOAA NMFS?

20   **A.**  Yes.

21   **Q.**  The BMAP is not a habitat management plan, is it?

22   **A.**  It is not.  No.

23   **Q.**  It doesn't mention manatees in it, does it?

24   **A.**  It does not.

25   **Q.**  FDEP does not believe it's going to meet its target

*KENNETH WEAVER | CROSS*                                                    40

1    reductions for total nitrogen in the lagoon on time.  Is that

2    true?

3    **A.**  We're working actively to meet it.  I know there was a

4    figure shown yesterday that's currently being updated that

5    looks at our projects.  We have every intention to meet those.

6    I will admit, we have a lot of work with the stakeholders to

7    identify the projects, but --

8    **Q.**  But you're not currently meeting them, are you?

9    **A.**  We are not currently meeting them.  That's correct.

10   **Q.**  You spent a little bit of time talking about the federal

11   Clean Water Act and how that affects the FDEP's program

12   authority, but the State of Florida has its own authority to

13   regulate clean waterways; isn't that true?

14   **A.**  That's correct.

15   **Q.**  The total maximum daily load process, does that allow you

16   to address nonpoint source pollution?

17   **A.**  Can you rephrase the question?

18   **Q.**  Are you able to address nonpoint source pollution through

19   the total maximum daily load process?

20   **A.**  So the process does -- as I said under my direct, it does

21   include the load allocation and waste load allocation for

22   permanent MS4 facilities, and so that is how it addresses it.

23   In the MAP part it, it picks it up.  Where we've had the

24   challenges -- and this is why I was mentioning Clean Water --

25   on the Clean Water Act, we didn't necessarily have as much

*KENNETH WEAVER | CROSS*

1    authority to go after stormwater.  That is where the state

2    processes come in with the BMAP that allow us program -- or

3    projects and programs to address those stormwater impacts.  So

4    it's through the BMAP process that we can really get at the

5    regulation.

6    **Q.**  But an MS4 permit is a type of NPDES permit?

7    **A.**  That's correct.

8    **Q.**  It's a point source.

9    **A.**  Right.

10   **Q.**  I'm talking nonpoint sources, like control of septic tanks.

11   Those are not addressed through the TMDL process.

12   **A.**  They are not -- they are -- so OSTS, septic tanks, are

13   inherently included in the load allocation.

14   **Q.**  But you cannot control that discharge of pollutants from a

15   septic tank through a TMDL process?

16   **A.**  That's correct.

17   **Q.**  That's why you have the BMAP?

18   **A.**  That's why we have the BMAP, correct.

19   **Q.**  Florida is not currently in compliance with its TMDL water

20   quality criteria in the lagoon, correct?

21   **A.**  We have not obtained the TMDL, so, yes, we're not in

22   compliance.

23   **Q.**  And that TMDL is based on data collected from the late '90s

24   through about 2006.  Does that sound right?

25   **A.**  That sounds right.

*KENNETH WEAVER | CROSS*                                               42

1    **Q.**  It was adopted in 2013?

2    **A.**  I'm uncertain of the adoption date.

3    **Q.**  I believe it is Plaintiff's Exhibit 6, potentially.  Let me

4    change that.  It's Exhibit 7.

5    **A.**  Exhibit 7, yes.  Yes, it's the final order adopting the --

6    **Q.**  And that's dated in 2013?

7    **A.**  Exhibit 7?

8    **Q.**  Yeah.

9    **A.**  So Exhibit 7 is the final order for the basin management

10   action plan.

11   **Q.**  Okay.  Are you in plaintiff's binder?

12   **A.**  No, ma'am.

13   **Q.**  Okay.  It's confusing with all of the binders.

14   **A.**  Yes.

15   **Q.**  Is that the TMDL?

16   **A.**  That is the TMDL.

17   **Q.**  Yes.  Okay.  And that was adopted in 2013?

18   **A.**  So the TMDL report was adopted -- or the TMDL -- the report

19   is from 2009.

20   **Q.**  And when was it implemented?

21   **A.**  So I was going to Defendant's Exhibit 4, which is the EPA

22   approval letter for TMDL, and I see that's dated in 2009.  That

23   would mean the TMDL was adopted in 2009.

24   **Q.**  Okay.  So 16 years ago?

25   **A.**  That's correct.

*KENNETH WEAVER | CROSS*

1    **Q.**  Okay.  And it hasn't been updated since then, correct?

2    **A.**  No.

3    **Q.**  You testified that FDEP worked with the EPA to develop the

4    TMDL?

5    **A.**  That's correct.

6    **Q.**  And only after the state was sued, correct?

7    **A.**  The TMDL?  I'm not aware of a lawsuit for the TMDL.

8    **Q.**  When you were describing the lawsuits, what were you

9    talking about?

10   **A.**  I was talking about the mandatory duty that EPA -- it was

11   filed against EPA.  I can't remember which environmental

12   organization.  But that was the mandatory duty requesting the

13   EPA to step in and ensure that Florida completed the

14   development of American nutrient criteria.

15   **Q.**  And Florida didn't do that until it was required to by the

16   lawsuit?

17   **A.**  Being actively involved, I don't necessarily agree with

18   that characterization.  We were actively working.  I think the

19   lawsuit helped us rally the political will to complete the job,

20   but, technically, we were working very hard at it.

21   **Q.**  Working very hard, but nothing had been published or

22   required?

23   **A.**  Nothing had been completed.  That's correct.

24   **Q.**  You testified that the TMDL doesn't cover manatees because

25   it cannot control for cold snaps or diseases, correct?

1  **A.**  So I testified that we didn't use manatees as an end point

2  because it's -- being a higher level organism, the relationship

3  between -- and I know I'm changing -- the nutrients and, say,

4  the measures of manatee health would be very noisy, and cold

5  snaps, disease, other factors increase that noise.  So there's

6  other factors that influence the health, the well-being of

7  manatees, in addition to just the health of the seagrass.

8  **Q.**  And you have no control over the weather, so why include

9  cold snaps, right?

10  **A.**  Right.

11  **Q.**  And you have to control over infectious disease?

12  **A.**  Right.

13  **Q.**  FDEP has no control.

14      But it does have control over sewage discharges, correct?

15  **A.**  Correct.

16          **MS. BLOME:**  Let me have a moment to confer with

17  co-counsel.

18          **THE COURT:**  Sure.

19          **MS. BLOME:**  Nothing further at this time.

20          **THE COURT:**  Redirect examination?  Redirect

21  examination?

22          **MR. BROWN:**  Yes, Your Honor.

23                          **REDIRECT EXAMINATION**

24  **BY MR. BROWN:**

25  **Q.**  Mr. Weaver, you were asked about compliance with the TMDL.

1    Within the context of that question, can you explain how the

2    department goes about identifying and addressing impaired

3    waters throughout the state of Florida?

4    **A.**    Sure.    Another one of my programs, it's under the -- it's

5    303(d) portion of the Clean Water Act.    Every two years now, I

6    have a team that evaluates water quality data for all water

7    bodies across the state, where it's available, large number of

8    water bodies.    And there's a very specific procedure that's

9    laid out in Chapter 62-303 that, sort of, gives the analytical

10   processes we go through.    But at the end of the day, it's

11   looking at the data and looking at how frequently, how

12   persistently water bodies are exceeding all our criteria,

13   whether it's American nutrient criteria or any of the other

14   criteria that are listed in Rule 62-302.530.    But it's just a

15   reasoned process where we look at the data and determine which

16   water bodies are not attaining standards.

17   **Q.**    Okay.    And does that encompass what's sometimes referred to

18   as the rotating basin approach?

19   **A.**    Historically.    So I mentioned -- so we used to, in order

20   that we could get the whole state done, we would break it

21   into -- we broke the state up into fifths, and we did a fifth

22   of the state every year.    It took us five years to get back, so

23   it wasn't as responsive.

24       My team took it upon themselves to update that process.

25   And now we do the whole state every two years.    So the rotating

*KENNETH WEAVER | REDIRECT*

1    basin approach is, sort of, a relic of the past.

2    **Q.**  Okay.  Moving on, you were asked about the timing of

3    development of nutrient criteria.  By way of background, what's

4    the relationship between the Indian River Lagoon numeric

5    criteria and the TMDL?

6    **A.**  They are the same.

7    **Q.**  Okay.  And why is that?

8    **A.**  So when we established American nutrient criteria, one of

9    the bits of feedback we had, both internally and externally, is

10   that a lot of work had gone into developing TMDLs, especially

11   for large systems, estuarian systems, Indian River Lagoon,

12   St. Johns, and Lake Okeechobee, and that, ultimately, all those

13   TMDL were developed to protect that -- to attain that narrative

14   nutrient standard, which is the point of the numeric criteria

15   is to attain the narrative.

16       We said, there's no sense in having two sets of criteria

17   apply to a water body with different targets for people to meet

18   when, at the end of the day, they should be focused on the same

19   thing.  So we set it up where if we developed a TMDL that

20   interpreted that narrative nutrient criteria, then it could

21   form the basis of the criteria.

22       So that's the case in the IRL, Indian River Lagoon, is that

23   the TMDL also serves as the criteria.

24   **Q.**  So that being the case, as it relates to the Indian River

25   Lagoon, would the TMDL be in effect, notwithstanding the

*KENNETH WEAVER | REDIRECT*                                           47

1    existence, whether or not the nutrient criteria existed?

2    **A.**  That's correct.

3    **Q.**  You were asked a question as to the department's role in

4    the control of what was described as sewage.  Did you

5    understand that question to include point sources or nonpoint

6    sources or both?

7    **A.**  Both.

8    **Q.**  Okay.  Has the department always had control over the

9    regulation of septic tanks or OSTDSs?

10   **A.**  We have not.

11   **Q.**  Okay.  And why is that?

12   **A.**  The regulation, OSTDS, and the program is still being

13   transferred over to DEP, used to be under the umbrella of

14   Florida Department of Health.  Several years ago that was

15   transferred by the legislature over to DEP.  We're now -- we,

16   being the department, is now taking that program over.

17   **Q.**  You were asked questions about whether the department had

18   programs related specifically to the health or well-being of

19   manatees.  Do you know, for example, whether the department has

20   programs for manatee recovery?  Do you recall those questions?

21   **A.**  I do, yeah.

22   **Q.**  Why is it we don't have those programs?

23   **A.**  Well, as simple as that's the purview of the Florida Fish

24   and Wildlife Commission, conservation commission.

25   **Q.**  You may not know this one way or the other, but do you know

*KENNETH WEAVER | REDIRECT*                                          48

1    whether the Florida constitution delegates those authorities to

2    FWC?

3    **A.**  I do not know that answer.

4          **MR. BROWN:**  No additional questions on redirect, Your

5    Honor.

6          **THE COURT:**  All right.  Thank you.  Feel free to be

7    seated at counsel table.

8          I have been told the students are on their way up.

9    We're going to take a break now so we don't interrupt your

10   presentations.  Once they're seated, we'll continue moving

11   forward.  I plan on giving them a brief summary of what this is

12   about, but it will be taken directly out of my order on summary

13   judgment.

14         Is there anything from the plaintiff before we start

15   this break?

16         **MS. BLOME:**  No, Your Honor.

17         **THE COURT:**  Mr. Brown, anything from the defense?

18         **MR. BROWN:**  We have three more witnesses.

19         **THE COURT:**  You've got to work a little harder on your

20   multitasking.  What I'm asking is, before we take the break, is

21   there anything further you would like to take up?

22         **MR. BROWN:**  No, Your Honor.

23         **THE COURT:**  All right.  Thank you.

24      (Recess at 9:37 a.m. until 9:56 a.m.)

25         **THE COURT:**  I invite the defense to call their next

*MOIRA HOMANN | DIRECT*                                                          49

1    witness.

2              **MS. CORBARI:**  Your Honor, the defendant calls

3    Ms. Moira Homann.

4              **THE COURTROOM DEPUTY:**  Ms. Homann, if you would please

5    come forward to be sworn.

6         (MOIRA HOMANN, witness sworn.)

7              **THE WITNESS:**  I do.

8              **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat

9    in the witness box.

10             **THE COURT:**  All right.  Good morning.  Once seated, if

11   you would be kind enough to make yourself comfortable with the

12   chair's proximity to the microphone, and then please state your

13   full name into that microphone, spelling your last name.

14             **THE WITNESS:**  Yes.  Good morning.  My name is Moira

15   Homann.  My last name is spelled, H-o-m-a-n-n.

16             **THE COURT:**  Your witness, counsel.

17                          **DIRECT EXAMINATION**

18   BY MS. CORBARI:

19   **Q.**  Good morning, Ms. Homann.  Could you please state your

20   current occupation?

21   **A.**  Yes.  I am the program administrator for the Water Quality

22   Restoration program in the Division of Environmental Assessment

23   and Restoration at the Florida Department of Environmental

24   Protection.

25   **Q.**  And how long have you been in that position?

*MOIRA HOMANN | DIRECT*

1  **A.**  About three years.

2  **Q.**  How long have you been with the department?

3  **A.**  Fifteen years.

4  **Q.**  And prior to your current position, what positions have you

5  held at the department?

6  **A.**  I was one of the two environmental administrators within

7  the same program, and I oversaw the development, adoption, and

8  implementation of springs basin management action plans, as

9  well as other surface water basin management action plans.

10  That did not include the Indian River Lagoon BMAPs or the south

11  Florida BMAPs.  Those are administered or overseen by a

12  different environmental administrator.

13  **Q.**  And the division you're currently in, that is what was

14  referred to by Mr. Weaver as DEAR?

15  **A.**  Correct.

16  **Q.**  Is that the same division?

17  **A.**  Correct.

18  **Q.**  Okay.  Could you briefly describe your educational

19  background?

20  **A.**  Yes.  I have a Bachelor of Science in natural resource

21  conservation management from the University of Kentucky and a

22  master's degree in environmental science with a focus on water

23  resources from Indiana University School of Public and

24  Environmental Affairs.

25       **MS. CORBARI:**  At this time, the department would like

*MOIRA HOMANN | DIRECT*

1    to enter DEP 6, Ms. Homann's CV.

2              **THE COURT:**  Any objection?

3              **MS. BLOME:**  No, Your Honor.

4              **THE COURT:**  All right.  Without objection, what's been

5    previously marked as Defendant's Exhibit 6 will be moved in and

6    marked.  You may proceed.

7         (Defendant's Exhibit No. 6 was admitted into evidence.)

8              **MS. CORBARI:**  And, Your Honor, the department would

9    like to tender Ms. Homann as -- I think she was one of the

10   witnesses like Mr. Weaver, as a hybrid fact expert.

11             **THE COURT:**  Any objection from the plaintiff?

12             **MS. BLOME:**  No, Your Honor.

13             **THE COURT:**  In that context, you may elicit opinion

14   testimony.  Feel free to proceed.

15   **BY MS. CORBARI:**

16   **Q.**  Ms. Homann, can you please give a brief explanation of what

17   a BMAP or basin management action plan is?

18   **A.**  Yes.  So a BMAP is a very holistic approach for

19   implementing total daily maximum loads.  So a TMDL is the

20   maximum allowable load of a pollutant that a water body can

21   receive and still be considered healthy or attaining its water

22   quality standards.  So the BMAP is the plan that is adopted and

23   implemented in order to achieve that TMDL target.

24        So a, kind of, layman's way to think about BMAPs is that

25   the TMDL targets are, kind of, the ideal weight of a water

*MOIRA HOMANN | DIRECT*

1    body, and the BMAP is the health plan that we're going to

2    follow to achieve that ideal weight, and I say "plan" not

3    "diet" because we're not just focusing on achieving the

4    necessary reductions to get to those TMDL targets.  So that

5    would be, kind of, you're counting your caloric intake to meet

6    that ideal weight, but a BMAP does more than that.  It takes

7    into account activities, provisions, statutory requirements

8    that all go into play -- the implementation of projects from

9    different stakeholders, that all come into play into the

10   overall plan to achieve those restoration targets.

11       And much like a health plan, it's iterative and it's

12   adaptive in the sense that we evaluate them regularly to

13   determine whether what we thought was working or the reductions

14   that we needed to achieve the TMDL are still accurate or the

15   projects that we're looking at are still in place or still plan

16   to occur, in order for us to get to those necessary reductions.

17       So we, also in that adaptive management process, look at

18   new data, new information, incorporate new legislation, and

19   ensure that, as we update these plans, always with the ultimate

20   goal of achieving that TMDL target, that we are taking in the

21   most recent information and the most accurate information for

22   the plan.

23          **MS. CORBARI:**  Apologies to the Court.  Your Honor, I

24   actually skipped a question prior to asking for Ms. Homann to

25   be tendered as an expert.

*MOIRA HOMANN | DIRECT*                                                    53

1    **BY MS. CORBARI:**

2    **Q.**  Ms. Homann, have you ever testified as an expert before?

3           **THE COURT:**  She's already -- I said you could elicit

4    testimony.  You did tender her.

5           **MS. CORBARI:**  Okay.

6           **THE COURT:**  You didn't forget.

7           **MS. CORBARI:**  Thank you, Your Honor.

8    **BY MS. CORBARI:**

9    **Q.**  Ms. Homann, do any other states in the United States have

10   BMAPs or similar holistic restoration plans or TMDL

11   implementation?

12   **A.**  I do not believe so.  I believe Florida is unique in having

13   a program to implement TMDLs to the extent that we have.

14   **Q.**  And this holistic approach -- I believe not a diet plan but

15   a plan, a management plan, is that a quick -- a quick plan?

16   This is our plan.  We think it's going to -- you're going to be

17   back to health quickly?

18   **A.**  No.  It is not, for various reasons.  Our BMAPs are

19   generally set up to occur over large periods of time, for

20   example, 15, 20 years, with the understanding that it takes

21   time for, A, the system that we're trying to restore to

22   actually react to the changes that are happening in the

23   watershed, and also because one of the big components of BMAPs

24   is the implementation of projects and the commitment to these

25   projects from local governments and other state agencies and

1    the planning for those projects takes a long time.

2        So obtaining funding for those projects, planning, design,

3    construction, if we're talking about structural projects, that

4    takes a long time to be implemented and put into place.  So in

5    that adaptive management framework, within that longer time set

6    that we set up for our BMAPs, that's where we, again, assess

7    and update, as needed, with new information, and now we are

8    statutorily obligated to do that every five years.

9    **Q.**  What's your specific role in the preparation and

10   implementation of BMAPs, department BMAPs?

11   **A.**  I oversee a very talented team of what are called "BMAP

12   coordinators," who are very passionate and knowledgeable about

13   the work they do in the implementation, adoption, and

14   development of BMAPs across the state.

15   **Q.**  Does part of those teams include modelers looking at data?

16   **A.**  We do have -- we do have staff that do look at data in more

17   detail and that do work with consultants or with other programs

18   within our division to look at the models that we include in

19   our BMAPs.

20   **Q.**  But you don't actually --

21   **A.**  I am not --

22   **Q.**  -- deal with --

23   **A.**  -- a modeler, no.

24   **Q.**  If you could look at the department's -- the yellow binder

25   one.  Turn to DEP 7.

*MOIRA HOMANN | DIRECT*                                                    55

1    **A.**  Oh, one of two.  Okay.

2    **Q.**  Ms. Homann, do you recognize this document?

3    **A.**  I do.  It is the final order establishing the North Indian

4    River Lagoon basin management action.

5    **Q.**  And it's a final order of the department?

6    **A.**  That is correct.  Our BMAPs are signed by secretarial

7    order.

8    **Q.**  Okay.  And if you would flip to DEP 8, and do you recognize

9    that document?

10   **A.**  Yes.  This is the 2021 -- February 2021 Indian River

11   Lagoon -- North Indian River Lagoon basin management action

12   plan.

13   **Q.**  And is that the BMAP that is adopted in the final order,

14   Exhibit 7?

15   **A.**  Yes.

