# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| BEAR WARRIORS UNITED, INC., a Florida Not for Profit Corporation, | |
| *Plaintiff,* | |
| v. | No. 6:22-cv-02048 |
| ALEXIS LAMBERT, in her official capacity as Secretary of the FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| *Defendant.* | |

## DEFENDANT'S TIME-SENSITIVE
## MOTION TO STAY INJUNCTION PENDING APPEAL

## INTRODUCTION

Defendant Alexis Lambert, sued in her official capacity as Secretary of the Department of Environmental Protection (DEP) respectfully requests that the Court stay its injunction (Doc.190) pending DEP's appeal to the Eleventh Circuit. Given the injunction requires DEP to comply with certain obligations by June 17, DEP respectfully requests that the Court issue a decision on this stay motion by May 28, 2025, to preserve the opportunity for appellate review before the injunction goes into force. DEP submits that a decision on this timetable is appropriate because the Court is already familiar with many of the arguments outlined below through its decisions on the motion to dismiss, motions for summary judgment, trial, and injunction. If the Court is inclined to deny this motion, DEP does not oppose it doing so without first hearing from Plaintiff because of the time-sensitive nature of this request.

*** 

DEP's appeal is likely to succeed on the merits. Plaintiff lacks standing to obtain its preferred injunction because it is unlikely to be injured in the future due to actions caused by DEP or that DEP could redress. Further, the injunction violates the anticommandeering doctrine by seeking to control how a state regulates its own citizens in its sovereign capacity. And the evidence that Plaintiff

presented at trial was not sufficient to prove that DEP would injure plaintiffs in the future as a matter of law.

In addition, DEP is likely to suffer irreparable injury during the pendency of the appeal in the absence of a stay. The injunction requires DEP to implement new manatee monitoring and feeding programs, requiring the department to expend resources that it will not recoup if it is successful in its appeal. Further, the balance of the equities tilts in DEP's favor, as the proposed injunction prevents it from fulfilling its statutory duty to implement Florida environmental regulations and is likely to be mooted by newly proposed federal regulations.

DEP respectfully requests that the Court stay its injunction pending appeal.

## ARGUMENT

In deciding whether to grant a stay pending appeal, "a court considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (internal quotation marks omitted). Here, those factors all counsel for staying this Court's injunction while the Eleventh Circuit considers whether that injunction was appropriate.

I.    **DEP's appeal is likely to succeed on the merits.**

The Eleventh Circuit is likely to conclude that Plaintiff was not entitled to the injunction that it requested. First, Plaintiff did not have standing to seek this injunction because its members are not likely to suffer future injuries that will be caused by DEP or that could be redressed by the Court's injunction. Second, the Court's injunction raises serious anti-commandeering concerns because, rather than enjoining polluters directly, it compels the state to regulate its citizen in its capacity as sovereign. Third, based on the Court's factual findings at trial, the proximate cause standard was not satisfied as a matter of law, because the Court's conclusions about present danger to manatees rested on "legacy pollutants" outside of DEP's current, or even past, control. The combination of these three legal flaws makes it likely that the injunction will ultimately be vacated on appeal.

A. **Plaintiff lacks standing to secure a prospective injunction.**

Plaintiff lacks standing to obtain the type of prospective injunction that the Court issued in this case. To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). For the injury-in-fact requirement, to obtain a prospective injunction, a plaintiff must show "a sufficient likelihood that he will again be

4

wronged in a similar way." *City of Los Angeles v. Ly*ons, 461 U.S. 95, 111 (1983). Further, "[i]n exercising their equitable powers federal courts must recognize the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Id.* at 112 (internal quotation marks omitted).

**1.** The Eleventh Circuit is likely to reverse the injunction in its entirety for lack of standing. First, Plaintiff has not shown sufficient likelihood of future injury to secure the type of broad injunction that it obtained from this Court. The injury-in-fact requirement demands that "the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381 (citation omitted). And an organization cannot establish standing based solely on the intensity of its members' interests. *Id.* at 394.