16          **MS. CORBARI:**  Your Honor, DEP would go ahead and ask

17   to enter DEP 7 and 8.

18          **THE COURT:**  Any objection?

19          **MS. BLOME:**  No, Your Honor.

20          **THE COURT:**  Without objection, what's been previously

21   marked as Defense Exhibit 7 and 8 will be admitted and marked.

22   You may proceed.

23      (Defendant's Exhibit Nos. 7 and 8 were admitted into

24   evidence.)

25   **BY MS. CORBARI:**

*MOIRA HOMANN | DIRECT*                                                       56

**Q.**  As a final order of the department, is the BMAP

enforceable?

**A.**  Yes.  The BMAP is enforceable because it is a secretarial

order, but BMAPs are also enforceable through national

discharge elimination system permits, so NPDS, wastewater

treatment facility permits, as well as municipal separate storm

sewer system, MS4, permits.

**Q.**  And the current BMAP for Exhibit 8, I believe you stated

it's in effect since February 2021?

**A.**  Correct.  It is in effect and being implemented since then.

**Q.**  And when is the next iteration of the IRL BMAP coming out?

**A.**  So the Clean Waterways Act of 2020 required DEP to update

nutrient BMAPs where wastewater sources -- so wastewater

treatment facilities or septic systems were at least 20 percent

of the overall pollutant source, and the Indian River Lagoon

qualified as that.  So the Clean Waterways Act requirement is

for us to update those BMAPs by July 1st of 2025.

**Q.**  Can you turn to -- I think it's in Exhibit 8.  I believe

it's Bates 158.  You mentioned there are five-year milestones.

Does this current BMAP, in effect in 2021, have these five-year

milestones?

**A.**  This BMAP has basin-wide five-year milestones.  The one

that we will be updating will also include entity-specific

five-year milestones.

**Q.**  Can you describe what exactly -- what are these milestones?

*MOIRA HOMANN | DIRECT*

1    **A.**  So the milestones for this particular BMAP were broken up

2    in a way for us to be able to achieve the total reduction

3    needed by the 2035 final milestone of this BMAP in a way

4    that -- in a more -- so that we wouldn't have to achieve

5    everything all at once.  Right?  So we could achieve them in

6    shorter time frames to be able to better coordinate/collaborate

7    with our stakeholders and to be able to better incorporate that

8    adaptive management approach so that if we determined that we

9    weren't going to achieve those milestones at the time of, you

10   know, a BMAP update, we would be able to reevaluate the

11   projects, reevaluate the requirements, and ensure that we would

12   meet those milestones.

13       So they were broken up in order to facilitate the achieving

14   of a smaller portion of the reductions, but the ultimate goal

15   of achieving the total reductions needed to get to the TMDLs.

16   **Q.**  When you stated, "instead of trying to achieve everything

17   at once," is that feasible?

18   **A.**  I don't believe it would be, no.

19   **Q.**  And why not?

20   **A.**  Because, as I explained earlier, it takes a long time for

21   projects to be identified, implemented, constructed, if they

22   are going to be constructed.  It takes a lot of time to find

23   the funding for those projects.

24       It's also important to note that data and information can

25   change within longer periods of time.  I mean, will change over

*MOIRA HOMANN | DIRECT*                                                58

1    longer periods of time.  So if we were to just focus on that

2    end date, I don't know that we would be able to proactively

3    have all the projects lined up to achieve those reductions, and

4    we would also not be incorporating newer information to

5    better -- to better explain what's happening in the basin and

6    changes that may have occurred in land use, changes that may

7    have occurred in existing sources, and also incorporate

8    projects that have already been implemented, which would be

9    making a difference, and we should see that in our updates.

10   **Q.**  You mentioned projects.  What type of projects are you

11   referring to?

12   **A.**  So those can be either structural or nonstructural

13   projects.  They can be projects that are implemented for

14   mitigating sources, like stormwater, wastewater, or

15   agriculture.

16       In the case of wastewater treatment facilities, the

17   projects, generally, involve a facility going to advanced

18   wastewater treatment or AWT or a facility expanding.  We also,

19   if we're focusing on wastewater, those can be projects to

20   either enhance sewer onsite sewage treatment disposal systems,

21   which are just septic systems.

22       In the case of stormwater, you can be looking at baffle

23   boxes or just different ways for local government to better

24   manage their stormwater.

25       Agricultural projects can be, you know, enrollment of

*MOIRA HOMANN | DIRECT*

1    agriculture producers in best management practices.

2        So there's different structural/nonstructural projects to

3    address the different sources.

4    **Q.**  Those projects, they're approved in the department's BMAP?

5    **A.**  They are listed as projects and commitments from the local

6    stakeholders and also other state agencies, as part of our BMAP

7    process, and they're updated annually through the statewide

8    annual report.

9    **Q.**  Does DEP come up with these projects to give to the

10   stakeholders?

11   **A.**  We do not.  We work with the stakeholders to identify

12   projects or better locate projects, if they need help with

13   that, based on maybe analyses data, analyses that we've done,

14   but we do not tell them what they have to do.

15   **Q.**  And we've been mentioning stakeholders.  Could you just

16   quickly explain what we're referring to?

17   **A.**  Sure.  I mean, the most -- I think basic definition of a

18   stakeholder is anybody who has a stake or an interest in

19   whatever you're talking about.  In this case, the restoration

20   of a particular water body.  So stakeholders can be anybody

21   from local governments, counties, cities, other state agencies,

22   Florida Department of, you know, Agriculture Consumer Services,

23   Florida Department of Transportation, water management

24   districts, citizens, environmental organizations.

25       When I talk about responsible stakeholder or responsible

*MOIRA HOMANN | DIRECT*

1    entities, those are the ones that have been assigned an

2    allocation.  So they have a responsibility to implement

3    projects to achieve the reductions that they are responsible

4    for to mitigate the loading and to achieve the TMDL.

5    **Q.**  These stakeholders -- or the entities that are responsible

6    for reductions, would those be nonpoint and point source

7    dischargers that Mr. Weaver referred to?

8    **A.**  Yes.

9    **Q.**  So the 2025 NIRL BMAP that's coming out July 1st -- were

10   new projects submitted by local governments to further reduce

11   their allocations?

12   **A.**  Yes.  So we requested -- we requested projects from our

13   stakeholders from, I want to say, September of '24 through

14   November of 2024, so fall of last year.  We reached out to our

15   stakeholders and specifically asked them to submit projects to

16   us to be included in the update -- in the updated BMAPs, and

17   that would have included the stakeholders for the Indian River

18   Lagoon.

19       We do have the statewide annual reporting process that

20   occurs on a yearly basis, so that time frame overlapped a

21   little bit with that, but we did specifically reach out to our

22   stakeholders in our basins to provide us with projects to

23   specifically include in our BMAP updates over that time frame

24   in the fall.

25   **Q.**  So annually in assessing the BMAP, these annual reportings,

*MOIRA HOMANN | DIRECT*                                              61

1   those are submitted by -- who submits those to the department?

2   **A.**   So the stakeholders submit those, their projects to us

3   every year in the November-to-January time frame, so end of the

4   year, beginning of the year.   And they provide us their

5   projects through the end of the previous calendar year, and

6   those projects get incorporated into the statewide annual

7   report, which is a report that we submit to the legislature

8   every year by July 1st, and that gets all updated and provided

9   on our website in the statewide annual report experience

10  builder, as we call it.

11  **Q.**   How does the department ensure that these stakeholder

12  entities are working to meet their allocated reductions in the

13  BMAP?

14  **A.**   So we have that annual statewide reporting process, so

15  we're able to -- once we've compiled all that information,

16  we're able to better understand how close or far away they are

17  to their targets.   We have one-on-one conversations with our

18  stakeholders where we talk to them about where they stand with

19  their projects, how close or far away they are.

20      I will say that now, because of House Bill 1379, we will

21  be -- there's a requirement for stakeholders to meet

22  five-year -- the reductions required for five-year milestones.

23  So we worked closely with our stakeholders.   We're going to be

24  working even more closely with them now to ensure that they

25  have projects set up in order for them to meet those required

1    reductions.  But we coordinate with them regularly, and we also

2    have BMAP annual update meetings where we discuss progress.

3    **Q.**  And what specifically -- was there a milestone in the

4    existing BMAP in effect that had to be met for 2025?

5    **A.**  Yes.  It was 55 percent pounds of total nitrogen and total

6    phosphorus.

7    **Q.**  And do you know whether that milestone is end of the year

8    or by state fiscal year, which would be July?

9    **A.**  It would be the end of the year, the end of the calendar

10   year 2025.

11   **Q.**  To your knowledge, is the department on track to meet --

12   or, I guess, the stakeholders on track to meet the 55 percent

13   reduction goal?

14   **A.**  For the 2025-year milestone, yes.

15   **Q.**  Okay.  Are you aware, for the new 2025 BMAP, are there new

16   legislation that's being required to be implemented in that new

17   BMAP?

18   **A.**  Yes.  And that is a big component of what that update will

19   include.  So I mentioned the Clean Waterways Act from 2020.

20   The Clean Waterways Act required local governments in BMAPs

21   where we had more than 20 percent of -- at least 20 percent of

22   pollution coming from wastewater sources, it required local

23   governments to provide DEP with wastewater treatment plans, as

24   well as OSTDS remediations plans.  So those will be

25   incorporated in the BMAP updates as projects that were

1    identified from those plans.

2        We will also be including the statutory requirements from

3    the Indian River Lagoon protection plan that was also from

4    House Bill 1379, which had very specific requirements for

5    meeting advanced wastewater treatment facility limits, so going

6    to total nitrogen of 3 milligrams per liter and total

7    phosphorus of 1 milligram per liter.

8        There were also very specific requirements for septic

9    systems.  So as of 2024, I want to say January 1st, 2024 -- and

10   I might be wrong.  I get my Januaries and Julys mixed up

11   sometimes.  But there's no more conventional -- the permitting

12   of conventional systems within the Indian River Lagoon is

13   prohibited.  You either have to connect to sewer, if sewer is

14   available, or go to an enhanced system.

15       In addition to that, we will be including the requirement

16   that by 2030 all septic systems, conventional septic systems

17   within the IRL, need to have been either sewered or enhanced.

18   So there's various --

19       Oh, and very importantly, we will be including the

20   requirement for local governments to meet five-year -- their

21   five-year milestone requirements.  So each local government is

22   going to have a designated amount of reductions they're going

23   to have to meet by the next five-year milestone.

24   Q.  And you mentioned the House Bill 1379 for the IRL

25   protection program.  If you know, would that be Florida Statute

*MOIRA HOMANN | DIRECT*                                                    64

1    373.469, the Indian River Lagoon Protection Program Act?

2    **A.**   Yes.

3    **Q.**   Okay.  And do you know how that statute came about?

4    **A.**   I believe it was an agency bill, so it was something that

5    DEP -- DEP wrote and presented and then it got sponsored and

6    ultimately signed by Governor DeSantis, and I believe he signed

7    it in May of 2023.

8    **Q.**   The protection bill, to summarize, includes, as of

9    January 1, 2024, no new conventional septics in the North

10   Indian River Lagoon and all conventional septics to having to

11   be replaced by 2030, was department initiated?

12   **A.**   That is part of, yeah, House Bill 1379, which would have

13   been that agency bill.

14   **Q.**   Okay.  You stated that you believe we were on track -- the

15   department and the stakeholders on track to meet the 55 percent

16   reduction goal by 2025.  Do we have that final data yet, "we"

17   being the department?

18   **A.**   We are in the process of verifying and finalizing those

19   numbers to be included in the BMAP update.

20   **Q.**   So the final numbers have not been confirmed?

21   **A.**   Correct.  We have not finalized those numbers yet.

22   **Q.**   I'm going to have you turn to the plaintiff's exhibit

23   binder.  You might want to keep that one aside.  I'm going to

24   come back to it.  I think it's the white one.  My apologies.

25   **A.**   All good.

*MOIRA HOMANN | DIRECT*                                            65

1    **Q.**  Okay.  Can you please turn to Plaintiff's Exhibit 8?

2        Ms. Homann, were you present for plaintiff's expert

3    Dr. Barile's testimony yesterday?

4    **A.**  Yes, I was.

5    **Q.**  Can you go to page 3 of that?  First, do you recognize this

6    exhibit?

7    **A.**  Yes.  I believe these are the slides from our BMAP annual

8    meeting that we had last April.

9    **Q.**  Page 3, can you identify that, what that is?

10   **A.**  Yes.  These are graphs for both total nitrogen estimated

11   project reductions and totally phosphorus estimated project

12   reductions for projects completed and anticipated reductions

13   from projects that are planned or underway for the northern

14   Indian River Lagoon.  That would probably have had data

15   through, just based on the timing of when that meeting was,

16   would have included data only through December 31st of 2023.

17   **Q.**  Okay.  I believe you stated it was a department annual

18   meeting?

19   **A.**  Correct.

20   **Q.**  And do you recall about when that was in 2024?

21   **A.**  I think it was around April.

22   **Q.**  So do you recall Dr. Barile's opinion about this particular

23   graph?

24   **A.**  If I remember correctly, I think he mentioned this as

25   model -- the department's model.

*MOIRA HOMANN | DIRECT*                                                       66

1    **Q.**  And do you agree with that statement?

2    **A.**  I do not.

3    **Q.**  Why not?

4    **A.**  This is not a model.  These reductions are the reductions

5    for the projects that are completed and projects that are

6    ongoing, which is the solid line.  Those are the reductions

7    that we have verified through our verification process for the

8    different projects that have been completed or ongoing, and,

9    then, the dash line shows anticipated reductions for planned or

10   underway projects, which we don't always have that information

11   because stakeholders don't provide us with -- always provide us

12   with the anticipated reductions for projects that are planned

13   or underway, because that can change.

14       So that would not be a complete capture of planned or

15   underway projects.  So that's just a rough estimate of whatever

16   reductions that we had for those planned or underway projects,

17   which, again, we do not consider for progress tracking when

18   we're talking about meeting our milestones.

19   **Q.**  So would it be fair to say it's a visual representation of

20   the current data the department had by the end of 2023?

21   **A.**  Correct, of achieved and potentially anticipated

22   reductions, yes.

23   **Q.**  In the context of the BMAP, what is a model?

24   **A.**  So we rely on different kinds of models, some more complex

25   than others, but ultimately to determine the loading -- the

*MOIRA HOMANN | DIRECT*                                                            67

1    watershed loading.  So we want to know how much is coming into

2    a given watershed and then compare that to the allowable load,

3    which is the load that we calculate with the TMDL.  So how much

4    load can that water body take, and, you know, achieve its

5    standards or meet its water quality standards.

6         So we use different models to estimate that starting load

7    and then compare that to the TMDL load, and then that

8    difference in load is called "the allocation," and that's

9    what's separated by entity.

10        So we use different models looking at land uses and other

11   different data sources in our BMAPs to help with that

12   information.

13   **Q.**  In updating BMAPs, are these models themselves updated?

14   **A.**  If it's -- we try to incorporate as more up-to-date

15   information as we can.  Sometimes models take more -- so we're

16   required to update the BMAPs every five years.  Sometimes

17   modeling is a long and lengthy process, so it could take,

18   potentially, longer than those five years, but we do try to

19   incorporate as more recent data and information as we have as

20   possible, and if modeling can be done within the context --

21   remodeling can be done within the context of the time frame, we

22   certainly will update models, as needed, to capture what's

23   happening more currently in the basins.

24   **Q.**  The model itself may not need to be revamped or tinkered

25   with every five years?

*MOIRA HOMANN | DIRECT*                                                        68

1    **A.**  Correct.

2    **Q.**  But the data that's put into the model is updated?

3    **A.**  Can you rephrase that question, please?

4    **Q.**  During the BMAP, when we're looking at updates and

5    achieving/hitting these milestones, how does the defendant

6    confirm we're achieving these reductions overall, the basin is

7    achieving the reductions?

8    **A.**  We do that through our verification process, looking at the

9    projects and looking at data that comes with those projects in

10   order to combine all that information and determine the

11   progress that is being done by the implementation of projects

12   and the reductions associated with that, and that happens on an

13   annual basis through the statewide annual reporting process.

14   **Q.**  And when the BMAPs are updated every five years, is the

15   TMDL changed?

16   **A.**  It does not, no.

17   **Q.**  Why not?

18   **A.**  Because the TMDL target -- Mr. Weaver explained this a

19   little bit earlier.  The TMDL target is set with the best

20   understanding and the knowledge that that is the most

21   protective target for a given water body.  So the purpose of

22   the BMAP is to, within our framework of restoration activities,

23   to reassess the reductions needed to achieve that TMDL.  So

24   throughout the BMAP process, that's where changes can occur to

25   the necessary reduction, but, ultimately, the target, the TMDL

*MOIRA HOMANN | DIRECT*                                                          69

1    target, doesn't change.  We adjust what is needed to get to

2    that -- to get to that target, and looking at additional data,

3    new data, making sure that we're already incorporating projects

4    that have been implemented and these reductions are already

5    taken into account.

6        So the TMDL does not change, but the iterative adaptive

7    management process of the BMAP allows for those changes.

8    **Q.**  During Dr. Barile's testimony yesterday, do you recall

9    Dr. Barile testifying as to any admissions or statements made

10   by the department at that April 2024 annual meeting on the

11   BMAP?

12   **A.**  No.

13   **Q.**  Were you present for the motion hearing this morning?

14   **A.**  I was.

15   **Q.**  Did you recall plaintiff's counsel stating that Dr. Barile

16   testified that the department admitted that it was not in

17   compliance with achieving its goals?

18   **A.**  I do.

19   **Q.**  Do you recall Dr. Barile testifying to that effect?

20   **A.**  No.

21   **Q.**  Were you present at that April 2024 public meeting?

22   **A.**  I was.

23   **Q.**  Do you recall any department personnel making such a

24   statement?

25   **A.**  No.

*MOIRA HOMANN | DIRECT*                                                          70

1  **Q.**  So when a reduction is allocated to an entity or

2  stakeholder in a BMAP, what does that mean, and how will those

3  reductions be achieved?

4  **A.**  So that means that that particular entity -- and it can

5  also be a -- it doesn't always have to be a local government.

6  It can be a state agency.  We do allocate to Florida Department

7  of Transportation, for example.  But what that means is that

8  entity, that responsible entity, has been assigned a reduction

9  of total nitrogen and total phosphorus loadings that they are

10 responsible for achieving through the implementation of

11 projects, those structural or nonstructural projects.

12 **Q.**  So you heard Mr. Weaver testify as to the difference

13 between point sources and nonpoint sources.  An OSTDS, which is

14 an onsite septic treatment and disposal system, is that a point

15 source or a nonpoint source for a BMAP?

16 **A.**  They would be considered nonpoint sources.

17 **Q.**  Specifically, how does the NIRL BMAP go about addressing

18 pollution from these septic systems?

19 **A.**  So I mentioned the Clean Waterways Act requirement for

20 local governments to submit OSTDS remediation plans, so we

21 worked with local governments to submit those plans to us by

22 August of last year.  We ensured that they included all of the

23 necessary requirements from the statute.  From those plans, we

24 identified projects that the local governments would be

25 implementing to address onsite sewage systems, OSTDS septic

1    systems, within their jurisdiction.

2        Again, the different requirements that came from House Bill

3    1379, including that no new conventional systems can be

4    installed in the IRL.  They have to be either connected to

5    sewer or enhanced.  There's also the requirement that by 2030

6    all conventional septic systems need to be addressed through,

7    again, sewering or enhancement.

8        I believe that some local governments, for example Brevard

9    County, does have some local ordinances where they, you know,

10   prohibit conventional septic systems in certain areas within

11   the lagoon as well.

12   **Q.**  And I believe you mentioned a treatment plan the local

13   governments were supposed to give to the department.  To your

14   knowledge, has the department received -- have the local

15   governments complied and submitted those to the department for

16   the next BMAP iteration?