At trial, this Court concluded that the injury-in-fact requirement was satisfied by Plaintiff's members who have seen dead manatees or lost business because of the declining manatee population. Doc.172 at 7-8. On the likelihood of future injury, it concluded that "Plaintiff's members are like[ly] to encounter dead manatees again" and noted that Plaintiff's expert had seen a dead manatee calf in the months before trial. *Id.* at 8 & n.4.

Those facts by themselves do not establish a sufficient likelihood of future injury. Plaintiff's expert did not establish that the manatee calf he saw died because of any cause traceable to DEP's actions or omissions. Indeed, at trial the Court took judicial notice of the fact that the manatee Unusual Mortality Event in the Indian River Lagoon has ended and noted that Plaintiff's own expert testified that "the last necropsy that showed manatee emaciation occurred two years ago." *Id.* at 19 (citing Def.'s Ex. 24). The Court downplayed the importance of these facts to the merits of Plaintiff's ESA claim because the death of "even one" member of an endangered species constitutes a taking. *Id.* But the end of the Unusual Mortality Event and the absence of any manatee deaths from emaciation are clearly relevant to Article III standing—*i.e.*, the likelihood that Plaintiff's members will be injured in the future. And these facts plainly undermine the need to impose an injunction requiring DEP to create new programs at taxpayer expense and halt construction by third parties that involves septic tanks. Doc.190.

Second, Plaintiff has not established that its speculative future injuries will be caused by DEP. "[P]laintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts." *All. for Hippocratic Med.*, 602 U.S. at 383 (internal quotation marks omitted). Further, "[t]he causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant

6

(even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.*

The Court's finding of present harm to manatees rested on "legacy pollutants" in the Indian River Lagoon that "have caused manatee takings in the past." Doc.172 at 12-13. But DEP did not regulate septic tank permits before 2021, Doc. 59-19 at 3, and this handover occurred after the manatee Unusual Mortality Event that has been a focus of expert discovery in this litigation, Doc.59 ¶ 24. Further, Plaintiff cannot hold DEP liable for past manatee takings between 2021 and 2025 under the *Ex parte Young* doctrine, which only allows lawsuits against states for present violations of federal law. 209 U.S. 123, 159 (1908).

The Court concluded that the existence of these "legacy pollutants" released by third parties meant that "FDEP would have to reduce nutrients entering the IRL to a low enough level and for a long enough time for nutrients to cycle out of the system to allow seagrasses to return at significant levels." Doc.172 at 17. In other words, the Court's injunction requires DEP to implement affirmative programs to remedy harms caused by third parties not before it, where DEP did not even have the power to regulate those polluters before 2021. The ESA "requires no affirmative conservation action by states or local governments." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 92 F. Supp. 2d 1296, 1308 (M.D. Fla. 2000). But that is precisely what the Court's injunction demands, by compelling the state

to take affirmative steps to create conservation programs within 30 days and cease all new septic permits in the affected area within 60 days. Doc.190.

Third, Plaintiff does not meet the redressability requirement for Article III standing. Redressability requires a demonstration that it is likely, not merely speculative, that an injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiff cannot show that the relief it requested is likely to prevent future harm to its members. Given the extent of "legacy pollutants" that the Court found to exist in the lagoon, Doc.172 at 16, it is highly speculative to conclude that forcing DEP to apply for an incidental take permit will prevent any of Plaintiff's members from encountering another dead manatee. Further, malnutrition due to eutrophication is hardly the only cause of manatee deaths, so Plaintiff's members may have previously encountered deceased manatees or will encounter them in the future where the death was unrelated to nitrogen released from septic tanks. *See* Florida Fish and Wildlife Conservation Commission, *Descriptions of Manatee Death Categories* (last visited May 20, 2025) https://perma.cc/65B8-Z8AK (describing watercraft, canal locks, poaching, and fishing equipment as other causes of manatee deaths).