17   **A.**  Yes.  The deadline for that was August 1st of last year.

18   **Q.**  So do you have any opinion on whether or not converting

19   septic to sewer or the installation of enhanced

20   nitrogen-reducing septics have an effect on nitrogen reduction,

21   total nitrogen reduction?

22            **MS. BLOME:**  Objection.  That exceeds the scope of this

23   witness's expertise.

24            **THE COURT:**  Response?

25            **MS. CORBARI:**  Your Honor, she is part of the BMAP

*MOIRA HOMANN | DIRECT*                                                72

1    program.  She is testifying as to this.  She just testified as

2    to the iteration of the new BMAPs, all the information that's

3    going into it --

4            **THE COURT:**  So here's the question.

5            **MS. CORBARI:**  -- and per the statute --

6            **THE COURT:**  All right.  So here's the question:  "Do

7    you have any opinion on whether or not converting septic to

8    sewer or the installation of enhanced nitrogen-reducing septics

9    have an effect on total nitrogen reduction?"

10           And you're saying her expertise covers this?

11           **MS. CORBARI:**  I'll rephrase.

12           **THE COURT:**  All right.  So objection sustained.

13   BY MS. CORBARI:

14   **Q.**  Ms. Homann, the conversions, septic-to-sewer conversions

15   and replacement of conventional septics in the North Indian

16   River Lagoon, does the department anticipate a reduction in

17   overall nitrogen for the loading and the milestones, for the

18   next milestones in the BMAP?

19   **A.**  Yes.

20   **Q.**  Do we know or anticipate -- does the department

21   anticipate -- have an idea of how much of a reduction at this

22   time?

23   **A.**  Not without looking at the projects that have been

24   submitted.

25   **Q.**  And the department is still compiling all of that for

*MOIRA HOMANN | DIRECT*                                                73

1    approval for the July 1st?

2    **A.**   Correct.

3    **Q.**   Okay.  So as part of the new legislation, the OSTDS

4    conventional systems need to be replaced -- either connected to

5    sewer or replaced with an enhanced nitrogen-reduction system.

6    Do you know the percentage per the statute of those enhanced

7    nitrogen-reducing systems is required?

8    **A.**   I believe the statute requires those enhanced

9    nutrient-reduction systems to treat nitrogen to at least

10   65 percent.

11   **Q.**   So it's your understanding all septic tanks by the end of

12   2030 will need to be replaced with enhanced nitrogen-reducing

13   systems that reduce 65 percent?

14   **A.**   Either connected to sewer, and if sewer is not feasible,

15   then, yes, they need to be replaced with enhanced

16   nitrogen-reducing systems by 2030 in the Indian River Lagoon.

17   **Q.**   So would it be fair that's a 65 percent reduction in total

18   nitrogen that will be going into the North Indian River Lagoon?

19   **A.**   I don't think that would be a direct -- the direct

20   connection to say that.  I don't know that that would be

21   exactly accurate, but we do anticipate, you know, big

22   reductions coming from those conversions.

23   **Q.**   I'm sorry.  You said "big reduction"?

24   **A.**   Big, yes.

25   **Q.**   Okay.

*MOIRA HOMANN | DIRECT*

1    **A.** Yes. I kind of mumbled that. Sorry.

2    **Q.** That's okay. All right. With regard to current projects,

3    if you will go back to the other DEP binder, the one with the

4    BMAP, yes. If you'll flip to Exhibit 9.

5    **A.** Mm-hm.

6    **Q.** And have you seen -- can you identify this document?

7    **A.** Yes. It appears to be a list of water quality projects

8    that lists the agreement number, with the project name, the

9    grantee, funding amount, and the funding source.

10   **Q.** Do you know who compiled this document?

11   **A.** I believe it would have been the department's Division of

12   Water Restoration Assistance.

13   **Q.** And what does the Division of Water Restoration Assistance

14   do?

15   **A.** They are -- I call them our division of money giving away.

16   They're a division that's in charge of the funding, the

17   different funding programs and different funding pots for water

18   quality improvement programs and also statewide -- or state

19   fund -- SRF, state revolving fund. Yes.

20   **Q.** You say "funding sources," is that federal and state or

21   just one or the other?

22   **A.** I believe it would be a combination of both.

23   **Q.** Okay. And do you know whether the department has received

24   significant funding -- whether or not the department has

25   received significant funding over the last several years to

*MOIRA HOMANN | DIRECT*

1  fund projects in the North Indian River Lagoon?

2  **A.**  I believe there has been unprecedented funding that has

3  been allocated to water quality restoration program -- or water

4  quality restoration programs over the last five years or so,

5  including funding, specifically, for projects in the Indian

6  River Lagoon as a whole.

7  **Q.**  You mentioned the stakeholders and local governments

8  submitting projects to the department.  Are you aware of

9  whether many of those projects are funded by the department?

10  **A.**  I believe many of them are, yes.

11  **Q.**  Okay.  Could you turn to Bates No. 281, for example?  Do

12  you see the two appropriation -- the last two on the bottom,

13  '23-'24 and '24-'25?

14  **A.**  Yes.

15          **MS. BLOME:**  I'm sorry.  Did you say Exhibit 9?

16          **MS. CORBARI:**  Yes.

17          **MS. BLOME:**  That is not what our Exhibit 9 looks like.

18          **THE COURT:**  Are you referring to Plaintiff's

19  Exhibit 9?

20          **MS. BLOME:**  Defendant's Exhibit 9.

21          **THE COURT:**  Defendant's Exhibit 9.  All right.

22          **MS. CORBARI:**  It's DEP's Exhibit 9.

23          **MS. BLOME:**  Ours looks like that.

24          **MS. CORBARI:**  That's what mine looks like.  I'm on

25  page 281, DEP Bates No. 281.

*MOIRA HOMANN | DIRECT*

1          **MS. BLOME:**  All right.  Thank you.

2          **THE COURT:**  All right.  Feel free to proceed.

3     BY MS. CORBARI:

4     **Q.**  Do you see the two appropriations down at the bottom?

5     **A.**  Yes.

6     **Q.**  Okay.  Can you explain what the 2023-'24 -- like, give an

7     example -- is that $100 million?

8     **A.**  If I'm counting all the zeros correct, then, yes.

9     **Q.**  What was that $100 million appropriation for?

10    **A.**  Specific appropriation in nonrecurring funds for provided

11    water quality improvement projects within the proximity of the

12    Indian River Lagoon.

13    **Q.**  And that the appropriation that says 2023-'24, that goes to

14    the fiscal years.  Can you briefly state when is the state's

15    fiscal year?

16    **A.**  It's June 1st of one year through -- no, pardon me,

17    July 1st through June 30th of the next year.

18    **Q.**  So that's the reason for the '24-'25 or '23-'24?

19    **A.**  Correct.  It says for "Fiscal Year" for the column header

20    there, so yes.

21    **Q.**  And did DEP receive another appropriation for this fiscal

22    year for the North Indian River Lagoon water quality

23    improvement projects?

24    **A.**  It looks like that would have been that 75 million in the

25    next line over.

*MOIRA HOMANN | DIRECT*                                                                77

1    **Q.**  So over two years, just in the last two years,

2    $175 million?

3    **A.**  Yes.

4    **Q.**  Okay.  Can you go to page 282?  Is that another for this

5    fiscal year, 2024-'25, another $25 million for similar

6    projects?

7    **A.**  Yes, for priority to improve water quality in the Indian

8    River Lagoon.

9    **Q.**  Okay.  And if you turn to the next page, 283, so are these

10   examples of funding amounts from the department to local

11   government stakeholders within Indian River Lagoon for

12   projects?

13   **A.**  That appears to be correct, yes.

14   **Q.**  Okay.  And that's just further examples just flipping

15   through the other pages.

16        **MS. CORBARI:**  Okay.  At this time, the department

17   would like to enter DEP 9.

18        **THE COURT:**  Any objection?

19        **MS. BLOME:**  Yes, Your Honor.  My objection is more of

20   a request for clarification.  It appears to be three separate

21   documents, and there was no testimony about who prepared

22   document two and three.  So there was a little testimony about

23   who prepared the first document, which is --

24        **THE COURT:**  So your objection is to predicate?

25        **MS. BLOME:**  Yes.

*MOIRA HOMANN | DIRECT*                                                          78

1          **THE COURT:**  What's the response?

2          **MS. CORBARI:**  Your Honor, it is one document.  It is

3    one Excel spreadsheet with three tabs.  Because we had to PDF

4    it, it shows as document one, but it's one document, three tabs

5    on an Excel spreadsheet.  So that's why each one has a

6    different, like, header, but it is one document, and it was

7    prepared by the same division.

8          **THE COURT:**  From the plaintiff's perspective, were you

9    previously provided this document in its entirety?

10         **MS. BLOME:**  I think so.  I can't find a copy of it,

11   but I'm not going to object on that basis.  I just wanted to

12   know where it came from.  So this is fine.  No further

13   objections.

14         **THE COURT:**  All right.  So what's previously marked as

15   Defense Exhibit 9 will be admitted.  Feel free to proceed.

16       (Defendant's Exhibit No. 9 was admitted into evidence.)

17         **MS. CORBARI:**  Give me just a moment.  I believe I

18   might be -- couple more.

19   **BY MS. CORBARI:**

20   **Q.**  Ms. Homann, do department BMAPs have specific requirements

21   for manatee habitats?

22   **A.**  They do not.

23   **Q.**  Why not?

24   **A.**  The BMAP -- the water quality restoration program, which is

25   also referred to as a BMAP program, is also tasked with the

*MOIRA HOMANN | CROSS*                                                79

1    implementation of the TMDLs and developing restoration plans to

2    specifically achieve those water quality targets.

3    **Q.**  Does DEP have any statutory authority to develop manatee

4    habitat plans, to your knowledge?

5    **A.**  No, not that I'm aware of.

6    **Q.**  Do you know if another state agency is responsible for

7    that?

8    **A.**  I would assume that the Florida Fish and Wildlife

9    Conservation Commission, FWC, would.

10            **MS. CORBARI:**  That's all I have.  Thank you.

11            **THE COURT:**  Cross-examination.

12                        **CROSS-EXAMINATION**

13   **BY MS. BLOME:**

14   **Q.**  Good morning, Ms. Hoffman -- Homann, I'm sorry.

15   **A.**  It's all good.  It's my husband's name.  I don't take

16   offense.

17   **Q.**  You are not a manatee veterinarian, are you?

18   **A.**  I am not.

19   **Q.**  You're not trained in manatee recovery?

20   **A.**  I am not.

21   **Q.**  You're not trained in manatee rehabilitation?

22   **A.**  I am not.

23   **Q.**  Manatee habitat?

24   **A.**  No.

25   **Q.**  Forage?

*MOIRA HOMANN | CROSS*                                                                    80

1   **A.**   No.

2   **Q.**   Seagrass?

3   **A.**   No.

4   **Q.**   In your work, do you rely on anybody else for information

5   about seagrass in the Indian River Lagoon?

6   **A.**   The St. Johns River Water Management District.

7   **Q.**   And in what capacity are you relying on them for their

8   expertise?

9   **A.**   They are the ones who go out there and do the data

10  collection for seagrass, and they compile that information and

11  generally share that with us as the experts in the Indian River

12  Lagoon ecosystem and as a partner agency.

13  **Q.**   In your work in preparing the BMAP -- well, did you

14  prepare -- let me clarify that.  Did you prepare the BMAP for

15  the north IRL?

16  **A.**   I did not.

17  **Q.**   But you administer its implementation now?

18  **A.**   I do now, yes.

19  **Q.**   Yeah.  Okay.  And in your work implementing the BMAP, are

20  you doing any work on seagrass restoration specifically?

21  **A.**   That work is done by St. Johns.

22  **Q.**   So FDEP isn't working through the BMAP to replant

23  seagrass --

24  **A.**   No.

25  **Q.**   -- or seed seagrass --

*MOIRA HOMANN | CROSS*

1    **A.**   No.

2    **Q.**   -- or transplant seagrass beds into the IRL?

3    **A.**   Not directly.  I can't speak to as to whether -- I'm not

4    familiar with all the different projects that we have listed in

5    the BMAP, but it is possible that there might be some projects

6    that local governments or even St. Johns River Water Management

7    is doing that are included as projects in the BMAP, so they

8    would be included in that way.

9    **Q.**   But you don't know of any right now?

10   **A.**   Not off the top of my head, no.

11   **Q.**   Nor do you know any plans for FDEP to study manatee

12   rehabilitation in the Indian River Lagoon?

13   **A.**   No.

14   **Q.**   You have not consulted with anyone at the U.S. Florida Fish

15   and Wildlife Service on that topic?

16   **A.**   For the previous iteration of the BMAP, no.

17   **Q.**   Well, even for -- how about on the 2025 update?

18   **A.**   We've not gotten that far yet.

19   **Q.**   Okay.

20   **A.**   But we can certainly do that.

21   **Q.**   You could do it, but you don't have a plan to?

22   **A.**   We've not gotten to that point yet.

23   **Q.**   Okay.  What does that mean?

24   **A.**   That we still have time to update that BMAP with additional

25   information.

*MOIRA HOMANN | CROSS*                                                    82

1    **Q.**  Oh, interesting.  And so you could also, in time for the

2    2025 update, consult with the Florida Fish and Wildlife

3    Conservation Commission?

4    **A.**  If there was a need to do that, we generally -- as I

5    mentioned, we like to update our BMAPs in order to incorporate

6    all the information necessary.  If there was need -- again,

7    it's not our purview to directly protect manatees with the work

8    that we do, but indirectly by making sure the water quality is

9    met and is healthy.  In our BMAPs, we consult with different

10   state agencies in order to make sure that they are robust as

11   possible.

12   **Q.**  You testified that you were listening to Dr. Barile's

13   testimony.

14   **A.**  Yes.

15   **Q.**  Did you hear Mr. Brown's questions of Dr. Barile about

16   legacy pollutants?

17   **A.**  I did.

18   **Q.**  Do you understand what legacy pollutants are?

19   **A.**  I do.

20   **Q.**  Can you explain what those are for the purpose of the BMAP?

21   **A.**  I mean, in general, legacy pollutants are pollutants that

22   remain in a water body for longer periods of time, that have

23   been accumulating over longer periods of time because of

24   different activities that happen in the watershed itself, and

25   then they tend to accumulate either in the water column or in

*MOIRA HOMANN | CROSS*

1    the sediments of the water body -- of a water body.

2    **Q.**  And some of those legacy pollutants will be removed through

3    the projects approved under the current BMAP; isn't that true?

4    **A.**  I'm not familiar with all the projects.  There could be

5    projects included in the BMAP that would address -- that could

6    address some of those.  I don't know the project list off the

7    top of my head, but there could be projects that could address

8    those.

9    **Q.**  Is muck removal something that would address legacy

10   pollutants?

11   **A.**  Muck removal would take care of a layer of the muck that

12   does include some of those legacy pollutants, so it could be an

13   option.

14   **Q.**  Just take a look at Exhibit 9, again, and on the first

15   couple of pages there.

16   **A.**  The one I was looking at before?

17   **Q.**  Yeah.  Sorry.  Yeah, Defense Exhibit 9.

18   **A.**  Okay.

19   **Q.**  That's correct.  Yeah, the one you were looking at before.

20   On the first couple of pages there, do you see some reference

21   to muck removal projects?

22   **A.**  I do.

23   **Q.**  So with the muck removal project, you would expect to see

24   some improvement in reduction in legacy nutrients?

25   **A.**  There would be.  The extent of that I cannot testify to.

*MOIRA HOMANN | CROSS*                                                    84

1   **Q.**  Sure.  But in your assessment of whether the state's

2   meeting the milestones under the BMAP, would those projects be

3   taken into consideration?

4   **A.**  If they are completed and we have the data to verify that

5   those reductions are verifiable, if you will, then they would

6   be included as part of the progress for whether we're achieving

7   our milestones or not, yes.

8   **Q.**  Sure.  But you testified it wasn't just completed projects

9   that you included in your projections but also in progress

10  projects.

11  **A.**  That is correct, yes.

12  **Q.**  And projected projects.

13  **A.**  Yes.

14  **Q.**  I want you to take a look at Plaintiff's Exhibit 8, page 3,

15  which you had discussed with Ms. Corbari.

16  **A.**  Can you give me that number again, please?

17  **Q.**  Yes.  Plaintiff's Exhibit 8, page 3.

18  **A.**  Mm-hm.

19  **Q.**  You testified that you project that you will meet BMAP

20  goals through 2025, based on completed and projected and

21  approved projects.

22  **A.**  Completed and ongoing.

23  **Q.**  Completed and ongoing.  Is projected reductions included in

24  this estimate here?

25  **A.**  Can you rephrase your question, please?

**Q.** Sure. Let's talk about three types. There's completed

projects, ongoing projects, and approved projects that are

projected. Are all three included in your analysis in this

document here, in this graph?

**A.** The dark line is the completed and ongoing. The dash line

is reductions that could be expected from planned or underway

projects.

**Q.** Planned or underway. Perfect.

Okay. Now, according to this graph, you would agree that

the dotted line falls far below the 10-year milestone for NIRL

TN, total nitrogen, estimated project reductions?

**A.** At the time of this report, yes, but we have newer data

that could show different -- a different trend.

**Q.** So based on that -- that's interesting. What new projects

have you added since April 2024 that would result in a marked

difference in this trend?

**A.** So if I'm remembering correctly, this would have included

only projects through December 2023. So we've gone through one

full cycle of the statewide annual reporting process since

then, so we now have new information for projects through 2024.

Generally, if there's been big septic-to-sewer projects or

advanced wastewater treatment facility projects, those result

in big reductions, and with the amount of funding that's been

going in for those types of projects, I would anticipate

that -- if they've been completed -- because as I've mentioned,

*MOIRA HOMANN | CROSS*

1    projects take a lot of time to get constructed, implemented,

2    planned.  So if they've been completed, I would anticipate that

3    trend to look slightly different based on newer data.

4    **Q.**  Are you in the -- are you responsible for preparing these

5    annual assessments?

6    **A.**  My team is.

7    **Q.**  Your team is.  Since this happened in April of 2024 -- that

8    was your testimony, right, this update was given in April 2024?

9    Are you in the progress of preparing another update for

10   April 2025?

11   **A.**  As we mentioned, that information will be included in the

12   updated BMAP that has to be adopted by July 1st of 2025.

13   **Q.**  What's your preliminary data showing you?

14   **A.**  I have not seen the numbers.

15   **Q.**  Okay.  So sitting here today, you can't say whether the

16   number is going -- that dotted line is going to be going up?

17   **A.**  I can tell you that that number -- that dotted line is a

18   very general estimate of reductions for those underway and

19   planned projects, which generally is a very broad estimate, and

20   that we do not have information -- that information for all

21   projects.  So if a stakeholder has submitted an underway or

22   planned project and it does not include a projected estimated

23   reduction, it would not be included in this graph.  These

24   numbers are not including the complete suite of planned and

25   underway projects, because we only use, you know, the estimated

1    numbers that we have.  So this is probably an underestimation

2    of that.

3    **Q.**  Why was this graph prepared?

4    **A.**  To show progress and to show, you know, anticipated project

5    progress, based on the information that we had at the time,

6    because it's important to show to stakeholders, too, that more

7    work needs to be done in order for us to achieve our

8    reductions.

9    **Q.**  Who are the stakeholders that received this update?

10    **A.**  I don't have the list of attendees, but, generally, it

11    would have probably been local governments, state agencies, the

12    public.

13    **Q.**  So this is what you presented to the public as FDEP's best

14    effort at making these projections?

15    **A.**  This is what we presented to them as the data that we have

16    available for the projects that we had on hand as of

17    December 31st, 2023.

18    **Q.**  Now I would like you to turn to Exhibit 7, page 118, of the

19    defendant's binder, so I think you're in the right spot.  Oh,

20    no.  You're still in plaintiff's.