This case is distinguishable from *Loggerhead Turtle*, where the Eleventh Circuit concluded that sea turtle plaintiffs had standing to sue a county government under the ESA. That case involved "a regulatory entity that exerts

8

control over the use of something that allegedly takes protected wildlife."
*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1251 (11th Cir.
1998). Here, DEP had no control over the majority of "legacy pollutants" that the
Court found caused Plaintiff's injury, and it has no authority to implement the
wildlife wellness programs required by the Court's injunction, *see infra* 11-12. The
Eleventh Circuit has recognized that in cases otherwise similar to *Loggerhead
Turtle*, standing still is not present where "the critical factual difference[] between
this case and *Loggerhead Turtle* is that the *Loggerhead Turtle* defendant had absolute
authority to issue environmental ordinances that would ... prevent plaintiffs'
injuries." *BBX Cap. v. FDIC*, 956 F.3d 1304, 1313 (11th Cir. 2020) (internal quotation
marks omitted). Those key causation and redressability differences also defeat
standing here.

**2.** In addition to lacking standing generally, Plaintiff lacks standing for
several of the specific provisions of the Court's injunction. *See TransUnion LLC v.
Ramirez*, 594 U.S. 413, 431 (2021) (explaining "standing is not dispensed in gross").
Both the requirement that DEP apply for an ITP and the requirement that it
implement three new manatee programs fail the causation and redressability
requirements.

The injunction's requirement that DEP apply for an ITP, Doc.190 ¶ 1, will
fail to redress Plaintiff's injury for two independent reasons. First, Incidental Take

Permits are discretionary, and there is no guarantee the U.S. Fish & Wildlife Service would entertain DEP's application. *See* 16 U.S.C. § 1539(a)(1) (USFWS "may" grant a permit). Second, if the permit *were* granted, DEP would be free to continue the very incidental taking that Plaintiff alleges is the source of its injury. *See* Doc.59 at 31 (complaining that "DEP has 'incidentally taken' manatees in the North IRL within the meaning of the ESA"). In other words, applying for and receiving a permit would, at best, provide explicit federal authorization to continue the very conduct that Plaintiff complains of. This is the antithesis of redressability.

In addition, several of the injunction's requirements are directed at the wrong state agency. The Eleventh Circuit has made clear that suing the wrong defendant creates insurmountable causation and redressability problems. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020). "[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

In *Jacobson*, the plaintiffs' injuries regarding ballot format were not "traceable to the Secretary [of State]—the only defendant in this action" because

the officials responsible for ballot order were "independent officials under Florida law who are not subject to the Secretary's control." 974 F.3d at 1253. For the same reason, the lawsuit could not "provide redress" because "[i]f a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable." *Id.* at 1254-55. This is because, for the redressability prong, "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (internal quotation marks omitted).

Foundational Article III standing requirements mean that injunctive relief must be addressed to state officials who have the power to remedy the plaintiff's injury. If the defendant cannot effectuate the plaintiff's proposed remedy, then the plaintiff's injury is neither traceable to, nor redressable by, the defendant. *Jacobson*, 974 F.3d at 1253-56.

Here, the injunction's requirement that DEP "establish and implement a biomedical assessment program for manatees," "establish a supplemental feeding program for manatees," and "submit quarterly reports … documenting mortality statistics for both adults and neonatal manatees, as well as live manatee recoveries," Doc.190 ¶¶ 2-4, are directed at the wrong agency. Under state law, DEP is not responsible for, has no authority to, and lacks the necessary expertise

to monitor or provide care for marine mammal populations. Its authority is limited to managing "air and water" pollution. Fla. Stat. §403.061.