21    **A.**  Can I have that number again, please?

22    **Q.**  Yes.  It looks like Exhibit 7, page 118.

23    **A.**  Okay.

24    **Q.**  On page 118 of that document, which is page 3 of 8 of the

25    actual document, but you can see little bolded "DEP 118" below?

*MOIRA HOMANN | CROSS*

1   **A.**   Yes.

2   **Q.**   Second from the end of this document, which is the order

3   adopting the BMAP, it states:  "This final order and

4   incorporated BMAP are enforceable pursuant to Sections 403.67,

5   403.121, 403.141, 403.161, 373.119, and 373.129 of the Florida

6   Statutes."

7        You testified that the BMAP is enforceable as to NPDES

8   permittees, correct?

9   **A.**   And MS4, uh-huh.

10  **Q.**   And MS4.

11  **A.**   That's also --

12  **Q.**   MS4 is a type of NPDES permit.

13  **A.**   Mm-hm.

14  **Q.**   So NPDES permittees are subject to DEP enforcement.  Is

15  that what these statutes are all referring to is the NPDES

16  program in various iterations?

17  **A.**   I cannot say with certainty what all these statutes are

18  referring to.  Sorry.

19  **Q.**   Okay.  What, if any, consequence is there to a nonsource

20  polluter who fails to meet the criteria of the BMAP?

21  **A.**   Can you please rephrase that question?

22  **Q.**   What, if any, consequence is there to a nonpoint source

23  polluter who fails to meet the criteria of the BMAP?

24  **A.**   An MS4 permittee would be considered a nonpoint source

25  polluter.  It would be --

CRITICAL

*MOIRA HOMANN | CROSS*                                                    89

1    **Q.**  An MS4 permittee is a point-source permit, right?

2    Sometimes they do have nonpoint source pollution that occurs

3    during combined storm sewer events or sewer events.  Those are

4    point sources, not MS4s.

5         Septic tanks, other nonpoint source pollution that is

6    contemplated by the BMAP, what is the consequence of someone

7    who does not comply with the BMAP if they are a nonpoint source

8    polluter?

9    **A.**  So the way that septic tanks would be addressed would be

10   each local government would be responsible for those septic

11   systems within their jurisdiction, and the loading from those

12   septic tanks would be incorporated into the loading reductions

13   for that entity.  So that entity would be responsible for

14   achieving their load reductions overall, not just for their

15   septic systems, for all of their resources within their

16   jurisdiction.

17        House Bill 1379, which requires entities to have very

18   specific allocations, very specific reductions, they have to

19   achieve milestones, now strengthens the fact that stakeholders

20   have to meet those reductions.  So we've been working with them

21   even more to make sure that they have the projects needed to

22   meet the next milestone.

23   **Q.**  Well, but the Florida statute that you just referred to

24   shifted responsibility for those septic tanks to FDEP, correct?

25   FDEP now has authority and control over the regulation of

*MOIRA HOMANN | CROSS*

1   septic tanks.

2   **A.**   I believe that was the Clean Waterways Act not House Bill

3   1379.

4   **Q.**   Apologies.  But you would agree that that's true?

5   **A.**   The responsibility of the onsite sewage program was

6   transferred to a division within DEP.

7   **Q.**   So DEP is required to ensure compliance with the onsite

8   sewage disposal program?

9           **MS. CORBARI:**  Your Honor, the department is going to

10  object.  The onsite sewage program itself is outside of her

11  scope and knowledge.  And the department has a witness who will

12  be testifying to that.  The enforcement of OSTDS and

13  implementation is outside the scope of her direct.

14          **THE COURT:**  Response?

15          **MS. BLOME:**  I'm trying to get at how the BMAP works to

16  enforce these targets and goals that they've set.

17          **THE COURT:**  The objection is overruled.  If the

18  witness doesn't know the answer to the question, she can simply

19  say, I don't know the answer to the question.  I haven't heard

20  anyone say that in two days now.  Maybe if you don't know, say

21  you don't know.  Go on ahead.

22          **THE WITNESS:**  There are enforcement measures that the

23  department can take based on these statutes.  I don't know

24  exactly what it is.  I know that there are monetary actions

25  that a local government can be given, you know, on a daily

*MOIRA HOMANN | CROSS*

1   basis if they are not in compliance with their BMAP

2   responsibilities.

3   **BY MS. BLOME:**

4   **Q.**   Would you agree that the Clean Waterways Act gave you a

5   power to create enforceable rules through the BMAP that would

6   apply to nonpoint source polluters?

7   **A.**   The Clean Waterways Act, in terms of the BMAP, it

8   established the requirement of local governments to provide us

9   with onsite sewage treatment disposal system remediation plans.

10  So they do have a requirement to provide us with that

11  information and to identify projects in those remediation

12  plans.

13  **Q.**   You've been talking about a lot of projects.  Would you

14  agree that's more of a carrot approach to this program, in that

15  you would be providing funding for voluntary projects?

16  **A.**   Projects are no longer voluntary with the requirements from

17  House Bill 1379.  Stakeholders have to meet their requirements.

18  So they have to identify projects that need to be incorporated

19  into the BMAP for them to meet those reductions.

20  **Q.**   And, then, they are given funding in exchange for those

21  projects, correct?

22  **A.**   They are.  Yeah.  I mean, funding -- projects need funding

23  in order to be implemented.

24  **Q.**   Has FDEP come up with any of its own projects that would be

25  necessary in order to reduce the nutrient load in the Indian

*MOIRA HOMANN | REDIRECT*

1    River Lagoon?

2    **A.** I don't know directly.  No, I'm not sure.

3    **Q.** Who would review or receive that information at FDEP, if

4    not you?

5    **A.** If FDEP would have come up with a project?

6    **Q.** Yeah, to implement the BMAP on its own.

7    **A.** We would be advised of that.  My program would be.

8    **Q.** Sure.

9        **MS. BLOME:**  All right.  One more moment to confer with

10   my co-counsel.

11       **THE COURT:**  Sure.

12       **MS. BLOME:**  No further questions at this time.  Thank

13   you.

14       **THE COURT:**  Redirect examination.

15                **REDIRECT EXAMINATION**

16   **BY MS. CORBARI:**

17   **Q.** Ms. Homann, you were asked about enforcement of the BMAP.

18   Generally, do you know if an entity that has a permit does not

19   have a permit, conducts unauthorized activities by the

20   department, does the department have an enforcement process?

21   **A.** Yes.

22   **Q.** Do you, yourself, deal with enforcement?

23   **A.** No.

24   **Q.** Okay.  Is there another division or different programs have

25   enforcement divisions?

*MOIRA HOMANN | REDIRECT*

1   **A.**  Yes, I would -- I mean, the permitting -- the divisions

2   that do the permitting for wastewater treatment facilities or

3   other different permits, environmental resources permits would

4   probably have the enforcement for those.

5   **Q.**  Do you know whether any entities have been referred to the

6   department's office of general counsel or enforcement for a

7   BMAP violation?

8   **A.**  No.

9   **Q.**  No, you don't know?

10  **A.**  I don't believe they have.

11  **Q.**  Okay.  But don't you do the referrals for enforcement?

12  **A.**  No.

13  **Q.**  Okay.  If you'll turn back to DEP 9, the very first page, I

14  think.  Yes, page 1, 275.  You were asked whether or not DEP

15  itself has seagrass planting projects.  Do you know who -- do

16  you know whether or not DEP is the state agency that is

17  statutorily responsible for seagrass and seagrass permitting?

18  **A.**  I don't believe it is.

19  **Q.**  Okay.  If you look at the last line, the last

20  appropriation --

21  **A.**  Mm-hm.

22  **Q.**  -- that's for $1.4 million?

23  **A.**  Mm-hm.

24  **Q.**  What was the project name?

25  **A.**  Indian River Lagoon Seagrass Restoration project.

*MOIRA HOMANN | REDIRECT*

1    **Q.**  And who was the grantee?

2    **A.**  Angler Action Foundation.

3    **Q.**  Do you know whether or not FWC issues aquatic management

4    plans and seagrass planting permits?

5    **A.**  I do not.

6    **Q.**  You were asked, "Does DEP come up with any projects on its

7    own to implement the BMAP?"  Is that feasible?

8    **A.**  DEP oversees the implementation of the projects that get

9    identified and implemented by the local governments, as it is

10   the local government's responsibility to address the loading

11   sources coming from their jurisdictions.  We work closely with

12   them to identify those projects, but we do not come up with

13   projects on our end.

14   **Q.**  And do you know why, or is there a reason why DEP doesn't

15   come up with its own projects?

16   **A.**  No.

17   **Q.**  Do you know if there's any authority for that?

18   **A.**  No.

19   **Q.**  You were asked about a carrot-and-stick approach for DEP

20   providing funding.  Are some of these -- if you know, do any of

21   these local governments that are doing, like, septic-to-sewer

22   conversions, what not, whether they're funding portions of

23   these projects themselves?

24   **A.**  I believe there are some -- certain funding pots that do

25   require a local match for the funding, so they get some of the

1    funding from the state, but some of it is required -- a portion

2    of it is required to come from the local government itself.

3    But I don't have much more information than that.

4    **Q.**   So look at the fifth line on that page, the Brevard County.

5    **A.**   LPA0056?

6    **Q.**   Yes.

7    **A.**   Mm-hm.

8    **Q.**   And the project name is Brevard County septic-to-sewer

9    conversions for 1,019 homes.

10   **A.**   Correct.

11   **Q.**   Is that accurate?

12   **A.**   Yes.

13   **Q.**   The grantee was Brevard County?

14   **A.**   Correct.

15   **Q.**   It looks like there are two appropriations totaling

16   $1.5 million.  Do you see that?

17   **A.**   Oh, yes.  I do see both of them.

18   **Q.**   Okay.

19   **A.**   Mm-hm.

20   **Q.**   Okay.  So would it be, rather than, I guess, the

21   carrot-and-stick approach that plaintiff's counsel mentioned,

22   is that necessarily a bad thing to help these counties out to

23   fund costs of $1.5 million to convert only a thousand homes?

24          **MS. BLOME:**  Objection, argumentative.

25          **THE COURT:**  All right.  What's the response to the

*MOIRA HOMANN | REDIRECT*                                        96

1   objection?

2          **MS. CORBARI:**  Well, the response is, that's

3   plaintiff's counsel's own words, and I'm asking Ms. Homann if a

4   carrot-and-stick approach is a negative or bad thing.

5          **THE COURT:**  All right.  I really don't understand your

6   question.  So I'm going to invite you to rephrase your

7   question, but you can continue moving forward.

8   **BY MS. CORBARI:**

9   **Q.**  A carrot and stick, Ms. Homann, do you understand the

10  carrot-and-stick saying?

11  **A.**  I do.

12  **Q.**  Okay.  Is the department, by providing local entities with

13  money, in your opinion, to implement projects a positive?

14  **A.**  Yes.

15  **Q.**  Do you recall in the 2021 BMAP approximately how many

16  septic systems were in the NIRL?

17  **A.**  Not off the top of my head.  I can look at the BMAP

18  document.

19  **Q.**  That's fine.  You can flip to it.  I believe it was 8,

20  Exhibit 8, page 154.

21  **A.**  Yes.

22  **Q.**  Approximately how many septic systems were in the North

23  Indian River Lagoon BMAP area as of 2020?

24  **A.**  Just a little over 16,000.

25  **Q.**  And the appropriation that we just spoke about, the

*MOIRA HOMANN | REDIRECT*

1    $1.5 million for a thousand homes, do you know how long it

2    takes to design these projects, a government entity, if you

3    know?

4    **A.**  I know it can take a while.  I don't know the length --

5    **Q.**  Okay.

6    **A.**  -- of time.

7              **MS. CORBARI:**  That's it.  Thank you.

8              **THE COURT:**  May this witness be excused?  May this

9    witness be excused?

10             **MS. CORBARI:**  Oh, I'm sorry.  I apologize, Your Honor.

11   Yes.

12             **THE COURT:**  Will she be subject to recall?

13             **MS. CORBARI:**  No.

14             **THE COURT:**  Will she be subject to recall by the

15   plaintiff?

16             **MS. BLOME:**  No, Your Honor.

17             **THE COURT:**  All right.  Thank you, ma'am.  You have a

18   nice day.

19             I would invite the defense to call their next witness.

20             **MR. BROWN:**  Your Honor, may I take the time to address

21   documents which you have not had a chance to --

22             **THE COURT:**  Sure.

23             **MR. BROWN:**  May I approach the bench and courtroom

24   deputy?

25             **THE COURT:**  My courtroom officer will retrieve the

1    document.  And have you provided a copy of that to opposing

2    counsel?

3            All right.  Jay, go on ahead and bring it up.

4            I need a moment to review this.

5            I think I've got an unnecessary third page on here

6    that's a copy of the first page.  You can give that back.

7            All right.  So I have had a chance to review it.  So

8    what do you want to do?

9            **MR. BROWN:**  I've provided the Court with a two-page

10   letter from the United States Department of Interior.

11           **THE COURT:**  Yes, I've read it.  I know what it is.

12   What do you want to do with it?

13           **MR. BROWN:**  I would ask the Court, first, for judicial

14   recognition, and, second, to admit the document into evidence

15   as Defendant's Exhibit 25.

16           **THE COURT:**  All right.  So you're either admitting it

17   as an exhibit or asking for judicial notice, which one is it?

18           **MR. BROWN:**  I submit it would be appropriate to do

19   both.  The plaintiffs do not oppose the request for official

20   recognition.  I believe, as the Court is aware, that

21   recognizing the document does not necessarily mean that it can

22   be accepted for the truth of the matter asserted.  So I would

23   ask the Court to do both.

24           **THE COURT:**  All right.  What is the plaintiff's

25   position on this?

1          **MS. BLOME:**  Thank you, Your Honor.  The first thing

2     that plaintiff would point out about this letter is that

3     Mr. Brown represented to the Court yesterday that it was a

4     letter closing the UME and that is not what this is.  This is a

5     letter from the U.S. Florida Fish and Wildlife Service

6     purportedly to NOAA concurring in the recommendation of the

7     Florida Fish and Wildlife Commission to close the UME, but

8     ultimately the decision to close the UME, to the extent the

9     status of the UME matters today, is in the hands of NOAA, and

10    they have not made that determination yet.

11          The second thing I would point out about this letter

12    is that there is a fair amount of hearsay information in this

13    letter that is not appropriate for admission for the truth of

14    the matter asserted; beginning, mostly, with the praise of

15    Governor DeSantis and the state of Florida, which is something

16    I've never seen in a correspondence like this in my 20 years of

17    experience practicing in environmental and wildlife law.

18          So, to me, the letter is inherently suspicious, but we

19    do agree that it exists, and we will not oppose judicial

20    notice.  We do oppose it being admitted for the truth of the

21    matter asserted.

22          **THE COURT:**  Well, that's what judicial notice is.

23          **MS. BLOME:**  Judicial notice is that it exists.  It is

24    not an appropriate exhibit.  It is not self-authenticating.  It

25    has no foundation.  But it is a concurring letter from the Fish

1    and Wildlife Service to NOAA.  So we will not object that it

2    exists and that the Fish and Wildlife Services appears to

3    concur, but we object to the remaining hearsay that has no

4    relevance to the case.

5         **THE COURT:**  All right.  With that proviso, I will take

6    judicial notice that it is what it purports to be, without

7    making a determination as to the truthfulness of what's in

8    there, and that's fine.

9         All right.  So we're agreeing as to the predicate.

10   It's admitted as an exhibit without objection from the

11   plaintiff, and what exhibit number is the next exhibit number?

12        **MR. BROWN:**  Twenty-five, Your Honor.

13        **THE COURTROOM DEPUTY:**  Twenty-five.

14        **THE COURT:**  All right.  Defendant's Exhibit 25 will be

15   admitted without objection.

16      (Defendant's Exhibit No. 25 was admitted into evidence.)

17        **THE COURT:**  All right.  So are you prepared to call

18   your next witness?

19        **MR. BROWN:**  If I may, Your Honor, I would like to move

20   into evidence the plaintiff's answer to interrogatories.  As

21   authorized by Rule 35(b)(6) -- or excuse me, 35(c), an answer

22   to an interrogatory may be used to the extent allowed by the

23   Federal Rules of Evidence.  Based upon that rule, I would move

24   into evidence the department's Exhibits 18, 19, and 20.

25        **THE COURT:**  All right.  So you're moving in Defendant

1    Exhibits 18, 19, and 20, which are --

2        MR. BROWN:  The answers to first interrogatories,

3    plaintiff's supplemental answers to first interrogatories, and

4    plaintiff's answers to second set of interrogatories.

5        THE COURT:  And what is the plaintiff's position on

6    that?

7        MS. BLOME:  Plaintiffs object.  These are -- you know,

8    it's unclear what is actually sought to be admitted here.  The

9    defendant -- plaintiff tried to meet and confer over this issue

10   with defense counsel, and he failed to identify which

11   provisions of these interrogatories he would like admitted or

12   which are relevant.

13       THE COURT:  It sounds like all three, the entirety of

14   what's been marked as Defense Exhibits 18, 19, and 20.

15       MS. BLOME:  Right, the entirety of our discovery

16   responses, but how is any of it relevant to the question at

17   hand today?  I believe that these are already in evidence on

18   his summary judgment motion as well, so it's unknown why that

19   duplicative effort needs to be made.

20       THE COURT:  And what is the defense's response to that

21   objection?

22       MR. BROWN:  Your Honor, these are offered for the

23   purpose of demonstrating, through contention their

24   interrogatories, essentially that there's no basis for the

25   allegation that the department has failed in its enforcement

1    responsibilities.

2         **THE COURT:**  How would you respond to the assertion

3    that they're duplicative, they're already included in and

4    attached to your motion for summary judgment?

5         **MR. BROWN:**  Because the --

6         **THE COURT:**  Well, let me just get a yes or no out of

7    you.  Are they attached in their entirety to your motion for

8    summary judgment?

9         **MR. BROWN:**  Yes, Your Honor.

10        **THE COURT:**  Okay.  So why do we need to admit them now

11   as evidence here?

12        **MR. BROWN:**  Because the Court -- I do not believe that

13   the Court would be authorized to consider documents which were

14   offered as part of a motion for summary judgment if they're not

15   offered at trial.  So out of an abundance of caution, I ask

16   that they be included in this trial record as evidence.

17        **THE COURT:**  All right.  And I think there may be

18   concerns about my considering evidence not admitted here but

19   that are merely attached to the motion for summary judgment.

20   So other than your objection that it's duplicative, what other

21   objections do you have to Defense Exhibits 18, 19, and 20

22   coming in?

23        **MS. BLOME:**  Hearsay.

24        **THE COURT:**  Okay.  I'll tell you what, I'll give you a

25   moment to process.  You weren't expecting this.

1          But as to the objection as to it being duplicative,

2     that objection will be overruled.  I'm going to table this

3     decision and put it on my unfinished business list and invite

4     the defendant to call their next witness.  We'll resolve this

5     once this next witness is closed out.

6          **MR. BROWN:**  May I provide the Court with authority

7     that addresses the hearsay question?

8          **THE COURT:**  Is there a witness waiting to be called?

9          **MR. BROWN:**  Yes, Your Honor.  May I call --

10         **THE COURT:**  Just friendly advice.  The reason

11    non-lawyers tend to not like lawyers is because we always do

12    things like that.  You're going to be here the rest of the day

13    anyway, so why don't we get the witness in and let them get

14    back to their day, and then we can handle this business later?

15         **MR. BROWN:**  Yes, Your Honor.

16         **THE COURT:**  Okay.  Let's go.

17         **MR. BROWN:**  The department calls Nathan Hess.

18         **THE COURTROOM DEPUTY:**  Mr. Hess, if you would please

19    come forward to be sworn.  Please raise your right hand.

20       (NATHAN HESS, witness sworn.)

21         **THE WITNESS:**  I do.