Instead, the Florida Constitution vests the authority over "management, protection, and conservation" of marine mammal life in the Florida Fish & Wildlife Conservation Commission. Fla. Const. Art. 4 §9. Florida statutes further specify that ensuring the stability of manatee populations is the Commission's responsibility. *See, e.g.*, Fla. Stat. § 20.331 (the Commission shall "[m]onitor the status and health of marine life" and "[d]evelop restoration and management techniques"); § 379.2433 ("The Fish and Wildlife Conservation Commission shall implement and administer an enhanced manatee protection study ….").

The Commission, in other words, is the only agency with the authority under state law to carry out the injunction's remedial programs (even assuming the finding of liability and injunction were appropriate in the first place). Plaintiff itself acknowledges this. For one of its requested remedies, it asked that at least one expert be appointed who is "not employed by the Florida Fish and Wildlife Conservation Commission." Doc.174 at 2. That admission is fatal, as it underscores that Plaintiffs have not only sued the wrong defendant but *anticipated* that Commission officials would be involved in implementing its injunction.

At bottom, the Commission is an "independent" body "not subject to [DEP's] control." *Jacobson*, 974 F.3d at 1253. But Plaintiff chose to sue DEP, not the

Commission. And "[a]ny persuasive effect a judicial order might have upon [other agencies], as absent nonparties who are not under the [DEP's] control, cannot suffice to establish redressability." *Id.* at 1254. The Court itself previously recognized this principle, explaining that what is "required is that the official be responsible for the challenged action." Doc.112, at 15.

**B. The Injunction violates Tenth Amendment anticommandeering law.**

The Court's injunction also violates anticommandeering principles established by the Tenth Amendment. The Supreme Court has interpreted that Amendment to require "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). This prohibition is particularly concerned with situations in which the federal government "require[s] the States in their sovereign capacity to regulate their own citizens" and "require[s] state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000).

That is precisely what the Court's injunction requires here. The true targets of Plaintiff's lawsuit are private entities allegedly violating the ESA with environmentally damaging construction in the North Indian River Lagoon area. For those ESA violations, "any person" can file a suit for injunctive relief against those entities directly. *See* 16 U.S.C. § 1540(g)(1). But Plaintiff didn't take that direct

13

route. By taking the indirect route (i.e., requiring DEP to adjust its own regulatory scheme to prohibit non-ESA-compliant behavior), Plaintiff effectively "commandeer[s] [the] State's … administrative machinery for federal purposes." *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1281 (11th Cir. 2019).

The injunction requires that DEP "cease to issue new permits for the construction and installation of onsite sewage treatment and disposal systems ('OSTDS')" in the relevant area, effectively imposing an expansive reading of the ESA on third-party regulated entities through state regulation. Doc.190 at 3. The requirement that DEP apply for a take permit, Doc.190 at 1, is also premised on the idea that DEP is required to regulate third parties in a way that prevents any additional pollutants that might exacerbate the conditions that "legacy pollutants" are causing in the lagoon. Both of these commands require DEP to exert regulatory power over private parties that it only has a result of being a state agency.

The Court previously rejected DEP's anti-commandeering argument, reasoning that because "[t]he ESA applies to *any* person," "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." Doc.172 at 11 (internal quotation marks omitted). DEP respectfully submits that the Court's holding was incorrect. That holding was originally drawn from *Reno*, which rejected an anti-commandeering challenge to a statute that "regulate[d] the States

14

as the owners of data bases." 528 U.S. at 151. *Reno* distinguished the statute at issue in that case from one that "require[s] the States in their sovereign capacity to regulate their own citizens" or "require[s] state officials to assist in the enforcement of federal statutes regulating private individuals." *Id.*

Other courts have explained that while federal law may "pervasively regulate[] states as marketplace participants; the anti-commandeering rule comes into play only when the federal government calls on the states to use their sovereign powers as regulators of their citizens." *Travis v. Reno*, 163 F.3d 1000, 1004-05 (7th Cir. 1998). And that is precisely what this injunction does. While the ESA may apply on its face to both private individuals and states, no other entity apart from states has the sovereign power to deny all septic system permits for an indefinite period of time. Indeed, that is a quintessential instance of "requir[ing] the States in their sovereign capacity to regulate their own citizens." As applied to DEP in this case, the ESA does not "evenhandedly regulate[] an activity in which both States and private actors engage," but instead compels the State to use its sovereign power to prevent takes that might otherwise be committed by regulated parties. *Murphy v. NCAA*, 584 U.S. 453, 476 (2018).