22         **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat

23    in the witness box.

24         **THE COURT:**  All right.  Good morning, sir.  Please

25    make yourself comfortable with the chair's proximity to the

*NATHAN HESS | DIRECT*                                                        104

1    microphone, and then please state your full name, spelling your

2    last.

3              **THE WITNESS:**  My name is Nathan Hess, H-e-s-s.

4              **THE COURT:**  All right.  Your witness.

5                        **DIRECT EXAMINATION**

6    **BY MR. BROWN:**

7    **Q.**  What is your current professional position?

8    **A.**  I'm the assistant director of the Central District Office

9    of the Florida Department of Environmental Protection.

10   **Q.**  Can you describe your education background following high

11   school?

12   **A.**  I received a bachelor of arts in environmental studies from

13   Eckerd College and a master of public administration from

14   University of Central Florida.

15   **Q.**  When were you first employed by the Department of

16   Environmental Protection?

17   **A.**  November of 2005.

18   **Q.**  And are you presently employed with the Central District?

19   **A.**  Yes.

20   **Q.**  And can you explain what the geographical responsibility

21   for the Central District is?

22   **A.**  We regulate activities in Marion, Lake, Sumter, Seminole,

23   Orange, Osceola, Brevard, and Volusia Counties.

24   **Q.**  Okay.  Please refer to Defendant's Exhibit 10 in the yellow

25   notebook.

*NATHAN HESS | DIRECT*

1    **A.**  Okay.

2    **Q.**  Is this memorandum present --

3        Can you explain what this document is?

4    **A.**  This is a memorandum of agreement between the State of

5    Florida and the United States Environmental Protection Agency.

6    **Q.**  And does it address the enforcement responsibilities of the

7    department as it relates to the Clean Water Act?

8    **A.**  Yes.

9    **Q.**  Is the memorandum presently in effect?

10   **A.**  Yes.

11   **Q.**  Does it require the Department of Environmental Protection

12   to maintain a vigorous program of taking timely and appropriate

13   enforcement actions under statutes to Clean Water Act and

14   federal regulations?

15   **A.**  Yes.

16   **Q.**  During the time of your employment, has the department

17   maintained such a vigorous program of taking timely and

18   appropriate enforcement actions?

19   **A.**  Yes.

20   **Q.**  Generally speaking, in your vernacular, what's a wastewater

21   facility?

22   **A.**  A wastewater facility is a facility that collects, treats,

23   and eventually disposes of wastewater.

24   **Q.**  Okay.  What types of permit would a wastewater facility

25   obtain before being able to discharge into the Indian River

*NATHAN HESS | DIRECT*

1   Lagoon?

2   **A.**  They would need an NPDS permit.

3   **Q.**  Okay.  Is that also sometimes referred to as a NPDES

4   permit?

5   **A.**  Yes.  I've heard that phrase.

6   **Q.**  Okay.  And what are the durations of those permits?

7   **A.**  Five years.

8   **Q.**  Is it common for those permits to be renewed?

9   **A.**  Yes.

10   **Q.**  If a new requirement takes effect during that five-year

11   term, does a facility have to provide reasonable assurances

12   that they will comply with the new requirements?

13   **A.**  Yes.

14   **Q.**  Are wastewater facilities also required to demonstrate that

15   they will achieve the requirements for basin management action

16   plans as they apply to point sources?

17   **A.**  Yes.

18   **Q.**  Generically, what does the term "advanced water treatment

19   system" refer to?

20   **A.**  Advanced wastewater treatment, AWT, refers to enhanced

21   removal of nutrients.

22   **Q.**  For facilities that contribute nutrients to the Indian

23   River Lagoon, is there a statutory deadline for the

24   installation of advanced water treatments?

25   **A.**  Yes.

*NATHAN HESS | CROSS*

1    **Q.**  And what is that deadline?

2    **A.**  July 1st, 2025.

3    **Q.**  How many facilities would be covered by that statute, in

4    terms that they would discharge into the Indian River Lagoon?

5    **A.**  I believe we regulate close to 30 facilities.

6    **Q.**  Okay.  Of those facilities, are there any that have not

7    installed advanced wastewater treatment?

8    **A.**  Yes.

9    **Q.**  How many?

10   **A.**  Four.

11   **Q.**  What are the status of those four facilities?

12   **A.**  One of the facilities is nearly complete with their

13   construction to achieve AWT, and the other three intend to

14   relinquish their NPDES permit.

15   **Q.**  Do you intend to fully exercise that statutory decline

16   without exceptions?

17   **A.**  Yes.

18          **MR. BROWN:**  I have no additional questions.

19          **THE COURT:**  Thank you.  Cross-examination.

20                    **CROSS-EXAMINATION**

21   **BY MS. BLOME:**

22   **Q.**  Good morning, Mr. Hess.

23   **A.**  Good morning.

24   **Q.**  You testified regarding the enforcement process for people

25   with NPDES permits.

*NATHAN HESS | CROSS*                                                                    108

1    **A.**   Yes.

2    **Q.**   What's the enforcement process for people who are

3    discharging from nonpoint sources to the Indian River Lagoon?

4    **A.**   The enforcement process is extremely similar.

5    **Q.**   Please describe.

6    **A.**   So it depends on the nature of, maybe, what is wrong, the

7    violation that's occurred.  We would conduct our action to

8    compel them to return to compliance, implement appropriate

9    corrective action, and, if appropriate, assess a monetary

10   penalty.

11   **Q.**   How many enforcement efforts has FDEP undertaken with

12   respect to nonpoint source pollution at the Indian River

13   Lagoon?

14   **A.**   That's a statistic I don't think I have handy.  Off the top

15   of my head, I can come up with a handful that I'm aware of, but

16   I'm certain that there are more.

17   **Q.**   A handful that you're aware of -- how are you aware of

18   them?

19   **A.**   Anecdotal recall.

20   **Q.**   Give me an example.

21   **A.**   City of Titusville.

22   **Q.**   The City of Titusville made a nonpoint source --

23   **A.**   Excuse me.

24   **Q.**   -- point --

25   **A.**   There's a -- I would have to -- I would have to check my

*NATHAN HESS | CROSS*

1    records on that.

2    **Q.**  Can you think of a single instance in your role as

3    enforcement of the coordinator for the Clean Water Act in

4    Florida, of a nonpoint source pollution enforcement action in

5    the Indian River Lagoon, sitting here today?

6    **A.**  I would have to check, because we do not categorize them as

7    basin management action plan violations.  They are categorized

8    as effluent exceedances because when a BMAP goes into effect,

9    an effluent limit is applied to these facilities, and that is

10    how we consider and evaluate their compliance.  We don't look

11    at it as a violation of the BMAP.  They look at it as violation

12    of their effluent limit.  So the phrasing of the question

13    around BMAP violations is just not something that is triggering

14    in my head right now.

15    **Q.**  My question didn't have anything to do with a BMAP

16    violation.  It had something to do with nonpoint source

17    pollution.  Whatever standard you're referring to, please

18    describe.  What is the effluent standard for a nonpoint source

19    polluter?

20    **A.**  That can depend on their proximity to the -- you know,

21    we're typically -- I'll give another example of for springs.

22    We have BMAPs in place around spring heads, where there are

23    certain ranges and areas where there are different limits that

24    go into effect.

25         So I would consider, then, in proximity to the Indian River

*NATHAN HESS | CROSS*

1    Lagoon what kind of limit might be in effect for somebody, and

2    their limit could be anywhere from 3 milligrams per liter

3    nitrogen to, I think it may be, up to 6 in some areas,

4    depending on their proximity to lagoon.

5    **Q.**  How do you measure the nonpoint source polluter's discharge

6    based on that criteria?

7    **A.**  There is monthly sampling -- oh, excuse me, various

8    frequencies of sampling that the facilities must complete and

9    submit those results to us.

10   **Q.**  You keep saying "facilities."  In my experience, and I

11   wonder if you'll agree, most septic tanks are run by

12   single-family homes.  Is that the facility you're referring to?

13   **A.**  No.  I didn't know we were talking about septic tanks.

14   **Q.**  That's generally what we're talking about today,

15   Mr. Hess --

16   **A.**  Oh.

17   **Q.**  -- nonpoint source pollution from septic tanks.

18   **A.**  I'm familiar with non -- we call them non-NPDES wastewater

19   treatment facilities that exist that are not septic tanks.

20   That's what I thought you were asking me about.

21   **Q.**  What is a non-NPDES treatment facility?

22   **A.**  A wastewater treatment facility that does not hold an NPDES

23   permit.

24   **Q.**  One that would have land application?

25   **A.**  Yes.

*NATHAN HESS | CROSS*

1    **Q.** So that's not what we're talking about.  We're not talking

2    about a closed system.  We're talking about a discharging

3    system that discharges effluent to the ground, like a septic

4    tank, that eventually makes its way into water.

5        How are you measuring compliance for those facilities?

6    **A.** I do not directly oversee regulation of septic tanks.

7    **Q.** So you don't oversee enforcement of septic tank violations?

8    **A.** Correct.

9    **Q.** Who at FDEP does?

10   **A.** I believe that would be our onsite septic program.

11   **Q.** In your declaration you submitted in support of summary

12   judgment, you discussed a consent decree that the department

13   entered into with the City of Cape Canaveral.  Does that sound

14   familiar to you?

15   **A.** Yes.

16   **Q.** Did you actually participate in the negotiation and

17   development of that consent decree?

18   **A.** I don't recall off the top of my head.  I probably had a

19   hand in it, yes.

20   **Q.** But you're familiar with it?

21   **A.** Yes.

22   **Q.** I'll represent to you in paragraph 4 the consent decree

23   states:  "The department finds that the following violations

24   occurred and unauthorized discharge occurred on March 14, 2021,

25   of 25,500 gallons of untreated wastewater that entered into the

*NATHAN HESS | CROSS*

1  central ditch that flows to the Banana River."

2     Do you recall that?

3  **A.** I don't have specific recollection of that, but it sounds

4  like standard language we would use when an item like that

5  would occur.

6  **Q.** Why don't you turn to defendant's exhibit binder,

7  Exhibit 11?

8  **A.** Okay.

9  **Q.** Is that the consent decree we're discussing?

10  **A.** Yep, looks like it.

11  **Q.** Take a second to look through it and just confirm it's a

12  complete and true copy of it.

13  **A.** It appears to be.

14  **Q.** In paragraph 4(a) you'll find that 25,500 gallon, and then

15  in paragraph 4(b) you'll see that there was 700 gallons of

16  untreated wastewater discharged in February of 2020.  Do you

17  see that?

18  **A.** Yes.

19  **Q.** And 150 additional gallons on September 22, 2020?

20  **A.** Yes.

21  **Q.** And 250 gallons of treated wastewater on December 8, 2020?

22  **A.** Yes.

23  **Q.** What is the significance of that "treated" designation?

24  **A.** It's the opposite of untreated.

25  **Q.** What's that mean?

*NATHAN HESS | CROSS*

1    **A.**  It's either raw sewage, or it has received -- it is

2    wastewater that has received treatment.

3    **Q.**  Had the City of Cape Canaveral Wastewater Treatment Plant

4    gone through any upgrades to ensure the nitrogen reductions

5    required by the BMAP at the point of this untreated or this

6    treated discharge in 2020?

7    **A.**  I do not know when they installed AWT.

8    **Q.**  Have they, as of today?

9    **A.**  To my knowledge, yes.

10   **Q.**  How much would you say it probably cost them, if you

11   recall, to install that additional treatment equipment?

12   **A.**  I have no idea.

13   **Q.**  We heard testimony before from Ms. Homann.  Were you in the

14   room for that?

15   **A.**  Yes.

16   **Q.**  It looked like it was many millions of dollars.

17   **A.**  That's not surprising.

18   **Q.**  Yeah.  The department fined the City of Cape Canaveral

19   $6,083.75 for these untreated discharges and untreated

20   discharges.  Is that true?

21   **A.**  That's what's in the consent order, yes.

22          **MS. BLOME:**  Nothing else for this witness at this

23   time.

24          **THE COURT:**  All right.  Thank you.

25          Redirect examination?

*NATHAN HESS | REDIRECT*

1      **MR. BROWN:** Briefly, Your Honor.

2      **THE COURT:** Sure.

3                    **REDIRECT EXAMINATION**

4    **BY MR. BROWN:**

5    **Q.** Referring to DEP Exhibit 11, can you explain the

6    circumstances regarding the events that led up to this consent

7    order?

8    **A.** Well, it appears that the facility had some unauthorized

9    discharges that occurred. Those were likely reported to us.

10   We conducted our investigation of the facts of what occurred,

11   where any releases occurred, made determinations about the

12   violations, and then sought negotiations to enter into a

13   consent order with the City of Cape Canaveral to resolve the

14   violations and require corrective actions and assess a penalty.

15   **Q.** Within the context of this enforcement action, are you

16   familiar with what was discharged as treated versus untreated?

17   **A.** As far as treated -- well, untreated discharge would have

18   been raw sewage, and treated would have been effluent that had

19   processed through the wastewater treatment plant.

20     **MR. BROWN:** Okay. I have no additional questions,

21   Your Honor.

22     **THE COURT:** All right. May this witness be excused?

23     **MR. BROWN:** The witness may be excused and --

24     **THE COURT:** Will he be subjected to recall?

25     **MR. BROWN:** No.

1            **THE COURT:**  Will he be subject to recall by the

2       plaintiff?

3            **MS. BLOME:**  No, Your Honor.

4            **THE COURT:**  All right.  Mr. Hess, you have a nice day.

5            All right.  Does that conclude the presentation of

6       evidence through witness testimony from the defense?

7            **MR. BROWN:**  The department has one additional witness.

8            **THE COURT:**  All right.  I would invite you to call

9       that -- well, hold on a second.  We're getting close to

10      lunchtime.  You have one more witness, correct?

11           And has the plaintiff made a decision on whether or

12      not they're going to be presenting evidence in rebuttal?

13           **MS. BLOME:**  We have not.

14           **THE COURT:**  All right.  So we can go a little bit

15      longer.  All right.  I'm going to break for lunch at this time.

16      We're going to treat this as 11:30.  I'm going to invite

17      everyone to be back here by 1:00 p.m.  As soon as everyone is

18      here and accounted for, we'll continue marching towards the

19      conclusion.

20           My plan is -- well, I'll make a decision when we get

21      back.  Upon further reflection, I do not think because exhibits

22      are marked as attachments to a motion for summary judgment that

23      I can fairly consider them as evidence at a contested

24      evidentiary hearing/bench trial.  So I need you to think about

25      that, because unless you have a very good reason -- I know you

1    gave me a hearsay objection, but I have a feeling that I'm

2    asking you to shoot from the hip right now, which I'm not a big

3    fan of.  And I'm not blaming you for that.  But I want you to

4    think about it over the lunch break and if you can come up with

5    an objection as to why these should not be admitted, I will

6    consider it, but I'm inclined to let them in.

7         All right.  Having said that, have a good lunch.  I'll

8    see everyone back here at 1:00 p.m.

9         Is there anything else, Ann?

10        **THE COURTROOM DEPUTY:**  No.

11        **THE COURT:**  All right.  Thank you.

12     (Recess at 11:39 a.m. until 1:04 p.m.)

13        **THE COURT:**  Before I invite the defense to call their

14   next witness, is there anything further the plaintiff would

15   like to add to the one pending issue involving the three

16   exhibits moved into evidence by defendant?

17        **MS. BLOME:**  Yes, Your Honor.  We've decided to

18   withdraw objections and just to be okay with them coming in.

19        **THE COURT:**  All right.  So a mentor of mine a long

20   time told me, When you are in the courtroom, you have to figure

21   out relatively quickly whether you're on the train or on the

22   tracks.  And I appreciate the fact that over the lunch break

23   you realized you were on the tracks.

24        All right.  Let's go off the record for a second so

25   Suzie can log me in.

*KIMBERLY DUFFEK | DIRECT*

1    All right.  I would invite the defense to call their

2    next witness.

3    And for the record, now that we're back on the record,

4    what's been previously marked as Defense Exhibits 18, 19, and

5    20 will be admitted, without objection.  They're part of the

6    record now.  Feel free to proceed.

7    (Defendant's Exhibit Nos. 18, 19, and 20 were admitted into

8    evidence.)

9    **MS. CORBARI:**  Your Honor, the department calls witness

10   Ms. Kimberly Duffek.

11   **THE COURTROOM DEPUTY:**  Ms. Duffek, please come forward

12   to be sworn.  Please raise your right hand.

13   (KIMBERLY DUFFEK, witness sworn.)

14   **THE WITNESS:**  I do.

15   **THE COURTROOM DEPUTY:**  Please have a seat in the

16   witness box.

17   **THE COURT:**  Good morning.  Please make yourself

18   comfortable with the chair's proximity to the microphone, and

19   then state your full name into that microphone, spelling your

20   last.

21   **THE WITNESS:**  Kimberly Duffek, D-u-f-f-e-k.

22   **THE COURT:**  Your witness.

23   **DIRECT EXAMINATION**

24   BY MS. CORBARI:

25   **Q.**  Good afternoon, Ms. Duffek.  Could you please state your

*KIMBERLY DUFFEK | DIRECT*

1    current employment?

2    **A.**  I am an environmental consultant with the Department of

3    Environmental Protection in the Division of Water Resource

4    Management and specifically in the onsite sewage program.

5    **Q.**  Is the onsite referred to as OSP?

6    **A.**  Yes.

7    **Q.**  What's your role as an environmental consultant in the OSP?

8    **A.**  We help oversee -- not oversee, but more we do technical

9    assistance to, right now, the county health departments who are

10   administering the programs.  We also do quality assurance and

11   training.

12   **Q.**  In the county health departments -- are the county health

13   departments under DEP?

14   **A.**  No.

15   **Q.**  What state agency are the county health departments under?

16   **A.**  The Department of Health.

17   **Q.**  And how long have you been employed with DEP?

18   **A.**  With DEP, since the program came over in July of 2021.

19   **Q.**  And you mentioned program coming over.  Where were you

20   before?

21   **A.**  Department of Health, in my same position, basically.

22   **Q.**  And how long were you at Department of Health?

23   **A.**  Since, like, April of 1994-ish.  I don't know if April is

24   right.  1994.

25   **Q.**  How long have you been in the current position at both DOH

*KIMBERLY DUFFEK | DIRECT*

1    and DEP?

2    **A.**  Thirty years -- 31 years, sorry.

3    **Q.**  And how long in your current position?

4    **A.**  Since 2021, so four years.

5    **Q.**  And at DOH, did you serve in the same --

6    **A.**  I did.

7    **Q.**  -- capacity/position?

8    **A.**  When I came over, yes.  I wasn't always in the same

9    position the whole time.

10   **Q.**  So you mentioned "when the program came over" --

11   **A.**  Yes.

12   **Q.**  -- as we lovingly refer to it.

13       Why did the program come to DEP?

14   **A.**  There was a statutory -- or the legislature moved the

15   program from the Department of Health to DEP.

16   **Q.**  And OSP was one specific program from DOH that came over?

17   **A.**  Yes.  Yes.  It was part of environmental health over at

18   DOH, and they moved it over -- just the onsite program from

19   environmental health over to DEP.

20   **Q.**  Does the Department of Health, specifically the county

21   health departments, have a role in the implementation,

22   currently, of the OSP program?

23   **A.**  Yes.  They basically do the implementation of the program

24   under the direction of the Department of Health but not the

25   direct supervision.  We don't have direct supervision over

*KIMBERLY DUFFEK | DIRECT*                                                    120

1    them.

2    **Q.**   Okay.  And I'm going to have you -- there should be -- one

3    of the yellow binders, I believe it's one, binder one.

4    **A.**   Okay.  This is one of two.  Okay.

5    **Q.**   If you could turn to tab 14.

6    **A.**   Okay.  Sorry.  I'm not on 14.  Now I am.