The Eleventh Circuit has previously adopted this view. In *Burban v. City of Neptune Beach*, the plaintiff attempted to force a municipal office to issue a form of identification that would entitle her to a concealed carry permit under federal law.

15

920 F.3d at 1276. The Eleventh Circuit affirmed dismissal of the lawsuit on anti-commandeering grounds despite the plaintiff's argument that the relevant law applied to private parties. *Id.* at 1281. The Eleventh Circuit rejected that argument and explained that the plaintiff's "proposal that we require states to issue identification plainly seeks to control how States regulate private parties, as opposed to regulating state activities." *Id.* Just so here: As applied to DEP, the injunction would require Florida to regulate its citizens in a way that prevents those citizens from violating a federal statute. This is an anti-commandeering violation even when the statute is neutrally drafted to apply to public and private entities alike.

### C. Plaintiff failed to prove proximate cause under the ESA as a matter of law.

DEP is also likely to succeed on appeal because Plaintiff did not establish proximate cause as a matter of law. "In order for regulatory acts to result in ESA liability, there must be a *close connection* between *the liable actor's conduct* and habitat destruction or killing of endangered species." *Fla. Panthers v. Collier County*, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016) (emphasis added). Here, the causal connection between DEP's permitting and the current taking of any manatees is quite attenuated, as it depends on a link between "legacy pollutants," much of which was permitted by a different agency, creating chemical conditions in the lagoon under which "seagrasses would only return after at least a decade" even if

16

"all nutrients ceased to enter the IRL." Doc.172 at 16. Under this logic, permitting *any* new septic tanks would constitute a "take" because it would exacerbate long-existing environmental conditions created by parties not before this Court.

This Court concluded that proximate cause was satisfied by relying in part upon Justice O'Connor's concurrence in the *Sweet Home*. There, Justice O'Connor gave the example that a farmer who drained a pond on his property would be the proximate cause of the taking of any endangered fish who died as a result. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 713 (1995) (O'Connor, J., concurring); Doc.172 at 18; Doc.134 at 15. But the more apt example from that concurrence is one Justice O'Connor provided to show when proximate cause under the ESA would *not* be satisfied. It would not satisfy proximate case where "a farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby [injures] protected fish." *Id.* (internal quotations omitted).

DEP's activities here are even more attenuated than the farmer whose tilling causes adverse effect for endangered fish. Here, DEP is issuing permits only for structures built by third parties that release chemicals to groundwater, that then travel underground to the lagoon, which then may contribute to the growth of algae in the lagoon, which then could shade seagrasses, which then limits the growth of the seagrasses, thereby purportedly harming a food source for

manatees. Indeed, the focus of Justice O'Connor's concurrence was on how proximate cause principles "alleviate" the harsh results of applying the ESA's exacting liability provisions to indirect takes of endangered species. *Id.* at 709, 713.

The downstream consequences of DEP's permitting regime could not have foreseeably caused manatee takings. In a similar case involving licensing use of state water that caused damage to a whooping crane habitat, the Fifth Circuit concluded "licensing is, in this case, indirect and far removed from committing acts with knowledge that a habitat will be adversely affected and the species killed." *Aransas Project v. Shaw*, 775 F.3d 641, 659 n.12 (5th Cir. 2014). The Fifth Circuit concluded: "Contingencies concerning permittees' and others' water use, the forces of nature, and the availability of particular foods to whooping cranes demonstrate that only a fortuitous confluence of adverse factors caused the unexpected 2008–2009 die-off found by the district court. This is the essence of unforeseeability." *Id.* at 662.