7    **Q.**   Can you identify this document?

8    **A.**   Yes.  This is the interagency agreement between the

9    Department of Environmental Protection and the Department of

10   Health.

11   **Q.**   What's the date on it?

12   **A.**   June 30th, 2021.

13   **Q.**   Was this part of the statutory requirement moving the

14   program?  Do you know?

15   **A.**   Yes.

16   **Q.**   And can you give me a brief description of what this

17   interagency agreement says?

18   **A.**   Basically, it is guidance for how the two departments will

19   work together in performing the onsite sewage program.

20   **Q.**   Under this interagency agreement, does DEP or DEP employees

21   actually issue individual OSTDS permits?

22   **A.**   Well, right now, in the Indian River Lagoon area, the

23   county health departments there are not DEP.  They're

24   Department of Health.  But, yes, permits.  This is saying that

25   they will issue the permits and all parts of the program.

*KIMBERLY DUFFEK | DIRECT*                                           121

1    **Q.**  So they're DOH county health employees reviewing --

2    **A.**  Yes.

3    **Q.**  -- permit applications, sites?

4    **A.**  Yes.

5    **Q.**  Can you briefly or just generally explain what an OSTDS is,

6    which is an onsite sewage treatment and disposal system?

7    **A.**  Yes.  Conventionally, it would be a septic tank where the

8    sewage from the building facility, whether it's single-family

9    residence, comes into.  There's some separation that goes on,

10   and clear effluent goes out and goes into a drainfield that is

11   permitted.

12   **Q.**  And can you just briefly describe a drainfield?  Is it

13   above ground, below ground?

14   **A.**  Sure.  That depends upon conditions in the soil and the

15   estimated wet season water table.  So we have a separation for

16   new systems to be 24 inches from the wet season water table and

17   then we also have a 42-inch effective soil depth that's

18   required.  And so depending on that, the system could be above

19   natural grade; the sidewall could be within natural grade; or

20   the whole thing could be below natural grade, so that would be

21   a subsurface system.

22        And, historically, it was rock and pipe, so aggregate and

23   pipe.  More currently, they've gone away from the aggregate

24   systems into what we call "alternative drainfield material,"

25   and there are chambers or multipipe systems.

*KIMBERLY DUFFEK | DIRECT*                                        122

1    **Q.**  And the system you just described, is that a

2    conventional --

3    **A.**  That's a conventional septic system.

4    **Q.**  In a conventional septic system, is there any treatment for

5    reducing --

6    **A.**  Very little.

7    **Q.**  -- nutrient reducing?

8    **A.**  Very little to none.

9    **Q.**  And is it very little to none in both the tank and the

10   drainfield, or which one are you referring to?

11   **A.**  In the tank, it's really just separating out the solids and

12   the fats, oils, and greases, and then leaving that clear

13   effluent.  There's very -- there's a little bit of B-O-D, but

14   we're talking about anaerobic conditions in a tank.

15       In the drainfield, it really just depends on the

16   conditions, the soil conditions there, whether there's any

17   treatment, but, again, very little to none.  If anything, if

18   you have your 24-inch separation, you're going to get some

19   fecal coliform reduction.

20   **Q.**  Are you familiar with an enhanced nitrogen removing --

21   removal system?

22   **A.**  Yes.  Yes, I am.

23   **Q.**  And, generally, explain an enhanced nitrogen removal --

24   **A.**  So we have ATU 245 systems, and what that means is, it was

25   tested at NSF, which is a third-party testing agency, to a

*KIMBERLY DUFFEK | DIRECT*                                                123

1    standard called "245," which says in the tank -- or the

2    effluent coming out of the tank will get a 50 percent reduction

3    in nitrogen.

4    **Q.**   And are ENRs, are they performance-based systems?  Would

5    you consider them performance-based systems?

6    **A.**   Yeah, to a degree, to a degree, but we have other

7    performance-based systems, which are just specialized systems

8    that can treat to specific standards, and some of those systems

9    treat nitrogen to greater than 50 percent reduction, and

10   they've gone through approval in the state of Florida.

11   **Q.**   What is a performance-based system -- or let me restate.

12       Who designs a performance-based system?

13   **A.**   Engineers that are licensed in the state of Florida with

14   wastewater experience.

15   **Q.**   To your knowledge, does the department design any

16   performance-based systems?

17   **A.**   We do not design them.

18   **Q.**   Do we design any conventional septic systems?

19   **A.**   We do not design them.

20   **Q.**   When you were at the Department of Health, did the

21   Department of Health design any of these systems?

22   **A.**   They do not design them.

23   **Q.**   Do you know if there's any new OSTDS requirements in the

24   Indian River Lagoon basin?

25   **A.**   Yes.

*KIMBERLY DUFFEK | DIRECT*

1    **Q.**  And what's your knowledge of the new requirements?

2    **A.**  That from January 1, 2024, all new septic systems that are

3    permitted in the Indian River Lagoon basin need to be ENR

4    systems or connect to sewer, if sewer is available.

5    **Q.**  Okay.  And let me go back to -- you are not an engineer?

6    **A.**  I am not.

7    **Q.**  And you do not design septic systems?

8    **A.**  I do not.

9    **Q.**  As part of your job duties, do you hold trainings?

10   **A.**  We do.

11   **Q.**  And who are those trainings directed at?

12   **A.**  We, every other month, do what's called an "accelerated

13   certification training," and it's for people who want to get --

14   so who work for the department, whether it's the department or

15   Department of Health, want to get certified in onsite sewage to

16   be able to perform duties in onsite sewage.  And also now we

17   have a program called "private provider inspectors," who also

18   have to attend and pass these courses, and then septic

19   contractors who want to get their master septic tank license,

20   which is just a more specialized, you know, training, they also

21   come take these courses.

22   **Q.**  Do you also advise county health departments, the CHDs, on

23   the OSP program?

24   **A.**  Yes.  Yes, we do.

25   **Q.**  And what's your role in advising these CHDs?

*KIMBERLY DUFFEK | DIRECT*                                                    125

1    **A.**  We make sure that they are up to date on any changes to

2    statutes or rules when rules get written.  We make sure they're

3    up to date on everything, you know, dealing with the onsite

4    program.

5    **Q.**  Are you assigned specific counties?

6    **A.**  I am.  I am assigned 15 counties in the central Florida

7    area, which includes Indian River, Brevard, and Volusia

8    Counties.

9    **Q.**  Do you field questions from the CHDs?

10   **A.**  I do every day.

11   **Q.**  Give me an example of the type of question you field.

12   **A.**  Just, in general, they may want to know -- like, they know

13   the statute says something in particular.  They're trying to

14   relay that to one of their clients, but they cannot remember

15   exactly where in the statute that is, and they may call me and

16   ask me, Where in the statute does it say this, and I will give

17   them that information.

18   **Q.**  With the program transfer to DEP, do you answer questions

19   from the CHDs about certain DEP types of procedures?

20   **A.**  Can you be more specific about what procedures?

21   **Q.**  So under the interagency agreement, who conducts

22   investigations of septic tanks or inspections of septic tanks?

23   **A.**  Okay.  Well, construction inspections is one thing.  If

24   we're talking about investigations of systems, where we have a

25   complaint called in, yes, we definitely go through how that's

*KIMBERLY DUFFEK | DIRECT*

1    supposed to be done.

2    **Q.**  And who does do the complaint investigations?

3    **A.**  The county health department.  They are the ones.  Since

4    they are the ones doing the program, they are the ones that do

5    the inspections -- or the investigations.

6    **Q.**  Who does the construction, the installation inspections?

7    **A.**  That can either be a department personnel, or now it could

8    be a private provider inspector who does those.

9    **Q.**  When you say department, DEP department?

10    **A.**  No, sorry.  Department of Health, department.  Sorry.

11    **Q.**  And you mentioned a private inspector.

12    **A.**  Private provider.

13    **Q.**  Are those private inspectors associated with DEP?

14    **A.**  No.  They're private businesses.

15    **Q.**  Is that from a new statutory change?

16    **A.**  Yes, fairly new.

17    **Q.**  So during a complaint inspection and the DOH inspector goes

18    out there, what's the typical investigatory process?

19    **A.**  So it really depends on what the complaint that was called

20    in, but if it was that there was sewage on the ground, they

21    would go out there to see if there was sewage on the ground,

22    and then they would probably investigate to see was that

23    sewage -- was that coming from a septic system or was it coming

24    from something else.  And if it's coming from a septic system,

25    then they would -- usually they would take pictures, and if the

*KIMBERLY DUFFEK | DIRECT*

1    homeowner is there, they will talk to the homeowner, and, then,

2    they'll gather up the information they need, they go back, and

3    they would issue a notice to abate to the owner, giving them --

4    the property owner, giving them specific guidelines for how

5    long they have to abate the nuisance.

6    **Q.**  And if the owner fails to comply within the timeline or

7    perform the suggestive corrective actions?

8    **A.**  Then it would be escalated to OGC, that's the Office of

9    General Counsel, for further enforcement.

10    **Q.**  The OGC you're referring to, is that at DEP --

11    **A.**  Yes.

12    **Q.**  -- or DOH?

13    **A.**  DEP.

14    **Q.**  So the county health departments then refer --

15    **A.**  Yes.

16    **Q.**  -- over for enforcement?

17    **A.**  Yes.

18    **Q.**  Okay.  With regard to the new statutory requirements for

19    septic systems in the Indian River Lagoon, you mentioned, as of

20    January 1, new construction of septics, I believe you said --

21    **A.**  Yes.

22    **Q.**  -- are required to have what?

23    **A.**  To either connect to sewer, if it's available, sanitary

24    sewer if it's available, or put in a nitrogen-reducing system,

25    a ENR, enhanced nitrogen-reducing system.

*KIMBERLY DUFFEK | DIRECT*                                              128

1   **Q.**  And to your knowledge, do all conventional systems need to

2   be replaced in the IRL?

3   **A.**  By 3030 -- 2030, sorry, 2030.  I won't be around.  2030.

4   **Q.**  Are you familiar with any statutory requirements in Chapter

5   381 with regard to mandates to connect to sewer?

6   **A.**  Yes.  So, basically, where sewer is available, we cannot --

7   meaning the department, whether it's DEP or Department of

8   Health -- cannot issue a septic permit where sewer is

9   available.

10      If sewer becomes available, the utility is supposed to

11  notify the property owner that sewer is available, and they are

12  given 365 days to connect to that system.

13      If there is a system in failure or if they -- there's also

14  modifications of systems and we find out sewer is available, at

15  that point we cannot issue a construction permit, either, and

16  they need to connect to the sanitary sewer.

17          **THE COURT:**  Just to let you know, because your

18  microphone is on, when you're tapping your fingers, it sounds

19  like a bongo drum up here.

20          **MR. BROWN:**  My apologies.

21          **THE WITNESS:**  Sorry.

22          **MS. CORBARI:**  Sorry.

23          **THE COURT:**  It's not you.  It's plaintiff's counsel.

24  I'm just saying that for the benefit of my court reporter

25  because everything is magnified in her earphones.

*KIMBERLY DUFFEK | DIRECT*                                                       129

1              Go on ahead and continue.

2         **MS. BLOME:**  Both of us.  My apologies.

3         **THE COURT:**  You can turn the microphone on, so you can

4    tap your hand and we can hear it, but you have to turn it off.

5    Just hit the button.

6              Feel free to proceed.

7    **BY MS. CORBARI:**

8    **Q.**  This statute in Chapter 381, for clarification, is Chapter

9    381 a department -- is the Chapter 381, is that a OSP program

10   statute?

11   **A.**  Yes, it is.

12   **Q.**  Okay.  And that statute has been in place --

13   **A.**  Yes.  It was part of Department of Health that transferred

14   over when the program transferred to DEP.

15   **Q.**  So there's always been a requirement that if sewer is

16   available, DOH before and now DEP OSP program could not

17   issue --

18   **A.**  Could not --

19   **Q.**  -- a septic permit?

20   **A.**  -- issue a septic permit.

21   **Q.**  How did either DOH, at the time, or now DEP, how does the

22   program find out if central sewer is available?

23   **A.**  Well, on the application, the applicant is supposed to give

24   us all the information, and one of the things it asks is, Is

25   sewer available, and where is the closest sewer line?

*KIMBERLY DUFFEK | DIRECT*

1    I will tell you, I used to work doing inspections prior to

2    working at the state health office and coming over here, and

3    you just know your county after a while.  You know where all

4    the sewer lines are.  You know where they are, and so you sort

5    of know, Oh, sewer is there.

6    You also, which we can sometimes do and do regularly do, is

7    contact the utilities themselves, who are in those areas, and

8    ask where the closest sewer line is, and we will even give them

9    an address and say, Is it here?

10   **Q.**  So if an applicant failed to include that information --

11   **A.**  It can still be looked at.  But if they fail to include

12   that information, we have things where we have statutory

13   timelines for reviewing applications, and we would write a

14   letter requesting additional information, and one of the things

15   we may request from them is where is the closest sewer line.

16   But we could also -- we don't like doing the work for the

17   applicant that's supposed to provide it, but we could help them

18   with that if we needed to.

19   **Q.**  So with the new requirement in the IRL with regard to

20   installation of enhanced nitrogen-reducing systems, the

21   provision if sewer is not available, then they have to install

22   the nitrogen reduction, that same process is looked at with

23   regard to is sewer available.  The department is going to ask?

24   **A.**  Yes.

25   **Q.**  And that same process would apply for July 1, 2030, where

*KIMBERLY DUFFEK | DIRECT*

1    everyone has to replace --

2    **A.**   Yes.

3    **Q.**   -- their systems if sewer is not available?

4    **A.**   If sewer is not available, yes.

5    **Q.**   Generally, where's the permitting criteria for an OSTDS

6    located?

7    **A.**   We have a rule, Chapter 62-6.

8    **Q.**   Are there inspection requirements in statute or rule --

9    **A.**   Yes.

10   **Q.**   -- for conventional systems?

11   **A.**   Yes.

12   **Q.**   What type of inspections are required?

13   **A.**   So there's construction inspections that are required when

14   they're installed.

15   **Q.**   Would that be new and modified?

16   **A.**   Yes --

17   **Q.**   Okay.

18   **A.**   -- and repaired.

19   **Q.**   So outside of natural installation, for a conventional

20   system, any requirement the owner monitor, report, inspect

21   annually?

22   **A.**   Not for a domestic flow, residential-type system, no.

23   **Q.**   So the average --

24   **A.**   We give recommendations, but there's no requirement.

25   **Q.**   So for a conventional system, the average homeowner is

*KIMBERLY DUFFEK | DIRECT*                                                    132

1   under no legal obligation to have the system inspected

2   annually?

3   **A.**   No.

4   **Q.**   Is there any legal obligation for the department to have

5   that residential conventional system inspected annually?

6   **A.**   No.

7   **Q.**   What about a commercial --

8   **A.**   Where commercial strength flow is generated, and that would

9   be something like a restaurant, then, yes, there is something

10  called an operating permit for that system, and it does require

11  annual inspections by the department, by that CHD in this

12  particular case.

13  **Q.**   So for a conventional system with no enhanced treatment

14  capability, there's only the requirement of inspections

15  annually for commercial flow systems?

16  **A.**   Commercial and industrial manufacturing and then for ATUs

17  and performance-based systems.

18  **Q.**   For performance-based systems or these enhanced

19  nitrogen-reducing systems, is there a requirement for annual

20  inspections?

21  **A.**   Yes.

22  **Q.**   And is that in statute and rule?

23  **A.**   Yes.

24  **Q.**   And who is required to perform those inspections?

25  **A.**   That would be the -- in the Indian River Lagoon area, the

*KIMBERLY DUFFEK | DIRECT*                                          133

1    CHDs.

2    **Q.**   What is a maintenance entity inspection?

3    **A.**   So these enhanced systems or aerobic treatment enhanced

4    nitrogen-reducing and performance-based systems have to have a

5    maintenance entity contract, and that would be part of the

6    permitting.   They would be required to submit that.   And the

7    maintenance entity goes out at least twice a year to make sure

8    the system is functioning the way it's supposed to, and they

9    submit those reports to the department.

10   **Q.**   Is that for both residential and commercial?

11   **A.**   Yes.

12   **Q.**   So all of these soon-to-be-installed enhanced

13   nitrogen-reducing systems are going to be required to have

14   maintenance entity contracts and be inspected twice annually

15   under the current rules?

16   **A.**   Twice, at least twice by the maintenance entity.   The

17   engineer who would design a performance-based system could ask

18   for greater, but with the ATU 245 system it's at least twice a

19   year by the maintenance entity and then annually by the CHD.

20   **Q.**   So is an owner, whether commercial or residential, required

21   to maintain, keep active, that maintenance entity contract?

22   **A.**   Yes.   For as long as the system is there, they are required

23   to do that.   So if they connect to sewer, then they would no

24   longer have to have that.

25   **Q.**   So what happens if the CHD realizes, We don't have updated

*KIMBERLY DUFFEK | DIRECT*

1    maintenance entity contracts for these properties?

2    **A.**  They would send a letter out to the homeowner or the

3    property owner indicating that they do not have an updated

4    maintenance contract and give them, again, a specific time.

5    They would start enforcement, basically, give them a specific

6    time to get them that information or get them the new contract

7    and, then, if that doesn't happen, they would, again, escalate

8    it.

9    **Q.**  You said "start enforcement"; is that because it's a

10   violation of department rules?

11   **A.**  Yes.  Yes.  They're required to have one, so it would be a

12   violation.

13   **Q.**  One thing about enforcement is -- are you involved in the

14   enforcement process at all, first?

15   **A.**  My extent is, if the inspector had a question about, maybe,

16   what are they violating.  Sometimes they're unsure of which

17   statutes or part of the rule they might be violating.  We get

18   involved and sometimes we review the notices, but only if

19   asked.

20   **Q.**  So you personally are not involved with enforcement once

21   it's referred to the department's office of the general

22   counsel?

23   **A.**  Again, not unless I'm asked a question.

24   **Q.**  Are you familiar with the statute in 381.00651, that

25   periodic evaluation and assessment of OSTDS?

*KIMBERLY DUFFEK | DIRECT*                                            135

1   **A.** I think.  I think I know what you're referring to.  It's

2   been a while since I've looked at that.

3   **Q.** What's your general understanding?

4   **A.** I think that's the one where it said if there is a --

5   first, magnitude spring that the county could adopt a -- it's

6   not maintenance -- but an inspection program on systems that

7   they be inspected or looked at every five years.

8   **Q.** I'm sorry.  I want to make sure I heard you correct.  The

9   counties can pass an ordinance?

10  **A.** The county -- yes, counties.  So that would be county

11  government.  Sorry.

12  **Q.** So to your knowledge, was this statute an

13  opt-in-or-opt-out?

14  **A.** Yes.  It was an opt-in-or-opt-out statute.

15  **Q.** To your knowledge, did any county within the IRL area opt

16  in and pass ordinances?

17  **A.** No.

18  **Q.** To your knowledge, is there anything in Chapter 381 or 62-6

19  that gives the DEP the authority -- or DOH at the time -- to

20  require counties to install or expand central sewer?

21  **A.** Could you repeat that, please?

22  **Q.** Do you know of any legal authority, either Chapter 381 or

23  62-6, that allows DEP to order a county local government to

24  install or expand its central sewer system?

25  **A.** No.  No.

1   **Q.**  So whether or not central sewer is installed is up to the

2   local government?

3   **A.**  Yes.

4            **MS. CORBARI:**  And, Your Honor, at this time, the

5   department would ask to enter DEP 14, the interagency

6   agreement.

7            **THE COURT:**  Any objection?

8            **MS. BLOME:**  No objection.

9            **THE COURT:**  All right.  What's been marked as

10  Defendant's Exhibit 14 will be admitted and marked, without

11  objection.

12       (Defendant's Exhibit No. 14 was admitted into evidence.)

13           **MS. CORBARI:**  That's all I have right now.