Just as in that case, the foreseeability requirement is not met here as a matter of law because of factors including "remoteness, attenuation, or the natural and probable consequences of actions." *Id.* at 658. The contingent construction of septic systems, combined with weather events like Hurricane Ian as alleged in Plaintiff's own complaint, Doc.59 ¶ 35, combined to affect the particular types of food available to manatees (seagrass vs. microalgae) that Plaintiff used experts to

18

establish at trial could be harmful for manatees. Nothing suggests this series of contingencies was foreseeable for DEP.

In this Court's order denying DEP's motion for summary judgment, it distinguished *Aransas Project* on the grounds that case involved "extraordinary conditions" while in this one "eutrophication from OSTDS and wastewater treatment plant discharges can be predicted as a function of population growth and is not solely caused by natural weather events." Doc.134 at 14. But that summary misses key facts from both cases. *Aransas Project* involved private parties withdrawing water from rivers that led to "a significant reduction in freshwater inflow" which, combined with a drought, harmed the whooping crane habitat. 775 F.3d at 646-47.

This case similarly involved "extraordinary conditions" that contributed to eutrophication, such as (according to the Second Amended Complaint) Hurricane Ian. Doc.59 ¶ 35. While the Court found that a healthy lagoon could recover from sea-grass loss from hurricanes, Doc.134 at 10, that does not change the fact that both man-made and natural causes contributed to seagrass loss in this case, just as they both contributed to drought conditions in *Aransas Project* in unforeseeable ways. On appeal, the Eleventh Circuit is likely to conclude that the Court's attempts to distinguish *Aransas Project* fall short and that harm to manatees was not foreseeable because of DEP's permitting process here.

II. **DEP will be irreparably harmed in the absence of a stay.**

Where, as here, a state seeks to stay enforcement of a federal decree against it, "often the harms and equities [will be] very weighty on both sides," and consequently the "resolution of these stay requests ultimately turns on the merits and the question who is likely to prevail at the end of this litigation." *Ohio v. EPA*, 603 U.S. 279, 291 (2024) (internal quotation marks omitted). As a result, DEP's analysis of likelihood of success above provides a sufficient basis for granting a stay pending appeal.

In addition, DEP is likely to incur substantial costs complying with the injunction's requirements to apply for an ITP permit and establish manatee monitoring, feeding, and reporting programs that it will not be able to recoup from Plaintiff if its appeal is successful. The Eleventh Circuit has repeatedly held that "unrecoverable monetary loss is an irreparable harm." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022); *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1165 (11th Cir. 2018) (irreparable harm established where there was "no adequate remedy at law to recover damages for the harm suffered"). Further, part of the injunction prevents DEP from issuing septic permits under state law, and "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of

irreparable injury." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (quoting

*Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)); *see also*

*Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (holding that an

"increase in [federal] CWA jurisdiction by 2.84 to 4.65% annually" would cause

"[l]oss of sovereignty [which] is an irreparable harm").

Moreover, "unique constitutional implications exist whenever a federal

district court is asked to order a state entity to take regulatory action." *Loggerhead

Turtle*, 148 F.3d at 1254. The injunction ignores those concerns by requiring the

state to spend money and halt certain types of development for an indefinite

period of time. At trial, the Court only identified requiring DEP to apply for an

incidental take permit (ITP) as an appropriate remedy that would not tread on

Florida's constitutional prerogatives. Doc.172 at 9-10. But the Court's injunction

goes much further, requiring the state to use taxpayer funds to create new manatee

monitoring and feeding programs and issuing a moratorium of indefinite length

on *all* new septic tank permits in the affected area. Doc.190. The Court's injunction

unduly impinges on Florida's sovereign interest by prescribing specific programs

that the state must implement to comply with the ESA.

### III.  The balance of the equities supports granting a stay.

The public interest also counsels for granting a stay pending appeal. In the

absence of a stay, DEP will be required to implement new manatee monitoring

and feeding programs immediately, programs which, as explained *supra* 11-12, it is not statutorily authorized to manage and which it is likely to abandon if it wins relief on this point in the Eleventh Circuit. This exercise will potentially expend considerable Florida tax dollars with no possibility of recovery.