14           **THE COURT:**  All right.  Thank you.

15           Cross-examination.

16           **MS. BLOME:**  Did you also want to admit 15 and 16?

17           **MS. CORBARI:**  Nope.

18           **MS. BLOME:**  Okay.

19                        **CROSS-EXAMINATION**

20  **BY MS. BLOME:**

21  **Q.**  Good afternoon, Ms. Duffek.  You testified that the onsite

22  sewage program moved from the Department of Health to the

23  Department of Environmental Protection in 2021.

24  **A.**  Yes.

25  **Q.**  Do you know why it moved over?  Again, you said you were

*KIMBERLY DUFFEK | CROSS*

1    with the department for 30 years, so do you know what the

2    reason for the move was?

3    **A.**   Not exactly, no.

4    **Q.**   Did anything about your job change when the move happened?

5    **A.**   Not specifically, no.  There's a few nuances between DEP

6    and DOH, but those are more procedural and not programmatic.

7    Enforcement has changed some.  We went to DEP's enforcement

8    protocol versus DOH's.

9    **Q.**   Can you describe that a little bit more?

10   **A.**   Pretty much, I did.  They do the investigation, the

11   department.  Right now, the Department of Health is the one in

12   the Indian River Lagoon area implementing the program.  They do

13   the investigations.  They send out the notices.  And where they

14   don't get compliance with the notices timely, they push it up

15   to OGC at DEP to take on further enforcement.

16   **Q.**   Is OGC, office of general counsel?

17   **A.**   Yes, ma'am.

18   **Q.**   Okay.  Who in DEP would, then, initiate an enforcement

19   action on behalf of DEP?

20   **A.**   Who in DEP?

21   **Q.**   Yeah.  Like, which department?

22   **A.**   I'm not sure I understand the question.

23   **Q.**   I'll put it a different way.  We heard from Nathan Hess

24   this morning, and we heard from Ken Weaver, and we heard from

25   Moira Homann, and neither of them and none of them seemed to

*KIMBERLY DUFFEK | CROSS*

1   believe they had enforcement power.  So as the person who

2   oversees this program, do you know who within DEP does have

3   that enforcement power?

4   **A.**  Not that specific enforcement power, no.

5   **Q.**  They all said it was you.  They all said it is the onsite

6   sewage program.

7   **A.**  For onsite sewage systems.

8   **Q.**  Right.  That's what I mean, so who does the investigation

9   and issues the penalties at DEP?

10  **A.**  The Department of Health does the investigations.  They

11  take the pictures.

12  **Q.**  Mm-hm.

13  **A.**  They do the case, and then it is pushed up to OGC to go

14  forward with.

15  **Q.**  So the general counsel's office is issuing penalty orders?

16  **A.**  Through the Department of Health -- I mean, through the

17  onsite sewage program office, yes.

18  **Q.**  Is there someone in the onsite sewage program who oversees

19  that enforcement bit?

20  **A.**  No, not a specific person.

21  **Q.**  Have you ever been involved in OGC's issuing of a penalty

22  order?

23  **A.**  Not specifically.

24  **Q.**  Can you think of any of your colleagues who have?

25  **A.**  Yes.

*KIMBERLY DUFFEK | CROSS*                                        139

1    **Q.**  Okay.  Who are those people?

2    **A.**  In the Indian River Lagoon area specifically are we talking

3    about?

4    **Q.**  Sure.

5    **A.**  I do not know.

6    **Q.**  In your tenure, are you aware of any enforcement actions

7    from DEP in the Indian River Lagoon area, through the onsite

8    sewage program?

9    **A.**  Not every one of those come up, and so there are plenty

10   that happen through the Department of Health that get taken

11   care of and we don't hear about them.

12   **Q.**  And so the specific question about DEP, is that a no,

13   you've not heard of any from --

14   **A.**  Me specifically, no.

15   **Q.**  Okay.  You testified that investigations are largely

16   complaint driven?

17   **A.**  Yes.

18   **Q.**  Does DEP have power to do any investigations on its own, or

19   do they have to be received by complaints?

20   **A.**  We would have no -- we can't just go out to somebody's

21   property with no provocation.  No, we cannot.

22   **Q.**  Do you view that your authority in your role has changed

23   since the program moved from the Department of Health to the

24   Department of Environmental Protection?

25   **A.**  Not specifically, no.

*KIMBERLY DUFFEK | REDIRECT*

1    **Q.**  Does the Department of Environmental Protection have

2    rule-making authority on this topic, on onsite sewage disposal?

3    **A.**  Specific rule-making authority through 381.

4        **MS. BLOME:**  Yeah.  Thank you.  No further questions.

5        **THE COURT:**  Redirect examination.

6        **MS. CORBARI:**  Yes.

7                    **REDIRECT EXAMINATION**

8    **BY MS. CORBARI:**

9    **Q.**  Ms. Duffek, could you please turn to page 405 of DEP 14.

10   Okay.  So at the very bottom -- well, first, can you identify

11   what this is?

12   **A.**  It's the OSTDS enforcement roles.

13   **Q.**  And just what's a general description of this?

14   **A.**  Oh, basically, it would be the steps taken from

15   investigation through enforcement.

16   **Q.**  And does it set out the role, whether it's DEP or the

17   county health department?

18   **A.**  Yes.

19   **Q.**  Okay.  At the very bottom, what is the action that says,

20   "Notice of Violation"?  Do you see that, the very bottom row?

21   **A.**  Yes, "Notice of Violation," uh-huh.

22   **Q.**  Who prepares the formal charging documents?

23   **A.**  DEP staff.

24   **Q.**  Would that be DEP legal staff?

25   **A.**  Yes.

*KIMBERLY DUFFEK | REDIRECT*

1    **Q.**  Okay.  The citation for a violation, who prepares --

2        What was a citation?

3    **A.**  Okay.  Prior to a change in the law, citations used to be

4    issued by the Department of Health, and they were the next step

5    in enforcement when there was not compliance.

6    **Q.**  Did a citation include a penalty?

7    **A.**  They did.

8    **Q.**  Was the citation form adopted by DOH rule?

9    **A.**  Yes.

10   **Q.**  You just mentioned a change.  Now, who issues -- are

11   citations issued any longer?

12   **A.**  No.  They no longer are issued, and DEP does the

13   enforcement when it gets escalated.

14   **Q.**  And DEP issues notices of violations pursuant to a 403

15   statute?

16   **A.**  Yes.

17   **Q.**  And are you aware that the change -- was that a statutory

18   change that DEP initiated --

19   **A.**  Yes.

20   **Q.**  -- to be able to have --

21   **A.**  Authority.

22   **Q.**  -- authority?

23       If you could go to the next page, 406.  For administrative

24   proceedings for a notice of violation or failure to comply with

25   a consent order, who has the lead role in enforcing that?

*KIMBERLY DUFFEK | REDIRECT*

1    **A.**  DEP OGC counsel.

2    **Q.**  And civil court proceedings, who has the lead role in that?

3    **A.**  DEP OGC.

4    **Q.**  So DEP is the lead enforcement?

5    **A.**  Yes.

6          **MS. CORBARI:**  Thank you.  That's all I have.

7          **THE COURT:**  All right.  Thank you.  May this witness

8    be excused?

9          **MS. CORBARI:**  Yes, Your Honor.

10          **THE COURT:**  Will she be subject to recall?

11          **MS. CORBARI:**  No, Your Honor.

12          **THE COURT:**  Will she be subject to recall from the

13   plaintiff?

14          **MS. BLOME:**  No.

15          **THE COURT:**  All right.  At this time, I would invite

16   the defense to call their next witness?

17          **MR. BROWN:**  Your Honor, the department is inclined to

18   rest.  May I confer briefly with counsel and the client

19   representative?

20          **THE COURT:**  Yes.

21          **MR. BROWN:**  The department rests, Your Honor.

22          **THE COURT:**  Will the plaintiff -- well, before we do

23   that, would you like to renew your Rule 50 motion?

24          **MR. BROWN:**  Your Honor, yes, I would, for the grounds

25   stated.

1          **THE COURT:**  All right.

2          **MR. BROWN:**  And also I had made that motion under

3     52(c), which I understand to be the analog for a motion for

4     directed verdict in a nonjury trial, based on the amendments to

5     the Federal Rules of Civil procedure, and I renew the motion

6     under 50(j), based upon the same grounds presented.

7          **THE COURT:**  All right.  I will incorporate those

8     grounds by reference.  What about the plaintiff?  Same

9     position?

10         **MS. BLOME:**  Yes, Your Honor.

11         **THE COURT:**  The issue is preserved, but will be denied

12    by endorsed order, incorporating by reference my prior

13    comments.

14         Will the plaintiff be presenting any evidence in

15    rebuttal?

16         **MS. BLOME:**  No, Your Honor.

17         **THE COURT:**  All right.  So I'm going to give you a

18    moment to clear your minds for closing argument, but I would

19    start by asking plaintiff:  How much time are you requesting

20    for closing?

21         **MS. BLACKNER:**  Plaintiff would ask for 20 to

22    30 minutes.

23         **THE COURT:**  Okay.  If you could narrow down to a

24    single number.

25         **MS. BLACKNER:**  Twenty minutes.

1          **THE COURT:**  You can do 30.  I just need a number.

2          **MS. BLACKNER:**  Twenty minutes, Your Honor.

3          **THE COURT:**  All right.  Will that suffice for the

4     defense?

5          **MR. BROWN:**  Yes, Your Honor.

6          **THE COURT:**  Let's take a 15-minute break.  We'll plan

7     on being back around 2:00, but let Ann know.  We don't have far

8     to go, but I want to make sure you can collect your thoughts to

9     thoroughly communicate whatever it is you want to communicate

10    on closing.

11         I will see you in about 15 minutes.  Court's in

12    recess.

13       (Recess at 1:48 p.m. until 2:05 p.m.)

14         **THE COURT:**  Please be seated, everyone.

15         I would be remiss if not asking Ms. Blackner if you're

16    waiving your rebuttal, because you didn't reserve time for it,

17    or if you neglected to reserve time for rebuttal argument.

18         **MS. BLACKNER:**  I neglected to reserve time, Your

19    Honor.

20         **THE COURT:**  All right.  So how much of the 20 minutes

21    do you want to reserve for rebuttal?

22         **MS. BLACKNER:**  Well, I would have asked for 30 minutes

23    if I had thought of rebuttal.

24         **THE COURT:**  I don't mind giving you 30, but the

25    defense will get 30 as well.

1          **MS. BLACKNER:**  Okay.  Yes, Your Honor.  I prefer

2     30 minutes with --

3          **THE COURT:**  Twenty and 10?

4          **MS. BLACKNER:**  Yes.

5          **THE COURT:**  It's your burden.  That's why you have the

6     rebuttal.  And 30 minutes for the defense.  I'll give you a

7     two-minute warning, and, by the way, I'll give you a two-minute

8     warning, but I'm not going to keep going on the warning.  So

9     if, hypothetically, I give you a two-minute warning and you go

10    five minutes over, then that comes off of your rebuttal time,

11    and there'll be a hard cutoff after rebuttal time is expired.

12          All right.  So is the plaintiff ready to make a

13    closing argument?

14          **MS. BLACKNER:**  Yes, Your Honor.

15          **THE COURT:**  All right.  Feel free to do so.  I'll

16    begin timing when you start addressing the Court.

17          **MS. BLACKNER:**  Your Honor, in its December 18th order

18    on the parties' motions for summary judgment, the Court

19    determined that it needed to hear live testimony and the

20    presentation of evidence to determine, quote, "whether there is

21    an ongoing risk of manatee takings under FDEP'sFlorida

22    Department of Environmental Protection regulatory regime."  The

23    evidence is testimony presented to this Court over the last

24    two days make that answer unequivocally clear.

25          Yes.  There is a reasonably certain ongoing risk of

1    manatee takings under FDEP's regulatory regime.

2         Our review of the relevant law on the Endangered

3    Species Act makes the answer to the Court's question

4    unequivocally clear.  Yes.  There is a reasonably certain

5    ongoing risk to manatees in the north IRL caused by FDEP's

6    sewage regulatory regime.  Therefore, take of manatees is

7    reasonably certain to be going on now and into the future.

8         The evidence and testimony presented to the Court

9    clearly establishes that, in the tragic case of the manatees in

10   the North Indian River Lagoon, the past is prologue.  Manatee

11   harm and harassment in the form of malnutrition and starvation

12   has been happening for well over a decade, and the Court can

13   confidently determine that this harm and harassment will

14   continue into the future, absent an injunction and judicial

15   relief.

16        In its December 18th order, the Court made important

17   findings of fact, which include:

18        One, the manatee is designated as a threatened species

19   under the ESA and subject to all ESA protections, including the

20   prohibition on take.  Notice Section 9.

21        Two, manatees occupy the North Indian River Lagoon.

22        Three, seagrass is the primary historic manatee forage

23   in the lagoon.

24        Four, absence of seagrass in the lagoon results in

25   manatee starvation, emaciation, and many manatees have died.

1           Five, excessive nutrient loading into the north IRL

2   has caused eutrophication and algae blooms, which have

3   decimated seagrasses.

4           Six, excessive nutrient loading into the north IRL has

5   resulted from septic tanks and wastewater-treatment plants.

6           Seven, septic tanks and wastewater-treatment plants

7   are under the control of FDEP.

8           Eight, manatee take has occurred in the past.

9           From the Court's order, quote:  "Previously the death

10  of seagrasses has caused the taking of manatees under the ESA."

11  And that's from the final page of the Court's order.

12          What does the law say with respect to the Court's

13  inquiry of, quote, "whether there is an ongoing risk of manatee

14  takings under FDEP's regulatory regime"?  Plaintiff addressed

15  this question in the bench memorandum regarding foreseeability.

16          The ESA defines "take" to, quote: "harass, harm,

17  pursue, hunt, shoot, wound, kill, trap, capture, or collect, or

18  to attempt to engage in any such conduct."

19          "Harm" and "harass" are further defined as:  "Harm" in

20  the definition of "take" in the Act means an act which actually

21  kills or injures wildlife.  Such act may include significant

22  habitat modification or degradation, where it actually kills or

23  injures wildlife by significantly impairing essential

24  behavioral patterns, including:  Breeding, feeding, or

25  sheltering.  That's 50, see FR 17.3.

1          "Harass" in the definition of "take" in the Act means

2     an intentional or negligent act or omission which creates the

3     likelihood of injury to wildlife by annoying it to such an

4     extent as to significantly disrupt normal behavioral patterns,

5     which include, but are not limited to, breeding, feeding, or

6     sheltering.

7          I note, in response to a point that was raised by

8     defense counsel, that plaintiff's second amended complaint has

9     adequately pled harm and harassment.  I direct the Court to

10    paragraph 18 of the second amended complaint.  Quote: "For the

11    past several years manatees have been suffering, starving, and

12    dying in the north IRL as a direct result of the lagoon's

13    eutrophication, which substantially results from DEP's

14    regulation, permitting, and authorization of sewage disposal

15    via septic tanks and wastewater plants located in the north IRL

16    watershed.  This harm and death suffered by manatees in the

17    north IRL, as a result of DEP's regulatory actions, have been,

18    are, and will continue to constitute unlawful violations of the

19    ESA."

20         And then at paragraph 26, quote:  "Further, the

21    attached reports do not include dead manatees who did not die

22    in the north IRL but were, nonetheless, severely impacted by an

23    absence of forage during their winter stay at the warm water

24    refuge at the FPL Power Plant or during their migration through

25    the north IRL to other waters."  That was paragraph 26.

1          I then note for the Court paragraph 48.  Let's see.

2     Paragraph 48, which the Court cited to the other day:  The

3     starvation, impaired health, and deaths of manatees in the

4     north IRL resulting from human-waste-driven hypereutrophication

5     continues.  DEP's authorization of wastewater discharges and

6     failure to enforce its own laws and regulations has created an

7     ongoing emergency that creates a catastrophic harm for manatees

8     in the north IRL.  DEP's ongoing authorization of septic tanks

9     and wastewater-treatment plants that leach and load nitrogen

10    into the north IRL will:

11              A, adversely impact manatee feeding;

12              B, adversely impact manatee health;

13              C, cause manatee starvation, suffering, and death;

14              D, cause the extirpation of manatees in the north IRL;

15              E, cause the degradation of manatee habitat;

16              F, hinder the recovery of manatees.

17          And, finally, in plaintiff's prayer for relief, on

18    page 30, we ask the Court for relief in the form of an order,

19    that:  "Manatee starvation, death, suffering and ill health are

20    a consequence of the destruction of manatee habitat and food

21    sources because of DEP's continuing authorization of septic

22    tanks and wastewater-treatment plants that release nitrogen

23    into the north IRL."

24          So that was simply to clarify, Your Honor, that

25    plaintiffs have clearly pled more than simply manatees are

1    being killed.  They're suffering.  They have malnutrition,

2    malnourishment, and all the problems -- all of the problems

3    that result from this lack of forage are part of our claim for

4    take.

5            These regulatory definitions of "harm" and "harass"

6    are fully accepted law under the Supreme Court's holding in

7    *Babbitt v. Sweet Home Chapter*, and in that chapter -- in that

8    decision the Supreme Court reiterated its prior holding in *TVA*

9    *v. Hill*, which cited the ESA itself, at 16 U.S.C. 1531(b).

10           "The purposes of this chapter are to provide a means

11   whereby the ecosystems upon which endangered and threatened

12   species may be conserved."

13           And, Your Honor, that is exactly what this case is

14   about.  It is about the ongoing destruction of the ecosystem of

15   the north IRL, upon which manatees are absolutely dependent.

16   And this case is about the power of the ESA to address that

17   destruction and come to the assistance of manatees.

18           The law is completely settled that an activity which

19   is reasonably likely to result in harm and/or harassment of a

20   federally listed species constitutes unlawful take under

21   Section 9 of the ESA.

22           In our bench memo, plaintiffs cited to several cases:

23           *Loggerhead Turtle*, 896 F. Supp. 1170, which was an

24   order on a motion for preliminary injunction.  Quote:  "A

25   reasonable likelihood that the defendant will commit future

1    violations of the ESA," was sufficient to obtain a preliminary

2    injunction in this court years ago.

3    Dead bodies of a listed species need not be documented

4    before the ESA can be invoked to enjoin the behavior or

5    activity that is causing the take.  Over the years, the courts

6    have consistently concluded that an activity that results in

7    habitat modification that is reasonably certain to cause harm

8    or harassment, as those terms are defined, establishes a take,

9    even when that habitat modification has yet to occur.

10    Of course, in this case, we've already had the habitat

11    modification, and the habitat modification continues.

12    Plaintiff cited to two cases which held that a

13    proposed clear-cutting of forest tracts occupied by and relied

14    upon by federally listed birds does constitute unlawful take

15    because the clear-cutting, if it occurred, would indeed

16    interfere with the birds' breeding, feeding, and/or sheltering.

17    In her *Babbitt v. Sweet Home* concurrence, Justice

18    O'Connor found that draining a pond occupied by a listed fish

19    would unquestionably constitute harm, and that's take because

20    the activity causes a habitat modification that would interfere

21    with breeding, feeding, and sheltering of the fish.  And this

22    Court cited to Justice O'Connor's example in its December 18th

23    opinion.

24    The evidence and testimony presented by plaintiff to

25    the Court at this trial unequivocally establishes that habitat

1    modification and destruction in the form of seagrass

2    disappearance and seagrass replacement with macroalgae has been

3    ongoing for at least 15 years, and is more than likely to

4    continue into the foreseeable future.  Dr. Barile testified to

5    this fact, and his testimony was not controverted.

6        The most powerful evidence establishing that seagrass

7    is not returning to the north IRL in the near future are the

8    State of Florida agency documents presented to the Court at

9    this hearing.  These exhibits constitute admissions that the

10   seagrass is not returning anytime soon.