The indefinite moratorium on the construction of new septic systems further threatens to impede commercial and residential development in the state. Florida law specifically *authorizes* construction using "nutrient-reducing onsite sewage treatment and disposal systems" or similar nitrogen-reducing "wastewater treatment systems." Fla. Stat. § 373.469. And these third-party property owners and developers have no ready means to challenge this moratorium, as they are not parties to this action.[1]

In addition, though Plaintiff described the moratorium as "temporary," it has no stated end date. It purports to remain in place unless and until DEP receives an Incidental Take Permit—by no means a sure thing. *See* Doc.190 at 3. In other words, the moratorium has "no limitation in time" and leaves affected parties "'to

---

[1] Enjoining the use of private property by third parties raises concerns under the Fifth Amendment as well. Like the other branches, federal courts are bound by the Takings Clause. *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 713 (2010). If this Court prevents landowners from developing their property, especially when those landowners have not themselves been found liable for an ESA violation, it will have arguably committed a taking without just compensation. *See Knick v. Scott*, 588 U.S. 180, 189-90 (2019). This is an additional reason to stay the moratorium.

guess about its intended duration.'" *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 363-64 (6th Cir. 2022) (quoting *Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 444 (1974)). "Rule 65(d) does not permit" such open-ended injunctions. *Id.* at 364.

Finally, the public interest particularly supports a stay because the federal government is poised to significantly amend its ESA regulations, which would moot both this case and the injunction's remedies. Plaintiff's case relies on federal regulations that expand the statutory definition of "harm" to include an act which causes "significant habitat modification or degradation which kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." Doc.59 ¶¶ 16, 44 (quoting 50 C.F.R. § 17.3).

On April 17, 2025, the U.S. Fish and Wildlife Service and National Marine Fisheries Service published a proposed rule that would completely excise that definition of "harm" under the ESA. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102, 16105 (Apr. 17, 2025) (to be codified at 50 C.F.R. pt. 17). The proposed regulation instead rests only on the definition of "take," which "require[s] an affirmative act directed immediately and intentionally against a particular animal—not an act or omission that indirectly or accidentally causes injury to a population of animals." *Id.* at 16103 (cleaned up).

Plaintiff has never contended DEP is intentionally killing manatees via pollutants; it has instead rested its entire case on the notion that DEP "indirectly or accidentally causes injury" to manatees. If this new regulation is finalized, as a result, then it will moot Plaintiff's entire case. It would represent an extraordinary waste of resources to force DEP to come into immediate compliance with an injunction that may in short order be foreclosed by federal law (even apart from DEP's case-specific defenses to liability and the injunction under existing law).

## CONCLUSION

For these reasons, the Court should stay its injunction pending appeal, until the Eleventh Circuit returns the mandate in this case.

Dated: May 22, 2025                    Respectfully submitted,


*/s/ Jeffrey Brown*

Jeffrey Brown (FL Bar 843430)
DEPARTMENT OF
  ENVIRONMENTAL PROTECTION
390 Commonwealth Blvd., MS 35
Tallahassee, FL 32399
(850) 245-2242
jeffrey.brown@floridadep.gov

*Counsel for Defendant Alexis Lambert, in her official capacity as Secretary of the Florida Department of Environmental Protection*

## LOCAL RULE 3.01(g) CERTIFICATION

I hereby certify that defense counsel has conferred with Plaintiff's counsel,
and Plaintiff expressed that it would not oppose Defendant's motion. The
conference was made through email exchange.

## CERTIFICATE OF SERVICE

On May 22, 2025, I e-filed this motion and its attachments with the Court
via ECF, which will email everyone requiring service.


Dated: May 22, 2025                                    */s/ Jeffrey Brown*
                                                       Counsel for Defendant