11       Significantly, Plaintiff's Exhibit 3, the 2023

12   St. Johns River Water Management District Seagrass Update,

13   states there's almost no seagrass present in the north IRL and

14   that the north IRL is more than 80 percent Caulerpa.  The

15   presentation further demonstrates the same trends are occurring

16   in the central IRL and Banana River, both of which are under

17   BMAP mandates.

18       The next agency admission that the grass is not

19   returning to the north IRL anytime soon is Plaintiff's

20   Exhibit 9, the St. Johns River Water Management District poster

21   that was created in 2022 entitled, "Where Has All the Seagrass

22   Gone in the IRL, and Why are the Manatees Hungry?"  In this

23   poster, St. Johns River Water Management District states, as

24   its take-home message:  Based on the rate of increase during

25   2013 to 2015, it could take 12 to 17 years to start to see

1    seagrass recovery.  This takes us to 2034 or up from 2034 to

2    2037 before things really start to turn around for seagrass in

3    the north IRL.

4            Plaintiff's Exhibit 8, defendant's own 2024 update on

5    the north IRL BMAP, is an admission that going forward from

6    2019, total nitrogen and phosphorus load reductions have

7    flatlined since 2023, and are projected to continue to flatline

8    into the foreseeable future, at least through 2030.  And all

9    through this period manatees are suffering from lack of

10   seagrass.

11           And it is an established fact that when water quality

12   does not improve, seagrass does not return.  Please review the

13   page Seagrass Extent By Lagoon, which was in the Exhibit 8.

14   There was no seagrass in the north IRL in 2021 and just a

15   little bit projected for 2023.  On page 12 of that Exhibit,

16   Mean Seagrass by Sublagoon, there's hardly been any seagrass in

17   the north IRL since 2016.

18           The uncontroverted evidence establishes, and DEP

19   admits, that nutrient loading into the north IRL is not getting

20   close to the state's own nutrient reduction goals necessary to

21   improve water quality sufficient to allow seagrass to return,

22   and an absence of seagrass in the north IRL will continue into

23   the foreseeable future.  This is an indisputable fact.

24           Indeed, the evidence presented shows that since the

25   TMDL was adopted in 2009, there have been multiple UMEs in the

1    north IRL resulting from continuing water quality degradation.

2    According to the 2021 BMAP, which is made by DEP, water quality

3    has been out of compliance with respect to seagrass since 2009.

4        I would like to address briefly defendant's witnesses.

5    The first witness, Mr. Weaver, admitted that -- he said, quote:

6    "If the TMDL and BMAP goals are met, the seagrass will

7    recover." So the BMAP is a plan. It's a goal. Everybody

8    wants to see the seagrass return, but the operative word is

9    "if." And he said that even if the goals are met, it's going

10   to take a long time for the seagrass to return. And at best --

11   the BMAP is a best case scenario. And Mr. Weaver admits it

12   will take at least 12 to 17 years to recover seagrass.

13       He also admitted that there wasn't even a TMDL in the

14   state of Florida until a suit was brought against the state to,

15   quote, push it along.

16       The next witness, Ms. Homann, she explained how the

17   BMAP process is iterative, and so DEP is always incorporating

18   new information to try to reach the TMDL goal. She called this

19   a holistic approach. She says the amounts are set up to take

20   15 to 20 years to give the system time to effect success in

21   seagrass return. BMAPs take time, and she discussed that the

22   BMAP is a constant process of evaluation and calibrating things

23   to try to achieve the goal of seagrass return. She said it

24   takes a long time. It takes a long time to achieve the goal.

25       The budget allocation she discussed, the financial

1    budget allocations for the north IRL, the money that's being

2    thrown at this, they're an admission and indicative that the

3    state is fully aware of how bad water quality is in the north

4    IRL.

5            **THE COURT:**  Two minutes.

6            **MS. BLACKNER:**  Oh.  Ms. Homann admits DEP has no plan

7    for manatee habitat.  She claims she has no statutory authority

8    over manatees and no duty to protect manatees, but the fact

9    remains that DEP, like all governmental entities, must not

10   violate the ESA.

11           The other two witnesses, Mr. Hess and Ms. Duffek,

12   presented no testimony as to whether there is an ongoing risk

13   of manatee takings under DEP's regulatory regime.

14           So what does the absence of seagrass in the north IRL

15   mean for manatees that occupy the north IRL?  It means that

16   manatee will continue to eat Caulerpa and other macroalgae,

17   which, again, is not their natural historic forage.

18           At the height of the present UME, there was nothing to

19   consume, no forage.  This total lack of forage meant mass

20   starvation and the declaration of the 2020 UME by NOAA, which

21   has listed the cause as:  "Malnutrition secondary to ecological

22   factors."  That was their cause.  This is Plaintiff's

23   Exhibit 20.  And the UME has not been closed.

24           Dr. de Wit testified with particular interest in

25   Exhibit 11, her report on the closeout of the 2013 UME.  She

1    stated that the UME followed a dramatic reduction of seagrass

2    coverage in the IRL due to nontoxic phytoplankton blooms with

3    the resulting ecosystem shift to macroalgae dominance.  That

4    has not changed.

5         No, I won't read that.

6         She concluded in her report:  "The suite of

7    clostridial virulence factors and toxins identified here,

8    likely caused by a shift to a predominantly macroalgal diet,

9    appears to play a significant role in the mortality of

10   manatees" --

11        **THE COURT:**  That's time, but you can keep going.  It's

12   coming off your rebuttal now.

13        **MS. BLACKNER:**  All right -- "primarily in the IRL, but

14   also elsewhere.  Concern for manatee health and survival

15   warrants yet further investigation as to primary causative

16   factors" -- including -- "wastewater-treatment plants" and

17   "sewage disposal systems."

18        I would ask the Court to review Plaintiff's

19   Exhibit 10, "Evidence of a Dietary Shift by the Florida Manatee

20   in the Indian River Lagoon," also published in 2022.  This

21   study is important, as Dr. Barile discussed, because it sets a

22   baseline for healthy feeding for the manatees in the IRL,

23   comparing seagrass in the '70s to after seagrass disappeared.

24        What the evidence and testimony presented to this

25   Court does is to tell the tale the past is prologue, and,

1    indeed, ecological collapse in the north IRL, resulting from

2    DEP's regulation, will continue into the future because

3    nitrogen and phosphorous loading into the north IRL is not

4    being reduced at rates sufficient to lead to seagrass

5    recovery -- fast enough to lead to seagrass recovery and save

6    the manatees.

7          The best case scenario is a seagrass return in

8    10 years.  Defendant and its sister agency St. Johns River

9    Water Management District admit this.

10          And because there is no seagrass recovery, manatees

11    will be forced to continue to eat macroalgae, which is

12    demonstrably harmful to them and causes malnutrition, and

13    sometimes the sewage dumping and nutrient loading get so

14    intense that you have a situation like a starvation UME that

15    killed over a thousand manatees.

16          The UME has not closed yet.  There's no evidence that

17    has been produced that it is closed.

18          So, finally, I would like to say to the Court, as

19    we've mentioned in our bench memo, that the ESA's take

20    prohibition applies to individual members of a listed species.

21          "'Take' is defined in the broadest possible manner to

22    include every conceivable way in which a person can take any

23    fish or wildlife."  And that's from *Babbitt v. Sweet Home*.

24          And I would also ask the Court to look at *Loggerhead*

25    *Turtle v. County Council*, 896 F.Supp. 1170.  "Any taking and

1    every taking, even of a single individual of the protected

2    species, is prohibited by the Act."

3          Defendant presented no testimony or evidence

4    challenging plaintiff's evidence that manatees will continue to

5    be impacted.

6          In closing, plaintiff urges this Court to find that

7    take of manatees in the north IRL is ongoing.  Plaintiff moves

8    this Court to enter judgment for plaintiff and enjoin defendant

9    from further take of manatees.

10          Plaintiff hopes that the BMAP for the north IRL is

11    successful and the seagrass returns, but until that happens,

12    manatees will continue to be taken by defendant in violation of

13    the ESA.  Defendant needs an incidental take permit and habitat

14    management plan to minimize manatee take in the north IRL until

15    the BMAP finally succeeds.

16          Plaintiff seeks an injunction, all appropriate

17    judicial relief, while the incidental take permit application

18    process is ongoing.  That would include medical monitoring and

19    ensuring that manatees have access to their natural forage.

20          Thank you, Your Honor.

21          **THE COURT:**  Thank you.

22          Is the defense ready to make a closing argument?

23          **MR. BROWN:**  Yes, Your Honor.

24          **THE COURT:**  All right.  I would invite you to begin

25    when you're ready.  I won't start timing until you begin

1    speaking.

2         **MR. BROWN:**  I appreciate the Court's consideration of

3    the legal arguments in this case.

4         For the closing argument, I will argue on the weight

5    of evidence on the matters presented by the Court, specifically

6    whether the plaintiffs can maintain their burden to demonstrate

7    an ongoing violation so they could sustain their lawsuit as an

8    exception to the *Ex parte Young* doctrine.

9         And I would like to -- I want to start with a

10   discussion on the chain of causation, discuss some

11   miscellaneous issues that have not been the -- not been argued

12   at length, and close with a discussion of the correspondence

13   from the United States Department of Interior.

14        And in considering the chain of causation, I go back

15   to the hearing on the motion for summary judgment when the

16   Court advised that it felt like it was drinking from a fire

17   hose, and I was trying to think of a better way to explain how

18   this argument might be considered, and it occurred to me that

19   it may be useful to compare the theory in this case to other

20   theories of secondary liability.

21        Take, for example, premises liability versus vicarious

22   liability.  Let's suppose you have an owner of a commercial

23   property that owns a garage and a third party, a criminal,

24   commits an assault within those premises.  Now, if the

25   third-party employee somehow could be vicariously liable for

1       that tort, which would be, again, unlikely, then the theory of

2       causation would not have a time consideration.

3              Now, let's suppose, by contrast, it's not a matter of

4       vicarious liability but the liability for the actual conduct of

5       the owner, such as like you would have in a case where there's

6       a claim that the owner had negligently failed to maintain

7       premises.  Now, the conduct of the owner begins and ends at a

8       certain point in time, such that -- let's suppose that the

9       issue in the lawsuit involved the question of lighting.  If the

10      lighting is fixed before the third party takes action, then

11      there would be no negligence on the part of the owner.  Blame

12      cannot be attributed to the owner because the conduct of the

13      owner itself had already been rectified.

14             Now, to summarize the chain of causation, as I

15      understand that the record has demonstrated.  First, the

16      question of regulatory regime:  The department will take

17      various actions or alleged inactions that will have an effect

18      on third parties.  In turn, local governments, nature, natural

19      sources will also have an effect on those third parties and the

20      resource itself.  In turn, those third parties discharge or

21      create pollutants, which are in turn discharged to the water.

22      Those nutrients to the water encourage algae growth, and the

23      algae growth, in turn, leads to damage to seagrass through

24      interference with sunlight and other factors.  And, then,

25      finally, after all these indirect lines of causation, the loss

1    of seagrass under different conditions may or may not cause a

2    harm to the Florida manatee.

3            Now, I want to focus on the first and final chain --

4    focus on the weight of evidence as it relates to the first and

5    the final links in the chain of causation.

6            First, we begin with the effect of the department on

7    third parties, what's been referred to as the "regulatory

8    regime."  Now, the plaintiffs have not attempted to quantify or

9    demonstrate what actual effect the regulatory actions of the

10   department have on loading or on the actual conduct of third

11   parties, and they have not demonstrated that under the current

12   regulatory regime the laws in place and the status of the basin

13   management action plan, that there is any cause and effect

14   relationship between the department's regulations and the

15   current conditions in the North Indian River Lagoon.

16           And for that reason, we submit that the department --

17   the evidence does not support a finding that there is causation

18   or that the department could be deemed to have violated the

19   Endangered Species Act based upon that first chain of

20   causation.

21           Second, I would ask the Court to consider the final

22   link in the chain of causation, which is the conditions of the

23   seagrass and how it affects manatees.  Now, the Court had heard

24   evidence from the plaintiff which describe conditions

25   theoretically that may be inopportune to the Florida manatee.

1    But the only witness that had actual knowledge of the condition

2    of the manatees during the past two winters was Dr. de Wit, who

3    testified emphatically that the current conditions of the

4    Indian River Lagoon do not cause death or harm to manatees,

5    that the manatee population has been healthy during those two

6    seasons, and she also refuted, emphatically, the theory

7    advanced by plaintiffs that the anecdotal reports of perinatal

8    death are related to the current habitat in the Indian River

9    Lagoon.

10        So we respectfully submit that as to the weight of

11    evidence, based upon the lack in those two parts in the chain

12    of causation, as a matter of fact, the department has not

13    committed an ongoing -- has not committed, is not committing an

14    ongoing violation of the Endangered Species Act.

15        Next, proceeding on to some of the miscellaneous

16    issues.  The Court has heard testimony from the experts about

17    what will happen in terms of the recovery of the Indian River

18    Lagoon under certain conditions.  And it would appear that

19    there is no set of circumstances, where you removed all human

20    inputs to the Indian River Lagoon where the seagrasses will

21    instantly return.  The damage by third parties, Your Honor, has

22    been done.

23        There is no proof or allegation that the department's

24    regulatory actions are harming the resource or restraining the

25    recovery of the Indian River Lagoon.  Rather, the testimony by

1    Dr. de Wit, among other testimony, shows that conditions are

2    improving and that, if anything, this can and should be

3    attributed to not just the regulatory actions of the department

4    but the other strategies, including funding of infrastructure,

5    that represent a constructive approach to restoring the health

6    in the Indian River Lagoon.

7        You had heard argument by plaintiff's counsel as to

8    the role of the Endangered Species Act.  One of the lingering

9    questions in this case is:  How, from a regulatory standpoint,

10   should the residential owners who own septic tanks be treated,

11   in terms of incentives or potential enforcement?  These

12   residential owners received construction permits for septic

13   tanks.

14       Now, if the breadth of the Endangered Species Act

15   should be so extensive, as claimed by the plaintiffs, then it

16   would appear that the appropriate role of the Endangered

17   Species Act, if it can be shown, and it has not been shown,

18   that any of those individual owners are causing or contributing

19   to the degradation of the Indian River Lagoon, then the proper

20   course of action is to take enforcement action under the

21   Endangered Species Act against those residential owners.

22       Now, I respectfully submit that is not the role of the

23   Endangered Species Act, to compel a state agency to take those

24   enforcement actions on behalf of a federal agency.

25       You have heard plaintiff's counsel about the supposed

1    admissions of the department in a PowerPoint presentation on

2    the progress of the implementation of the basin management

3    action plan.  That testimony was presented by a very qualified,

4    brilliant expert witness who had no actual knowledge what the

5    graphs meant and what they actually depict.

6            The testimony of Moira Homann emphatically

7    demonstrated that the graphs are not what that witness,

8    Dr. Barile, said they were.

9            I respectfully submit that for the reasons stated in

10   my previous argument, because subject matter jurisdiction must

11   be proven throughout every course in the proceedings, that the

12   case should be dismissed for lack of standing as a matter of

13   subject jurisdiction.  I won't repeat that argument.

14           And I respectfully submit, as I described earlier in

15   my argument for similar reasons, the action should not be

16   maintained under the anti-commandeering action.

17           Now, I would like to conclude with the department's

18   final exhibit, the letter from the United States Department of

19   Interior.  I wanted to point out two things.

20           First, plaintiff's counsel said that this was not --

21   this was not a closure or ending of the UME.  I would like to

22   read, for the record, the first sentence to the second

23   paragraph.  "This service concurs with the recommendation from

24   the working group and declares the UME closed," on the

25   letterhead of the United States Department of Interior.

1          For the remainder of my argument, the next part of the

2     letter says it best.  This was the view as expressed by the

3     United States Department of Interior:  "The criteria under

4     which the UME was originally declared are no longer applicable.

5     With no marked increase in the magnitude of mortality,

6     morbidity, or strandings when compared with prior records,"

7     citation omitted, "the affected animals are no longer

8     exhibiting unusual pathologic findings, behavioral patterns,

9     clinical signs, or general physical condition."  Citation

10    omitted.  "Seagrass in the Indian River Lagoon is slowly

11    recovering, and manatees are exhibiting better physical

12    condition with documentation of reproductive activity."

13          I couldn't say it better, Your Honor.  That ends my

14    closing argument.

15               **THE COURT:**  All right.  Thank you for your argument.

16               You have six minutes and one second for rebuttal.

17               **MS. BLACKNER:**  First, I would like it to say, Your

18    Honor, that the document produced yesterday is not a closeout

19    of the UME.  Only NOAA can close out the UME.

20          And to bring an Endangered Species Act, you don't -- a

21    UME is not even required.  The ESA does not require a pending

22    UME to establish take under Section 9.  Although this UME has

23    not been closed out, the ESA doesn't require it, and I could

24    locate no case law that even insinuated this.

25          Second, with respect to Dr. Martine de Wit and

1    Dr. Ball, the evidence was established that malnourishment does

2    interfere with reproductive success and the success of baby

3    manatees.  Malnourishment compromises the weaning of baby

4    manatees.  Dr. Ball testified to this.  Malnourishment

5    interferes with reproduction because pregnant manatees have a

6    very high energy demand, and they have to get even more forage

7    than usual.  So if you have a lagoon devoid of seagrass, it

8    imposes an additional stressor on the pregnant mothers.

9         The evidence established that there were about eight

10   perinatal mortalities in January of 2025.  Seven of the eight

11   were in Brevard County.  In 2024, the total perinatal deaths

12   was 154 for the whole state, with 55 of those in Brevard and

13   Volusia, which is the north IRL.  Thus, there were 82 perinatal

14   deaths, most of them in the IRL, as Dr. de Wit did testify.

15   And these deaths accord with Dr. Ball's testimony regarding

16   malnutrition interfering with successful reproduction and

17   weaning of young.  And, of course, we look back at the last

18   high of perinatal mortality, and that occurred during 2013, at

19   the height of that UME.

20        So I know that Dr. de Wit did not dispute anything

21   plaintiffs have put forward.  She simply hypothesized and noted

22   that there will be more investigation forthcoming about the

23   cause of this current UME.

24        And it's really misleading to suggest that DEP's

25   wholesale failures somehow immunize it.  They are the agency

1    with total regulatory control over wastewater in the lagoon,

2    even if they choose to delegate it to local actors and sister

3    agencies.

4         Mr. Brown's argument about causation should be

5    rejected because the Court's prior finding is now the law of

6    the case.

7         Again, the plaintiff and everyone hopes that these

8    BMAPs eventually succeed.  They're a goal.  They're a plan.

9    They're a hope.  Maybe they're a prayer.  They're an iterative

10   process, where the state is trying to fix a catastrophe.

11        In the meantime, manatees are suffering and will

12   continue to suffer, and they're suffering at the hands of the

13   wastewater that loads nitrogen into the lagoon, and because of

14   that, the defendant needs to go seek an incidental take permit.

15        Thank you, Your Honor.

16       **THE COURT:**  All right.  Thank you.  That concludes

17   today's proceedings.

18        Is there anything further from the plaintiff before we

19   end the session?

20       **MS. BLACKNER:**  No, Your Honor.

21       **THE COURT:**  Is there anything from defense before we

22   end the session?

23       **MR. BROWN:**  No, Your Honor.

24       **THE COURT:**  All right.  I will begin working on this

25   order in short order.  Thank you for your capable

1     presentations, and you'll be hearing from me in the near

2     future.

3              Court's in recess.

4          (WHEREUPON, this matter was concluded at 2:48 p.m.)

5                        *      *      *

6              **CERTIFICATE OF REPORTER**

7     I certify that the foregoing is a correct transcript of the
      record of proceedings in the above-titled matter.

8

9     s/Suzanne L. Trimble                    5/16/24
      Suzanne L. Trimble, RPR, WACCR, CRR      Date

10    U.S. Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25